UNITED STATES of America

v.

Harry R. HALDEMAN, Appellant.

UNITED STATES of America

v.

John D. EHRLICHMAN, Appellant.

UNITED STATES of America

v.

John N. MITCHELL, Appellant.

UNITED STATES of America

v.

Harry R. HALDEMAN and John D. Ehrlichman, Appellants.

Nos. 75–1381, 75–1382, 75–1384 and 76–1441.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 6, 1976.

Decided Oct. 12. 1976.

Rehearing Denied Dec. 8, 1976 in Nos. 75–1381 and 75–1384.

Certiorari Denied May 23, 1977. See 97 S.Ct. 2641.

See also 502 F.2d 375.

50

John J. Wilson, Washington, D. C., with whom Frank H. Strickler, Ross O'Donoghue, and George A. Fisher (at the time the case was argued), Washington, D. C., were on the brief, for appellant in No. 75–1381. Messrs. Strickler and O'Donoghue were on the brief for appellant Haldeman in No. 76–1441.

William Snow Frates, Miami, Fla., with whom Andrew C. Hall, Miami, Fla., was on the brief, for appellant in No. 75–1382. Messrs. Frates and Hall were on the brief for appellant Ehrlichman in No. 76–1441.

William G. Hundley, Washington, D. C., with whom Plato Cacheris, Robert S. Erdahl, and Cary Mark Feldman, Washington, D. C., were on the brief, for appellant in No. 75–1384.

Peter M. Kreindler, Washington, D. C., Counsel to the Sp. Prosecutor, with whom Henry S. Ruth, Jr., Sp. Prosecutor at the time the brief was filed, Peter F. Rient, Kenneth S. Geller, Maureen E. Gevlin, Jay B. Stephens, and Judith A. Denny, Asst. Special Prosecutors, and Sidney M. Glazer, Atty., Department of Justice, Washington, D. C., were on the brief, for appellee in Nos. 75–1381, 75–1382, and 75–1384. Charles F. C. Ruff, Sp. Prosecutor, and Peter M. Kreindler, and Paul Hoeber, Sp. Assts. to the Sp. Prosecutor, Washington, D. C., were on the brief, for appellee in No. 76–1441.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, LEVENTHAL, ROBINSON and MacKINNON, Circuit Judges, sitting *en banc.*

Opinion for the court *per curiam.*

Dissenting opinion filed by MacKINNON, Circuit Judge.

PER CURIAM:[1]

On March 1, 1974 a grand jury in Washington, D. C. returned a 13-count indictment against seven individuals. It charged what amounted to an unprecedented scandal at the highest levels of government, for most of the defendants had held major positions in the Nixon administration. Charged were John N. Mitchell, former Attorney General of the United States and later head of the Committee to Re-elect the President (CRP), President Nixon's campaign organization for the 1972 election; Harry R. Haldeman, former Assistant to the President, serving basically as chief of the White House staff; John D. Ehrlichman, once Assistant for Domestic Affairs to the President; Charles W. Colson, former Special Counsel to the President; Robert C. Mardian, earlier an Assistant Attorney General, then an official of CRP; Kenneth W. Parkinson, hired in June of 1972 as CRP's lawyer; and Gordon Strachan, once a staff

assistant to Haldeman at the White House.[2] The counts of the indictment embraced conspiracy, 18 U.S.C. § 371 (1970), obstruction of justice, *id.* § 1503, and various instances of false statements made to the Federal Bureau of Investigation (FBI), *id.* § 1001, to the grand jury, *id.* § 1623, and to the Senate Select Committee on Presidential Campaign Activities, *id.* § 1621.[3] J.A. 65–112.

Five defendants ultimately went to trial together before Judge Sirica; prior to trial the charges against Colson had been dropped after his guilty plea in another case, and the case against Strachan was severed with the Government's consent due to legal problems stemming from prior grants of use immunity.[4] The jury acquitted Parkinson, found Mardian guilty of conspiracy, the only offense with which he was charged, and convicted Mitchell, Haldeman, and Ehrlichman of both conspiracy and obstruction of justice as well as all the individual perjury counts submitted.[5] Sentences of imprisonment were imposed,[6] and those convicted have appealed. We deal in the instant appeals only with the convic-

---

1. The opinion in this case is issued *per curiam* not because it has received less than full consideration by the court, but because the complexity of the issues raised on appeal made it useful to share the effort required to draft this opinion among the members of the court.

2. The grand jury also authorized the Special Prosecutor to name 18 individuals as co-conspirators: Bernard L. Barker, William O. Bittman, John D. Caulfield, John W. Dean, III, Virgilio R. Gonzalez, Sally Harmony, Dorothy Hunt, E. Howard Hunt, Jr., Herbert W. Kalmbach, Fred C. LaRue, G. Gordon Liddy, Jeb S. Magruder, Eugenio R. Martinez, James W. McCord, Jr., Richard M. Nixon, Paul O'Brien, Frank L. Sturgis, and Anthony T. Ulasewicz. J.A. 483. Several of these individuals have been convicted in other cases of various offenses connected with the Watergate incident.

3. Count 1 charged all defendants with conspiracy to obstruct justice, to make false statements to a government agency, and to defraud the United States by corrupting the operation of the Central Intelligence Agency (CIA), the FBI, and the Department of Justice. It detailed 45 overt acts allegedly committed in furtherance of the conspiracy by one or more co-conspirators. Count 2 charged all but Mardian with the substantive offense of obstruction of justice. Counts 3 through 6 charged Mitchell with making various false statements—one to

the FBI, on two occasions to the grand jury, and once before the Select Committee. Counts 7 through 9 charged Haldeman with three instances of making false statements before the Select Committee. Counts 10 through 12 alleged that Ehrlichman had made false statements, once to the FBI and twice before the grand jury. Finally, Count 13 charged Strachan with making a false statement to the grand jury. J.A. 65–112.

4. The charges against Strachen were later dismissed pursuant to Fed.R.Crim.P. 48(a).

5. *See* note 3 *supra.* Counts 3 and 10, charging Mitchell and Ehrlichman respectively with false statements to FBI agents, had been dismissed by the court at the close of the Government's case.

6. Mardian received a sentence of 10 months to three years in prison. Mitchell, Haldeman, and Ehrlichman were sentenced to concurrent terms of 20 months to five years on Counts 1 and 2, and to concurrent terms of 10 months to three years on each perjury count on which they were convicted. The perjury sentences were to run consecutive to the sentences for conspiracy and obstruction of justice, making a total of two and a half to eight years in prison for each of these three defendants.

tions of Haldeman, Ehrlichman, and Mitchell.[7] We affirm.

## I. THE FACTS

Evidence at trial[8] consisted of both direct testimony and actual tape recordings of key conversations of the co-conspirators. It established a wide-ranging conspiracy designed to impede a grand jury investigation into the break-in at the Democratic National Committee (DNC) headquarters in the Watergate Office Building in Washington, D.C., and into other related matters.

### A. The Gemstone Plan

In the early morning hours of June 17, 1972, roughly four and a half months before the presidential election, police discovered five men inside the DNC offices carrying electronic equipment, cameras, and large sums of cash. These were no ordinary burglars. They were operating as part of a larger CRP intelligence gathering plan code-named Gemstone, and they had been in the DNC offices once before, in late May. Their mission this time was to fix a defective bugging device placed during the prior entry on the telephone of the DNC chairman; these orders had come after high officials at CRP expressed dissatisfaction with the information theretofore produced by the expensive Gemstone.[9] Tr. 2649, 4143–4147, 4519–4521.

Gemstone was the brainchild of G. Gordon Liddy, CRP's general counsel, who had been hired in late 1971 with the expectation that he would develop plans for gathering political intelligence and for countering demonstrations. Tr. 2625–2628, 4507. That expectation was abundantly fulfilled. Collaborating with E. Howard Hunt, Jr., a former CIA agent whom Liddy knew well from previous ventures undertaken at White House behest,[10] Liddy went to work on his assignment. In two meetings held during January and February 1972 he presented his initial Gemstone plan and budget to Mitchell, at that time Attorney General but even then the functional head of the Nixon re-election effort. These meetings were attended by Jeb Stuart Magruder, Deputy Director of CRP and later an important Government witness, and John W. Dean, III, counsel to the President and eventually the Government's prime witness at trial.[11] At these first meetings Liddy failed to win approval. Mitchell indicating that the original million-dollar budget had to be scaled down.[12] Tr. 2628–2634, 4507–4513. By March 30, however, Liddy had pared his budget to $250,000, and Mitchell had resigned his duties as Attorney General to become head of CRP in title as well as function. On that date, in Key

---

7. The statement of facts in Part I of this opinion gives a general summary of the evidence against all four individuals. Mardian's appeal, however, was argued separately before this court and is treated in a separate opinion issued today. *United States v. Mardian*, 178 U.S.App.D.C. 207, 546 F.2d 973..

8. Since none of the three appellants challenges the sufficiency of the evidence to sustain the jury verdict, we summarize here only the major events of the conspiracy. Moreover, it is well settled that on appeal we are to set forth the evidence in the light most favorable to the jury's verdict. *United States v. Clayborne*, 166 U.S.App.D.C. 140, 142, 509 F.2d 473, 475 (1974). *See, e. g., Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. DeLoach*, 174 U.S.App.D.C. 38, 39–40 & n.2, 530 F.2d 990, 991–992 & n.2 (1975).

9. The burglars were James McCord, Bernard Barker, Eugenio Martinez, Virgilio Gonzalez,

and Frank Sturgis. Tr. 4143. They, along with E. Howard Hunt, Jr. and G. Gordon Liddy, were convicted of burglary, conspiracy, and unlawful endeavor to intercept oral and wire communications. All but McCord and Liddy were convicted on pleas of guilty. *See United States v. Liddy*, 166 U.S.App.D.C. 95, 509 F.2d 428 (1974).

10. Tr. 7662–7664. Hunt still maintained an office in the Executive Office Building next door to the White House.

11. Both Dean and Magruder were convicted of conspiracy on pleas of guilty entered before the instant trial began. Both served prison terms for their roles in the cover-up. Tr. 3330–3331, 4503.

12. These early proposals included plans to kidnap demonstration leaders and to plant call girls with Democratic officials. Tr. 4117–4120.

Biscayne, Florida, Magruder obtained Mitchell's approval for Gemstone in a meeting attended only by Mitchell, Magruder, and Fred LaRue, a close personal friend to Mitchell then serving as a top·campaign aide.[13] Tr. 3276–3277, 4514–4517, 4638–4639.

Magruder, who had once served on Haldeman's staff, was keeping the White House informed of campaign developments, including Gemstone plans and operations, by regularly transmitting documents and information on to Strachan, Haldeman's assistant. Tr. 4511–4513, 4518, 6612–6613. Haldeman himself had learned directly about an early version of the Liddy plan when Dean reported to him shortly after the February meeting. Tr. 2635–2636.

B. *The Early Stages of the Conspiracy*

The five burglars arrested inside the DNC gave aliases to the D.C. police, but within hours of the break-in Liddy, who had been monitoring the operation from a safe vantage point in a nearby building, reported the capture to CRP's highest officials, then in California. He told them that one of the captured burglars was James McCord, on CRP's payroll as chief of security. In an apparent effort to avoid the appearance of any link between CRP and the burglars, Mitchell, Mardian, LaRue, and Magruder met and decided to contact the new Attorney General, Richard Kleindienst, urging him to have McCord released from jail before the police penetrated his alias. Mardian placed the call, but ultimately sent Liddy to find the Attorney General when Kleindienst could not be reached directly. Tr. 4530–4536, 6563–6565. This fitful effort foundered, however, on Kleindienst's insistence that the burglars receive no special treatment. If Mitchell wanted to talk to him about it, Kleindienst said, Mitchell should contact him directly. Tr. 5898–5909.

Aware that McCord's true identity would come to light. Mardian, Magruder, and LaRue the next day worked on a press release that would deny any CRP tie to the break-in. Tr. 4537–4540, 6565–6569. It suggested instead that McCord might have been working for clients of his private security firm. Haldeman, contacted by long-distance telephone, approved the statement and urged that the release issue as soon as possible, even though Magruder had already informed him that the break-in was "Liddy's operation." Tr. 4542–4544. The release appeared on June 18 under Mitchell's name and with his approval. J.A. 912.

Meanwhile, in Washington, White House and CRP files were being cleansed of sensitive materials relating to Gemstone. Strachan performed this function at the White ·House, under orders from Haldeman to remove anything embarrassing. Among the items destroyed were DNC wiretap reports and a memorandum from Haldeman to Magruder urging that the intelligence operation shift from Senator Muskie to Senator McGovern, the emerging Democratic frontrunner. Tr. 2651–2653, 4547–4548. Magruder immediately ordered removal of all Gemstone materials from the files at CRP; he took them to his home upon his return from California on June 19. At a meeting that night, attended by Mitchell, Magruder, LaRue, Dean, and possibly Mardian,[14] Magruder asked Mitchell what to do with the papers. Mitchell suggested that he "have a fire," and he did—destroying the Gemstone documents in his home fireplace. Tr. 4540–4550, 4823, 6570–6573.

Dean met with Liddy on June 19 and received a full briefing on the background of the break-in. He then imparted his own substantial knowledge to Ehrlichman, detailing the roles of Hunt and Liddy and ·mentioning the pledge he had received from Liddy that Liddy would keep silent. Tr. 2648–2656. There was no similar assurance regarding Hunt; Ehrlichman consequently

---

13. LaRue, like Dean and Magruder, became an important Government witness. He too entered, a plea of guilty to conspiracy and was awaiting sentencing at the time of this trial. Tr. 6733–6734, 6743–6746.

14. Mardian did attend the meeting, but he left early. Most witnesses could not recall whether he was present when the Gemstone documents were discussed. Tr. 2673, 5215, 6572–6573.

issued, then retracted, an order that Hunt leave the country. Tr. 2657–2660, 4192–4193. He also directed that Hunt's safe, in his office in the Executive Office Building, be opened. Tr. 2660–2661. Dean retrieved the materials from the safe (which included some electronic equipment related to Watergate along with documents related to other questionable activities), whereupon Ehrlichman suggested to Dean that he shred some and "deep six" the rest. Dean refused, fearing that too many people— White House employees and Secret Service agents—knew he had removed materials from the safe. Tr. 2679–2687. Ultimately the items were turned over to the FBI, although the most sensitive went directly to L. Patrick Gray, the Acting Director, with directions from Dean and Ehrlichman that they should never see the light of day. Gray complied. Tr. 6212–6217.

It was becoming increasingly clear that the grand jury investigation would eventually tie Liddy and Hunt to the break-in scheme, primarily by tracing the currency that had been found on the burglars.[15] Tr. 2696–2708, 6605–6608. This presented added problems, as the links to CRP and the White House became more apparent. The conspirators decided to cover higher involvement by placing all blame on Liddy, who had pledged silence. They would maintain that Liddy was off on a frolic of his own, betraying his position of trust within CRP. Tr. 2762–2763. It still was necessary to explain why this man, general counsel to the Committee, had been supplied with such large sums of money (it proved later to be $199,000) capable of diversion to private frolics. Tr. 2759–2773, 4552–4562, 6652–6660.

Hunt presented an additional problem. He, like Liddy, apparently knew that Gemstone was a project approved at the highest levels of CRP. Like Liddy he had participated earlier in several "seamy things" for the White House, as he once described them. Tr. 3088. For example, as members of the White House Special Investigation

15. The conspirators were able to stall the FBI's tracing of the money for about two weeks by invoking the danger of trespassing on secret CIA projects. The FBI had already traced the funds to two individuals who apparently served as CRP intermediaries in the "laundering" of certain contributions from former Democratic Party supporters. Tr. 2696–2710, 6170–6175. One of the intermediaries was a Mexican citizen. The Bureau was ready to interview these individuals, but was deterred when General Walters, Deputy Director of the CIA, told Gray on June 23 that such interviews might uncover CIA operations in Mexico. Walters was acting on direct orders from Haldeman, delivered during a meeting participated in by Ehrlichman. (CIA Director Helms had also been at the meeting, insisting all along that there was no danger to CIA operations. Both Haldeman and Ehrlichman, moreover, knew at the time that the break-in was Liddy's operation.) Tr. 6123–6130, 6202–6204. Haldeman, in turn, had acted only after receiving approval for this course from President Nixon in a key meeting earlier that same day, June 23. He had told Nixon that both Dean and Mitchell suggested use of the CIA to contain the FBI investigation. Nixon agreed. Govt. Ex. 1 (a tape recording of the actual Nixon-Haldeman conversation), Tape Tr. 2–7. It was the public disclosure of this tape which led to the resignation of President Nixon.

By July 5 Gray had grown increasingly uneasy. He told Walters that the interviews would proceed unless the CIA directed otherwise, in writing. Walters delivered instead a memorandum stating that the CIA had no interest in the matter. The intermediaries were then finally interviewed. Tr. 6142–6144, 6207–6210.

This delay was made possible because some of the conspirators were carefully monitoring the FBI investigation. Beginning on June 21, at Ehrlichman's direction, Dean established a liaison with the FBI. Tr. 2690–2697. He sat in on several FBI interviews, received copies of reports and "lead sheets," and finally obtained a memorandum summarizing the investigation and future FBI plans. This memorandum he showed to Mitchell, Haldeman, and Ehrlichman. Tr. 2690–2697, 2711–2712, 2727–2728, 2830–2837, 6168–6176, 6217–6221, 6661.

Throughout this opinion "Govt.Ex." refers to a Government exhibit at trial. Most of the exhibits referred to here were tape recordings of the conversations of co-conspirators. "Tape Tr." refers to the transcript of tapes included as an appendix on appeal. These transcripts were carefully checked by the trial judge and, once he ruled they were "substantially accurate," they were then given to the jury to serve as listening aids while the jury heard the tapes through headphones. The transcripts themselves were not admitted into evidence, and the jury was repeatedly told that their own interpretation of what they heard on the tapes was to control. Tr. 2850–2855, 6152–6153.

Unit,[16] and with the approval of Ehrlichman, who was head of the Unit, they had broken into the office of Daniel Ellsberg's psychiatrist, ransacking the doctor's records.[17] Tr. 7654–7656, 7664–7675. Significantly unlike Liddy, however, Hunt had never pledged to keep his knowledge of these things to himself. Assuring his silence would be extremely costly; he began to demand large cash payments on behalf of himself and the five burglars.

Thus were born the two major parts of the conspiracy: the cover story to explain the frolicsome Liddy's ability to draw so deeply on the CRP treasury, and the payment of hush money to those indicted and later convicted for the burglary.

### C. The Cover Story

Magruder first suggested that CRP officials simply say that the $199,000 had gone to Liddy for security at the Republican nominating convention. He broached this story to a meeting attended by Mitchell, Mardian, LaRue, and Dean. Mardian expressed doubts that it would hold up—the sums seemed too large. Tr. 2759–2763. Thereafter Magruder tried again. He came to a subsequent meeting of the same group with the story that $100,000 was delivered to Liddy for protection of "surrogate speakers"[18] as they traveled around the country in behalf of the Nixon campaign. Only the remainder was meant for convention security. This story met with approval. Tr. 2769–2773, 4552–4562, 5254–5255, 6652–6660. It seemed sufficiently convincing, particularly when Magruder indicated that, at Magruder's urging, the CRP official in charge of the surrogate program would corroborate the story with perjured testimony of his own. Tr. 2769–2770, 4562–4563, 4570, 4697.

Magruder refined the story, reviewed it with Mitchell (who urged him to minimize Mitchell's role in running the campaign), and then rehearsed it with Dean, all in preparation for his appearance before the grand jury on August 16. His delivery of it on that date proved sufficiently persuasive that he escaped indictment—"by the skin of his teeth," according to Dean's intelligence from the investigation. Tr. 2773–2776, 4605–4612. Magruder was recalled before the grand jury in September to explain the January and February meetings that were entered in his calendar, the meetings where Gemstone was first discussed. With the assistance of Mitchell and Dean, however, he had prepared a subsidiary cover story to hide the purposes of these meetings. The first, he told the grand jury, had been cancelled, and the second related solely to the new election law. Tr. 2824–2829, 4612–4616.

Mitchell and Ehrlichman, meantime, were being careful to say nothing that might ruffle the veil the cover story had cast over Gemstone activities. Each denied to FBI agents that he knew anything about the break-in except what he read in the newspapers. Tr. 2820–2824, 5393–5402. Then on September 14 Mitchell told the grand jury that he was not aware of any clandestine CRP intelligence program, nor did he know of Liddy's illegal activities. Tr. 7094–7095. This testimony formed the basis for Mitchell's false declarations conviction under Count 4 of the indictment. 18 U.S.C. § 1623 (1970).

### D. Hush Money

On June 20 or 21 Liddy met with Mardian and LaRue. He told them the full story concerning the background of the break-in, confessed his own role in the planning and execution, and explained that all those arrested would remain silent. He went on to

---

**16.** This Unit was nicknamed the "Plumbers" since its mission was to stop leaks of classified information. Tr. 7656.

**17.** See United States v. Ehrlichman, 178 U.S. App.D.C. 144, 546 F.2d 910 (1976); United States v. Barker, 174 U.S.App.D.C. 174, 546 F.2d 940 (1976); United States v. Liddy, 177 U.S.App.D.C. 1, 542 F.2d 76 (1976). Ellsberg,

at one time a Defense Department official, had been responsible for transmitting the classified Pentagon Papers to the New York Times.

**18.** These were high Government officials who bore the major burden of campaign speaking duties, in place of Mr. Nixon. Tr. 2770, 4561.

**56**

say, however, that certain "commitments" had been made to provide them with bail, legal fees, and living expenses. LaRue assured him that all commitments would be met. Tr. 6601–6603. Later LaRue and Mardian met with Mitchell, Dean, and Magruder to tell them of Liddy's revelations and to decide how to raise the funds. Mardian suggested that the CIA might be a source (the burglars had prior CIA connections), and Dean was dispatched, after checking with Ehrlichman, to bring the CIA in. Tr. 2728–2735, 6610. He was unsuccessful. At Ehrlichman's insistent urging he tried again, but again was turned down. Tr. 2735–2737, 6132–6142.

With the approval of Haldeman and Ehrlichman, Dean on June 28 turned to another source. He contacted Herbert Kalmbach, a long-time Nixon fund-raiser. Tr. 2740–2742. He told Kalmbach that funds were needed to meet certain CRP commitments to the burglars, and that absolute secrecy was essential. Kalmbach agreed to take on the task. Tr. 2743–2745, 6298–6308. He obtained money from LaRue (money which came from excess cash held at the CRP offices), from the chairman of the Finance Committee to Re-elect the President, CRP's finance arm, and from a private contributor. Tr. 6309–6312, 6326–6345. Before he approached the private contributor, however, he checked with Ehrlichman to be sure that Dean had authority to put this fund-raising in motion. Ehrlichman quieted his doubts and took the occasion to stress the need for confidentiality. If the operation did not remain secret, he warned, "they would have our heads in their laps." [19] Tr. 6328–6332.

To distribute the money Kalmbach employed a courier who devised a complex scheme of leaving the funds in pay telephone booths and airport lockers. He was responsible for delivering $187,000 to the burglars through Hunt's lawyer, Hunt's wife, Hunt himself, and Liddy. All this took place between July 1 and mid-September, when Kalmbach made his final accounting and insisted he did not want to continue. Tr. 4213–4216, 6315–6348, 6350–6356, 6477–6511. Dean and LaRue kept Haldeman, Ehrlichman, and Mitchell posted throughout on the "money problem." Tr. 2751–2754, 6620–6628, 6683–6684.

On September 15 the grand jury handed up indictments against the five burglars, plus Hunt and Liddy. No one else was implicated. Tr. 4221–4222. The initial policy of "containment," as Dean was later to call it, had proven successful. Tr. 2855–2860, 3100.

The need to channel hush money continued nonetheless. LaRue inherited Kalmbach's role. He delivered $20,000 or $25,000 to Hunt's lawyer immediately, and for a while the demands abated. Tr. 2872, 2907–2908, 6662, 6684–6685. But on November 13, only a few days after Nixon's re-election, Hunt called Colson at his White House office. With a tone of urgency he maintained that the commitments had not been met, and he reminded Colson that loyalty "is a two-way street." Colson taped the full conversation. Tr. 4250–4254, Govt. Ex. 35B, Tape Tr. 642–658. Dean made a copy of the tape and took it to Camp David, Maryland, the presidential retreat, to play it for Haldeman and Ehrlichman. They agreed that the money was Mitchell's responsibility and dispatched the Hunt tape to New York in the possession of Dean— Dean to play the tape for Mitchell and impress upon him his responsibility. Tr. 2909–2931.

Mitchell did not shoulder it alone. Instead he promptly inquired, through Dean, about the availability of a secret $350,000 fund under Haldeman's control, transferred to the White House from excess CRP funds. Haldeman approved use of part of it to meet the burglars' demands. Tr. 2935–2941, 6687–6692, 6705–6708. Those involved initially expected that the fund would be replenished through LaRue's fund-raising, but that hope soon vanished. It ultimately became necessary to transfer the entire fund to LaRue (all with Haldeman's approval), and by February he had

19. Tr. 6331.

dispensed $167,000. Tr. 3033–3042, 6716–6724, Govt. Ex. 15, Tape Tr. 244–246.

Money was not enough to assure silence. Hunt had decided to plead guilty and wanted a guarantee that his sentence would be short. Colson, his erstwhile friend at the White House, checked with the President and then provided some veiled assurances which Hunt took to mean he would be granted clemency at Christmas 1973. Tr. 2987–2992, 4261–4270. Hunt and four of the burglars did plead guilty. Liddy and McCord insisted on going to trial, although neither took the stand. They were found guilty, and sentencing was set for March 23, 1973. Tr. 4271. When McCord began to get restless as that date approached (he threatened in a letter to the White House that "all the trees in the forest will tumble" [20]), Mitchell urged that the same veiled assurances of clemency be extended to him. Ehrlichman agreed, and assurances were delivered to McCord—to no avail, it later developed. Tr. 2992–3001, 6518–6520.

## E. *The Cover-up Unravels*

The greatest apparent threat to the conspirators' plans lay in the impending hearings of the Senate Select Committee on Presidential Campaign Activities, chaired by Senator Ervin. Dean, Haldeman, and Ehrlichman met at Rancho LaCosta in California in mid-February to plot strategy.

They worried most about what the break-in defendants might say before the Committee if granted immunity. Knowing that more demands for money had been made, they decided it was essential that Mitchell meet what they all agreed was *his* responsibility—the providing of funds. A presidential assistant was sent to New York to tell Mitchell the results of the meeting and, once again, to remind him of his responsibility. Tr. 3032–3034.

Hunt demanded another $122,000 on March 16, in order to settle his financial affairs before sentencing. Dean relayed this word to Ehrlichman and, at his suggestion, on to Mitchell. Tr. 3086–3090. But Dean decided he had to speak with the President directly about the dangers inherent in guaranteeing the continued flow of money. On March 21, 1973 Dean thus told Nixon that there was a "cancer" growing on the presidency in the form of the endless hush money demands. He recounted all that he knew about the origin of the break-in and the subsequent payment of hush money. He guessed that future demands would come to another million dollars. Nixon replied that "you could get a million dollars. And you could get it in cash. I, I know where it could be gotten." [21] Nixon returned to the Hunt demand several times during the ensuing conversation, and he continued to mention it after Haldeman

---

**20.** Tr. 2995.

**21.** Govt. Ex. 12, Tape Tr. 131. This conversation figured in Haldeman's conviction of perjury under Count 8 of the indictment. Haldeman testified before the Senate Select Committee that he had listened to a tape of the Nixon-Dean conversation, that Nixon had in substance made the remark quoted in text, but that Nixon then said "but it would be wrong." The tape of the conversation revealed, however, that many minutes passed and the topic had shifted before Nixon uttered any words to that effect:

PRESIDENT: One problem; you've got a problem here. You have the problem of Hunt and uh, his, uh, his clemency.

DEAN: That's right. And you're going to have the clemency problem for the others. They all would expect to be out and that may put you in a position that's just . . .

PRESIDENT: Right.

DEAN: untenable at some point. You know, the Watergate Hearings just over, Hunt now demanding clemency or he is going to blow. And politically it'd be impossible for, you know, you to do it. You know, after everybody . . .

PRESIDENT: That's right.

DEAN: I am not sure that you will ever be able to deliver on the clemency. It may be just too hot.

PRESIDENT: You can't do it till after the '74 elections, that's for sure. But even then . . .

DEAN: (Clears throat)

PRESIDENT: your point is that even then you couldn't do it.

DEAN: That's right. It may further involve you in a way you shouldn't be involved in this.

PRESIDENT: No it's wrong, that's for sure.

Govt. Ex. 12, Tape Tr. 156.

joined the discussion. Each time he stressed, in the presence of Haldeman and Dean, that Hunt's immediate demands should be "handled" in order to "buy time." Neither Dean nor Haldeman demurred. Tr. 3094–3102, Govt. Ex. 12, Tape Tr. 103, 131, 135–137, 155, 159, 164–167, 189, 196, 205–206.

Haldeman, Ehrlichman, and Dean met later that day to discuss possible strategies. They agreed that Mitchell should step forward and take the full blame, thinking the prosecutors and the Senate Committee would thereby be pacified and would press no further. Tr. 3140–3141.

Mitchell, meanwhile, was meeting his "responsibility." Informed of the Hunt demand by LaRue, he directed LaRue to deliver $75,000 to Hunt's attorney that night. After this delivery Hunt, according to his own testimony at trial, repeatedly perjured himself before the grand jury. Tr. 4276–4290, 6726–6732.

The next day, March 22, Mitchell came to Washington and told the others that the Hunt problem was under control. Tr. 3208–3213, 8589–8590, 10280. Nixon, Dean, Mitchell, Haldeman, and Ehrlichman then took up a discussion that had begun the day before: the best strategy for dealing with the upcoming Senate hearings. Despite the previous day's plans, no one had the fortitude to suggest directly to Mitchell that he take the full blame and go to jail to save the Nixon presidency. Lacking that alternative, they all focused on a plan Nixon had discussed with Dean on March 17—indeed, it had been mentioned as an option for several months. Dean would make a report to the President. It would be quite general and would indicate that no one from the White House was involved. They might deliver it to the Senate Committee, but in any event it would serve as a safeguard for Nixon. Ehrlichman explained that if "some corner of this thing comes unstuck," the President could say he relied on the

report.[22] Tr. 3213–3221, Govt. Ex. 16, Tape Tr. 273–287.

The Dean report was never written, for on March 23 the conspiracy was dealt a heavy blow. McCord, facing sentencing, had written a letter to Judge Sirica breaking the word that the burglar's silence was the result of pressure, that others were involved, and that perjury had been committed. The letter was released to the public at the sentencing hearing that day. Tr. 3253–3254, 3259–3262. Shortly thereafter Magruder, Dean, and LaRue began to talk to the prosecutors. Tr. 3277–3280, 4639–4643, 6732–6733.

Throughout the month of April 1973 Haldeman, Ehrlichman, and Nixon met frequently at the White House trying to decide how to respond to the new developments.[23] They were faced with two primary problems: how to cope with Dean, who plainly knew a great deal, and how to explain the hush money payments—which, they recognized, were now bound to be revealed to the prosecutors and the public. As to the first, after much discussion Nixon asked Ehrlichman to try to bring Dean back on board through veiled assurances of clemency. Govt. Ex. 18, 22, Tape Tr. 389–393, 403–407, 469–476. Dean refused to speak with Ehrlichman, however, and his refusal rekindled the remaining conspirators' interest in a "scenario" laying the blame for all illegality on Dean. Tr. 3306–3307, Govt. Ex. 24, Tape Tr. 500–504. Haldeman, after spending a few hours reviewing the possibilities, reported that this scenario "works out pretty well."[24] It would key on Dean's failure to present the President with the Dean report in late March. Only then, the scenario went, were the President's suspicions fully aroused, and only then did he discover the scope of Dean's involvement. Govt. Ex. 26, Tape Tr. 557–567.

This scenario also dealt tentatively with the second problem—explaining the hush

---

22. Govt. Ex. 16, Tape Tr. 277.

23. Admitted into evidence were tapes of 14 conversations during this period involving Nix-

on and either Ehrlichman or Haldeman or both. Govt. Ex. 18–24, 26–29, 31–33.

24. Govt. Ex. 26, Tape Tr. 557.

money. They would state that the money was delivered for humanitarian purposes [25] —legal fees and family support—and that their sole motivation was to discourage the defendants from talking to the press; they did not seek to keep them from being candid with the prosecutors. But both Haldeman and Ehrlichman wanted to consult their lawyers before relying too heavily on that version of the story. Govt. Ex. 27, 28, Tape Tr. 570, 573–574.

When Haldeman was called before the Senate Select Committee in late July and early August 1973, he carried out the scenario laying all blame on Dean. He told the Committee that no one at the White House, except Dean, knew that the payments to the burglars were for "hush money" before March of 1973. He said Nixon discussed with Dean on March 21 the possible payment of a million dollars to the burglars, but he insisted that Nixon had followed that up by saying "it would be wrong." [26] And he claimed that there had been no discussion of Magruder's perjury at the March 21 meeting. Tr. 7483–7489, 7518–7519, Govt. Ex. 100. These statements formed the basis for Counts 7, 8, and 9 of the indictment charging Haldeman with perjury. 18 U.S.C. § 1621 (1970). He was convicted on all three counts.

In early May Ehrlichman told the grand jury that he had no recollection of Dean's having told him of Liddy's involvement in the break-in during the first weeks after the burglary. He also testified that he had spoken generally with Kalmbach about Kalmbach's fund-raising efforts, but he denied all recollection of any mention of the purposes the money was to serve, and he claimed no memory of telling Kalmbach to keep the efforts secret. Tr. 7180–7192. For this testimony he was charged in

Counts 11 and 12 with making false material declarations, 18 U.S.C. § 1623 (1970), and the jury found him guilty of both offenses.

Mitchell too, although he had not been privy to most of the April meetings where scenarios were devised, advanced the cover-up through his testimony before the grand jury and the Senate Committee in the spring and summer of 1973. On April 20 he denied before the grand jury any recollection of having been told of Liddy's confession to LaRue and Mardian. Tr. 7158, 7166–7167. Before the Senate Committee in July he claimed not to have heard of Gemstone as of June 19, 1972, and he denied that there was any mention of destroying documents at the meeting he held that evening with Magruder, Mardian, Dean, and LaRue. Tr. 7177–7180. These statements founded Counts 5 and 6 of the indictment, charging false declarations, 18 U.S.C. § 1623 (1970), and perjury, *id.* § 1621, respectively. Mitchell was convicted under each.

## II. PRETRIAL PUBLICITY

The unveiling of the conspiracy which is the central element of this case received extraordinarily heavy coverage in both national and local news media. In addition, the media fully covered allegations of wrongdoing at the upper levels of the Nixon Administration in matters unrelated to the Watergate break-in. Appellants contend that this pretrial publicity was so pervasive and so harmful to them that it must be assumed they could not receive a fair adjudication of the charges against them at the time and in the place at which they were tried. Alternatively, they contend that the *voir dire* of veniremen [27] conducted by the District Court was insuffi-

**25.** As Nixon expressed it to Ehrlichman on April 14, all those involved have "gotta have a straight damn line that, of course we raised money. Be very honest about it. But, uh, we raised money for a purpose that we thought was perfectly proper." Ehrlichman agreed. Govt. Ex. 22, Tape Tr. 471–472. *See* Govt. Ex. 37, Tape Tr. 664–665.

**26.** *See* note 21 *supra.*

**27.** A "venireman" is a prospective juror. Before becoming a juror he must pass *voir dire* examination. Throughout this opinion the term "juror" is reserved for those who served as such in this case.

ciently probing to assure empaneling of an impartial jury.[28]

### A. The Motions for Continuance or Change of Venue

It is fundamental that "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). To be "indifferent" a juror need not be ignorant:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.* * * *

*Id.* at 722–723, 81 S.Ct. at 1642 (emphasis added). *Accord, Murphy v. Florida,* 421

U.S. 794, 799–800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

*Irvin* establishes "a common-sense standard" of juror qualification. *United States v. Caldwell,* 178 U.S.App.D.C. 20, 33, 543 F.2d 1333, 1346 (1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). In keeping with that approach, a defendant who claims he was denied a fair trial because the jury was not sufficiently "indifferent" generally must sustain that claim " 'not as a matter of speculation but as a demonstrable reality.' " *United States ex rel. Darcy v. Handy,* 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 (1956), *quoting Adams v. United States ex rel. McCann,* 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268 (1942).[29] This demonstration can be made only by reference to the *voir dire.* In "extreme circumstances," however, prejudice to the defendant's rights may be presumed. *Calley v. Callaway,* 519 F.2d 184, 204 (5th Cir. 1975), (*en banc*) (dictum), *cert. denied,* 423 U.S. 888, 96 S.Ct. 182, 46 L.Ed.2d 119 (April 5, 1976).[30] Appellants urge that this exception applies to their case and that the District Court committed reversible error by denying their pre-*voir dire* motions[31] for a continuance or a change of venue.

The Supreme Court has reversed a conviction because it presumed that pretrial publicity had made a fair trial impossible only in the case of *Rideau v. Louisiana,* 373

---

**28.** Interestingly, appellants do not claim that the jury which found them guilty was other than impartial. *See* note 57 and accompanying text *infra.* Indeed, the fact that the jury acquitted defendant Parkinson is some indication that the *voir dire* examination succeeded in eliminating any unfairness that might otherwise have resulted from the pretrial publicity.

**29.** *See also, e. g., United States v. Muncy,* 526 F.2d 1261, 1263 (5th Cir. 1976); *United States v. Caldwell,* 178 U.S.App.D.C. 20, 31, 543 F.2d 1333, 1344 (1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).

**30.** *See also, e. g., United States v. Delay,* 500 F.2d 1360, 1365 (8th Cir. 1974) (dictum); *Hale v. United States,* 435 F.2d 737, 746 (5th Cir. 1970) (dictum), *cert. denied,* 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971). In all of these cases the reviewing courts looked to the *voir dire* as part of their inquiry whether "the

totality of the circumstances raise[d] the probability of prejudice." *United States v. McNally,* 485 F.2d 399, 402 (8th Cir. 1973); *see* note 56 *infra.*

**31.** Appellants have previously brought the District Court's action to this court by seeking writs of prohibition and/or mandamus, which were denied. *Ehrlichman v. Sirica,* No. 74–1826 (Aug. 22, 1974) (*en banc*), *application for stay denied,* 419 U.S. 1310, 95 S.Ct. 6, 42 L.Ed.2d 25 (1974) (Burger, Circuit Justice); *Haldeman v. Sirica,* No. 74–1829 (Aug. 22, 1974) (*en banc*); *Mitchell v. Sirica,* No. 74–1878 (Sept. 20, 1974) (*en banc*). All appellants supported the relief sought in these petitions, but co-defendant Parkinson opposed continuing the trial. *See Response to Petitions for a Writ of Prohibition and Writ of Mandamus* in No. 74–1826.

U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).[32] The defendant in *Rideau* was filmed making an in-custody confession to the bank robbery, kidnapping, and murder for which he was convicted. That film was then broadcast three times to large audiences in Calcasieu Parish, whose total population was 150,000. The Court concluded, without examining the *voir dire* transcript, that denial of Rideau's motion for a change of venue constituted a violation of his due process rights:

> For anyone who has ever watched television the conclusion cannot be avoided that this spectacle [the filmed confession], to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Id.* at 726, 83 S.Ct. at 1419 (emphasis in original).

"A confession or statement against interest is the paradigm" of "facts that strongly implicate an accused * *." *Nebraska Press Ass'n v. Stuart,* 423 U.S. 1327, 1332–1333, 96 S.Ct. 251, 255, 46 L.Ed.2d 237 (1975) (Blackmun, Circuit Justice). We have carefully reviewed the "Watergate" articles submitted by appellants, and we find that the pretrial publicity in this case, although massive, was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession. It is true that some of the pieces contained in the extensive collection of articles gathered by appellants are hostile in tone and accusatory in content. The overwhelming bulk of the material submitted, however, consists of straightforward, unemotional factual accounts [33] of events and of the progress of official and unofficial investigations.[34] In short, unlike the situation faced by the Court in *Rideau,* we find in the publicity

**32.** The other cases relied on by petitioners, Haldeman br. at 37–46; Ehrlichman br. at 76–77, either turned on factors other than pretrial publicity or involved the Court in an examination to determine whether the trial was in fact unfair. Thus in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Court emphasized the trial court's failure to take measures to insulate the jury from massive publicity *during the trial* and the lack of that " 'judicial serenity and calm to which [Sheppard] was entitled.' " *Id.* at 355, 86 S.Ct. at 1518; *see id.* at 342–357, 86 S.Ct. 1507. *See also Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). In *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), the Court held that the defendant had been deprived of his due process rights "by the televising and broadcasting of his trial." *Id.* at 535, 85 S.Ct. at 1629. The Court had excluded a question concerning pretrial publicity from its grant of certiorari. *See id.* at 609–610, 85 S.Ct. 1628 (Stewart, J., dissenting). Similarly, *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), and *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), involved events occurring during the trial which were found to have violated the defendants' rights. *See also United States ex rel. Doggett v. Yeager,* 472 F.2d 229 (3d Cir. 1973). Cases involving preventable intrusions on the trial process present greater justification for presuming prejudice than does a case such as this, in which there is no complaint that the District Court failed to take all appropriate steps to assure the integrity and dignity of the trial. *See* text accompanying notes 39–42 *infra.*

*Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), was a pretrial publicity case. There, however, the Court did not simply review the pretrial publicity and conclude that prejudice resulted, as appellants would have us do. Rather, the Court "independently evaluate[d] the *voir dire* testimony of the impaneled jurors," *id.* at 723, 81 S.Ct. at 1643, and determined that the " 'pattern of deep and bitter prejudice' shown to be present throughout the community" had invaded the jury box. *Id.* at 727, 81 S.Ct. at 1645. *See also United States ex rel. Bloeth v. Denno,* 313 F.2d 364 (2d Cir.) (*en banc*), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963).

**33.** *Cf. Beck v. Washington,* 369 U.S. 541, 556, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); *United States ex rel. Darcy v. Handy,* 351 U.S. 454, 457, 76 S.Ct. 965, 100 L.Ed. 1331 (1956); *Calley v. Callaway,* 519 F.2d 184, 206 (5th Cir. 1975) (*en banc*), *cert. denied,* 423 U.S. 888, 96 S.Ct. 182, 46 L.Ed.2d 119 (1976); *United States v. McNally, supra* note 30, 485 F.2d at 401.

**34.** Without attempting to deny that the pretrial publicity in this case was extraordinarily extensive, we note that appellants' submissions overstate the amount of publicity by including, apparently, every story concerning the many difficulties of the last years of the Nixon administration, whether or not those stories discussed appellants. We also note that the overwhelm-

here no reason for concluding that the population of Washington, D. C. was so aroused against appellants and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial that their due process rights were violated by the District Court's refusal to grant a lengthy continuance or a change of venue prior to attempting selection of a jury.[35]

 The federal courts can, of course, establish more rigorous standards for their own governance than those minimum guarantees of fairness imposed on the state courts by the Constitution. *See, e. g., Ristaino v. Ross,* 424 U.S. 589, 597 & nn.9–

10, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *Murphy v. Florida, supra,* 421 U.S. at 797–798; *id.* at 804, 95 S.Ct. 2031 (Burger, C. J., concurring); *cf. United States v. Williams,* 523 F.2d 1203, 1209 n.11 (5th Cir. 1975). We believe, however, that it is inappropriate to attempt to formulate a supervisory power standard for concluding that a fair jury cannot be selected. Except in the most extreme cases, like *Rideau,*[36] such a pre-*voir dire* conclusion must depend solely on the subjective reaction of the judge·who reaches it.[37] Invocation of an appellate court's supervisory power to require a continuance or a change of venue, although failure to do so did not constitute a denial of due process,

---

ing bulk of the publicity dealing with the conspiracy related to information properly brought out at trial. *Cf. Stroble v. California,* 343 U.S. 181, 195, 72 S.Ct. 599, 96 L.Ed. 872 (1952); *United States v. Persico,* 425 F.2d 1375, 1380 (2d Cir.), *cert. denied,* 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970). Moreover, all the pretrial publicity was not hostile to appellants. All the veniremen were aware of the then three-week-old Nixon pardon. Indeed, four of the jurors stated on *voir dire* that it was unfair to prosecute appellants in view of the pardon. *See* note 48 *infra.*

**35.** The dissent seeks to analogize *Rideau* and the present case on the ground that, in each instance, "the publicity *was* the trial." The suggested basis for this purported analogy is the fact that some of the jurors in *Rideau* had witnessed the defendant's televised confession and the *possibility*—which stems from several jurors having seen portions of the televised Senate hearings—that some of the jurors in the present case had witnessed appellants' alleged perjuries before the Senate committee.

.The inaptness of this comparison is palpable. Unlike the television broadcasts in *Rideau,* the broadcasts in question here did not involve confessions by any of the appellants to any of the crimes charged. Furthermore, and notwithstanding the language of the dissent, neither authority nor common sense provides any reason to think that witnessing a statement that is subsequently alleged to constitute perjury is comparable to witnessing a confession of guilt to crimes of violence. Also, the defendant in *Rideau* was apparently without the benefit of counsel when he made his confession and, according to the Supreme Court, "no one has suggested * * * even that he was aware of what was going on when the·sound film was being made." 373 U.S. at 725, 83 S.Ct. at 1419. By contrast, appellants here had the benefit of counsel in their appearances before the Senate committee, and no one has suggested that they did *not* know what was going on at the time.

**36.** Even in *Rideau* Justices Clark and Harlan dissented on the ground that there was no showing that the jury had been affected by the publicity.

**37.** A judge reviewing pretrial publicity before the *voir dire* would have to attempt to determine from his own reactions how the community would respond to that publicity. The subjective nature of this determination is well illustrated by the arguments in the briefs. The Government maintains that since "[t]he offenses charged here were not crimes of violence and passion," but rather legally complex white collar crimes, pretrial publicity would make little impression on most citizens. Br. for the United States (hereinafter Govt. br.) at 76–77. Haldeman, on the other hand, maintains that the publicity was such as to arouse strong personal feelings in all who came in contact with it:

Each citizen and thus each prospective juror was led to believe that his security and way of life was [*sic*] personally threatened by what these appellants had done. There could be no sympathy for them. The publicity was calculated to inspire the jurors with a high sense of duty involving much more significant issues than bringing some petty criminal to justice. They were made to feel that they were patriots repelling an attack on their country by an enemy within the gates. * *

Haldeman reply br. at 12. After the *voir dire* a judge can determine which. description of the publicity's impact is accurate; before the *voir dire* a judge could only gave guessed.

Our own reading of the 2,000-page *voir dire* demonstrates that the Government's assessment of the public's interest in Watergate matters is correct. Most of the venire simply did not pay an inordinate amount of attention to Watergate. This may come as a surprise to lawyers and judges, but it is simply a fact of

would therefore introduce additional unguided discretionary line-drawing and consequent uncertainty into the process of litigating controversial cases.[38] Moreover, this uncertainty would not guarantee a commensurate increase in the fairness of federal criminal trials. When the trial court has taken all appropriate measures to minimize pretrial publicity, as was the case here,[39] a supervisory fair trial standard, however stated, could not stimulate the court to additional vigilance in protecting the defend-

ant's right to be tried on the evidence presented in court.[40] And if an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*. The defendant will then be entitled to any actions necessary to assure that he receives a fair trial. In sum, we believe that "each case must turn on its special facts." *Marshall v. United States*, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959).[41]

■ For these reasons we hold that the District Court was correct to follow this

---

**38.** Uncertainty could, of course, be avoided by using a *per se* rule based on the quantity of publicity. Such a rule, however, would be contrary to the law of this circuit, *see United States v. Caldwell, supra* note 29, 178 U.S.App. D.C. at 29, 543 F.2d at 1342, and far removed from the basic question of the fairness of a trial. Similarly, a rule that avoided uncertainty by requiring the trial court to grant a motion for continuance or change of venue whenever a minimal showing of the existence of pretrial publicity had been made would be both contrary to long accepted practice, *see, e. g.,* Fed. R.Crim.P. 21(a), and only remotely related to the underlying concern with obtaining an impartial jury.

**39.** Simultaneously with filing of the indictment, the District Court enjoined the "staff of the Watergate Special Prosecutor, defendants, their attorneys and witnesses from making extrajudicial statements concerning any aspects of [the] case that are likely to interfere with the rights of the accused or the public to a fair trial by an impartial jury * * *." J.A. 2. All members of the venire were told not to read about or discuss the case, *see, e. g.,* Tr. 197, and the jury was sequestered as soon as it was selected.

**40.** This factor sharply distinguishes this case from *Marshall v. United States, supra* note 32, and other cases involving publicity which reached the jury during the trial. *See* note 32 *supra.*

The supervisory power has also been used as a judicial response to improper actions by another branch of government. *See* Note, *The Supervisory Power of Federal Courts,* 76 Harv. L.Rev. 1656, 1660–1664. *Delaney v. United States,* 199 F.2d 107 (1st Cir. 1952), appears to be such a case. *See id.* at 115 (different result possible when legislative action has greater utility); *Silverthorne v. United States,* 400 F.2d 627, 633 (9th Cir. 1968). The utility of the legislative activities complained of by appellants is unquestionable. The hearings of the Senate Select Committee on Presidential Cam-

paign Activities (Ervin Committee) took place before appellants were indicted, see *United States v. Ehrlichman, supra* note 17, 178 U.S. App.D.C. at 150 n.8, 546 F.2d at 916 n.8, and well over a year before they were tried, at a time when it was far from clear that the Executive Branch would adequately deal with the burgeoning scandal. *Contrast Delaney v. United States, supra,* 199 F.2d at 114. The impeachment hearings of the House Committee on the Judiciary did take place after the indictments in this case and within a few months of the beginning of the trial. However, those hearings, which were conducted pursuant to a power conferred by the Constitution only on the House of Representatives, did not involve public taking of evidence. Moreover, although appellants' actions were prominently considered by the Committee, the focus of the public debates, and of public attention, was on the role of the President. In view of these factors and of decisions by the Supreme Court subsequent to *Delaney, see, e. g., Beck v. Washington, supra* note 33, we do not believe the same result as in *Delaney* is called for here.

**41.** Judge MacKinnon's dissent on this issue relies most heavily on *Marshall* in taxing this court for refusing to use its supervisory power to reverse these convictions. Marshall was convicted of unlawfully dispensing a number of dextro amphetamine sulfate tablets without a prescription from a licensed physician, in violation of 21 U.S.C. § 353(b)(1)(B). The trial court refused to allow the Government to show that Marshall had previously practiced medicine without a license. Marshall never took the stand during his trial, nor did he offer any evidence. His only defense was entrapment. *During* the trial seven of the jurors read newspaper accounts stating that Marshall had a record of two prior felony convictions, one being for forgery. The accounts also stated that Marshall admitted he had only a high school education and that he practiced medicine with a $25 diploma he received through the mail. The newspaper reports also stated that Marshall "told in detail of the ease in which he wrote and passed prescriptions for dangerous

---

life that matters which interest them may be less fascinating to the public generally.

circuit's well established procedure by refusing appellants' pre-*voir dire* requests for a continuance [42] or a change of venue.[43] *See, e. g., United States v. Wilkerson,* 175 U.S.App.D.C. 383, 384, 536 F.2d 410, 411 (1976), (*per curiam* ); *United States v. Caldwell, supra,* 178 U.S.App.D.C. at 29, 543 F.2d at 1342; *Jones v. Gasch,* 131 U.S.App. D.C. 254, 261, 404 F.2d 1231, 1238 (1967), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968). We therefore turn to an examination of the *voir dire* itself.

---

drugs." 360 U.S. at 311, 79 S.Ct. at 1172. One of the accounts indicated that the information contained therein came from court attaches. In reversing the conviction under its supervisory power the Supreme Court stated, "We have here the exposure of jurors [during the trial] to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence." *Id.* at 312, 79 S.Ct. at 1173. The Court further stated that on the issue of prejudice resulting from the reading by jurors of news articles during the trial "each case must turn on its special facts." *Id.* We believe that the *Marshall* case was obviously rightly decided. We also believe that its special facts are distinctly different from our case.

**42.** The potential efficacy of a continuance is also open to question. At the time of the trial there was little reason to believe the news media would not continue their inquiry into the events of Watergate, at least until the activities of the primary participants had been fully explored at a public trial. *Cf. United States v. Hoffa,* 367 F.2d 698, 711 (7th Cir. 1966), *vacated and remanded on other grounds,* 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967); *United States v. Marcello,* 280 F.Supp. 510, 519 (E.D.La.1968), *aff'd,* 423 F.2d 993 (5th Cir.), *cert. denied,* 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970).

**43.** Moreover, on the basis of the record, we note that a change of venue would have been of only doubtful value. Many of the articles appellants submitted in support of their motions were taken from nationally circulated news magazines. The network news programs and legislative hearings of which appellants also complain were similarly national in their reach. Scandal at the highest levels of the federal government is simply not a local crime of peculiar interest to the residents of the District of Columbia. *Cf. United States v. McNally, supra* note 30, 485 F.2d at 403 (questioning value of change of venue since airline hijacking a national crime).

## B. *Selection of the Jury*

Conduct of the *voir dire* is a matter left primarily to the trial judge:

> Pursuant to Rule 24(a), Fed.R.Crim.P., the trial judge is vested with "broad discretion" in the conduct of *voir dire*—both as to the mode and manner of proceeding, * * * and as to the range of questions put to the prospective jurors * * *. The exercise of this discretion is "subject to the essential demands of fairness." * * * But absent abuse of his broad

---

In reaching the conclusion that a change of venue was required, the dissent relies heavily on two disparate, though equally suspect, indicia. The first is a poll commissioned by the appellants and conducted by a public opinion research company. This court has previously held, however, that a trial judge, sitting in lieu of a jury, is not required to accept expert testimony. *Hightower v. United States,* 117 U.S. App.D.C. 43, 325 F.2d 616 (1963), *cert. denied,* 384 U.S. 994, 86 S.Ct. 1903, 16 L.Ed.2d 1009 (1966). Similarly, the trial court must also be accorded discretion in assessing the weight to be given expert evidence that is submitted—as was this evidence—in support of a pretrial motion. Indeed, such discretion is peculiarly necessary where the expert evidence consists of the results of a public opinion poll—data that is open to a variety of errors. *Cf.* Zeisel, *The Uniqueness of Survey Evidence,* 45 Cornell L.Q. 322, 339–344 (1960). It is our judgment that in determining whether a fair and impartial jury could be empanelled the trial court did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive *voir dire* examination conducted by the judge in the presence of all parties and their counsel pursuant to procedures, practices and principles developed by the common law since the reign of Henry II.

The second major prop for the dissent's argument that a change of venue should have been granted is, oddly, the District of Columbia's voting record in the past two presidential elections. Not without reason, the relevance of this information seems to have escaped the prosecution, the defendants, their counsel, and the trial court. Nevertheless, undeterred by the absence of any reference to voting results anywhere in the record or the appellate briefs, the dissent introduces the subject with a quotation from *United States v. Dennis,* 183 F.2d 201 (2d Cir. 1950), *aff'd,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). It need only be said that the reader will search *Dennis* in vain for any intimation that a community's voting patterns are at all pertinent to venue.

discretion, and a showing that the rights of the accused have been substantially prejudiced thereby, the trial judge's rulings as to the scope and content of *voir dire* will not be disturbed on appeal.

\* \* \*

*United States v. Robinson,* 154 U.S.App. D.C. 265, 269, 475 F.2d 376, 380 (1973) (citations omitted). *See, e. g., United States v. Caldwell, supra,* 178 U.S.App.D.C. at 32, 543 F.2d at 1345; *United States v. Liddy,* 166 U.S.App.D.C. 95, 101, 509 F.2d 428, 434 (1974) *(en banc); United States v. Nix,* 465 F.2d 90, 96 (5th Cir.), *cert. denied,* 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307 (1972). Our review, while based on a thorough study of the record, is limited accordingly.

▆▆▆▆ The *voir dire* in this case lasted eight days and is recorded in over 2,000 pages of transcript. The first phase was devoted to identifying veniremen who would not be able to be sequestered for the expected length of the trial. This process resulted in elimination of 170 of the 315 veniremen. The remainder were then asked general questions concerning their relationships with any of the individuals or organizations involved in the case. Eighty-five veniremen remained following those questions. After questioning two individu-

ally,[44] the trial judge had the rest of the venire divided into groups of 12 to 18 for further questioning. The inquiries directed to these groups covered such areas as previous jury service, factors affecting credibility of witnesses, and other subjects unrelated to pretrial publicity. Finally, the trial court individually questioned 77 veniremen on matters such as their employment, attitudes toward the defendants, and exposure to pretrial publicity.[45] This individual questioning, which took place out of the hearing of all other members of the venire, accounts for almost three quarters of the *voir dire.*

Since the answers to the court's questions were met with appropriate follow-up questions, the individual *voir dire* interrogation was not uniform.[46] Nevertheless, the questioning did follow a basic pattern. After some personal inquiries relating to employment history and political activity, the court focused on the venireman's exposure to pretrial publicity and possible biases. Before the publicity was mentioned the venireman was asked if he believed that any defendant was probably guilty. He was then asked if he had heard of the case and, if so, whether anything he had heard or read about the case stood out in his mind. The next questions asked whether the venireman had

---

44. After the first two veniremen had been questioned individually, the District Court determined that many questions could be put to small groups without harm to the selection process and with a great time saving. Only defendant Ehrlichman stated an objection to this change in procedure, Tr. 520, and this objection appears to have been *pro forma.* We see nothing wrong with the trial court's decision.

One of the first two veniremen questioned was excused because of inability to be sequestered for the necessary time. Tr. 471–472. The other (Barksdale) was excused because of a challenge for cause by the defense. Tr. 518–519. That challenge was based on the juror's negative response to the following question:

Do you agree that you are enforcing the law just as vigorously or just as much by voting for an acquittal or not guilty, in other words, if there is a reasonable doubt, which I will go into [in] greater detail later, as to the guilt of any Defendant as you would do by voting for conviction when there is no such doubt?

Tr. 480; *see* Tr. 507–508, 518–519. Defense counsel admitted when making the challenge that the venireman had probably not understood the question, Tr. 508, and the court concluded that the question was confusing and should not be asked again. Tr. 519. Barksdale said she had paid little attention to the Watergate news and had no opinion as to the guilt of any defendant. Tr. 490–499. It is therefore improper to count her as biased against the defendants *because of the pretrial publicity. But see* Mitchell reply br. at 18 n. 12.

45. This description of the steps in the process is not chronological. The individual questioning of members of a group of 12 to 18 occurred immediately after collective questioning of that group had been completed and before the next group was questioned.

46. *Compare, e. g.,* Tr. 607–619 (Juror G. Carter) *with* Tr. 1876–1901 (Juror Young). The flexibility in the trial court's questioning belies appellants' contention, Ehrlichman br. at 74, 79–80, that the *voir dire* involved only "perfunctory" repetition of a few uninformative questions.

seen the defendants or their lawyers in the newspapers or on television and whether he remembered anything in particular about them. Subsequently the court determined which newspapers and magazines the venireman read and with what degree of regularity; which television news programs he watched; whether he had followed the legislative inquiries related to Watergate or read any of the books or other lengthy pieces concerning Watergate, including the presidential tape transcripts; whether he had followed Watergate closely or casually; and whether (and how recently) he had discussed the case.

After determining the venireman's degree of interest in and exposure to the case, the court inquired whether he had formed or expressed an opinion of the guilt or innocence of any defendant. In addition, the judge determined whether the venireman knew of Ehrlichman's trial and conviction in the "plumbers" case,[47] whether he knew of the pardon of former President Nixon, whether he thought it unfair to prosecute appellants in light of the pardon, whether the pardon caused the venireman to believe appellants were guilty or innocent, and whether the fact that Nixon had been named an unindicted co-conspirator affected the venireman's view of appellants. If the venireman had formed an opinion, the judge attempted to determine whether that opinion was firmly held or could be set aside. In closing he was asked whether he could return a fair and impartial verdict based solely on the evidence presented at trial and the court's instructions on the law. After the basic questioning was completed, the venireman was excused while the court considered counsel's objections and suggestions for additional inquiries. This step often resulted in recall of the venireman for more questioning.

Appellants claim that this interrogation was inadequate. Their principal complaint[48] is that the *voir dire*, which they

47. *United States v. Ehrlichman*, D.D.C., 389 F.Supp. 95, *affirmed*, 178 U.S.App.D.C. 144, 546 F.2d 910 (No. 74–1882, decided May 17, 1976). Since proof of Ehrlichman's conviction in the "plumbers" case was properly admitted at trial, *see* Part VII *infra*, juror knowledge of that case and its outcome is not objectionable under the doctrine of *Marshall v. United States, supra* note 32. Ehrlichman's suggested *voir dire* questions would have informed all veniremen who were ignorant of the trial or its outcome of the fact that Ehrlichman had been convicted. *See* Defendant John D. Ehrlichman's Proposed Voir Dire to the Jury, J.A. 435, 444 (Questions 140–142); *cf. Murphy v. Florida, supra* note 32, 421 U.S. at 800 n.3, 95 S.Ct. 2031.

48. Although appellants focus on the issue of "content" questions, their briefs criticize many other aspects of the conduct of the *voir dire*. Taking these complaints as assertions of error, we find them to be unworthy of extended discussion. In no instance mentioned in the briefs did the trial court abuse its substantial discretion in determining the conduct of the *voir dire, see* pp. ——–—— of 181 U.S.App.D.C., at pp. 64–65 of 559 F.2d, *supra*, and in ruling on challenges. *See, e. g., Reynolds v. United States*, 98 U.S. (8 Otto) 145, 156–157, 25 L. Ed. 244 (1878), *quoted in Irvin v. Dowd, supra* note 32, 366 U.S. at 723, 81 S.Ct. 1639; *United States v. Robbins*, 500 F.2d 650, 653 (5th Cir. 1974); *United States v. Ploof*, 464 F.2d 116, 118 (2d Cir. 1972).

The dissent, which largely echoes appellants' assorted complaints about the *voir dire*, also fails to point to a single instance in which the trial court abused its discretion. In its attempt to show that the *voir dire* was in some way inadequate or improper, however, the dissent carefully selects, from the more than 2,000 pages of the *voir dire* transcript, the isolated passages that are most susceptible to the interpretation that the trial judge and the jurors were predisposed to find the defendants guilty. Consistently ignored, it should be pointed out, are the numerous passages that suggest a predisposition to find the defendants innocent— passages which often appear immediately before or after those quoted by the dissent. For instance, the dissent specifically refers to the *voir dire* of jurors Ruth Gould, Marjorie Milbourn, and Jane Ryon as demonstrating that the trial judge erred in not eliciting more fully the jurors' general opinions on the subject matter of the case. Omitted from the dissent, however, is any reference to the opinions these jurors *did* express. In truth, *each* of these three jurors, in response to a question from the trial court, said she felt that, in view of the pardon granted to former President Nixon, *it would be unfair to prosecute any of the defendants.* Tr. 843 (Gould *voir dire*); Tr. 1187 (Milbourn *voir dire*); Tr. 1429–1430 (Ryon *voir dire*). *See also* Tr. 631 (*voir dire* of Roy G. Carter, a juror who also responded that, in view of the pardon, it would be unfair to prosecute any of these defendants).

characterize as perfunctory, did not include "content" questions.[49] A "content" question, as appellants' *voir dire* proposals show, is simply a request that the venireman recite everything he remembers about the topic of the inquiry. Thus appellant Haldeman wished to ask each member of the venire, "What do you remember about this case? What, if anything, do you remember about any of these defendants?" Voirdire [*sic*] Questions to Individual Jurors, Requested by Defendant Haldeman, J.A. 431. Appellant Ehrlichman suggested similar, although more elaborate, questions.[50] According to appellants, these questions were necessary to provide an objective basis for evaluating a venireman's impartiality.[51]

Following an objection by the Government, the District Court decided not to ask these questions. The positions of the parties and the court's reasoning emerge clearly from the dialogue with the lawyers:

[DEFENSE COUNSEL]: But it is basic for us to know whether it is disabling or not, what they have heard, seen, about Watergate. Otherwise, I mean, every citizen in the District of Columbia we

---

**49.** The dissent finds the trial court's *voir dire* inadequate in restricting its inquiry to what "in particular" stood out in a venireman's mind as the result of the pretrial publicity. This self-imposed restriction, it is argued, led to the court's not inquiring as to the general opinions and impressions that the veniremen have formed from the publicity.

Though not without ambiguity, this portion of the dissent appears to be little more than a variation on appellants' complaint that the trial court erred in refusing to ask "content" questions. For the reasons given *infra*, we find this refusal entirely justified.

Further, we specifically note that the questions that were propounded during the *voir dire* refute any suggestion that the trial court failed to address the fundamental issue of whether the veniremen were predisposed to find the defendants guilty. The dissent, of course, concedes that the trial court did inquire as to this issue, but contends that the court's questions should have been worded differently. The judge asked a "loaded question," according to the dissent, when he said, "Do you believe at this very moment, and without having heard any of the evidence that will be offered in this case, that any Defendant in this case is guilty of violation of any or all of the charges set out in the various counts of the indictment?" But in a *voir dire* involving as many prospective jurors and as many questions as did the *voir dire* in this case, the fact that certain questions could have been formulated more adroitly is not surprising—much less is it reversible error. Also, it is instructive to note, as regards the "loaded question" referred to, that one of the jurors responded to the question with the statement that in her opinion the defendants were "not guilty." Tr. 1675–1676 (*voir dire* of Thelma L. Wells).

**50.** *See, e. g.*, J.A. 436–437 (Questions 26, 29, 35, 41, 47). Ehrlichman's proposed *voir dire* consisted of 230 questions. Many of them were intended to obtain the veniremen's reactions to the facts which would come out at trial and to explain those facts in terms favorable to Ehrlichman's defense. *See* J.A. 442–450. This at-

tempt to use *voir dire* as an occasion for argument of contested facts was clearly improper.

Mitchell's proposed *voir dire* did not include any "content" questions. *See* Record Vol. 9, Doc. 308.

**51.** Appellants contend that the trial judge improperly relied solely on the subjective assurances of veniremen that they were capable of setting aside their opinions when ruling on defense challenges for cause. *E. g.*, Mitchell br. at 113–114. We agree that it would have been reversible error for the court to accept jurors simply because they said they would be fair. *See, e. g., United States v. Dellinger*, 472 F.2d 340, 376 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *Silverthorne v. United States, supra* note 40, 400 F.2d at 638–639; American Bar Ass'n Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.4 (approved draft 1968). In this case, however, the court had before it and acted on not only the jurors' subjective assurances but also objective information relating to how closely they had followed Watergate and their sources of information. The trial judge also had ample opportunity to observe the veniremen's demeanor and assess their candor during individual questioning. As defense counsel occasionally admitted during the *voir dire*, the District Court was clearly relying on objective as well as subjective indicators of bias. *See* Tr. 720 (comment of Mr. Stein). Indeed, Mitchell's brief contains extensive excerpts from the *voir dire* of a venireman who was excused for cause despite his assurance that he could render a fair verdict. Mitchell br. at 111–113. Although Mitchell maintains that this action was taken because the court deviated from its normal practices and asked a "content" question, it is apparent from the record that the venireman was dismissed because of the trial court's assessment of his answers to questions which were addressed to every venireman during individual interrogation. *See* Tr. 2008–2016.

would assume would come in and say, yes, they [had] heard about it, read about it, and seen it on television.

THE COURT: If I ask them if they heard about it I am not going into specifics, what did you hear, some commentator implied somebody is guilty or. innocent. They are not going to try this case on hearsay or what somebody might have said. If they haven't got any more intelligence than that, we ought to quit now.

\* \* \* \* \* \*

[PROSECUTOR]: \* \* \*

We are now taking the extraordinary course in the Federal system of examining jurors individually. Regardless of what Your Honor does and how Your Honor pairs [*sic*] down these questions, it is still going to be remarkably liberal voir dire if you get down to eight or ten questions; but to ask a question as, what have you heard about Watergate, I could not answer that, Your Honor, myself, and I believe I have a threshold intelligence.

THE COURT: I don't think I could, myself.

\* \* \* \* \* \*

[DEFENSE COUNSEL]: \* \* \*

We feel strongly what they read, heard, their sources, their opinions, even though it takes six months, is absolutely essential to the Defendants \* \* \*,

whether or not we can get a fair and impartial jury.

Tr. 486–489.

■■■■ We agree with the District Court that the questions requested by appellants would have been unreasonable in the circumstances of this case. Appellants were not seeking to discover whether some particular piece of highly prejudicial, inadmissible information had made an impression on the members of the venire.[52] *Cf.* American Bar Ass'n Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.4(b) (approved draft 1968) (hereinafter *ABA Standards*). Rather, they simply wished to learn how much the veniremen recalled from their exposure to the publicity, regardless of whether that exposure caused them to form opinions of guilt. Under *Irvin v. Dowd,* however, mere familiarity with "the facts and issues involved" in the case would not have rendered a venireman unqualified to sit. *See* 181 U.S.App. D.C. at ——, 559 F.2d at 60, *supra.* The District Court therefore properly concluded that the information appellants sought, although undoubtedly of interest to them, did not warrant the extraordinarily prolonged *voir dire* that would have been necessary to obtain it.[53]

■■■■ We also find unconvincing appellants' attempts to identify legal support for their claimed right to ask "content" questions. Appellants rely principally on Sec-

---

**52.** At defendants' request, veniremen were asked about their knowledge of and reaction to specific incidents with a high potential for prejudice such as the "plumbers" trial, *see* note 47 *supra,* and the naming of ex-President Nixon as an unindicted co-conspirator.

**53.** Appellants suggest that if the *voir dire* had included "content" questions the belated revelation that one juror (Plunkett) had discussed the case with a secretary in the office of the Special Prosecutor and that another (Milbourn) had written letters to Senator Baker mentioning Watergate as an example of the country's moral problems would have been avoided. Ehrlichman br. at 74–76; Mitchell br. at 81. (Plunkett was dismissed from the jury and replaced by an alternate; Milbourn was retained after additional questioning in chambers.) We reject the contention that these incidents demonstrate that the *voir dire* was not sufficiently

thorough. All of the veniremen were asked about contacts with anyone in the Special Prosecutor's office; Plunkett apparently simply forgot about the incident. Similarly, all veniremen were asked whether they had expressed any opinions about the guilt or innocence of the defendants. Juror Milbourn mentioned her letters in belated response to this question. If anything, her action following a weekend recess indicates that the *voir dire* successfully impressed upon the jurors the seriousness of their undertaking and the importance of full answers. We also note that Juror Milbourn had indicated during the original *voir dire* that she felt Watergate had been morally undesirable, essentially the same opinion she expressed in her letters. She was not challenged for cause by the defense. *See* Tr. 1172–1212; note 57 *infra.*

tion 3.4 of the *ABA Standards, supra; Silverthorne v. United States,* 400 F.2d 627 (9th Cir. 1968); and *United States v. Dellinger,* 472 F.2d 340 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). The *ABA Standards,* which have been approved by this court, *United States v. Bryant,* 153 U.S.App.D.C. 72, 76–77, 471 F.2d 1040, 1044–1045 (1972), *cert. denied,* 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973), provide in Section 3.4(a) that "[t]he questioning shall be conducted for the purpose of determining *what the prospective juror has read and heard about the case* and how his exposure has affected his attitude towards the trial \* \* \*." (Emphasis added.) Contrary to appellants' suggestion, we believe this standard, as its language suggests, mandates an inquiry into the sources and intensity of a venireman's exposure to pretrial publicity, not an inquiry into his recollection of the content of that publicity. This reading is supported by Section 3.4(b) which provides that "[b]oth *the degree of exposure* and the prospective juror's testimony as to his state of mind are relevant to the determination of acceptability." [54] (Emphasis added.)

Both of the cases relied on by appellants refer to the *ABA Standards.* In *Silverthorne* the *voir dire* relating to pretrial publicity was both minimal [55] and addressed to the veniremen as a group. There was no private, individual questioning of each member of the venire. The Ninth Circuit, citing Section 3.4(a) and (b), held that the questioning was inadequate because "[t]he trial court made no effort to ascertain *what* information the jurors had accumulated and, consequently, had no way of objectively assessing the impact caused by this pretrial knowledge on the juror's impartiality."

400 F.2d at 638 (emphasis in original). In *Dellinger* the trial court asked whether there was any reason the veniremen would be unable to return a fair verdict, but refused to ask any questions concerning exposure to the extensive pretrial publicity surrounding that case. 472 F.2d at 372. The Seventh Circuit, citing *Silverthorne* and the *ABA Standards,* held that the *voir dire* inadequately explored the impact of the pretrial publicity. *See id.* at 370–377.

The extensive *voir dire* in the instant case, with its detailed inquiry into the sources and intensity of the veniremen's exposure to Watergate publicity, is a far cry from the minimal questioning which took place in *Silverthorne* and *Dellinger.* Thus on their facts those cases do not suggest that the *voir dire* here was insufficient. Moreover, the language in *Silverthorne* on which appellants have seized appears to have been intended as an adoption of the *ABA Standards.* As we have shown, those *Standards* do not require that "content" questions be asked in the circumstances of this case. Rather, the *Standards* recognize that, as the Seventh Circuit said in *Dellinger,* "the court could probe the impact of pretrial publicity without requiring the veniremen to describe what they had heard." 472 F.2d at 377. That is what the District Court did in this case.

As the Supreme Court stated in *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 565, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683 (June 30, 1976), "[P]retrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." In this case, moreover, it is clear that the District Judge took particular care—during

---

**54.** Section 3.4(b) also provides that a potential juror "who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material," should be excused for cause. There was no such material or information in this case, *see* 181 U.S.App. D.C. at ——– ——, 559 F.2d at 61–62, *supra,* and appellants were not seeking "content" ques-

tions to determine whether the jurors recalled any specific matters. *See* note 52 and accompanying text *supra.*

**55.** The *voir dire* concerning publicity consisted of only four questions. 400 F.2d at 635 n.10. "The totality of the dialogues between the jurors selected and the court concerning the publicity issue" is reprinted in less than two full pages of the appellate court's decision. *See id.* at 635–637 n.11.

the *voir dire* and throughout the proceedings—to ensure that the trial was a fair one. Of course, "[*v*]*oir dire* 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.' [*Quoting Connors v. United States,* 158 U.S. 408, 413, 15 S.Ct. 951, 39 L.Ed. 1033 (1895); other citations omitted.] This is so because the 'determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge.' *Rideau v. Louisiana,* 373 U.S. 723, 733 [83 S.Ct. 1417, 1423, 10 L.Ed.2d 663] (1963) (Clark, J., dissenting)." *Ristiano v. Ross, supra,* 424 U.S. at 594–595, 96 S.Ct. 1020, 47 L.Ed.2d 258. After diligently studying the voluminous transcript of the *voir dire* in

this case, we are convinced that the District Court exercised its discretion judiciously and intelligently. Indeed, no one who reads this transcript can fail to be impressed with the patience, attention, and acumen with which the judge probed the opinions of the veniremen so as to remove those who harbored any prejudice or preconception.

▇▇▇▇ Our conclusion that the *voir dire* was adequate does not end our review of the jury selection. As is our duty, we have reviewed the record to ascertain for ourselves whether appellants were tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial.[56] Appellants appear to concede this ultimate conclusion, for they never suggest that the jury was actually prejudiced against them[57]

**56.** Appellants contend that we cannot determine whether the jurors were biased by reviewing the *voir dire.* To the extent this contention rests on their claims that the publicity was certain to prejudice all who came in contact with it and that the *voir dire* was inadequate, we have already rejected their position. To the extent their argument rests on *Irvin v. Dowd, supra* note 32, we reject it here.

In *Irvin* 62% of the 430-member venire admitted possessing a fixed opinion of the defendant's guilt which could not be set aside. *See* 366 U.S. at 724 & n.4, 727, 81 S.Ct. 1639. Almost 90% of the members of the venire who were asked about their opinion "entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty." *Id.* at 727, 81 S.Ct. at 1645. Two thirds of the jurors who found Irvin guilty believed him guilty before the trial began. The Court held that the evidence of " 'deep and bitter prejudice' shown to be present throughout the community" and in the jury box warranted rejection of the jurors' assurances that they could be impartial. *Id.*

Appellants claim that 52% of the veniremen questioned individually had an inclination, "ranging in intensity from mere suspicion to absolute certainty," toward a belief in guilt. Mitchell br. at 96. The Government maintains that only 8% of those questioned indicated an opinion of guilt that could not be set aside. In all, the Government identifies 29% of the venire as having had an opinion of appellants' guilt and another 7% as possessing an "arguable predisposition against defendants." Govt. br. at 243. *Compare Murphy v. Florida, supra* note 32, 421 U.S. at 803, 95 S.Ct. 2031 (20 of 78, 26%, excused because of opinion of guilt). Our review of the *voir dire* suggests that appellants have included in their totals not only potential jurors who may have believed them

guilty but also potential jurors about whom appellants had a "mere suspicion." The Government's estimate that approximately a third of the members of the venire were predisposed against appellants is much more consistent with the *voir dire* transcript.

This may indeed be [one third] more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against [appellants] as to impeach the indifference of jurors who displayed no animus of their own.

*Murphy v. Florida, supra* note 32, 421 U.S. at 803, 95 S.Ct. at 2037.

**57.** Appellants list three of the jurors as "inclined to belief in guilt." *See* note 56 *supra*; Mitchell br. at 97. There is no basis for holding that any of these jurors were biased against appellants. Juror Gould was apparently so classified because, in response to the question whether she had formed or expressed an opinion as to appellants' guilt or innocence, she said, "No. I think the only expression of that kind was when the tapes came out and I was rather amazed." Tr. 841; *see* Mitchell br. at 75. She also indicated she believed it unfair to prosecute appellants in view of the pardon of former President Nixon. She was not challenged for cause, and the judge's decision to accept her apparently received affirmative approval from counsel for appellant Haldeman. Tr. 851.

Jury Chairman Hoffar is considered by appellants to have inclined toward a belief of guilt because he expressed his agreement with others' viewpoints about the case in order to avoid arguments. Tr. 994; Mitchell br. at 76. The only challenge to Hoffar was based on his asserted equivocation. Tr. 946–947. Nothing in the transcript indicates he had formed any disqualifying opinion of his own.

or that its verdict rested on anything other than the overwhelming evidence of their guilt. On the basis of our own review, we have no doubt that the jury was impartial.[58] Accordingly, we find no reversible error associated with the impaneling of the jury.

## III. EHRLICHMAN'S MOTION FOR SEVERANCE

Appellant Ehrlichman contends that his motion for severance under Rule 14, filed May 1, 1974, was improperly denied. In his motion he claimed that severance was required because his co-defendants would assert defenses inconsistent with, and hostile to, his own. As he puts it, Mitchell and Haldeman asserted that their contacts with then President Nixon were lawful and proper in every respect, while "[i]n direct contrast, Appellant Ehrlichman sought to establish that his contact with Mr. Nixon was lawful, but that he had been misled by the former President."[59]

■ While there are situations in which inconsistent defenses may support a motion for severance, the doctrine is a limited one. As set forth in *Rhone v. United States,* 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966), the governing standard requires the moving defendant to show that "the defendants present conflicting and ir-

reconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." Application of this standard, which is for the District Court in the first instance, and reviewable here only for abuse of discretion, requires that the accounts of co-defendants be not merely divergent from one another but indeed "so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of the inconsistency." To warrant a severance, in short, the accounts of co-defendants must be "on a collision course." *United States v. Bolden,* 169 U.S. App.D.C. 60, 69, 514 F.2d 1301, 1310 (1975).

■ Ehrlichman's claim that the defenses of Haldeman and Mitchell were in "direct contrast" to his assertion that he should be judged innocent because he had been misled by former President Nixon does not meet this standard. The defenses of the co-defendants were simply not at the requisite level of conflict. The jury could have accepted or rejected both. "[T]he mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another have both been held to be insufficient grounds to require separate trials." *United States v. Barber,* 442 F.2d 517, 530 (3d Cir.), *cert. denied,* 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275

---

Finally, appellants list Juror Milbourn as prejudiced against them because of her belief that Watergate did not represent morally desirable activities. *See* note 53 *supra* ; Mitchell br. at 79; Tr. 1182–1183. Milbourn very clearly expressed her understanding of the distinction between her moral sentiments and the question of appellants' legal guilt; as to the latter she had no opinion. *See* Tr. 1182–1183. Moreover, she was not challenged for cause, and the dialogue following her questioning suggests the defense was eager to have her on the jury because of her belief that appellants should receive the same treatment as former President Nixon. *See* Tr. 1196–1202.

**58.** We note that even if some of the jurors had harbored preconceptions as to appellants' guilt, the three-month period during which the jury was sequestered would have greatly reduced the importance of any impressions based on pretrial publicity. "Although [sequestration] insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the

elements of the jurors' oaths." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 565, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683 (June 30, 1976).

**59.** Ehrlichman br. at 92. Ehrlichman refers to his testimony that when he listened to the tapes it became clear that in various major instances the former President had given him a false impression: "In the matter of the June 23 meeting, in the matter of what he learned from John Dean on March 21, which he did not impart to me, in the matter of his conversations with Charles Colson in January, which were just exactly diametrically opposite to the representations that he had made to me with regard to his intents on clemency, about the matter of his conversation with Mr. Mitchell on March the 22nd after I left the room, when I thought we had an agreement in principle that there was going to be a full disclosure statement issued, and then, of course, his position was exactly the contrary, I feel." Tr. 554, 10241, *quoted in* Ehrlichman br. at 92.

(1971).[60] Here the contention is further diluted by the circumstance that appellant is not claiming prejudice because other defendants were inculpating him, as in the Valdés' case [61] Ehrlichman relies on, but rather is asserting that he lacks the knowledge and blame that may be imputable to the co-defendants. Any inconsistency in defenses stems from Ehrlichman's defense strategy to shift the blame onto, to assign sole culpability to, his co-defendants.

Ehrlichman stresses the difference between his claim and Haldeman's concerning their meeting with CIA representatives on June 23, 1972. Each contended his purpose in attending the meeting was lawful. Haldeman had to overcome the tape recording of his earlier June 23 meeting with then President Nixon with respect to the need to use the CIA to "derail" the FBI investigation because, in Haldeman's words, "the FBI is not under control." [62] Haldeman attempted to explain that the prior conversation was not for the purpose of enlisting the CIA to stifle the FBI's Watergate investigation. Whether successful or not, this did not cut across Ehrlichman's defense. Ehrlichman contended that he had not been made privy to the conversation in question—an assertion neither the Government nor Haldeman disputed—and had no reason to attribute any but a lawful purpose to the meeting, namely, that he believed Mr. Nixon's statement that an investigation into the activities of the persons behind the Watergate matter might interfere with the legitimate activities of the CIA.

More broadly, Ehrlichman is claiming that he was prejudiced because there was strong evidence implicating his co-defendants. There are instances where severance is necessary to overcome gross disparity in the weight of the evidence which might tend to prejudice a defendant involved in a relatively "inconsequential part of the trial." [63] But here the evidence against Ehrlichman, while perhaps not as compelling in certain details as with respect to the others, is not only consequential but overall a very strong showing of involvement in the coverup. The judge instructed the jury in the clearest terms that it could consider only a defendant's own words and acts in determining whether he joined the conspiracy, Tr. 12365, and that it must consider the guilt or innocence of each defendant separately and independently, Tr. 12407. And even in a separate trial the Government would have been entitled to prove the scope of the entire conspiracy, and would not have been restricted to the limited involvement of the severed defendant.[64] Appellant Ehrlichman falls far short of the showing of "clear abuse of discretion" required for reversal even when there is a welter of "conflicting stories and veiled accusations emanating from the defense ta-

---

60. See Allen v. United States, 91 U.S.App.D.C. 197, 202, 202 F.2d 329, 334, cert. denied, 344 U.S. 869, 73 S.Ct. 112, 97 L.Ed. 674 (1952); Dauer v. United States, 189 F.2d 343 (10th Cir.), cert. denied, 342 U.S. 898, 72 S.Ct. 232, 96 L.Ed. 672 (1951).

61. United States v. Valdés, 262 F.Supp. 474 (D.C.P.R.1967). In that case defendant Vega sought to lay the blame for narcotics transactions solely on defendant Valdés. The court found severance appropriate because "Valdés, if compelled to go to trial together with defendant Vega, would have to prepare his defense against two adversaries, the United States and co-defendant Vega. They would be unified in their effort to convict Valdés. We must agree under these conditions, a joint trial would be the equivalent of a denial of a fair and impartial trial." Id. at 476.

62. Govt. Ex. 1A, Tape Tr. 2.

63. United States v. Leonard, 161 U.S.App.D.C. 36, 47, 494 F.2d 955, 966 (1974); United States v. Gambrill, 146 U.S.App.D.C. 72, 83, 449 F.2d 1148, 1159 (1971); McHale v. United States, 130 U.S.App.D.C. 163, 164, 398 F.2d 757, 758, cert. denied, 393 U.S. 985, 89 S.Ct. 462, 21 L.Ed.2d 447 (1968), quoting United States v. Kelly, 349 F.2d 720, 759 (2d Cir. 1965).

 Ehrlichman's brief does not cite these cases, but we give him the benefit of considering their doctrine.

64. United States v. Mayes, 512 F.2d 637, 645 (6th Cir.), cert. denied, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975); United States v. Pearson, 508 F.2d 595, 597 (5th Cir.), cert. denied, 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66 (1975).

ble * * * ." [65] We do not here discern anything like the kind of unfairness necessary to overcome a joint trial of defendants shown by substantial, independent evidence to be involved in the conspiracy for which they have been jointly indicted.

## IV. DISCOVERY BY EHRLICHMAN

Months ahead of trial, Ehrlichman and other defendants filed motions for extensive discovery. Ehrlichman's demand included a large volume of documentary matter in the possession of the Special Prosecutor or one of his investigative arms. It also embraced additional materials, some held by the White House and others by a congressional subcommittee.

In his response to the motions the Special Prosecutor agreed to adduce a great deal of what was sought. While disclaiming responsibility for items beyond his control, he also represented that he would search for and try to obtain for the defendants all possibly exculpatory evidence in the custody of executive and congressional bodies. The District Court temporarily withheld action on the motions in order to facilitate voluntary efforts by the parties, leaving open to

each defendant the opportunity to contend individually for additional discovery if dissatisfied with the outcome. The arrangement seems to have worked quite well, for the Special Prosecutor's production was massive.[66]

Ehrlichman, however, continued to press his motion, which the District Court eventually denied.[67] He also procured the issuance of two subpoenas *duces tecum*,[68] which were promptly quashed.[69] He asserts in this court that he has yet to be afforded complete discovery; his central argument, invoking *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1960),[70] is that the Special Prosecutor was constitutionally obligated to turn over all favorable data either in his hands or in those of any other branch of the Federal Government. In the circumstances shown by the record, we need not pass on a proposition so broad,[71] nor are we persuaded that Ehrlichman was deprived of anything to which he was entitled.

■ Our attention has not been directed to any arguably helpful information possessed by the Special Prosecutor,[72] or any investigative unit under his control,[73] or any

65. *United States v. Leonard, supra* note 63, 161 U.S.App.D.C. at 48, 494 F.2d at 967.

66. *See* appendix and attachments to the District Court's memorandum and order of Sept. 25, 1974 (R. 342). The memorandum is officially reported, *United States v. Mitchell,* 397 F.Supp. 182 (D.D.C.1974), but the appendix and attachments are not. Some of the items produced are identified by the District Court's findings:

> [T]he [Special Prosecutor] provided each defendant with copies of his own grand jury testimony, prosecution interviews, F.B.I. interviews, and all other statements or testimony possessed by the prosecution which related to this case. Additionally, the [Special Prosecutor] made efforts to obtain for each defendant his statements or testimony relating to this case made before congressional committees. . . . [E]ach defendant had been provided with copies of or access to the tapes and transcripts of the subpoenaed White House conversations, a list of scientific tests and experiments the prosecutor had knowledge of, and a tremendous volume of other possibly relevant materials.

> *Id.* at 183 (footnote omitted).

67. *United States v. Mitchell, supra* note 66.

68. *See* note 89 *infra.*

69. R. 338.

70. *See also United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Ring v. United States,* 419 U.S. 18, 95 S.Ct. 164, 42 L.Ed.2d 29 (1974); *DeMarco v. United States,* 415 U.S. 449, 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974); *Moore v. Illinois,* 408 U.S. 786 (1972); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Giles v. Maryland,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).

71. The pivotal consideration, as will develop, is that Ehrlichman does not indicate how any possibly inaccessible information might have been material to his defense. *See* cases cited *supra* note 70.

72. *See* cases cited *supra* note 70.

73. *See, e. g., United States v. Bryant,* 142 U.S. App.D.C. 132, 140, 439 F.2d 642, 650 (1971).

other agency allied with the prosecution,[74] which was not made available. Nor does Ehrlichman refer us to any particular item allegedly unproduced other than files generated at the White House [75] and testimony taken by a congressional subcommittee in executive session.[76] As to these materials, we find no cause for reversal.[77]

 Ehrlichman's demand for the White House files fell far short of legal requirements.[78] Criminal Rule 16(b) at that time [79] conditioned discovery of matter of that type "upon a showing of materiality to the preparation of [the accused's] defense and that the request is reasonable." [80]

**74.** *Compare United States v. Deutsch,* 475 F.2d 55 (5th Cir. 1973). There the defendants, charged with offering to pay a postal employee for credit cards abstracted from the mail, and with giving the employee money to induce him to act in violation of his duty, moved for production of the employee's personnel file for examination for possibly impeaching material. The motion was denied on the ground that the prosecutor did not have the file. On appeal, the ruling was held erroneous. "It was a Post Office employee," said the court, "who had been sought to be bribed. The government cannot compartmentalize the Department of Justice and permit it to bring a charge affecting a government employee in the Post Office and use him as its principal witness, but deny access to the Post Office files. * * * [T]here is no suggestion in *Brady* that different 'arms' of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities." *Id.* at 57.

**75.** Discussed in text *infra* at notes 78-104. While Ehrlichman's brief alludes to unidentified White House tapes, we note the District Court's finding that prior to commencement of the trial "each defendant had been provided with copies of or access to the tapes and transcripts of the subpoenaed White House conversations." *See* note 66 *supra.* Ehrlichman does not specify any other tape desired; indeed, the White House aspect of his discovery argument centers on files, particularly his notes therein. *See* note 78 *infra.* In any event, our discussion of the discoverability of materials in the files is equally applicable to any additional tapes.

**76.** Discussed in text *infra* at notes 105-113.

**77.** Nor do we find error with respect to other discoverable materials. *See* note 75 *supra* and notes 80, 112 *infra.*

**78.** Even so, the White House files actually did yield some materials. Ehrlichman was provided with a written report, and related notes, which he made to President Nixon and he employed them at trial. Tr. 7640 B–E; Ehrlichman Ex. 22, 23.

**79.** During all of the period relevant to these cases, Fed.R.Crim.P. 16(b) provided:

Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, upon a showing of materiality to the preparation of his defense and that the request is reasonable. Except as provided in subdivision (a)(2), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by government agents in connection with the investigation or prosecution of the case, or of statements made by government witnesses or prospective government witnesses (other than the defendant) to agents of the government except as provided in 18 U.S.C. § 3500.

Rule 16 was revised and considerably broadened in 1975. Pub.L. No. 94–64, 89 Stat. 370 (1975). Since, however, the changes did not become effective until December 1, 1975, *id.* § 2, they have no effect on the cases at bar. Throughout this opinion we refer to Rule 16 as it was before the 1975 revisions.

**80.** *See* note 79 *supra.* We are advertent to provisions of Fed.R.Crim.P. 16(a)(1)(A) respecting discovery of "written or recorded statements * * * made by the defendant" and "recorded testimony of the defendant before a grand jury," which were in force when Ehrlichman was tried. Production of these documents was practically a matter of right even without a showing of materiality, *see Xydas v. United States,* 144 U.S.App.D.C. 184, 188 n.8, 445 F.2d 660, 664 n.8, *cert. denied,* 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971); *United States v. Bryant, supra* note 73, 142 U.S.App. D.C. at 139 n.14, 439 F.2d at 649 n.14, and the right extended to an accused's conversations with third persons. *See United States v. Bryant, supra* note 73. The District Court found, however, that the Special Prosecutor had "provided each defendant with copies of his own grand jury testimony, * * * and all other statements or testimony possessed by the prosecution which related to this case." *See* note 66 *supra.* The record reveals that Ehrlichman's testimony before the Subcommittee on Intelligence of the House Armed Services Committee was supplied, Tr. 9115, and *see* text *infra* at notes 105–113, and that he had full access to his White House files for inspection of any "written or recorded statements" of his contained therein. *See* note 93 *infra.* Thus we have no further concern with Rule 16(a)(1)(A).

Criminal Rule 17(c),[81] which is not a discovery device,[82] confines a subpoena *duces tecum* to admissible evidence,[83] authorizes the quashing of the subpoena if it is "unreasonable or oppressive,"[84] and indulges pretrial inspection [85] of subpoenaed papers only upon a showing

(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the

failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." [86]

 Ehrlichman's discovery motion, aptly described by the District Court as a "sweeping and broadly phrased" endeavor to secure "a tremendous array of materials,"[87] ignored Rule 16(b)'s admonition of reasonableness.[88] His subpoena effort, deserving of like characterization,[89] similarly defied Rule 17(c)'s counterpart.[90] More importantly, in neither instance, so far as the

**81.** Fed.R.Crim.P. 17(c), relating to subpoenas for production of documentary evidence and of objects, provides:

A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

Portions of Rule 17 were likewise amended in 1975, see note 79 *supra,* but subsec. (c) was left as it was at the time the instant cases were before the District Court.

**82.** *United States v. Nixon,* 418 U.S. 683, 698–700, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). "Rule 17(c) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place *before* trial for the inspection of the subpoenaed materials." *Bowman Dairy Co. v. United States,* 341 U.S. 214, 220, 71 S.Ct. 675, 679, 95 L.Ed. 879 (1951) (emphasis in original).

**83.** *Bowman Dairy Co. v. United States, supra* note 82, 341 U.S. at 219–220, 71 S.Ct. 675; *United States v. Marchisio,* 344 F.2d 653, 669 (2d Cir. 1965).

**84.** *See* note 81 *supra.*

**85.** *See* note 81 *supra* and note 89 *infra.*

**86.** *United States v. Nixon, supra* note 82, 418 U.S. at 699–700, 94 S.Ct. at 3103.

**87.** *United States v. Mitchell, supra* note 66, 397 F.Supp. at 184.

**88.** *See* note 79 *supra.* "While specific designation is not required of the defendant, the burden is placed on him to make a showing of materiality to the preparation of his defense and that his request is reasonable. The requirement of reasonableness will permit the court to define and limit the scope of the government's obligation to search its files while meeting the legitimate needs of the defendant." Advisory Committee Note to 1966 Amendment. *Compare United States v. Jordan,* 399 F.2d 610, 615 (2d Cir.), *cert. denied,* 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968); *United States v. Ross,* 511 F.2d 757, 763 (5th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).

**89.** Ehrlichman caused two subpoenas *duces tecum* to issue. One, dated Sept. 4, 1974, called for production of

books, records, tape recordings, drawings, graphs, charts, photographs, phono records, and other intangible matters which refer to or relate to the concealment or cover-up of the break-in into Democratic National Headquarters and the involvement as to the same by agents or employees of The White House or the Committee for the Re-election of the President.

on a date prior to actual beginning of the trial. R. 338. An earlier subpoena, dated Aug. 29, 1974, is not included in the record on appeal, and our only information as to it is the statement in the Special Prosecutor's brief that it "sought production of [Ehrlichman's] notes of conversations with then President Nixon, correspondence and memoranda, and his 'personal' papers relating to Watergate for the time period June 17, 1972 to May 1, 1973 * * *." Br. for United States at 211.

**90.** *See* note 81 *supra.* The requirement of reasonableness subsumes a duty to designate the documents sought with reasonable particularity. *See, e. g., Margoles v. United States,* 402 F.2d 450, 451–52 (7th Cir. 1968).

record discloses, did Ehrlichman attempt any demonstration of materiality or relevance of any file item to the exigencies of his defense,[91] nor does he offer any explanation even now. There is no room for any suggestion that this omission is attributable to any informational handicap,[92] for Ehrlichman has long since had ample opportunity to examine the files and to fully acquaint himself with their contents.[93]

Beyond these considerations, the White House files may well have an extra dimension. Ehrlichman, who is in position to know, makes no claim that the files do not reflect intercommunication and other interaction with President Nixon,[94] and "[i]n no case of this kind would a court be required to proceed against the president as an ordinary individual."[95] On the contrary, any court completely in the dark as to what

Presidential files contain is duty bound to respect "the singularly unique role under Art. II [96] of a President's communications and activities, related to the performance of duties under that Article."[97] For "a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any 'ordinary individual,'"[98] and "[i]t is therefore necessary in the public interest to afford Presidential confidentiality the greatest protection consistent with the fair administration of justice."[99] Not only, then, were the Criminal Rules governing evidentiary discovery and production to be meticulously observed,[100] but an even higher standard was to be met. The White House files were "presumptively privileged"[101] and the burden of justifying production was Ehrlichman's.[102] Nothing less than a "demonstrat-

**91.** Compare, e. g., United States v. Schembari, 484 F.2d 931, 935 (4th Cir. 1973); United States v. Ross, supra note 88, 511 F.2d at 763.

**92.** We do not lose sight of the question once posed by Chief Justice Marshall: "Now, if a paper be in possession of the opposite party, what statement of its contents or applicability can be expected from the person who claims its production, he not precisely knowing its contents?" United States v. Burr, 25 Fed.Cas. pp. 187, 191 (No. 14,694) (C.C.D.Va.1807). See also United States v. Ross, supra note 88, 511 F.2d at 763–764.

**93.** Ehrlichman had personal access to the White House files, and he utilized the opportunity to review them. He asserts, however, that his attorney was not permitted to accompany him on those occasions, and that he was thereby denied his Sixth Amendment right to counsel. From our reading of the record, it appears that while at one time there was a prohibition on examination of the files by counsel, the restriction was subsequently removed. See Tr. 8394, 8628–8631. In any event, on another appeal Ehrlichman raised the same point and only recently we rejected it:

The fact that Ehrlichman was given access to these files—which recorded Presidential conversations apparently unrelated to the [case on trial]—could not vest a right of access in his attorney, who was not privy to the conversations. The [restrictive] order did not prevent Ehrlichman from leaving the room where the files were located at any time to inform his attorney in detail of the materials he had located. Ehrlichman does not contend that his attorney would have been pre-

vented from framing subpoenas duces tecum for relevant material so located.
United States v. Ehrlichman, supra note 17, 178 U.S.App.D.C. at 165–166, 546 F.2d at 931–932. The conditions here were no different, and we reaffirm what we said there.

**94.** For example, see note 78 supra.

**95.** United States v. Nixon, supra note 66, 418 U.S. at 715, 94 S.Ct. at 3111, quoting United States v. Burr, supra note 92, 25 Fed.Cas. at 192.

**96.** U.S.Const. art. II.

**97.** United States v. Nixon, supra note 82, 418 U.S. at 715, 94 S.Ct. at 3111.

**98.** Id.

**99.** Id.

**100.** See text supra at notes 79-86.

**101.** United States v. Nixon, supra note 82, 418 U.S. at 708, 94 S.Ct. 3090, quoting Nixon v. Sirica, 159 U.S.App.D.C. 58, 75, 487 F.2d 700, 717, 19 A.L.R.Fed. 343 (en banc 1973). No question has been raised as to whether inspection of White House files by the defendants and their counsel, and trial use of information thereby obtained, operated as a waiver of the Presidential privilege as to broader inspections or added uses. Cf. Nixon v. Sirica, supra, 159 U.S.App.D.C. at 76, 487 F.2d at 708.

**102.** United States v. Nixon, supra note 82, 418 U.S. at 699–700, 94 S.Ct. at 3103, quoted in text supra at note 86; Senate Select Comm. on

ed, specific need for evidence in a pending criminal trial" [103] could carry that burden here. In appropriate cases there may well be a difference in result when the claim of privilege is asserted and the incumbent president interposes no objection. But even so, there is a presumption of privilege which can only be overcome by some demonstration of need. From what we have already said,[104] it is manifest that for information in the files beyond that which Ehrlichman was indulged, the burden was not discharged here.

 Turning now to Ehrlichman's complaint in reference to congressional materials, we find that his discovery motion was similarly flawed. By no measure could his call for virtually everything related to the oncoming trial [105] be deemed

reasonable.[106] Nor, any more than with respect to the White House files, was there any attempt to show materiality of congressional items to the defense.[107] Even as to one category of information eventually designated—evidence taken in executive session by the Subcommittee on Intelligence of the House Armed Services Committee—the motion encountered these problems and more. The record reveals beyond peradventure that while the Subcommittee originally refused to furnish any of the evidence, at least some—including Ehrlichman's own testimony before the Subcommittee [108] —was later supplied,[109] and that free access to all of the evidence was conferred ultimately.[110] Ehrlichman does not say that these concessions came too late in the trial to serve his interests [111] nor, if they did,

*Presidential Campaign Activities v. Nixon*, 162 U.S.App.D.C. 183, 187–191, 498 F.2d 725, 729–733 (*en banc* 1974).

**103.** *United States v. Nixon, supra* note 82, 418 U.S. at 713, 94 S.Ct. at 3110.

**104.** *See* text *supra* at notes 87–93.

**105.** *See* text *supra* at note 87.

**106.** *See* note 88 *supra* and accompanying text.

**107.** *See* text *supra* at note 91.

**108.** Tr. 9115.

**109.** Tr. 9115, 9246–9250, 9304–9305.

**110.** Tr. 9620–9621.

**111.** A related matter is Ehrlichman's invocation of the Jencks Act, 18 U.S.C. § 3500 (1970), which entitles an accused, on motion after completion of direct examination of a prosecution witness, to any "statement" of the witness "in the possession of the United States which relates to the subject matter as to which the witness has testified." *Id.* § 3500(b). "Statement" includes a contemporaneous and substantially verbatim recording or transcription of oral testimony, *id.* § 3500(e)(2), and Ehrlichman contends that testimony previously given by trial witnesses for the prosecution to the Subcommittee on Intelligence of the House Armed Services Committee was within the purview of the Act.

The question whether, by adopting the Act, Congress contemplated subjection of its own records to the Act's disclosure requirements is surging increasingly to the fore. *See United States v. Liddy, supra* note 17, 177 U.S.App.

D.C. at 7–8, 542 F.2d at 82–83; *Harney v. United States*, 306 F.2d 523, 532–533 (1st Cir.), *cert. denied*, 371 U.S. 911, 83 S.Ct. 254, 9 L.Ed.2d 171 (1962); *United States v. Lev*, 258 F.2d 9, 12–13 (2d Cir. 1958), *aff'd by equally divided court*, 360 U.S. 470, 79 S.Ct. 1431, 3 L.Ed.2d 1531 (1959); *Calley v. Callaway*, 519 F.2d 184, 224–226 (5th Cir. *en banc* 1975); *United States v. Ehrlichman*, 389 F.Supp. 95 (D.D.C.1974), *aff'd*, No. 74–1882, 178 U.S.App. D.C. 144, 546 F.2d 910 (1976); *United States v. Tane*, 29 F.R.D. 131, 133 (E.D.N.Y.1962); *United States v. Calley*, 46 C.M.R. 1131, 1190–1194, *aff'd*, 48 C.M.R. 19 (1973). We are not summoned to address that question here.

Jencks Act requirements do not rise *per se* to constitutional stature, *Scales v. United States*, 367 U.S. 203, 258, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); *Palermo v. United States*, 360 U.S. 343, 345, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); we deal rather with rules of evidence statutorily ordained for federal criminal trials. *United States v. Augenblick*, 393 U.S. 348, 356, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). The Act expressly provides that in such trials "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a) (1970). The Act supplies the only avenue to the materials it encompasses, and "statements of a government witness made to an agent of the Government which cannot be produced under the terms of 18 U.S.C. § 3500, 18 U.S.C.A. § 3500, cannot be produced at all." *Palermo v. United States, supra*, 360 U.S. at 351, 79 S.Ct. at 1224.

does he indicate in any way how he might possibly have been harmed by the delay.[112] Rather, his complaint, as nearly as we can fathom it, is that at no time was any of the evidence available to him.[113] In light of the disclosures by the record, we cannot accept

It follows that neither Ehrlichman's discovery motion nor any other effort to gain pretrial access to such statements could prevail, and that any further inquiry—aside from the question we have pretermitted—would be limited to whether Ehrlichman was barred from the Subcommittee testimony of any prosecution trial witness or witnesses and whether any such deprivation was prejudicial. Because Ehrlichman has not fulfilled his responsibilities incidental to judicial resolution of these questions, we do not speculate on the answer to either.

We later observe that Ehrlichman was late in asserting in this court his congressional-materials claim, and that as a result the case lacks argumentative focus on that claim. See note 113 infra and accompanying text. Nowhere is that condition graver than here. In the face of record revelations that some if not all of the Subcommittee testimony was opened to the defendants, see text supra at notes 108–110, Ehrlichman insists that he never gained access to any of the testimony, see note 113 infra and accompanying text, and his tardiness in raising the point has foreclosed responsive briefing by the Special Prosecutor. See note 113 infra and accompanying text. Moreover, Ehrlichman does not furnish record references to in-trial requests for the testimony at statutorily-appointed times or to rulings on any such requests, see Fed.R.App.P. 28(a), (e); D.C.Cir.R. 8(e), and we think it unwise to attempt a search of a three-month-trial record generating more than 12,000 pages of transcript in a quest for unspecified error. Compare Minnesota Mining and Mfg. Co. v. Technical Tape Corp., 309 F.2d 55, 59 (7th Cir. 1962), cert. denied, 372 U.S. 942, 83 S.Ct. 936, 9 L.Ed.2d 968 (1963). See also Holt v. Sarver, 442 F.2d 304, 307 (8th Cir. 1971); Herrera v. United States, 280 F.2d 888, 889 (9th Cir. 1960). And even if it could be demonstrated that the Subcommittee's delay in producing the testimony had some consequence, any undertaking to assess possible prejudice to Ehrlichman would be perilous. There is positive indication in the record that all Subcommittee testimony became accessible while the trial was ongoing, see notes 109, 110 infra and accompanying text, and Ehrlichman does not point to the least bit of harm that could be attributed to the delay, and in the face of the overwhelming evidence against him it may well be doubted that in any event there was harm necessitating reversal. See note 112 infra. In this milieu, we leave the matter as it is.

112. Compare United States v. Pinkney, 177 U.S.App.D.C. 423, 431 & n.59, 543 F.2d 908, 916 & n.59 (1976); United States v. Ehrlichman, supra note 17, 178 U.S.App.D.C. at 164 n.95, 546 F.2d at 930 n.95. Error not affecting substantial rights is to be disregarded. Fed.R. Crim.P. 52(a). Compare United States v. Bundy, 153 U.S.App.D.C. 191, 192, 472 F.2d 1266, 1267 (1971) (Brady doctrine, Jencks Act); Leach v. United States, 115 U.S.App.D.C. 351, 352–353, 320 F.2d 670, 671–672 (1963) (Jencks Act); Hansen v. United States, 393 F.2d 763, 769–770 (8th Cir.), cert. denied, 393 U.S. 833, 89 S.Ct. 103, 21 L.Ed.2d 103 (1968) (discovery). Surely there is no plain error, see Fed.R. Crim.P. 52(b), in regard to discovery by Ehrlichman.

Thus there is no occasion to consider whether the Special Prosecutor's Brady duty, see text supra at note 70, extended to congressional materials, see Calley v. Callaway, 519 F.2d 184, 220–224 (5th Cir. en banc 1975); United States v. Ehrlichman, 389 F.Supp. 95, 97 (D.D.C.1974); United States v. Ehrlichman, 376 F.Supp. 29, 36 (D.D.C.1974); or whether in any event the materials were legally amenable to a subpoena duces tecum. Compare United States v. Liddy, No. 74–1885 supra note 17, 177 U.S.App.D.C. at 7–8, 542 F.2d at 82–83; Nixon v. Sirica, supra note 101, 159 U.S.App.D.C. at 73 n.70, 487 F.2d at 715 n.70.

113. In his opening brief Ehrlichman made only passing reference to the initial refusal of the Subcommittee on Intelligence of the House Armed Services Committee to release the executive session testimony. Br. for Ehrlichman at 55. That brief sets forth no claim that he did not later receive the testimony, nor argument that any failure to receive it wronged him. In his reply brief Ehrlichman asserted for the first time that "[t]he trial court declined to require compliance with the Jencks Act with respect to any testimony given before the Subcommittee on Intelligence of the House Armed Services Committee" and that "[a]s a result, [he] was deprived of testimony which had been given by either [him] or other witnesses, before the Subcommittee, as to this case." Reply br. for Ehrlichman at 16.

Points raised for the first time in a reply brief are not normally to be considered on appeal. Finsky v. Union Carbide & Carbon Corp., 249 F.2d 449, 459 (7th Cir. 1957), cert. denied, 356 U.S. 957, 78 S.Ct. 993, 2 L.Ed.2d 1065 (1958); Mississippi River Corp. v. FTC, 454 F.2d 1083, 1093 (8th Cir. 1972); Fredrick v. United States, 163 F.2d 536, 549 (9th Cir.), cert. denied, 332 U.S. 775, 68 S.Ct. 87, 92 L.Ed. 360 (1947). In this instance, Ehrlichman's handling of the point has deprived us of the benefit of a response by the Special Prosecutor. At most, we can accept Ehrlichman's presentation only as a thesis assuming complete nonaccess to the testimony, a premise directly refuted by the record. See notes 108–110 supra and accompanying text.

that position; nor, without elucidation from Ehrlichman of the elements of a different claim, can we say that his right to discovery was in any wise abrogated.

## V. ALLOCATION OF PEREMPTORY CHALLENGES

 Fed.R.Crim.P. 24(b) provides that "[i]f the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges." It further provides that "[i]f there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly." The defendants requested 15 additional peremptory challenges, for a total of 25. The District Judge awarded them five extra challenges to be exercised individually, one to each defendant. Together with the mandated 10 challenges, to be exercised jointly, this award gave the defendants a total of 15 challenges. The judge indicated his unwillingness to grant the request in full because of the imbalance it would create between prosecution and defense. After noting that there is no power to award the Government extra challenges unless all defendants agree to the award, the District Judge indicated that if such agreement was forthcoming he would be willing to increase both the Government's and the defendants' totals. When no agreement was reached, the totals remained at six and 15 respectively. J.A. 509; Tr. 698.

Appellants' objection to the treatment of peremptory challenges is easily disposed of. In multiple defendant cases the award of additional challenges is permissive rather than mandatory, and rests in the trial judge's sound discretion. *See, e.g., United States v. Mayes,* 512 F.2d 637, 644 (6th Cir.),

*cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975), and 423 U.S. 840, 96 S.Ct. 69, 46 L.Ed.2d 59 (1975); *United States v. Williams,* 463 F.2d 393, 395 (10th Cir. 1972); *United States v. Crutcher,* 405 F.2d 239, 245 (2d Cir. 1968), *cert. denied,* 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969); 2 C. Wright, Federal Practice and Procedure, Criminal § 386 (1969). The trial judge's decision to grant the defendants' request in part—providing them with two and one-half times the number of challenges held by the Government—reflects his awareness of the problem of pretrial publicity in this case. His refusal to grant that request in its entirety reflects a legitimate concern with the wisdom of providing one side with a far greater number of challenges than the other.

 Indeed, a proposal to amend Rule 24(b) has been approved by the Advisory Committee on Rules and Practice of the Judicial Conference of the United States, the Judicial Conference itself, and most recently by the Supreme Court,[114] and will take effect shortly unless blocked by action of one House of Congress, *but cf.* H.R. 13899, 94th Cong., 2d Sess. (1976) (bill to delay the effective date of the proposed revisions of the Federal Rules of Criminal Procedure). It provides that, in felony cases, the Government and the defense are entitled to an equal number of challenges and, in multiple defendant cases, a District Judge may award additional challenges to the Government as well as the defense. *See* 44 U.S.L.W. 4549–4550. The District Judge explicitly relied on the Advisory Committee's proposal in reaching his decision. *See* J.A. 511. It is true that the proposed revision was not in effect at the time of trial. Yet the District Judge surely is to be commended rather than faulted when, in exercising his broad discretion under Rule 24(b), he sought guidance from the

---

**114.** For the Advisory Committee's report, *see* Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure 10 (1973); for the approval by the Judicial Confer-

ence, *see* Report of the Proceedings of the Judicial Conference of the United States, September 25–26, 1975, at 76; for the approval by the Supreme Court, *see* 44 U.S.L.W. 4549–4550 (U.S. Apr. 27, 1976).

most recent thinking of the Advisory Committee.

■ Appellants also complain that the trial judge's unwillingness to award more than five additional challenges unless the defendants agreed to permit the Government additional challenges punished them for exercising their "right" to foreclose the Government from obtaining more than six challenges. We think this contention is without merit. The trial judge's responsibility is to use his discretion in a way that he thinks provides a fair balance between the parties. Apparently, he believed that a ratio of 15 to 6 was fairer than one of 10 to 6; that permitting defendants more than 15 and the Government more than six challenges would be even fairer, but required defendants' approval; and that in the absence of such approval, a ratio of 15 to 6 was fairer than a ratio of 25 to 6. Such a judgment on his part lies well within the scope of his discretion.

Appellants also take exception to the system established for exercising the peremptory challenges, whose features they have succinctly summarized:

a. Veniremen would be placed in the box according to a pre-determined order.

b. The ten joint defense peremptories had to be exercised two at a time.

c. Challenges would alternate between the government and the defense [the government to proceed first].

d. Two failures to exercise a challenge [or pair of joint challenges] would bring about a forfeiture of that challenge or challenges.

e. The government's final challenge would be exempt from forfeiture.

Br. for Mitchell at 116; see J.A. 520.

■ Appellants' principal objection to this scheme seems to be that at the end of the jury selection process, when the defense was left with two individual challenges and the Government with one challenge, the defendants thought it more advantageous to forfeit their challenges than to exercise them and permit the Government to then exercise its challenge, thereby reaching down the predetermined list to a venireman allegedly favorable to the prosecution. Assuming arguendo that appellants' characterization of this strategic decision is accurate, we find nothing prejudicial about their having been required to face it.[115] The fact is that by choosing to forfeit the challenges appellants obtained a jury that, in their view, was more advantageous than the jury that they would have obtained by exercising the challenges. It is true that when prospective jurors are selected for the jury box in a non-random order, and both sides have opinions about the desirability of particular prospective jurors, tactical decisions will have to be made. But that results directly from relying upon a non-random order, not an unusual practice and one which was adopted with the encouragement of the defendants and over the objection of the Government, see Tr. 1231–1236. The trial judge has broad discretion to structure the method of exercising peremptory challenges, see e.g., United States v. Mayes, supra, at 644; United States v. Williams, 447 F.2d 894, 896–897 (5th Cir. 1971); Amsler v. United States, 381 F.2d 37, 44 (9th Cir. 1967); United States v. Mackey, 345 F.2d 499, 501–503 (7th Cir.), cert. denied, 382 U.S. 824, 86 S.Ct. 54, 15 L.Ed.2d 69 (1965), and he did not abuse it in this case.

## VI. CONTINUANCE FOR NIXON TESTIMONY

Ehrlichman argues on behalf of all three appellants that the trial judge erred in denying their motions for a continuance until former President Nixon was physically well enough to be deposed. We find the contention without merit.

### A. Background

On September 4, 1974 Ehrlichman issued a subpoena to Mr. Nixon, returnable on September 30, the day before trial was to begin. Two weeks later the Government

---

**115.** It is noteworthy that appellants have not advanced any colorable claim that the jury which convicted them possessed any identifiable or demonstrable bias. See note 57 supra.

also subpoenaed Nixon. On September 18 Ehrlichman filed a one-paragraph motion for a 60- to 90-day continuance, stating that "recent public accounts of Mr. Nixon's health suggest that he may be physically unable to testify when called at the trial as now set" and that "Mr. Nixon's personal appearance at trial is indispensable to Mr. Ehrlichman's defense." Doc. 303. The Government opposed the motion, arguing that it had "just as much interest in securing Mr. Nixon's testimony," but that the "factual basis" for Ehrlichman's motion was "entirely speculative." Doc. 306. The Government suggested that the court either conduct an immediate inquiry into Nixon's health or wait to see if Nixon appeared on the date on which the subpoena was returnable. On September 20th the District Court denied the motion for a continuance. Doc. 307.

At a pretrial conference held on September 24 Herbert Miller, Nixon's lawyer, reported that his client had been hospitalized the preceding day for tests. Miller requested that the subpoenas be stayed for two weeks until the tests were completed and he had an opportunity to make any appropriate motions regarding the subpoenas. With the assent of all parties it was agreed that Miller would report to the court on Nixon's health by October 3rd. Tr. of Sept. 24th hearing at 7–11.

Three days after the conference, Ehrlichman moved, pursuant to Fed.R.Crim.P. 15, for authorization to depose Nixon, for a severance, and for a continuance until Nixon was well enough to be deposed and for at least two weeks thereafter to conduct the deposition. Doc. 353. In this motion Ehrlichman noted that Nixon had informed the court that he was suffering from "thrombophlebitis, and as a result requires present hospitalization and treatment." Ehrlichman then asserted that Nixon's condition had been "complicated by the lodging of a blood clot in [his] lung, thereby precluding travel to the District of Columbia at this time." Reciting 30 areas in which Nixon was said to have "sole and personal

knowledge . . . to which he can be expected to testify," Ehrlichman contended that "the interests of justice compel . . . a severance, continuance and deposition." The Government again opposed the motion, arguing that it was still premature to conclude that Nixon would be unavailable to testify or that his deposition should be taken. Doc. 354. Ehrlichman's motion was denied orally at the start of trial. Tr. at 3.

As agreed at the pretrial conference, on October 3rd Miller filed an affidavit reporting on Nixon's health. Miller's affidavit, based on a telephone conversation with Nixon's physician, stated that the testing of Nixon had been suspended shortly after he had been admitted to the hospital because a pulmonary embolus had been discovered; that a test performed on September 30 indicated the embolus was resolving itself; and that tests were resumed on the 30th and were to be completed by October 4th, at which time Nixon would be released from the hospital. The affidavit went on to state that for 3–6 months Nixon would be receiving anticoagulant medication, and that for an indefinite period of time until his condition stabilized Nixon would be required to avoid prolonged sitting, standing, or walking and any possible trauma.[116] On the basis of this prognosis, Miller filed motions to quash the two subpoenas issued to his client. Docs. 362, 363.

Ehrlichman replied to the motion to quash by renewing his motions for leave to depose, a severance, and a continuance, again noting and expanding on the issues on which Nixon's testimony was needed. Doc. 396. Haldeman filed a separate motion with the same requests, and listed 34 areas as to which Haldeman needed Nixon's testimony. Doc. 371. The Government did not respond to the appellants' motions, but opposed Nixon's motion to quash on the ground that the supporting affidavits failed to establish that Nixon would be unable to testify under any conditions at any time during the trial. Doc. 386. The Government argued that at most the court should appoint an independent panel of doctors to

116. This was corroborated by an affidavit by Nixon's physician filed on Oct. 7. Doc. 368.

assess Nixon's health and ability to testify. The Government stated, however, that it would no longer insist upon Nixon's testimony as part of its direct case because it intended to authenticate the White House tapes with other proof.

On October 17 a hearing was held on the motion to quash.[117] At that time Miller reported that his client's prognosis was good, and predicted that within 3–4 weeks "we would no longer wish to raise the health issue . . .." Tr. 2953. Ehrlichman's lawyer then stated that "we are not pressing for an immediate disposition of this . . . [but] neither do we want to place ourselves in a position where we waive anything." The court deferred ruling on the motion to quash, and requested an updated medical report from Nixon within three weeks. *Id.* 2957.

On November 7, 1974, Nixon's counsel filed his report. Doc. 452. It stated that nine days earlier Nixon had undergone surgery and experienced post-operative shock, hemorrhaging, and other complications. He had been on the critical list for a week, and was expected to be hospitalized for an additional ten days to two weeks. Thereafter, he would be precluded from "any activity requiring substantial mental or physical effort . . . [for] two or three months." [118]

On November 13, 1974 Judge Sirica appointed a panel of three physicians to "make investigation" concerning Nixon's condition and ability to testify. Doc. 472. On November 29 the panel submitted its unanimous report, estimating that, barring further complications, Nixon would be able to travel to Washington to testify by mid-February, to testify near his home in earlier February, and, starting January 6, would be able to be deposed in no more than two well-spaced daily sessions of no more than one hour each. Doc. 511.

After receiving the medical report, all three appellants filed motions to depose Nixon and to continue the trial until that was possible. Docs. 516, 524, 525, 526. Haldeman and Ehrlichman repeated the statements from their earlier motions concerning their need for Nixon's testimony; Mitchell listed a number of areas as to which Nixon's testimony allegedly would be vital to Mitchell's defense. Each appellant waived his right to a sequestered jury during the requested continuance. Docs. 524, 526, 527. Co-defendant Mardian filed a statement opposing the continuance and the suggestion to unsequester the jury, Doc. 529; co-defendant Parkinson opposed only the latter, Doc. 530. Mr. Nixon took no position other than to note that even if he were well enough to be deposed starting January 6, he would not be well enough to prepare prior to that date, and would need a "substantial" amount of time to do so. Doc. 532. The United States opposed the motions of all three appellants. Doc. 524.

In an opinion dated December 5, 1974, discussed *infra*, the court denied the motions.[119] The trial therefore proceeded as scheduled, and the last defendant completed his case on December 19. After a brief rebuttal case by the Government, the summations began the same day and stretched over the next week. The jury began deliberating on December 30 and returned its verdict on January 1, 1975.

---

117. On the day of the hearing Nixon's counsel filed an updated medical report, indicating that the doctors had determined that the cause of the clots was Nixon's chronic phlebitis, that Nixon's leg was still swollen, and that it was not known whether there were further clots in the leg. The affidavit stated that another lung scan was scheduled in roughly a week and that if the results were negative Nixon would be well enough to be deposed in or near his home. A veinogram was scheduled in approximately two weeks (assuming the lung scan results were satisfactory) and any determination of Nixon's ability to travel would have to await the results of that test. Doc. 393.

118. On Nov. 13, 1974 counsel updated his affidavit by reporting that Nixon had been having "labile hypertension seemingly stimulated by both physical and non-physical effort"; that Nixon had been advised to restrict his activities; and that Nixon expected to be discharged from the hospital very soon. Doc. 471.

119. *United States v. Mitchell,* 385 F.Supp. 1190 (D.D.C.1974).

B. *General Principles*

 Defendants sought a continuance here to enable them to produce an unavailable witness who, they alleged, could offer evidence favorable to the defense. Criminal defendants plainly have a substantial interest in being able to present the testimony of such witnesses to the jury. Indeed, this interest implicates constitutional values, since the Sixth Amendment right to compulsory process is "in plain terms the right to present a defense."[120] On the other hand, the Government generally has a substantial interest in avoiding disruptions of a court's calendar and in having guilt or innocence promptly adjudicated.[121] Accordingly, in ruling on motions for continuances trial judges must carefully evaluate and then balance the defendant's need for the continuance against the Government's interest in going forward. Because no firm rules can be articulated as to when a continuance is required,[122] the decision to grant a continuance is vested in the trial judge's discretion, and reviewable only when such discretion has been abused.[123]

 From the decisions of the Supreme Court and of this and other circuit courts, at least some of the factors that should be considered by district judges in evaluating the competing interests can be readily discerned. First, the court must assess the likelihood—as it appears from defendant's motion for a continuance, his supporting papers, and from anything else in the record—that defendant will be able to and will produce the missing evidence if the continuance were granted.[124] Second, the court must assess the likelihood—again based primarily on defendant's showing—that the evidence will be favorable to the defense and, if so, that it will be significant.[125] Third, the court must deter-

120. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967); *see Shirley v. North Carolina*, 528 F.2d 819 (4th Cir. 1975); *Johnson v. Johnson*, 375 F.Supp. 872 (W.D.Mich.1974). *See generally* Westen, *The Compulsory Process Clause*, 73 Mich.L. Rev. 71 (1974), *and Compulsory Process II*, 74 Mich.L.Rev. 191 (1975).

121. *See Barker v. Wingo*, 407 U.S. 514, 519–521, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

122. *See* note 128 *infra*. *But see* Westen, *Compulsory Process II*, 74 Mich.L.Rev. 191, 244–250 (1975).

123. *See, e.g., Isaacs v. United States*, 149 U.S. 487, 489, 13 S.Ct. 1048, 37 L.Ed. 963 (1895); *Mahoney v. United States*, 137 U.S.App.D.C. 3, 5, 420 F.2d 253, 255 (1969); *United States v. Brandenfels*, 522 F.2d 1259, 1262 (9th Cir. 1975); *cf. Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964) (same rule for state court trial judges); *Franklin v. South Carolina*, 218 U.S. 161, 168, 30 S.Ct. 640, 54 L.Ed. 980 (1910) (same).

124. *See, e.g., United States v. Reed*, 155 U.S. App.D.C. 198, 200 n.1, 476 F.2d 1145, 1147 n.1 (1973) (whereabouts unknown); *United States v. Brandenfels*, 522 F.2d 1259, 1262–1263 (9th Cir. 1975) (missing witness may not be extradited, and if extradited could invoke Fifth Amendment privilege); *United States v. Cawley*, 481 F.2d 702, 705 (5th Cir. 1973) (fugitive); *Powell v. United States*, 420 F.2d 799, 801 (9th Cir. 1969) (immune to process); *cf., e.g., United States v. Bolden*, 169 U.S.App.D.C. 60, 70, 514

F.2d 1301, 1311 (1975) (severance not required where no indication co-defendant would waive Fifth Amendment if defendant tried separately).

125. *See, e.g., Isaacs v. United States*, 159 U.S. 487, 489, 16 S.Ct. 51, 40 L.Ed. 229 (1895) (evidence would have been cumulative); *Crumpton v. United States*, 138 U.S. 361, 364–365, 11 S.Ct. 355, 34 L.Ed. 958 (1891) (testimony "of little importance"); *United States v. Reed, supra* note 124, 155 U.S.App.D.C. at 200 n.1, 476 F.2d at 1147 n.1; *Payton v. United States*, 96 U.S.App.D.C. 1, 3, 222 F.2d 794, 796 (1955) (lack of specificity in proffer); *United States v. Cawley*, 481 F.2d 702, 705 (5th Cir. 1973); *United States v. Harris*, 436 F.2d 775, 776 (9th Cir. 1970).

The Government goes too far in asserting that a movant must show by "affidavit" or "verifiable representation" what the proposed witness would testify to. Govt. br. at 211. When the witness is uncooperative or unavailable, a defendant can do no more than predict what the witness would say if he testified truthfully. *Cf. United States v. White*, 324 F.2d 814 (2d Cir. 1963) (continuance required for defendant to produce Government informer in hopes of substantiating entrapment defense). However, if the defendant is able to produce a "verifiable representation" of what the proposed witness would say, that fact may bear on the district judge's ruling. *Cf. Byrd v. Wainwright*, 428 F.2d 1017 (5th Cir. 1970) (severance required where co-defendant's prior statements indicate he would exonerate defendant if he testified); *United States v. Echeles*, 352 F.2d 892 (7th Cir. 1965) (same).

mine whether the defendant acted with diligence in attempting to secure the missing evidence in time for trial.[126] Finally, the court should consider the length of the continuance being requested and the burdens that would be placed on the Government and the court if the request were granted.[127]

## C. *Application of Law to Facts*

■ In denying the final requests for a continuance,[128] the district judge focused on the delay and burden that would be entailed in securing Nixon's testimony, and on the likelihood that the testimony would be favorable to and significant for appellants' defenses. The court found that securing the testimony would necessitate a lengthy continuance, during which time the jury would have to be sequestered.[129] It concluded that the defendants had failed to justify such a prolonged continuance,[130] and had failed to show, as required by Rule 15,

that a deposition of Nixon was necessary "to prevent a failure of justice."[131]

■ The District Court's exclusive focus on the burdens of a continuance and the likely significance of Nixon's testimony was entirely proper. Appellants were not responsible for Mr. Nixon's absence, and thus could not be taxed for lack of diligence in seeking a continuance. And although there was no guarantee that Nixon would recover his health so as eventually to be able to testify, there was nothing in the medical reports suggesting the contrary. Thus the dispositive question before the District Court was whether the burdens of granting an indefinite continuance outweighed the likely value of Nixon's testimony.

■ The District Court's conclusion that securing Nixon's testimony would have required a lengthy delay is abundantly supported by the record. The court relied on three factors in reaching its conclusion. First, it predicted, based on representations made to it by counsel, that all the evidence

---

126. *See, e.g., Isaacs v. United States, supra* note 125, 159 U.S. at 489, 16 S.Ct. 51; *Crumpton v. United States, supra* note 125, 138 U.S. at 364, 11 S.Ct. 355; *Mahoney v. United States, supra* note 123, 420 F.2d at 255; *Neufield v. United States,* 73 App.D.C. 174, 179, 118 F.2d 375, 380 (1941), *cert. denied, sub nom. Ruben v. United States,* 315 U.S. 798, 62 S.Ct. 580, 86 L.Ed. 1199 (1942).

In *Neufield v. United States, supra,* we stated that these first three factors constituted the "showing" a party seeking a continuance "must make." 73 App.D.C. at 179, 118 F.2d at 380. We do not read *Neufield* as necessarily holding, however, that a party who makes the requisite minimum showing always will be entitled to a continuance regardless of the disruptions that a continuance would cause. And our subsequent decision in *J. E. Hanger, Inc. v. United States,* 81 U.S.App.D.C. 408, 160 F.2d 8 (1947), indicates that sometimes a continuance will be required even absent a specific proffer as to the nature of the missing evidence. *See also* note 125 *supra,* Thus we restate the requirements here as factors bearing on the ultimate question *Neufield* poses: is a continuance "reasonably necessary for a just determination of the cause." 73 App.D.C. at 179, 118 F.2d at 380; *cf. Byrd v. Wainwright,* 428 F.2d 1017, 1019–1020 (5th Cir. 1970) (adopting a similar approach to severances).

127. *Compare, e.g., United States v. Reed, supra* note 124, 155 U.S.App.D.C. at 200 n.1, 476 F.2d at 1147 n.1 (indefinite interruption of trial); and *United States v. Trenary,* 473 F.2d 680, 682

(9th Cir. 1973) (6-month continuance); *with J. E. Hanger, Inc. v. United States, supra* note 126 (2-day continuance); *and Johnson v. Johnson,* 375 F.Supp. 872 (W.D.Mich.1974) (1-day continuance).

128. In rejecting the earlier requests the District Court properly found that there was insufficient reason to believe Nixon would be unable to travel to Washington at any time during the three-month trial. Indeed, as late as October 17 Nixon's counsel was arguing that his client probably would be able to attend. It was only after Nixon's unexpected surgery on October 29, and his even more unexpected reaction to the surgery, that Nixon's health precluded travel. It is well-established that motions for continuance "must be decided by the trial judge in the light of facts then presented and conditions then existing." *Avery v. Alabama,* 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1940); *see Ungar v. Sarafite, supra* note 123, 376 U.S. at 589, 84 S.Ct. 841.

129. *United States v. Mitchell, supra* note 119, 385 F.Supp. at 1192.

130. *Id.* at 1192–1193.

131. *Id.* Because we affirm the court's decision not to grant a continuance, we do not decide whether appellants' showing would have satisfied Rule 15's requirements.

would be presented "well before" January 6th, the "earliest possible date" Nixon would be well enough to begin the deposition;[132] with hindsight, we know that all defendants rested two and one half weeks before January 6th. Second, the court agreed with Nixon's uncontroverted statement that even if he were physically able to be deposed starting January 6th, the deposition still could not commence then because he would need time to review his voluminous records.[133] Finally, the court noted that the deposition process itself would be "very lengthy," since Nixon's health permitted only two hours of questioning per day.[134] Indeed, before learning of these time limitations, Ehrlichman and Haldeman each had estimated independently that deposing Nixon would take "not less than two weeks to conclude." Thus Haldeman's estimate in his final motion for continuance that "a month or more" would be required to secure Nixon's testimony, and the Government's estimate of "at least four or five weeks," seem, if anything, understated.

That granting a continuance of this duration would have entailed significant risks and costs is plain. First, leaving the case in limbo might have made it difficult for the court and the parties opposing the continuance—Mardian and the Government—to carry on their normal business during the continuance. Second, because of the public attention that would have been focused on the adjourned trial (and perhaps on the jurors), and because neither the Government[135] nor co-defendants Mardian and Parkinson had waived their rights to a sequestered jury, the court virtually would

have been compelled to keep the jury sequestered during the continuance.[136] This obviously would have disrupted the lives of the jurors, the alternatives, and their guards, and would have been costly to the Government as well. Third, even with the jury sequestered, the Government and Mardian might have been prevented from receiving a fair trial. The jury might have resented the prolonged period of idleness and consciously or otherwise blamed all the defendants for it, and in any event, after a long delay the evidence would have been less fresh in the jurors' minds during their deliberations. Finally, regardless of prejudice, Mardian had a substantial interest in a quick ending to the cloud of uncertainty that had enveloped him, and the public a similar interest in a speedy resolution of this major trial.

■ The question before us, then, is whether, in light of these costs, the District Court abused its discretion in concluding that appellants had failed to show that Nixon's testimony would be of such importance as to warrant a continuance. After carefully reviewing the proffers of all three appellants, we conclude it did not. We reach this conclusion for three reasons.

First, not only was there no assurance that Nixon's testimony would be favorable to the defense, as the District Court observed,[137] but also, to a great extent, appellants failed to indicate what testimony they hoped to elicit. Appellants' proffers frequently listed topics they wanted Nixon to discuss, without explaining the reasons they wanted him to discuss the topics, i. e., what

132. *Id.* at 1192.

133. *Id.*

134. *Id.*

135. This court has held that sequestration is proper despite a defendant's objection. *Baker v. United States,* 131 U.S.App.D.C. 7, 16–17, 401 F.2d 958, 967–968 (1968). *See also United States v. Holovachka,* 314 F.2d 345, 351–352 (7th Cir.), *cert. denied,* 374 U.S. 809 (1963); *United States v. Isaacs,* 364 F.Supp. 895, 899–900 (N.D.Ill.1972), *conviction affirmed,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). The

reason for this rule is plain; the public, as well as the accused, has a substantial interest in having guilt or innocence decided by a jury free from prejudicial influences.

136. It is axiomatic that the decision to sequester (or unsequester) a jury rests within the trial judge's discretion. *See, e. g., Holt v. United States,* 218 U.S. 245, 250–251, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); *Carter v. United States,* 102 U.S.App.D.C. 227, 231, 252 F.2d 608, 612 (1957).

137. 385 F.Supp. at 1193; *see* note 125 *supra.*

they expected to gain from his testimony on those topics.[138]

Second, Nixon's testimony on many of the topics listed in appellants' proffers would have been cumulative of other evidence which was or could have been produced, as the District Court also noted. In several instances one or more appellants sought Nixon's testimony regarding conversations Nixon had with persons who were neither defendants nor unindicted co-conspirators;[139] in other instances, one appellant sought Nixon's testimony concerning discussions in which other appellants had participated;[140] in still other cases, appellants desired Nixon's testimony about conversations that either were taped or were closely related in time and subject matter to taped conversations.[141] Even where an appellant sought Nixon's testimony relating to an untaped, unique talk between Nixon and that appellant alone, Nixon's testimony still would have been cumulative of the appellant's own testimony, and because Nixon was himself an unindicted co-conspirator the corroborative value of his testimony was at best questionable, as the District Court observed.[142]

Third, Nixon could not have disputed the central propositions in the Government's case, and thus his testimony would have been of marginal significance. The Government's case against the appellants for the most part rested on evidence of their participation in discussions and decisions outside Nixon's presence from January 1972 to March 1973 and on tape recordings of their participation in discussions and decisions within his presence starting in March 1973. Nixon could not have directly contradicted testimony that Mitchell approved the Gemstone plan, see pages ———–——— of 181 U.S.App.D.C., at 51–52 of 559 F.2d supra; suggested that files be burned, id. at ——— of 181 U.S.App.D.C., at 53 of 559 F.2d; participated in the launching of

138. Examples of this abound, and we list just three: (1) Mitchell wanted Nixon's testimony about "[t]he June 20, 1972 telephone conversation between Mr. Mitchell and Mr. Nixon"; (2) Haldeman desired Nixon's testimony regarding "[t]he nature, content and extent of [Nixon's] knowledge of the facts of the Watergate break-in and cover-up and which parts thereof were imparted by him to defendant Haldeman . . . ."; (3) Ehrlichman sought Nixon's testimony as to "[his] reason and motive for including Defendant Ehrlichman in the Helms-Walters meeting of June 23, 1972."

139. For example, Ehrlichman and Haldeman each sought Nixon's testimony concerning conversations he had with Henry Peterson in which Peterson discussed statements made to the U.S. Attorneys by Dean. Similarly, Ehrlichman wanted Nixon to testify about information he received from Attorney General Kleindienst in Aug., Sept., and Dec. 1972 and about a meeting with Kleindienst on March 31, 1973. (Interestingly, when Kleindienst testified Ehrlichman did not question him about any of these discussions.)

140. For example, Haldeman and Ehrlichman both desired Nixon's testimony regarding a conversation involving the three of them prior to the LaCosta meeting (see Part I–E supra) discussing its purposes, and regarding conversations involving one or both of them after LaCosta concerning the results. Not only did Haldeman and Ehrlichman agree as to the purposes, but so too did Dean. See Tr. 3019 ("dis-cussions about how to deal with the Senate Watergate Committee").

141. For example, Mitchell sought Nixon's testimony regarding a taped meeting with the President on March 22, 1973. Haldeman wanted Nixon's testimony regarding "any conversations" between the two of them relating to employment for Magruder and Bart Porter, and any mention of perjury in such conversations; one such conversation, a highly incriminating one, was included on the tape of a March 22 meeting. Govt. Ex. 15, Tape Tr. 257–258. Ehrlichman wanted Nixon to verify Ehrlichman's claim that he urged a course of full disclosure upon Nixon. Ehrlichman testified at trial, however, that he was "perfectly willing to stand on the record of these tapes where time after time I am advocating a full disclosure." Tr. 10, 242.

142. 385 F.Supp. at 1193. It also should be observed that in several instances Nixon's testimony would have been cumulative of documentary evidence that was available. For example, Ehrlichman wanted Nixon to testify that Ehrlichman was not informed of the Nixon-Haldeman discussion regarding the CIA on June 23 prior to the Haldeman-Ehrlichman meeting with General Walters that same day. But Nixon's daily diary and Ehrlichman's log were also available to prove that Ehrlichman did not meet with Nixon between the two meetings, and only Haldeman could have testified as to whether he informed Ehrlichman about his conversation with the President.

the cover story and the knowing payment of hush money, *id.* at ——–——, —— of 181 U.S.App.D.C., at 54–57, 58 of 559 F.2d; and suggested that McCord be given veiled assurances of clemency, *id.* at —— of 181 U.S.App.D.C., at 56 of 559 F.2d. Nor could Nixon have contradicted the testimony that Haldeman was informed of the Gemstone plan before it was launched, and that both Ehrlichman and Haldeman were informed of the responsibility of CRP for the Watergate burglary shortly after it occurred, *id.* at —— – —— of 181 U.S.App.D.C., at 52–53 of 559 F.2d; that they each ordered that files be destroyed, *id.* at —— of 181 U.S.App.D.C., at 53 of 559 F.2d; each used the CIA to stall the FBI investigation, *id.* at ——–—— of 181 U.S.App.D.C., 53–54 of 559 F.2d n. 15; and each participated in the decision to raise and distribute hush money, *id.* at —— – ——, ——–—— of 181 U.S.App.D.C., at 55–57, 58 of 559 F.2d. Nixon could not even have impeached indirectly the credibility of the Government's key witnesses since Magruder and LaRue did not testify to any conversations with Nixon, and most if not all the conversations with Nixon that Dean testified about were taped. And of course Nixon could not have disproved what the tapes revealed. Thus Nixon's testimony would have been collateral to the essence of the defense cases, which consisted of denials of the Dean, Magruder, and LaRue testimony.

The limited significance of Nixon's testimony is clearly revealed by those portions of appellants' proffers that are specific. Because of the large number of topics listed on the proffers, we discuss only general problems with illustrative examples.

(a) In a few instances a topic listed on one of the proffers does not even appear relevant, let alone significant, to the issues involved in the trial. For example, Ehrlichman indicated he wanted Nixon to testify that Ehrlichman had urged the President in 1972 to discontinue prosecution of Daniel Ellsberg, and that Nixon had directed Ehrlichman in April 1973 to meet with the judge presiding over the Ellsberg trial. The proffer does not indicate why such testimony would be relevant, and Ehrlichman did not testify about these matters when he was on the witness stand.

(b) In a great number of instances Nixon's testimony was desired to establish a point not in contention. For example, Mitchell indicated he wanted Nixon to testify that "matters discussed by Mr. Nixon with Mr. Colson"—presumably relating to clemency—and "matters discussed with Messrs. Dean, Haldeman and Ehrlichman on March 21, 1973"—presumably relating to the payment of hush money—were not "conveyed by Mr. Nixon to Mr. Mitchell." But the Government never claimed otherwise. Rather, it showed that Mitchell was made aware by *Dean* that veiled assurances of clemency had been given to Hunt, *see* Tr. 2992–2993, 2998–2999, and by *Dean and LaRue* of Hunt's March, 1973 money demands, Tr. 3086–3090, 6728–6732. That Mitchell may not have been informed of the details of Nixon's conversations is of little consequence.

(c) In largest measure, appellants sought Nixon's testimony to provide indirect support to their defenses. For example, Haldeman and Ehrlichman each indicated they wanted Nixon to testify that he instructed them to speak to Dean about the Nixon Estate plan in June, 1972; not to make offers of clemency or to limit the FBI investigation; not to spend time on Watergate; and to meet at LaCosta to discuss strategy regarding the Senate Watergate Committee. Again, the Government did not contend that contrary instructions had been given. But Haldeman and Ehrlichman apparently desired this testimony in the hope that the jury would infer that they talked to Dean only about the Nixon Estate in June 1972, talked only about the Watergate Committee at LaCosta, and did not violate Nixon's instructions regarding work on Watergate, clemency, or the FBI. The weakness of these inferences is patent.

In sum, we conclude that the District Court did not abuse its discretion in denying the requested continuance. According-

ly its decision on this point must be affirmed.

## VII. EVIDENCE OF THE ELLSBERG BREAK-IN AND EHRLICHMAN'S INVOLVEMENT

· Both Ehrlichman and Haldeman contend that the trial court committed error in allowing the Government to introduce evidence that Ehrlichman had authorized an illegal break-in at the offices of Dr. Lewis J. Fielding, a Beverly Hills psychiatrist, for the purpose of examining the psychiatric records of one of his patients, Daniel Ellsberg, who had misused some classified defense documents.[143] The warrantless entry was carried out by some of the persons who were later involved in the Watergate break-in.[144]

### A. The Claim of Prejudice

Objection was made to the introduction of evidence of the Ellsberg break-in on the ground that the prejudice engendered by the admission into evidence of such prior acts of criminal misconduct outweighed their legitimate probative value. Ehrlichman br. at 45–53a; Haldeman br. at 4. Rejecting this objection, the court admitted the evidence as being probative of motive. The Government now contends it was properly admitted on two grounds:

(1) to show a central motive for the conspiracy by proving the occurrence of activity the conspirators desperately wanted to conceal, and (2) to explain the background and meaning of Hunt's threats to expose the "seamy things" he had done for the White House if his money demands were not met.

Govt. br. at 222. As Mr. James Neal, the Government prosecutor, explained to the court in arguing for the admission of the evidence in question:

MR. NEAL: Your Honor, we say the purpose of the conspiracy was to conceal those involved in the planning and implementation of the break-in as well as other matters.

Now, our contention and theory in this case—and we will put on proof this was one of the reasons for covering up—was that if they really got into this matter, if the investigation of the planning and implementation of the break-in was explored and divulged, it would lead them to the operations of Hunt and Liddy and others with respect to the Ellsberg affair.

Tr. 2298–2299.

▇ The general rule in this country is that evidence of other crimes is admissible to show, *inter alia*, motive, so long as its probative value outweighs its prejudicial effect.[145] As Dean Wigmore pointed out, this

---

**143.** *See generally United States v. Ehrlichman, supra* note 17.

**144.** The operation was carried out by Bernard Barker, Eugenio Martinez, and Felipe DeDiego, under the supervision of E. Howard Hunt and G. Gordon Liddy.

**145.** McCormick on Evidence § 190 (E. Cleary 2d ed. 1972); 1 Wharton's Criminal Evidence § 247 (C. Torcia 13th ed. 1972); 1, 2 J. Wigmore Evidence §§ 216, 389 (3d ed. 1940); *cf. Anderson v. United States,* 417 U.S. 211, 221, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *Nye & Nissen v. United States,* 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949); Fed.R.Evid. 403, 404(b). In our own circuit, the rule is established beyond argument. *See Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964). *Accord, United States v. Greene,* 160 U.S.App.D.C. 21, 35, 489 F.2d 1145, 1159 (1973), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974); *United States v. Fench,* 152 U.S.App.D.C. 325, 331, 470 F.2d 1234, 1240

(1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973); *Robinson v. United States,* 148 U.S.App.D.C. 58, 67 & n. 63, 459 F.2d 847, 856 & n. 63 (1973); *United States v. Bobbitt,* 146 U.S.App.D.C. 224, 450 F.2d 685, 688 (1971); *Bradley v. United States,* 140 U.S. App.D.C. 7, 13, 433 F.2d 1113, 1119 (1969); *Bracey v. United States,* 79 U.S.App.D.C. 23, 25–26 & n. 9, 142 F.2d 85, 87–88 & n. 9, *cert. denied,* 322 U.S. 762, 64 S.Ct. 1274, 88 L.Ed. 1589 (1944); *Borum v. United States,* 61 App. D.C. 4, 6, 56 F.2d 301, 303, *cert. denied,* 285 U.S. 555, 52 S.Ct. 459, 76 L.Ed. 944 (1932); *Eagles v. United States,* 58 App.D.C. 122, 124, 25 F.2d 546, 548, *cert. denied,* 277 U.S. 609, 48 S.Ct. 603, 72 L.Ed. 1013 (1928); *McHenry v. United States,* 51 App.D.C. 119, 124–125, 276 F. 761, 766–767 (1921); *Miller v. United States,* 41 App.D.C. 52, 66, *cert. denied,* 231 U.S. 755, 34 S.Ct. 323, 58 L.Ed. 468 (1913); *Ryan v. United States,* 26 App.D.C. 74, 83 (1905).

is basically a question of relevancy,[146] and "the fact that the circumstance offered also involves *another crime* by the defendant charged is in itself no objection, if the circumstance is relevant [to show motive]." [147] We do not understand Haldeman and Ehrlichman to challenge this statement of the law; rather, as we have noted above, they argue that "[w]hen balanced against the lengthy, inflammatory evidence of Ehrlichman's involvement in the Ellsberg matter * * * the probative value of this prior criminal activity was outweighed by the prejudice which it caused to Mr. Ehrlichman's defense." Ehrlichman br. at 50. Having reviewed the facts carefully, we disagree and find the balance to lie clearly in favor of the probative value of the evidence with only minimal danger of improper prejudice.

Appellants list four factors which, they contend, made this evidence unduly prejudicial and therefore inadmissible: (1) the "tenuous" connection between the Ellsberg affair and the Watergate cover-up; [148] (2) the adduction of "a large quantum of evidence which went to the very heart of Mr. Ehrlichman's conviction in the 'Plumber's Trial' "; [149] (3) the introduction and reading of an August 11, 1971, memorandum from David Young and Egil Krogh to Ehrlichman which bore Ehrlichman's initialed approval of a proposed "covert operation * * * to examine all the medical files still held by Ellsberg's psychoanalyst * * * "; [150] and (4) the fact that the prior crime was mentioned in the Government's opening statement, contrary to *United States v. Bailey,* 164 U.S.App.D.C. 310, 505

F.2d 417 (1974), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975).

### B. *Application of the Governing Principles*

As regards the first source of claimed prejudice, the "tenuous" connection between the Ellsberg-Fielding break-in and the Watergate cover-up, we find evidence introduced at the instant trial which could well have allowed the jury to find a definite link between the two events. It could be concluded from the Hunt Memorandum, Tr. 7554–58, and the payment of money thereafter that concealing responsibility for the Ellsberg break-in was part of the motivation for the payment of money to those involved in Watergate.[151] The desire on the part of appellants to conceal the Ellsberg break-in was clearly indicative of a motive to conceal the identities of higher-ups involved in the Watergate break-in as charged in Count 1, paragraph 11 of the indictment [152] because some of those who participated in the former operation were also in the latter and any reasonable person would suspect that if the names of the participants in either venture were discovered, such fact might lead investigators to the identities of those persons participating in the planning, execution, or concealment of the other crime.

Evidence of the Ellsberg-Fielding break-in also casts light upon the meaning of Hunt's threat to reveal the "seamy things" he had done for the White House if he were not paid certain sums of money. This incident came about during Hunt's conversation with co-conspirator Colson, which was

146. 1 J. Wigmore, *supra* note 145, at § 216.

147. 2 J. Wigmore, *supra* note 145, at § 389 (emphasis original).

148. Ehrlichman br. at 46.

149. *Id.* at 51. The "Plumber's Trial" reference is to *United States v. Ehrlichman, supra* note 17.

150. Govt. br. at 12 in *United States v. Ehrlichman, supra* note 17.

151. This memorandum, which was read to the jury at Tr. 7552–7560, was given by E. Howard

Hunt to his attorney, to be delivered to Kenneth Parkinson. In it, Hunt reminded the Administration of its "commitments" for "financial support" and made lightly veiled threats of disclosure if "all past and current financial requirements" were not met by a specified date.

152. The Government's Bill of Particulars, ¶ B(1) (filed July 5, 1974), defined "other illegal and improper activities" in ¶ 11(C) of the indictment on Count 1, J.A. 116, to include *inter alia,* "the burglary of the offices of Dr. Louis J. Fielding." J.A. 353.

generally referred to in Overt Act 22 of the indictment.

In addition, the evidence of Ehrlichman's connection to the Ellsberg break-in was also probative on the issue of whether he had consistently urged full disclosure about Watergate as he contended.[153] Thus, far from requiring the jury "to reach highly speculative inferential and deductive conclusions," Ehrlichman br. at 46, the Ellsberg-Fielding break-in evidence was tied directly to the Watergate cover-up by the statements and defenses—which were placed before the jury—of the co-conspirators themselves.

■ Second, Ehrlichman asserts that the prosecution presented an "avalanche" of evidence concerning the Ellsberg operation which in effect resulted in his retrial and reconviction on the Ellsberg charges.[154] We find such allegations to be a very substantial overstatement of the record. Actually the testimony concerning the Ellsberg matter was rather limited. It was confined to two Government witnesses, Hunt and Krogh. Hunt answered only four questions which referred to the surreptitious entry at Dr. Fielding's office, and at no time mentioned Ehrlichman. Krogh's direct testimony was relatively minimal, Tr. 7653–7681, with only a part referring to the Special Investigations Unit and the Ellsberg matter. Furthermore, the testimony only went to Ehrlichman's connection with the event and did not concern Ehrlichman's conviction of a crime in connection therewith.[155] It is also noteworthy that appellants did not request a limiting instruction and objected to

the court giving the cautionary instruction suggested by the Government. Tr. 7745–7747, 7847, 7863–7870. See 1 J. Wigmore, Evidence § 216 (3d ed. 1940).

■ Third, we find no impropriety in the introduction and reading of the August 11 memorandum from Krogh to Ehrlichman to the jury. Tr. 7668–7672. Given that there was evidence linking the Ellsberg-Fielding break-in to the Watergate cover-up, it was certainly appropriate to introduce the one piece of documentary evidence which clearly tied Ehrlichman, who was accused of the cover-up, to the California break-in. It is exactly because the memorandum "went to the very heart of the Government's [Ellsberg break-in] case and was one of the principal instruments employed to bring about Mr. Ehrlichman's conviction," Ehrlichman br. at 53, that its use was so apposite. The alternative would have been the use of more speculative and less probative evidence which would undoubtedly have prejudiced appellants far more.

■ Finally, we reject the argument that our holding in Bailey, supra, was violated.[156] Here, unlike Bailey, both the court and the defendants were warned in advance by Count 1, paragraph 13 of the indictment and paragraph B(1) of the Bill of Particulars[157] and the Government's Trial Memorandum[158] that this evidence would be offered. In fact, prior to the opening statement, Ehrlichman did object on double jeopardy grounds to the use of the Ellsberg break-in evidence, and this objection was denied.[159] Moreover, even if reference in

---

**153.** Tr. 2454.

**154.** Ehrlichman br. at 49, 45–53a. Ehrlichman's claim of double jeopardy was denied by the trial judge. Tr. 374.

**155.** Ehrlichman's counsel himself made or elicited several references to the Ellsberg break-in trial during his cross-examination of Krogh. Tr. 7783, 7784, 7804.
Ehrlichman did not deny that he approved the Ellsberg operation or that he was aware of it immediately after it occurred. Tr. 10059, 10070. He denied authorizing a "burglary" and introduced evidence that the participants believed it to be justified on national security

grounds. Tr. 2455, 7598–7599, 7603, 7722, 7749–7753, 7758–7759, 7764–7765, 9949–9967.

**156.** It cannot be contended that the prosecutor disregarded established precedent in including a reference to the Ellsberg break-in in his opening statement of October 14, 1974, since Bailey was not decided until October 17, 1974.

**157.** See note 152 supra.

**158.** Govt. Trial Memorandum 3, 14 (filed Oct. 16, 1974).

**159.** See note 154 supra.

the opening statement to the evidence would be held to be improper, the error would be harmless here because, as we have observed above, in this case the evidence was admissible. "[L]ater government efforts to introduce evidence of the prior offenses" were *not* "unavailing" in this case. *Bailey, supra,* 164 U.S.App.D.C. at 313, 505 F.2d at 420. No harm was thus done to appellants by its inclusion in the opening remarks, even if *Bailey* could be read to bar such mention.

■ We therefore conclude that the probative value of the Ellsberg-Fielding break-in evidence far outweighed its prejudicial effect,[160] and we hold that evidence of

Ehrlichman's relation to that venture was properly admitted into evidence.

## VIII. USE OF MITCHELL'S TESTIMONY BEFORE CONGRESSIONAL COMMITTEES

Appellant Mitchell contends that the trial court committed constitutional error in permitting the Special Prosecutor to use testimony given by Mitchell under subpoena to the Senate Select Committee in July, 1973 and to the House Judiciary Committee in July, 1974. Mitchell objects to the use of this testimony as a basis for the charge of perjury to the Senate Committee contained in Count 6 and in cross-examination on critical aspects of the other charges.[161]

**160.** We reject the argument of Ehrlichman that he was "forced * * * to abandon his character witness testimony" because the Government threatened "to ask these witnesses if they had heard that Mr. Ehrlichman was charged with [the Ellsberg break-in]." Ehrlichman br. at 45 n.6a. This statement is inaccurate in several respects. First, the crime on which the prosecution sought to question Ehrlichman's witnesses was *perjury*, and not the conspiracy to violate Dr. Fielding's civil rights. Although the Government's initial request to the judge, Tr. 9317–9322, was unclear on this point, the court's ruling is unambiguous. Tr. 10297–10299. Second, it was his conviction, rather than his indictment, which the prosecution sought to raise. *See, e. g.,* Tr. 9319. Third, the "threat" which Ehrlichman complains of was in fact a request to the trial judge to rule in advance on the propriety of asking future character witnesses about this conviction. Such a request is a legitimate trial tactic which avoids the possibility of improperly and irretrievably presenting prejudicial matter to the jury before the judge has a chance to rule on its admissibility.

When a character witness is offered by the accused, he becomes subject to cross-examination as to his testimonial qualifications. The probe on cross-examination may extend to those matters, among others, which legitimately affect the witness' knowledge of the accused's community reputation for the character trait or traits which he confirms. Accordingly, it is well settled . . . that it may become appropriate on cross-examination to ask a good-character witness whether he has heard reports of particular events, *including prior convictions* or arrests of the accused, which are inconsistent with the reputation to which he has testified.

*United States v. Lewis,* 157 U.S.App.D.C. 43, 49, 482 F.2d 632, 638 (1973) (footnote eliminated, emphasis added). *See also Michelson v.*

*United States,* 335 U.S. 469, 483, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Annots., 47 A.L.R.2d 1258 (1956), 71 A.L.R. 1504 (1931); 3A J. Wigmore, Evidence § 988, at 913–20 n.1 (Chadbourn rev. ed. 1970). *Cf.* Fed.R.Evid. 405(a). Here there can be no question that Ehrlichman's conviction on perjury charges has a direct bearing on "the reputation asserted," *Michelson, supra* at 484, *Lewis, supra,* 157 U.S.App.D.C. at 50, 482 F.2d at 639, which was Ehrlichman's reputation for truth and veracity. Tr. 9316. Also, the character witness' knowledge of this conviction would certainly be a valid test of his testimonial qualifications—*i. e.,* his actual knowledge of Ehrlichman's reputation in the community. *Lewis, supra,* 157 U.S.App.D.C. at 49, 482 F.2d at 638; 3A J. Wigmore, *supra* § 988, at 912.

We are confirmed in our view that the trial judge acted properly here by the fact that his ruling shows a great concern for limiting any possible prejudice to Ehrlichman from the Government's attempt at impeachment of his character witnesses. *Cf. Lewis, supra,* 157 U.S.App.D.C. at 50, 482 F.2d at 639. In his ruling the judge required the character witness to be initially questioned on this point *out of the jury's presence* to insure that the jury would not learn of Ehrlichman's conviction on the perjury charge through an inadvertent or imprecise answer. Tr. 10298. Thus it appears that appellants were given every indulgence short of denying the prosecution an established procedure, and we find no cause for complaint.

**161.** Mitchell's prior testimony appears in Hearings on S.Res. 60 Before the Senate Select Committee on Presidential Campaign Activities, 93rd Cong., 1st Sess., Bk. 4, at 1601–1681; Bk. 5, at 1816–1936 (1973); Hearings on H.Res. 803 Before the House Committee on the Judiciary, 93d Cong., 2d Sess., Bk. 2, at 113–217 (1974). *See* Mitchell br. 12–45, 54–55.

The Government also introduced portions of Mitchell's congressional testimony as part of

■ Appellant argues that since he was subpoenaed after the Special Prosecutor had targeted him as a "potential defendant," and even after he was indicted in the case of the House Judiciary Committee, he was a "virtual" or "putative" defendant with an "absolute right to stand mute." Faced with the Hobson's choice of answering committee questions or stating (on national television) that his answers would tend to incriminate him, Mitchell charges he was perforce "compelled" to answer the committees' questions, and the use of this testimony at his trial violated his Fifth Amendment privilege not to "be compelled in any criminal case to be a witness against himself." [162] We reject Mitchell's contention.

1. Mitchell relies principally on *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and several cases in the lower courts extending the safeguards of *Miranda* to putative defendants called before the grand jury,[163] as recognizing a right "to invoke silence" which "serves to protect persons in all settings in which their freedom is curtailed in any significant way from being compelled to incriminate themselves." [164]

■ a. The *Miranda* warnings were developed in response to the compulsion believed inherent in police custodial interro-

gation. The Supreme Court has yet to decide whether they extend to the context of a grand jury inquiry. Four Justices in *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), deemed the transplanting of the *Miranda* warnings from the original context of "extra-judicial confessions or admissions procured in a hostile, unfamiliar environment which lacked procedural safeguards" to the "wholly different" context of "questioning before a grand jury inquiring into criminal activity under the guidance of a judge," to be "an extravagant expansion never remotely contemplated by this Court in *Miranda* * *." 425 U.S. at 579, 580, 96 S.Ct. at 1778. Earlier, in *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), a unanimous Court declined to require that *Miranda* warnings be given in a noncustodial criminal tax investigation even though the "focus" of the investigation was on the taxpayer when he was interviewed. The Court made clear that "it was the *custodial* nature of the interrogation which triggered the necessity for adherence in the specific requirements of its *Miranda* holding," and that a person does not become the "focus" of a criminal investigation for purposes of triggering *Miranda* until he " 'has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " 425 U.S. at 347, 96 S.Ct. at 1616.[165]

its direct case on Counts 4 and 5 (perjury to the grand jury) and Counts 1 and 2 (conspiracy and obstruction of justice) on the theory that they constituted admissions, *see* Tr. 7159–7165, 7166–7170B, 7192–7195. Mitchell makes no challenge to this use of his prior testimony, *see* Mitchell br. 54–55, and indeed relied, in his argument to the jury, on his testimony before the Senate Committee to show that he had not testified falsely before the grand jury, Tr. 11965.

162. Although no specific objection was raised during the trial on this ground, Mitchell's motion to dismiss the indictment, filed May 1, 1974, charged that he "was denied fundamental fairness and due process by being compelled to testify before the Senate Committee at a time when he was a putative defendant in this case." J.A. 267. We take it that the trial court intended to reject Mitchell's contention outright, and that he was not required to take further procedural steps to keep his contention alive—at least in the absence of any indication

by the trial judge that the denial of the motion was without prejudice, and required further procedures. This is a contention that defendant was subject to compulsion in violation of the Fifth Amendment, and denial should not lightly be put on purely procedural grounds.

163. *United States v. Mandujano*, 496 F.2d 1050 (5th Cir. 1974), *rev'd on other grounds*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); *United States v. Rangel*, 496 F.2d 1059 (5th Cir. 1974); *United States v. Rose Wong*, 553 F.2d 576 (9th Cir. 1974), *cert. granted*, 426 U.S. 905, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976); *United States v. Washington*, 328 A.2d 98 (D.C.App. 1974), *cert. granted*, No. 74–1106, 426 U.S. 905, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976).

164. Mitchell br. at 37.

165. *Quoting Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The requisite "custody" may be accomplished out-

b. Assuming *arguendo* that a putative defendant called before the grand jury may stand mute and refuse to answer questions put to him without invoking the stated ground of self-incrimination, and that this rationale applies to the legislative committee context,[166] we find the trial court did not err in permitting the Special Prosecutor to use Mitchell's testimony. The perjury charge in Count 6 was based on Mitchell's Senate Committee testimony that there was neither discussion nor instruction concerning destruction of the "Gemstone file" at a June 19, 1972 meeting in his apartment. The Supreme Court was unanimous in *Mandujano* that the Fifth Amendment privilege provides no protection for the commission of perjury,[167] at least where the false answers could not be said to have been procured by Government tactics or procedures so inherently unfair as to violate due process. While not expressly on point, *Mandujano* states a principle that would authorize the Special Prosecutor's use of Mitchell's testimony in impeachment by contradiction. Such impeachment is also sanctioned by *Harris v. New York*, 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *Oregon v. Hass*, 420 U.S. 714, 722, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975): "[T]he shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." *Mandujano*, 425 U.S. at 583, 96 S.Ct. at 1780, *quoting Oregon v. Hass, supra*, 420 U.S. at 723, 95 S.Ct. 1215.

c. Seeking to avoid the impact of these rulings, Mitchell argues that in both cases the Court specifically found that the confessions used for impeachment purposes were neither involuntary nor coerced,[168] and claims "Mitchell's statements before the congressional committees, after his right of silence had been asserted and wrongfully denied, 'cannot be other than the product of compulsion.'"[169] As *Hass* makes clear, the Court's references to "coerced" or "involuntary" confessions are to the voluntariness standard of the pre-*Miranda* cases, which excluded confessions or statements induced by police behavior so egregious as "to overbear petitioner's will to resist and bring about confessions not freely self-determined * * *."[170] In *Hass* the police had given the required warnings but continued questioning notwithstanding the suspect's request to telephone his lawyer. Justice Blackmun, writing for the Court, found that the pressure on the suspect "was no greater than that on any person in like custody or under inquiry by any investigating officer," and that questions of police abuse, coercion or duress are to be "meas-

---

side of the police station context. *See Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

**166.** But there are critical differences between the grand jury and legislative committee contexts. *See* discussion pp. ———— of 181 U.S.App.D.C., pp. 95–96 of 559 F.2d *infra*.

**167.** The Court cited *United States v. Knox*, 396 U.S. 77, 82, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); *Bryson v. United States*, 396 U.S. 64, 72, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969); *Glickstein v. United States*, 222 U.S. 139, 142, 32 S.Ct. 71, 56 L.Ed. 128 (1911).

**168.** *Harris v. New York*, 401 U.S. 222, 224, 91 S.Ct. 643 (1971); *Oregon v. Hass*, 420 U.S. 714, 722–723, 95 S.Ct. 1215 (1975).

Professors Dershowitz and Ely dispute Chief Justice Burger's finding in *Harris* that "[p]etitioner makes no claim that the statements made to the police were coerced or involuntary." *See Harris v. New York: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority*, 80 Yale L.J. 1198, 1201–1208 (1971).

**169.** Mitchell br. 53 n.33.

**170.** *See Rogers v. Richmond*, 365 U.S. 534, 540–541, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961); *Jackson v. Denno*, 378 U.S. 362, 376–377, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Davis v. North Carolina*, 384 U.S. 737, 740–742, 86 S.Ct. 1344, 16 L.Ed.2d 360 (1966). *See also Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

ured by the traditional standards for evaluating voluntariness and trustworthiness."[171]

■ Mitchell's "dilemma" simply does not fit the pre-*Miranda* "coerced confession" rulings. Mitchell was represented by counsel throughout the proceedings. He was not subjected to any physical ordeal. The hearings were held in public. The inquiring congressmen repeatedly indicated that they would abandon any question that met with invocation of the self-incrimination privilege. The House Judiciary Committee informed Mitchell in advance that his appearance would not be required if he announced an intention to rely on the Fifth Amendment. There was absolutely no effort made to overcome Mitchell's will and produce statements not "freely self-determined."

2. We have met Mitchell on his home ground, pointing out that even if his Fifth Amendment rights had been violated by the Committee's questioning it was permissible to use his non-coerced testimony in the perjury count and for impeachment purposes.

But we would not want in such an important case to leave the implication that we accept Mitchell's claim that the Self-Incrimination Clause embodies an absolute right of silence. Appellant has mistaken what is a narrow exception, born of very special circumstances, for the general rule.

■ a. Mitchell was merely required to follow the usual path for asserting the privilege against self-incrimination. Generally the privilege must be claimed to be respected. The reason for this is that government acting within its proper sphere and by proper process—Mitchell does not argue that the committees were acting otherwise—has a right to everyone's testimony, and that the Fifth Amendment privilege "addresses only a relatively narrow scope of inquiries," which the individual being questioned is in the best position to identify. "Unless a witness objects a government ordinarily may assume that its compulsory processes are not eliciting testimony that he deems to be incriminating. Only the witness knows whether the apparently innocent disclosure sought may incriminate him, and the burden appropriately lies with him to make timely assertion of the privilege. If, instead, he discloses the information sought, any incriminations properly are viewed as not compelled." *Garner v. United States*, 424 U.S. 648, 655, 96 S.Ct. 1178, 1183, 47 L.Ed.2d 370 (1976). *See also United States v. Monia*, 317 U.S. 424, 439–442, 63 S.Ct. 409, 87 L.Ed. 376 (1943) (Frankfurter, J., dissenting).

This principle, often stated by the Court, and the operative principle of many decisions,[172] was squarely decided in *United States v. Kordel*, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970). A unanimous Court held that an individual under compulsion to make disclosures as a witness in a civil case brought by the Government, while at the same time the target of a pending criminal investigation, lost the benefit of the privilege when he revealed information without claiming the privilege. Justice Stewart pointed out that the individual answered the interrogatories in the civil case while represented by counsel. "His failure at any time to assert the constitutional privilege leaves him in no position to complain now that he was compelled to give testimony against himself." *Id.* at 9–10, 90 S.Ct. at 768.

b. The general rule is subject to a few narrowly delineated exceptions where the privilege against self-incrimination need

---

**171.** 420 U.S. at 722–723, 95 S.Ct. at 1221. *See also Beckwith v. United States*, 425 U.S. 341, 345–347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), where the Court cites "coerced confession" cases to illustrate that in some situations noncustodial interrogation may yield inadmissible evidence.

**172.** *See, e. g., Quinn v. United States*, 349 U.S. 155, 164–165, 75 S.Ct. 668, 674, 99 L.Ed. 964 (1955) ("If the witness unequivocally and intel-

ligently waives any objection based on the Self-Incrimination Clause, or if the witness refuses a committee request to state whether he relies on the Self-Incrimination Clause, he cannot later invoke its protection in a prosecution for contempt for refusing to answer that question"); and cases cited in *Garner v. United States*, 424 U.S. 648, 653, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976).

not be expressly claimed, and where there is a right of silence. These exceptions are simply not applicable to Mitchell's case. The exceptions fall into essentially two categories.

■ The first category of exception is exemplified by the *Miranda* decision, involving situations so rife with coercion as to "deny an individual the ability freely to choose to remain silent" and where "the inquiring government is acutely aware of the potentially incriminatory nature of the disclosures sought." [173] The *Miranda* safeguards were promulgated as a prophylactic measure for an inherently coercive situation altogether lacking in procedural niceties, poles apart from proceedings "in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." [174]

We are not called upon to anticipate whether in the review already granted the Supreme Court will affirm lower court rulings extending *Miranda* to the grand jury situation. These rulings are based on the premise that there is coercion in the grand jury situation, not overcome by the judicial supervision available, since the witness under subpoena obligation may not be aware that he is a potential defendant, and therefore not on alert to avoid incriminating disclosures, and he does not have a lawyer at his side during the questioning. [175] The image of a trap for the unwary underlies the Ninth Circuit's view: "The imposing ex parte nature of grand jury inquisitions, coupled with the predicable ignorance of many lay witnesses about the intricacies of the privilege against self-incrimination, creates a foreseeable probability that the witness will subject himself to criminal liability." [176] However the Supreme Court may rule on the grand jury issue, Mitchell's case is not comparable. Mitchell had counsel by his side at all times, knew he was a potential defendant, was appreciative of the consequences of his actions, and could have readily asserted the privilege if he so wished.

■ The purpose of the grand jury inquiry is to obtain information about criminal activities in order to determine whether to return an indictment and launch a criminal proceeding. Although the grand jury's focus may extend beyond the particular witness, it has been found "smack[ing] of entrapment" to "bait" a witness already suspected of being guilty of a precise offense into either committing perjury or offering incriminating testimony. [177] By contrast, the congressional committees subpoenaed Mitchell for purposes independent of the criminal proceedings that were the bailiwick of the Special Prosecutor. The committee's purpose was to expose the workings of an unprecedented national scandal

173. *Garner v. United States, supra* note 172, 424 U.S. at 657, 96 S.Ct. at 1184.

174. *Miranda v. Arizona, supra* note 165, 384 U.S. at 461, 86 S.Ct. at 1621:

An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.

As examples of such "official investigations," the Court cited two cases dealing with a congressional investigation and an administrative agency hearing. *Id.* n. 30, *citing Quinn v. United States,* 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964 (1955); *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896).

175. *See United States v. Washington, supra* note 163, 328 A.2d at 100; *United States v. Rose Wong, supra* note 163, 553 F.2d at 576.

We note that the Constitutional Rights Subcommittee of the Senate Judiciary Committee has scheduled hearings on grand jury reform. Before the Subcommittee is S. 3274, a bill introduced by Senators Abourezk, Gravel, and McGovern, which includes provisions requiring notice to grand jury witnesses when they are potential defendants, relief from compelled appearance absent a grant of immunity upon advance written notice that the Fifth Amendment privilege will be claimed, and the right to counsel in the grand jury room.

176. *United States v. Rose Wong, supra* note 163, 553 F.2d 576.

177. *See United States v. Mandujano, supra* note 163, 496 F.2d at 1055, 1056–1057, 1058.

as a basis for proposing corrective legislation, and in the case of the House Judiciary Committee to decide whether to return a bill of impeachment against former President Nixon. They had a right to Mitchell's testimony, except where by timely and explicit interposition of the self-incrimination privilege Mitchell identified potentially incriminating matters and gave the committees the opportunity to proceed further with their inquiry by conferring immunity from use in a subsequent criminal proceeding. This is the process contemplated by the Fifth Amendment for asserting the privilege in the course of investigations of official misconduct.[178]

■■■ c. The second exception from the general rule requiring assertion of the privilege involves situations where the very invocation of the privilege is likely to result in criminal sanctions. We do not require the defendant in a criminal trial to take the stand and assert the privilege in open court, and indeed we do not permit comment on the failure to testify in one's own defense,[179] because of the likelihood that the jury will infer guilt from the mere assertion of the constitutional privilege.[180] Indeed, the fear of "disproportionate impact" on the jury has led us to extend this principle to a non-party witness who indicates his intention to invoke the privilege, irrespective of whether his testimony would be favorable to the defense or the

prosecution.[181] Another line of cases involves gambling excise tax and reporting measures, where the Supreme Court has held that the privilege could be exercised by simply failing to make the required disclosures. The Court reasoned that because of the pervasive criminal regulation of gambling activities, and the fact that the taxes and disclosures were required only of gamblers, a group "inherently suspect of criminal activities," disclosures made in connection with the taxes were likely to result in criminal sanctions, and assertion of the privilege would not remove the compulsion as it would identify the claimant as a gambler.[182]

Mitchell cannot claim to have been under a similar compulsion to forego assertion of the privilege. While his assertion might lead to public speculation or opprobrium, the public would not be in a position to impose or precipitate criminal sanctions, and hence failure to assert the privilege is not justified in law.[183] The courts would always be open to hear the contention that the consequence of a publicized assertion of the privilege was pretrial publicity so pervasive and so harmful as to prevent a fair trial at the time and in the place at which he was tried.[184] This issue is considered in Part II of our opinion.

It is only in the exceptional case that the privilege can be relied upon without claim-

---

178. *Compare Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); *Gardner v. Broderick,* 392 U.S. 273, 278, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

179. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

180. *In re Liddy,* 165 U.S.App.D.C. 254, 260 n. 29, 506 F.2d 1293, 1299 n. 29 (*en banc* 1974), *quoting United States v. Scully,* 225 F.2d 113, 115–116 (2d Cir.), *cert. denied,* 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955). *See* 8 Wigmore, Evidence § 2268, at 407–08 (McNaughton rev. 1961); McCormick on Evidence § 130, at 272 (2d ed. 1972).

181. *Bowles v. United States,* 142 U.S.App.D.C. 26, 31–32, 439 F.2d 536, 541–42 (*en banc* 1970),

*cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971).

182. *See Marchetti v. United States,* 390 U.S. 39, 47–49, 57, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Grosso v. United States,* 390 U.S. 62, 66–68, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). *See generally Garner v. United States, supra* note 172, 424 U.S. at 656, 96 S.Ct. 1178, 1183.

183. *Cf. Quinn v. United States,* 349 U.S. 155, 164–165, 75 S.Ct. 668, 99 L.Ed. 964 (1955); *Brown v. Walker,* 161 U.S. 591, 605–608, 16 S.Ct. 644, 40 L.Ed. 819 (1896).

184. That Mitchell's underlying grievance goes to the issue of pretrial publicity is suggested by his reference to *Delaney v. United States,* 199 F.2d 107, 114 (1st Cir. 1952). *See* Mitchell br. at 45–46.

ing it, and Mitchell's case does not come within the recognized exceptions.

We find no error in the Special Prosecutor's use of Mitchell's testimony before the committees as the basis for the perjury count and in impeachment by contradiction of Mitchell's assertions on the stand.

## IX. HALDEMAN'S PERJURY CONVICTIONS—THE EVIDENCE AND THE INSTRUCTIONS

In addition to finding the defendant Haldeman guilty of conspiracy and obstruction of justice, the jury also found him guilty on three counts of perjury—Counts 7, 8, and 9—in violation of 18 U.S.C. § 1621 (1970). All of these offenses were allegedly committed from July 30 to August 1, 1973, when he testified before the Senate Select Committee on Presidential Campaign Activities (the Ervin Committee). Count 7 charged Haldeman with falsely testifying that, prior to March 21, 1973, no one in the White House other than John Dean had any idea that hush money was being paid to the Watergate burglars. Count 8 alleged that Haldeman committed perjury in testifying that he had listened to a tape recording of the President's March 21, 1973, conversation with Dean and that he (Haldeman) was "absolutely positive that the tapes" recorded the President as saying, "We can [raise $1,000,000 for hush money] * * * but it would be wrong." Count 9 alleged that perjury was committed when Haldeman told the Senate Committee that, during a March 21, 1973, meeting among himself, the President, and John Dean, "I don't believe

there was any reference to [Jeb] Magruder committing perjury."

### A. *Count 7: The Two-Witness Rule*

 Haldeman first contends that the trial court erred in not explaining the meaning of "corroboration" in connection with the "Two-Witness Rule" applicable to perjury offenses.[185] He had requested such an instruction. J.A. 828–829. This objection is directed to Count 7, which alleged that Haldeman committed perjury when he denied personal knowledge that anyone was aware until March 1973 that around $350,-000 which had been collected and paid for the "defense" of the Watergate burglars involved either blackmail or hush money.[186] The court's instruction on this point was as follows:

As to the second element, the law requires in a case such as this that the falsity of the testimony in question be proved by the sworn testimony of at least one witness, and that the testimony as to falsity given by such witness be corroborated by some other evidence in the case. In other words, a person cannot be convicted of perjury when the evidence simply consists of his oath against another's; there must be some corroboration of the testimony against him before he can be convicted. This is one of the factors which distinguishes this perjury law from the false declaration law which forms the basis of Counts Four, Five, Eleven, and Twelve as I noted a while ago.

Accordingly, if you find, with respect to any of these perjury counts, namely,

---

**185.** In proving the crime of perjury, the uncorroborated testimony of a single witness is not sufficient to establish the falsity of the statement of a defendant under oath. *Hammer v. United States,* 271 U.S. 620, 626, 46 S.Ct. 603, 70 L.Ed. 1118 (1926); *Young v. United States,* 94 U.S.App.D.C. 54, 59, 212 F.2d 236, 241, *cert. denied,* 347 U.S. 1015, 74 S.Ct. 870, 98 L.Ed. 1137 (1954). However, the "two-witness" rule does not require testimony by two independent witnesses as to the falsity of the alleged perjurious statement. The testimony of a single witness as to falsity, if corroborated by other evidence, is sufficient. *See United States v. Cohn,* 452 F.2d 881, 883 (2d Cir. 1971), *cert. denied,* 405 U.S. 975, 92 S.Ct. 1196, 31 L.Ed.2d

249 (1972); *Young v. United States, supra,* 94 U.S.App.D.C. at 59, 212 F.2d at 241; *Maragon v. United States,* 87 U.S.App.D.C. 349, 350, 187 F.2d 79, 80 (1950), *cert. denied,* 341 U.S. 932, 71 S.Ct. 804, 95 L.Ed. 1361 (1951); 2 Wharton's Criminal Evidence § 488 (C. Torcia 13th ed. 1972); 7 Wigmore, Evidence § 2042 (3d ed. 1940).

**186.** The allegedly perjurious statement was:
No one, to my knowledge, was aware that these funds involved either blackmail or "hush money" until this suggestion was raised in March of 1973.
Indictment, Count 7, ¶ 4, J.A. 139.

98

Six, Seven, Eight, and Nine, that the prosecution has presented only one witness who has testified to the falsity of a Defendant's Senate testimony, and no independent corroborating evidence of the falsity of the Defendant's testimony, you must find the Defendant not guilty on that count.

Tr. 12390–12391.

 Haldeman contends that this instruction constitutes "reversible error on count Seven" because the trial court failed to define "corroboration." Haldeman br. at 137. His apparent point is that the court should have additionally instructed that "corroborative evidence necessary to sustain a perjury conviction is that which tends to show the perjury independently."[187] Haldeman br. at 136–137. It seems, however, that the court's instruction, given above, practically complied with this requirement in that portion of the charge stating:

> * * * if you find * * * that the prosecution has presented only one witness who has testified to the falsity of a Defendant's Senate testimony, and *no independent corroborating evidence of the falsity of the Defendant's testimony,* you must find the defendant not guilty on that count.

J.A. 12391 (emphasis added). We are of opinion that this instruction was adequate and appellant's objection to it is not well taken.

A second argument raised by Haldeman is that, even assuming an adequate instruction on corroboration, there was no "independent corroborating evidence" of the falsity of this testimony. The main proof of perjury is John Dean's testimony that Haldeman was aware at the very outset of the conspiracy that money was being paid to the break-in defendants to keep them silent. *See, e. g.,* Tr. 2741–2742. The "corroborating" proof of this, however, is said to be only *allegations by Dean* that Haldeman heard a tape recording of a conversa-

tion between E. Howard Hunt and Charles Colson in which Hunt complained that the Administration's promises of money payments were not being fulfilled. Tr. 2909–2912, 2920–2923, 2928–2931, 4250–4254; Tape Tr. 646–647, 651.

 If this were the only corroborating evidence, it would be insufficient, for it is not "independent"—it is only Dean affirming Dean. But contrary to Haldeman's argument, there is independent evidence to support Dean's allegations in this regard. Several of the taped conversations involving Haldeman and the President, which were heard by the jury, could reasonably be interpreted to include admissions by Haldeman of knowledge, prior to March 21, 1973, of hush money payments to the Watergate break-in defendants. For example, on April 14, 1973, the President, Haldeman, and Ehrlichman discussed Dean's June 28, 1972, request that Herbert Kalmbach be asked to raise hush money:

> EHRLICHMAN: As a matter of fact, I didn't refer him [Dean] to Kalmbach. He came to me and said, "May I go to Kalmbach?"
>
> HALDEMAN: *He did the same thing to me.*
>
> PRESIDENT: Go to Kalmbach for the purpose of?
>
> EHRLICHMAN: For the purpose of getting Herb to raise some money. For the purpose of paying the defendants. *For the purpose of keeping them, quote, on the reservation, unquote.*
>
> PRESIDENT: Right. With that they could try to tie you and Bob in a conspiracy to obstruct justice.
>
> EHRLICHMAN: That's his theory.

Tape Tr. 456 (emphasis added). In another conversation on March 22, 1973, between Haldeman and the President, Haldeman essentially admitted approving transfer of $350,000 from a fund under his control for use to pay off the Watergate break-in de-

187. *See, e. g., United States v. Thompson,* 379 F.2d 625, 627 (6th Cir. 1967); *McWhorter v. United States,* 193 F.2d 982, 985 (5th Cir. 1952).

fendants.[188] These *direct statements* of Haldeman are strong substantiating evidence, and are completely independent of the testimony of John Dean. In addition, they allow inferences to be drawn from other circumstantial evidence (such as Dean contacting Kalmbach about raising money for the defendants, Tr. 6301–6305), which corroborate Dean's story.

Therefore, we reject both the challenge to the instructions and the challenge to the evidence under Count 7, and affirm Haldeman's conviction on this count.[189]

### B. Count 8

The next attack on the instructions by Haldeman relates to his conviction on Count 8—the "but it would be wrong" count. This charge arises from the false statement to the Senate Select Committee that, on March 21, 1973, during a meeting among Haldeman, the President, and John Dean, the President discussed the possibility of raising hush money but concluded by saying "we can do that but it would be wrong." Indictment, Count 8, ¶ 4, J.A. 141–143. Haldeman complains that the jury was not instructed on the theory of his defense to this charge, although appropriate requests were made. Specifically, he asserts in his brief that the

> Jury Was Not Told that Defendant Haldeman Challenged the Accuracy of the Alleged Perjurious Senate Testimony Which Formed the Basis for Count Eight on the Ground that He Did Not Quote President Nixon but Rather Paraphrased His Statements

\* \* \* \* \* \*

Defendant Haldeman testified at trial that he was not quoting President Nixon to this effect but was only paraphrasing

188. HALDEMAN: Okay, but, we're very clear on that, except this concern is what they do on the other side. What happened was that is they, they needed the money

. . . . .

PRESIDENT: Right.
HALDEMAN: . . . They were supposed to be getting it themselves from other sources, from other Cubans and all that kind of crap . . .
PRESIDENT: Right.
HALDEMAN: . . . So, they got back to a crunch once in a while when *a guy had to have another $3,000 or something, or, or he was gonna blow, blow—*
PRESIDENT: Then, who did it? Dean? That's what worries him.
HALDEMAN: No. Then what happened was, the only, see they knew over there that the only money there was that was useable was this 350,000.
PRESIDENT: Who's they, who's they?
HALDEMAN: LaRue and Mitchell.
PRESIDENT: Okay.
HALDEMAN: And so, Mitchell said, "You've got to use that MONEY." *So, I said, "Turn the whole thing back to 'em.* We don't want the money anyway. Give just enough, I've been looking for a way to get rid of it." I'll admit I was, I was worried about this, this money. I wanted to get it back into the, where it belonged. Uh, so, so, he gave it back to them, and they wouldn't take, Mitchell wouldn't let them take it back, but he did say "You've got to use some of it." So Dean told Strachan, who was the guy that had the

. . . .

PRESIDENT: Yeah.

HALDEMAN: . . . the physical possession to give X thousand dollars to LaRue. So, Strachan would go and open his safe, take out X thousand dollars and, and go trudging over to LaRue's, and, and this is all after the election, this is in the—
PRESIDENT: After the election?
HALDEMAN: Yeah, on the, yeah, and this in—
PRESIDENT: Oh, after the election.
HALDEMAN: Yeah. And he would go over and give LaRue . . .
PRESIDENT: Yeah.
HALDEMAN: . . . X thousand dollars and, and, we can certainly claim that, that Strachan had no knowledge of what that was for—he was carrying out Dean's instructions; that Dean was carrying out instructions from me; and you've gotta prove it for me. And my point there was, it's their money, give it back to 'em, give it all back to 'em. So we were giving—
Tape Tr. 245–246 (emphasis added). *See also* Tr. 6688–6689 (testimony of Fred LaRue).

189. We also reject the argument that appellant believed the statement to be true. Haldeman br. at 77. "[A] belief as to the falsity of testimony may be inferred by the jury from proof of the falsity itself." *Young v. United States, supra* note 185, 94 U.S.App.D.C. at 59, 212 F.2d at 241, *cert. denied,* 347 U.S. 1015, 74 S.Ct. 870, 98 L.Ed. 1137 (1954). *See also* R. Perkins, Criminal Law 461 (2d ed. 1969); 65 Harv.L. Rev. 520 (1952).

the former Chief Executive. Claiming a variance from the Indictment, defendant Haldeman submitted a proposed instruction that would have advised the jury of this theory of defense (J.A. 711) but the court rejected this request without explanation (J.A. 776).

Haldeman br. at 137.

The requested instruction, which he now asserts he was entitled to because it would have presented the theory of his defense, would have instructed the jury:

> If you find that Mr. Haldeman did not purport to quote former President Nixon at the date, time and place alleged in Count Eight, then you should find Mr. Haldeman not guilty of the offense charged in Count Eight. Otherwise, you should apply to Count Eight the instructions on perjury which I have heretofore given you.

J.A. 711.[190] The actual charge delivered to the jury by the trial judge with respect to Count 8 did include the following language, however:

> [A]s I will mention again in a minute, *Mr. Haldeman is contesting the accuracy of his testimony as it set forth in Count Eight of the indictment.* Let me now remind you that even though there are some stipulations, you must decide for yourselves whether the first element has been proved beyond a reasonable doubt.

Tr. 12390 (emphasis added).

\* \* \* \* \* \*

The jury must note that the Defendant, Mr. Haldeman, has *challenged the accuracy of the testimony alleged in Count Eight of the indictment to be false.* So on this count of the indictment, the jury must also determine whether the Defendant testified before the Senate Committee as alleged in Count Eight.

> Thus, in each of these counts the Government must prove beyond a reasonable doubt the falsity of the alleged perjurious testimony.

Tr. 12391–12392 (emphasis added).

■ While these instructions were not worded exactly as Haldeman requested, they did fairly present to the jury the fact that he was challenging the accuracy of his alleged perjurious Senate testimony as alleged in Count 8. In fact, that point was twice stated. We see no error in the instructions on this matter.

■ Haldeman also challenges the evidence on Count 8, arguing that "a fair and liberal construction of the March 21 tape, as explained by the defendant, finds the statements true, and surely they were believed to be true" [191] since he allegedly was paraphrasing rather than quoting President Nixon. This amounts to a challenge to the sufficiency of the evidence to convict on this count. We find no error in submitting the question to the jury, for there is enough evidence here to support a conviction. The actual testimony before the Senate Committee, as quoted in Count 8 and reproduced in the margin,[192] goes a long

---

**190.** In its entirety, Haldeman's Requested Jury Instruction No. 26 read as follows:

*COUNT EIGHT*

With regard to Count Eight of the Indictment which charges Mr. Haldeman with perjury, your attention is directed to the portions of Mr. Haldeman's testimony before the Senate Select Committee which is set forth in paragraph 4 thereof, particularly that part wherein Mr. Haldeman is alleged to have falsely quoted former President Nixon as follows: "The President said 'there is no problem in raising a million dollars, we can do that, but it would be wrong.'" This alleged quotation forms the basis for Count Eight.

If you find that Mr. Haldeman did not purport to quote former President Nixon at the date, time and place alleged in Count Eight,

then you should find Mr. Haldeman not guilty of the offense charged in Count Eight. Otherwise, you should apply to Count Eight the instructions on perjury which I have heretofore given you.

J.A. 711.

**191.** As to appellant's brief in the truthfulness of his statements, *see* note 189 *supra.*

**192.** *July 30, 1973:*

I was present for the final 40 minutes of the President's meeting with John Dean on the morning of March 21. Whilte [sic] I was not present for the first hour of the meeting, I did listen to the tape of the entire meeting.

Following is the substance of that meeting to the best of my recollection.

\* \* \* \* \* \*

way toward answering the question of whether Haldeman did, or did not, purport to *quote* former President Nixon as alleged in Count 8. The "addendum" referred to by Senator Baker on July 31 is presumably a written statement filed with the Committee by Haldeman, *see* Exhibit 22; *Hearings Before the Senate Select Comm. on Presidential Campaign Activities,* 93d Cong., 1st Sess., Book 7, at 2866, 2897 (July 30, 1973). It (unlike the actual testimony) obviously

> He [Dean] also reported on a current Hunt blackmail threat. He said Hunt was demanding $120,000 or else he would tell about the seamy things he had done for Ehrlichman. The President pursued this in considerable detail, obviously trying to smoke out what was really going on. He led Dean on regarding the process and what he would recommend doing. He asked such things as— "Well, this is the thing you would recommend? we ought to do this? is that right?" and he asked where the money would come from? how it would be delivered? and so on. He asked how much money would be involved over the years and Dean said "probably a million dollars—but the problem is that it is hard to raise." The President said "there is no problem in raising a million dollars, we can do that, *but it would be wrong."*
> *July 31, 1973:*
> Senator Baker. . . . What I want to point out to you is that *one statement in your addendum* seems to me to be of extraordinary importance and I want to test the accuracy of your recollection and the quality of your note-taking from those tapes, and I am referring to the last, next to the last, no, the third from the last sentence on page 2, "The President said there is no problem in raising a million dollars. We can do that but it would be wrong."
> Now, if the period were to follow after "We can do that", it would be a most damning statement. If, in fact, the tapes clearly show he said "but it would be wrong," it is an entirely different context. Now, how sure are you, Mr. Haldeman, that those tapes, in fact say that?
> Mr. Haldeman. *I am absolutely positive that the tapes—*
> Senator Baker. Did you hear it with your own voice?
> Mr. Haldeman. *With my own ears, yes.*
> Senator Baker. I mean with your own ears. Was there any distortion in the quality of the tape in that respect?
> Mr. Haldeman. No, I do not believe so.
> \* \* \* \* \* \*
> Senator Ervin. Then the tape said that the President said that there was no problem raising a million dollars.

involves no interruption. The Senator quotes Haldeman as stating flatly in this addendum, *"The President* said there is no problem in raising a million dollars. We can do that but it would be wrong." J.A. 142 (emphasis added).[193] Then, in response to a question from the Senator, Haldeman affirmed that this is what he heard:

> Senator Baker. Did you hear it with your own voice?
> Mr. Haldeman. With my own ears, yes.

> Mr. Haldeman. Well, I should put that the way it really came, Mr. Chairman, which was that Dean said when the President said how much money are you talking about here and Dean said over a period of years probably a million dollars, but it would be very hard—it is very hard to raise that money. And the President said it is not hard to raise it. We can raise a million dollars. *And then got into the question of, in the one case before I came into the meeting making a statement that it would be wrong* and in other exploration of this getting into the—trying to find out what Dean was talking about in terms of a million dollars.
> Senator Ervin. Can you point—are you familiar with the testimony Dean gave about his conversations on the 13th and the 21st of March with the President?
> Mr. Haldeman. I am generally familiar with it, yes, sir.
> Senator Ervin. Well this tape corroborates virtually everything he said except that he said that the President could be—that the President said there would be no difficulty about raising the money and you say the only difference in the tape is that the President also added that but that would be wrong.
> Mr. Haldeman. And there was considerable other discussion about what you do, what Dean would recommend, what should be done, how—what this process is and this sort of thing. It was a very—there was considerable exploration in the area.

Indictment, Count 8, ¶ 4, J.A. 141–143 (emphasis in original).

[193.] Although Haldeman objects to the use of quotation marks around this statement in the indictment, contending that they improperly give the impression that he was quoting (and not paraphrasing) the President, we find them unobjectionable. In the indictment, the quotation marks do not begin after the phrase "The President said," but rather before it. *See* note 190 *supra.* This makes clear the fact that what the indictment is indicating as a quotation is Haldeman's statement from his prepared addendum, and not the President's statement.

*Id.* Several minutes later, in response to a question from Senator Ervin, Haldeman refers again, without qualification, to the statement of the President that payment of hush money "would be wrong." *Id.* at 93. While it is true that Haldeman did preface his statement before the Committee on July 30, 1973, with the caveat that he was recounting "the substance of that [March 21] meeting to the best of my recollection" after listening to the tape, *id.* at 91, this by itself does not indicate whether he would be quoting or paraphrasing particular sentences; moreover, the caveat was not repeated the next day (July 31) when, as pointed out above, he again flatly stated twice that the President had said hush money "would be wrong." Haldeman's argument was presented to the jury, *see, e. g.,* Tr. 1808–1812, and it was clearly within the province of the jury to interpret these statements as quotations.[194]

### C. *The Interruption in Count 8*

Haldeman next asserts that the court erred in failing to grant his requested instruction with respect to the effect of an alleged interruption in his testimony.

As is indicated by the transcript of Haldeman's testimony before the Senate Committee, the following colloquy occurred with Senator Baker:

Senator Baker. What I want to point out to you is that one sentence in your addendum . . . the third from the last sentence on page 2, "The President said there is no problem in raising a million dollars. We can do that but it would be wrong." Now, how sure are you, Mr. Haldeman, that those tapes, in fact say that?

Mr. Haldeman. I am absolutely positive that the tapes—

Senator Baker. Did you heard it with your own voice?

Mr. Haldeman. With my own ears, yes.[195]

Haldeman points to what appears to be an interruption by Senator Baker of the reply to the Senator's first question. At trial, Haldeman "testified that his answer was incomplete and that if he had been allowed to do so he would have enlarged upon his answer to avoid what on the face of the record [he now contends] appears to be a misinterpretation of his statement (Tr. 8676)." Haldeman br. at 138. To assist in making this point to the jury, Haldeman proffered the following proposed instruction:

You may not convict a defendant of perjury merely because his testimony was factually incorrect, or if he gave incorrect testimony because of surprise, confusion, haste, inadvertence, an honest mistake as to the facts, carelessness, negligence, or *if an incorrect impression was created because the defendant was interrupted while making his statement.*

J.A. 712 (emphasis added). He now claims error because this instruction was denied.

▮▮▮▮▮ The court, however, did give the following instruction:

A Defendant may not be found guilty of perjury simply because he gives testimony which is factually incorrect. He may have given incorrect testimony because of surprise, confusion, inadvertence, honest mistake of facts, carelessness or negligence. Also, if a Defendant believed a statement to be true when he made it, you must find that Defendant not guilty, even if it so happens that the statement was, in fact, false.

This instruction covers all the principal points of the requested instruction, except it omits the italicized words, *i. e.,* a defendant may not be found guilty of perjury *"if an incorrect impression was created because the defendant was interrupted while making his statement."* We do not find error in the refusal to so instruct the jury.

---

**194.** We also reject Haldeman's claim of prejudice arising from the prosecutor playing for the jury segments of a video-tape of Haldeman's appearance before the Committee. Given Haldeman's argument that he was paraphrasing and not quoting the President, the value of the video-tapes in casting light on this problem far outweighed any prejudice.

**195.** *See* note 192 *supra* for the more complete colloquy.

The italicized portion of the requested instruction was too strongly worded in the defendant's behalf and was not a correct statement of the law.[196] It would have in effect instructed the jury that they could acquit the defendant on Count 8 if an interruption in his testimony created "an incorrect impression" even though it clearly appeared that other testimony set forth in the count constituted clear perjury. The requested instruction was far too inclusive—the creation of "an incorrect impression," without further specification, is not a legal defense to the offense charged in Count 8 of the indictment. There was much more to the perjury charged in this count than the portion related to the alleged interruption. The same statement was repeated elsewhere, and particularly in Haldeman's prepared statement. If the apparent falsity of *all* the testimony that is charged as being false in a particular count of an indictment was due to an incorrect impression created by an interruption, that would be a defense to the count. The court is not required to adopt the exact words of a proposed instruction which is given in substance,[197] and it appears here that the

court's charge adequately instructed to this end when it pointed out, "He may have given incorrect testimony because of *surprise, confusion, inadvertence.* * * * *"* That portion of the charge was sufficient for Haldeman's counsel to make his point in arguing that particular defense to the jury. He was therefore not denied an instruction on the theory of his defense, to the extent that his theory was valid. The charge was sufficient and it was not necessary to make it more detailed.[198]

We likewise find no error in the denial of the following instruction suggested by Haldeman:

The essence of the crime of perjury is that the challenged sworn testimony must be false and that the witness believes it to be false. No one may be convicted of perjury where he gives an answer that is literally accurate or is reasonably susceptible of more than one interpretation, one of which is truthful. Nor is it a criminal act for a witness to willfully state any material matter that implies any material matter that he does not believe to be true.

**196.** If a requested instruction is in *any* respect incorrect, the denial of such a request is not error. *United States v. Billingsley,* 474 F.2d 63, 65 (6th Cir.), *cert. denied,* 414 U.S. 819, 94 S.Ct. 42, 38 L.Ed.2d 51 (1973); *United States v. Kelly,* 349 F.2d 720, 759–760 (2d Cir. 1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); *Grandsinger v. United States,* 332 F.2d 80, 82 (10th Cir. 1964); *Carbo v. United States,* 314 F.2d 718, 745 (9th Cir. 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964); *Huff v. United States,* 301 F.2d 760, 768 (5th Cir.), *cert. denied,* 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230 (1962); *Lash v. United States,* 221 F.2d 237, 240–241 (1st Cir.), *cert. denied,* 350 U.S. 826, 76 S.Ct. 55, 100 L.Ed. 738 (1955).

**197.** If the trial judge has included in his charge to the jury accurate instructions on a particular issue, it is not error to refuse to repeat substantially the same or a different statement of the same principles of law in the language submitted by counsel. *Agnew v. United States,* 165 U.S. 36, 51, 17 S.Ct. 235, 41 L.Ed. 624 (1897); *Heflin v. Silverstein,* 132 U.S.App.D.C. 7, 9, 405 F.2d 1075, 1077 (1968); *United States v. Fayette,* 388 F.2d 728, 737 (2d Cir. 1968); *United States v. Kelly,* 349 F.2d 720, 760 (2d Cir. 1965), *cert. denied,* 384 U.S. 947, 86 S.Ct.

1467, 16 L.Ed.2d 544 (1966); *Dranow v. United States,* 307 F.2d 545, 568–570 (8th Cir. 1962); *Windisch v. United States,* 295 F.2d 531, 533 (5th Cir. 1961); *Bary v. United States,* 292 F.2d 53, 59 (10th Cir. 1961).

**198.** *Williams v. United States,* 131 U.S.App.D.C. 153, 156–157, 403 F.2d 176, 179–180 (1968). *See also Dranow v. United States,* 307 F.2d 545, 568 (8th Cir. 1962):

It is the duty of a trial court to instruct the jury on general principles of law applicable to the facts of a case. It is not required to include in its charge what is not applicable law nor to give instructions or outline all possible factual situations which would establish one's innocence of the crime charged. In the giving of instructions there is necessarily a wide range of discretion vested in the trial judge who must clearly and accurately state the rules of law by which the jury is to be guided in its deliberations. He is not bound to adopt the appellant's theory of the case or effect to be given any particular part of the proof. Cf. *Nelson v. United States,* 97 U.S.App.D.C. 6, 227 F.2d 21, 53 A.L.R.2d 1206 (1955); *Jones v. United States,* 251 F.2d 288 (10 Cir. 1958).

J.A. 708. This instruction is said to be predicated upon *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), where the Supreme Court held that the federal perjury statute does not reach a witness' answer that is literally true but unresponsive, even assuming the witness intends to mislead his questioner by the answer.[199]

*Bronston,* however, dealt with an answer that was undisputably true, which is not the case here. The appellant's statement to the Committee under Count 8 in this case was untrue (though responsive) unless the jury accepted his explanation. *Bronston* cannot be read to shield from prosecution answers or statements which are arguably true under some defense theory, for such a holding would all but void the federal perjury statute. Therefore, we hold that the instruction which was given [200] fully satisfied *Bronston,* and we affirm the conviction.

## D. *Count 9*

This count charges Haldeman with perjury in testifying before the Senate Committee that he did not believe there had been any reference during a March 21, 1973, meeting to Magruder's having committed perjury.[201] The proof of this offense was bottomed on Dean's positive testimony, the tape recordings of the meeting, and Haldeman's notes which he reviewed prior to his testimony before the Senate Committee. At trial Haldeman admitted the falsity of his answer but defended on the ground that he was honestly mistaken.[202] The issue on this count was thus squarely for the jury which was thereby called upon to determine the credibility of Haldeman's testimony. In choosing to disbelieve him it was completely within the province assigned by the law to it [203] and we will not interfere with the result it reached. In reaching this conclusion we also find the proof of willfulness to be sufficient.[204]

**199.** In *Bronston* a witness in a bankruptcy proceeding was being questioned by a creditor's lawyer:

> Q. Do you have any bank accounts in Swiss banks, Mr. Bronston?
> A. No, sir.
> Q. Have you ever?
> A. The company had an account there for about six months, in Zurich.
> Q. Have you any nominees who have bank accounts in Swiss banks?
> A. No, sir.
> Q. Have you ever?
> A. No, sir.

409 U.S. at 354, 93 S.Ct. at 598. It was later determined that, while it was literally true that the company did have an account in Zurich, the petitioner also himself had a personal Swiss bank account into which he had deposited over $180,000. He did not have such an account at the time of questioning, nor had he then or ever had nominees with such accounts.

**200.** The court instructed the jury:

> You should also remember, with regard to the second essential element [falsity] what I told you previously, that a statement is not false if it is literally true and technically responsive. If a statement, or a reasonable interpretation of a statement, made by a Defendant is narrowly or literally true, there can be no violation of this statute.

Tr. 12391. The court also followed *Bronston* in instructing on the false declaration counts. Tr. 12386.

**201.** Senator Gurney, a member of the Senate Select Committee, asked appellant Haldeman the following question:

> Do you recall any discussion by Dean about Magruder's false testimony before the Grand Jury?

Appellant made the following reply, the italicized sentence constituting the charge of perjury:

> There was a reference to his feeling that Magruder had known about the Watergate planning and break-in ahead of it, in other words, that he was aware of what had gone on at Watergate. *I don't believe there was any reference to Magruder committing perjury.*

Indictment, Count 9, ¶ 4, J.A. 145.

**202.** Tr. 8688–8689, 9147–9151.

**203.** *See* note 189 *supra.*

**204.** We also reject the further argument of appellant that Senator Gurney's question was not intended to seek the answer which is claimed to be perjurious, but rather sought to discover "whether Dean and Magruder had conferred about Magruder's testimony before the grand jury prior to his appearance there." Haldeman br. at 92. However, the question was plain on its face and the jury has determined it was answered falsely. The Senator's later questions do not change this; had appellant answered truthfully, the later questions might well have taken a different direction.

## X. ADMISSIBILITY OF THE TAPE RECORDINGS

The Government's evidence at trial included tape recordings of conversations among President Nixon, appellants Ehrlichman and Haldeman, and other conspirators. The bulk of the conversations occurred in the Oval Office or the Executive Office Building, while others took place over the telephone. Appellants object to the introduction of the recordings on three grounds, each of which we find to be without merit.

### A. *Admissibility under the Omnibus Act*

Under Title II of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.* (1970), interceptions of oral or wire communications may not be introduced in evidence except under specified circumstances, one of which is that one of the parties to the conversation consented to the interception. *Id.* § 2511(2)(c), (d). Appellants contend that the District Judge made no finding of consent, or, alternatively, that there was not an adequate basis for such a finding.

■ The transcript reveals some confusion in the hearing on the consent issue. There was only one genuine issue to be decided at that hearing—whether the interceptions that were effected by recording the conversations in question were consented to by Mr. Nixon, a party to them. However, the trial judge appears to have believed there was a second issue—whether the overall supervision of the recording equipment by the Secret Service, and specifically the custody of the completed recordings, was itself an interception. Many

of the judge's comments, including his statement that the statute was not intended to apply "to the situation we have in this case," Tr. 5841, appear to relate to this second issue.[205] And he was correct in ruling that these purely custodial duties of the Secret Service did not constitute an interception.[206]

■ As to the first issue—the only genuine interception involved—the record cannot be considered crystal clear. Yet on reviewing it in its entirety, we are persuaded that the District Judge did find Mr. Nixon to have consented to the interceptions by directing the installation of the recording equipment. The District Judge stated that "[t]hese are completed conversations that were ordered according to the testimony and it can be inferred I think by the President through Mr. Higby." Tr. 5826. That view was immediately reiterated: "[the tapes] were made at the direction of the President." Tr. 5827. This finding of presidential consent is reflected in the statement that the Secret Service employees could be "construed as agents of the President," Tr. 5839, and in yet another suggestion that the President "consented to [the interception] by directing somebody to give the word to Mr. Higby, who gave the word to somebody else," Tr. 5840. Certainly, a greater measure of clarity and precision in formulating the finding would not have been amiss in view of its importance. Nonetheless, we believe the complete record reveals that the District Judge based his decision to admit the tape recordings on an unmistakably implicit finding that President Nixon directed the installation of the

---

**205.** *See, e. g.,* Tr. 5827 ("* * * I can't see that you are going to charge the Secret Service with intercepting those conversations just because they had custody of those tapes. They didn't play them."); Tr. 5828 ("Although Secret Service did, as I understand it, they were more or less custodians of the tapes after the conversations were had and they protected the tapes according to regulations, I take it, so there is no interception there unless you infer from the custody of the tapes they listened to the tapes or something like that, and that isn't in evidence anyway."); Tr. 5839 ("Where has the interception occurred? I mean here you have

completed reels of tape put in a box and kept in the custody of the Secret Service.").

**206.** *See* note 205 *supra.* It is hard to see how, once the oral and wire communications had been intercepted by the taping system, the spot-checking of the tapes could constitute an interception of the *communications* themselves. Moreover, such inspection fell within the reasonable contemplation of those who authorized (and thereby consented to) the installation of the system, and was so limited that the agents did not even listen to full conversations.

recording equipment and thereby consented to the interception of the conversations in question.

 Although appellants urge that such a finding is not supported by the evidence, we believe there is no merit to this contention. Findings of District Judges are not to be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). This rule is fully applicable to transcribed oral findings, and its scope extends even to inferences drawn from undisputed facts. *Case v. Morrisette,* 155 U.S.App.D.C. 31, 37–38, 475 F.2d 1300, 1306–1307 (1973).

The record before the trial judge provided a more than adequate basis for inferring that President Nixon directed the installation of the recording system. Alexander Butterfield, a Deputy Assistant to the President, testified that Lawrence Higby, the principal aide to Mr. Haldeman, the President's Chief of Staff, told him to arrange for the Secret Service to install recording equipment in the President's Oval Office. Tr. 5521, 5524–5526. Butterfield then told the head of the Secret Service's Technical Security Division at the White House that the President wanted a tape recording system installed.[207] It is possible that this activity could all have been initiated by Higby acting on his own; the record does not absolutely preclude such an inference from the testimony. But, by the same token, it is at least equally plausible to infer that, in a matter as extraordinary as this, Higby, a 24-year-old aide, Tr. 5527, would

not have acted without Haldeman's authorization, and that Haldeman in turn would similarly not have acted without presidential approval. Indeed, an inference of presidential consent could have been drawn merely from the existence of the devices in presidential offices. Reviewing the finding with the appropriate deference, we find no basis for upsetting it as clearly erroneous.

 Finally, even if it were thought that additional evidentiary support were needed to sustain the District Judge's ruling, such support exists. For, in the course of the hearing on the consent issue, the Government read into the record testimony given by Mr. Haldeman in a hearing in the District Court on November 8, 1973, regarding the 18½ minute gap that appeared on one of the recordings.[208] That testimony was as follows:

Question: Now, would you explain the circumstances of the installation of the equipment, how it came about and with whom you discussed the matter?

Answer: The matter was discussed with the President initially and the equipment for the procedure was established for the purpose of providing a complete accurate record of conversations held by the President in these two offices and on the particular telephones and on some occasions in the Cabinet Room for his reference and for historical purposes. He has made a practice of meeting with individuals and groups without having staff members present, and it was felt that

**207.** That Butterfield's testimony may technically have been hearsay is of no significance, *see* pp. ——–—— of 181 U.S.App.D.C., pp. 107–108 of 559 F.2d *infra,* and no objection was raised at the hearing.

**208.** Although we believe this prior testimony of Mr. Haldeman could appropriately be considered by the District Judge in making his ruling, we decline the Government's invitation to consider testimony subsequently given by Haldeman during the criminal trial itself as support for the prior decision to admit the tapes. This later testimony largely duplicates the earlier testimony in the Nov. 8, 1973 hearing and is unnecessary to support the trial judge's finding. We do note, however, that the Government's suggestion is problematic. First,

it is a bootstrap argument. Had the tapes not been introduced, Haldeman might have made a tactical decision not to testify. It is, therefore, somewhat circular to justify introduction of the tapes by referring to testimony that might never have been given were the tapes not admitted. Second, appellants' counsel had no notice that Haldeman's testimony at trial was to be used to justify admission of the tapes. Had the defense been informed of that fact, it might have raised objections before the judge which, for strategic reasons—such as not highlighting particular testimony—were not pressed before the jury. Finally, there is no assurance that the judge would have credited the testimony had it been considered in relation to the question of admissibility.

such a record was importatn [*sic*] to be maintained and a procedure was set up to provide it.

Tr. 5835.

The District Judge could surely take judicial notice, in a preliminary hearing merely on the admissibility of certain evidence, that this testimony was in fact presented in a hearing at which he presided on a not unrelated matter. *See Gomez v. Wilson,* 155 U.S.App.D.C. 242, 247 n.28, 477 F.2d 411, 416 n.28 (1973); *cf. Partridge v. Presley,* 88 U.S.App.D.C. 298, 300, 189 F.2d 645, 647, *cert. denied,* 342 U.S. 850, 72 S.Ct. 79, 96 L.Ed. 642 (1951). *See generally* C. McCormick, Handbook of the Law of Evidence § 330, at 765–766 & nn.74–75 (Cleary ed. 1972).

▮ Appellants argue that, even if Haldeman's testimony were judicially noticeable, it was hearsay and hence not admissible. Although the facts that the declaration was made in a prior judicial proceeding, that the declarant is a party-defendant, and that the other defendants were co-conspirators, might bring the declaration within an exception to the hearsay rule, we need not carry out such an inquiry. For the technical rules of evidence are inapplicable to a hearing before the trial judge on the preliminary legal question of the admissibility of evidence. This view is held by the commentators, *see, e. g., id.* § 53, at 122–123 n.91; 5 J. Wigmore, Evidence § 1385, at 87 (Chadbourn ed. 1974), finds ample support in the case law, *see Schwimmer v. United States,* 232 F.2d 855, 863–864 (8th Cir.), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956); *Healy v. Rennert,* 9 N.Y.2d 202, 209, 213 N.Y.S.2d 44, 49, 173 N.E.2d 777, 780 (1961), and has been adopted in the new Federal Rules of Evidence, *see* Rule 104(a), which although not in effect when this case was tried surely provide persuasive authority. If, after reviewing

the live testimony before the trial judge, any suspicion that his finding of consent was clearly erroneous remained, it is surely put to rest by the substance of Haldeman's prior testimony.[209]

### B. *Authenticity of the Tape Recordings*

▮ Appellants challenge the foundation for the introduction of the tape recordings. In determining whether there was a sufficient showing of accuracy to warrant admissibility, we must keep in mind the governing standard: "the possibilities of misidentification and adulteration [must] be eliminated, not absolutely, but as a matter of reasonable probability * * ." *Gass v. United States,* 135 U.S.App.D.C. 11, 14, 416 F.2d 767, 770 (1969); *accord, e. g., United States v. Robinson,* 145 U.S.App. D.C. 46, 51, 447 F.2d 1215, 1220 (1971) (*en banc*), *on rehearing,* 153 U.S.App.D.C. 114, 471 F.2d 1082 (1972) (*en banc*), *rev'd on other grounds,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. S. B. Penick & Co.,* 136 F.2d 413, 415 (2d Cir. 1943). Although the evidence bearing on admissibility should be carefully scrutinized to see if it measures up to the standard, it may be circumstantial or direct, real or testimonial, and need not conform to any particular model. *E. g., United States v. Sutton,* 138 U.S.App.D.C. 208, 213, 426 F.2d 1202, 1207 (1969). Viewing the record against this standard, we must reject appellants' challenge.

▮ The record included adequate proof that the tape recordings were made by elaborate electronic recording devices installed in the White House and the Executive Office Building by the Technical Services Division of the Secret Service. *See* Tr. 5633–5634. There is no evidence that the system did not accurately record the conversations it was designed to preserve. *See* Tr. 5584. Although on rare occasions a reel

---

**209.** Appellants' reliance upon *Rumely v. United States,* 90 U.S.App.D.C. 382, 197 F.2d 166 (1951), *aff'd,* 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953), is misplaced. In that case the majority objected to the dissenting judge's consideration of evidentiary materials that were not in the record and that were relied upon in

reaching a view on one issue on the merits. Unlike the testimony of Mr. Haldeman, the disputed evidence in *Rumely* was never read into the record, and was itself introduced on the merits, rather than in making a preliminary ruling on the admissibility of other evidence relating to the merits.

would run out before it was changed or a minute of conversation would be lost while reels were being changed, Tr. 5584, 5685, 5708–5709, such lacunae would not affect the accuracy of recordings that were made.

When a Secret Service agent placed a tape on a machine, a box associated with the tape was marked with the date and the location of the machine. Tr. 5672–5673, 5701. After a completed reel was removed, it was placed in the box and marked with the date of removal and the location of the machine and initialed by the Secret Service agent involved.[210] Tr. 5672–5673, 5701–5702. The tapes were then stored in the locked cabinet housing the machines. Tr. 5674, 5703–5704. After some 30 or 40 completed reels accumulated, they would be taken from the locked cabinet and deposited in a safe located inside a room, on the ground floor of the Executive Office Building, that was protected by an alarm system. Tr. 5704.

After a subpoena *duces tecum* was issued for particular conversations, White House attorneys removed from the safe those reels which appeared, from the date and location markings on the boxes, to contain the specified conversations.[211] To locate a particular conversation, the attorneys used the President's daily diaries, which had been prepared for unrelated purposes by personnel of the National Archives. Tr. 5740–5744. The diaries revealed the time, sequence, duration, and participants in presidential conversations in his offices or over the telephone. By identifying the voices on the tapes and checking the tapes against the diaries, conversations could be identified precisely. For every conversation introduced into evidence there was a corresponding entry in the presidential diaries. Tr. 5770–5785. Once the tapes were turned over to the District Court, it was stipulated that they were "kept in a safe place with access carefully documented up until to-

day's date," and that the conversations introduced were the ones called for by the subpoena. Tr. 5738.

The Government thus accounted for every stage from the inception of the tape recording system to the introduction of the tapes into evidence. There was never any significant risk, as there would be with a fungible piece of real evidence, such as blood sample, that the tape recordings were inadvertently exchanged with other evidence of a similar type. As the stipulation reflects, any possibility of misidentifying tapes or conversations was eliminated by the notation on the boxes, the identification of the voices on the tapes, the correspondence of each conversation sought with the detailed information in the daily diaries, and the distinctiveness of the evidence itself.

If the possibility of misidentification was virtually nonexistent, the risk of tampering with the tapes was also slight. There was very little opportunity at any stage for someone to obtain access to the tapes for the purpose of tampering with them. The only persons specifically shown to have known of the existence of the taping system were four Secret Service agents and Messrs. Butterfield and Higby (and the trial judge's finding on the consent issue indicates that Nixon and probably Haldeman must have known). Only the four agents had access to the keys to the locked cabinets in which the tapes were initially stored. Tr. 5679–5680. Access to the safe located within the room protected by an alarm system was similarly restricted.

 Appellants' attempt to establish the probability of tampering by pointing to (1) the regular access of the Secret Service to the tapes and their occasional spot checks of the completed reels, Tr. 5675, 5707, (2) the rare instances in which completed reels

---

**210.** Sometimes the reel did not require replacement. The routine in such a case was for the Secret Service agents to "take the box associated with that reel of tape and note the date that [the reel was checked] and * * * indicate on the [*sic*] counter reading, the little index

counter on the tape recorder." Tr. 5672; *accord*, Tr. 5702.

**211.** The notation of counter markings, *see* note 210 *supra*, was also useful in locating particular conversations. Tr. 5778–5779.

may have been removed from storage for use by individuals in the White House, Tr. 5586, 5717, and (3) the existence on one tape recording of an unexplained 18½-minute gap. As to the Secret Service agents, there is nothing to indicate that the spot checking was anything other than the routine performance of custodial duties; indeed, the agents did not listen to full conversations when conducting a spot check. Tr. 5707. As to the occasional use of the tapes by White House employees, the only person definitely identified in this regard was Mr. Butterfield, who himself admitted the fact, Tr. 5586. There is nothing in his testimony on direct or cross-examination to indicate that he in any way attempted to tamper with the tapes. The record is similarly lacking in support for any assertion that such access as *may*, on a handful of occasions, have been had by others in the White House resulted in tampering.

We may assume *arguendo* that the 18½-minute gap resulted from intentional conduct, but that does not lead to the conclusion that the conversations introduced at trial were suspect. To begin with, none of those conversations was contained on the tape having the 18½-minute gap. Moreover, the fact that one tape was erased hardly shows that other tapes, on which no erasures were present, were not authentic. All the conversations corresponded to the detailed information contained in the President's daily diaries. The trial judge listened to all the conversations that were admitted. In doing so, he had the opportunity to confirm the Government's claim that there was nothing on the tapes that raised a suspicion of tampering: no long or unusual pauses, choppy dialogue or incomplete conversations.

Although it is conceivable that sophisticated redubbing could escape detection by normal listening, real evidence is not admissible because one can conjure up hypothetical possibilities that tampering occurred. Appellants, who participated in many of the conversations, have raised no challenge to the accuracy of any one of them. John Dean testified that the six conversations to which he was a party accurately reflected his recollection of the discussions.[212] Indeed, there has been no specific suggestion as to when tampering would have taken place, what equipment would have been used, and how it would have escaped contemporaneous detection by the Secret Service or discovery after the fact. *See Robinson v. United States*, 109 U.S.App.D.C. 22, 23–24, 283 F.2d 508, 509–510, *cert. denied*, 364 U.S. 919, 81 S.Ct. 282, 5 L.Ed.2d 259 (1960).

The determination of a District Judge to admit tape recordings rests in his sound discretion. *E. g., United States v. Young*, 488 F.2d 1211, 1214 (8th Cir. 1973); *United States v. Clements*, 484 F.2d 928, 930 (5th Cir. 1973), *cert. denied*, 415 U.S. 991, 94 S.Ct. 1591, 39 L.Ed.2d 888 (1974); *United States v. Bryant*, 480 F.2d 785, 790 (2d Cir. 1973); *Monroe v. United States*, 98 U.S.App.D.C. 228, 234, 234 F.2d 49, 55, *cert. denied*, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956). The decision in this case to admit the tapes, leaving to the jury the question of their weight, falls far short of an abuse of that discretion.

### C. *Admissibility of Particular Excerpts*

Mitchell objects on two different grounds to the admission of a number of specified excerpts in the tape recordings.

---

**212.** Appellants claim that one of the tape recordings did not correspond with Dean's recollection. The tape in question, Feb. 27, 1973, was not introduced in evidence. Dean had previously testified to the Senate Select Committee that three statements were included in that conversation which did not subsequently turn up on the transcript of the tape-recorded conversation. Dean indicated that he could not be sure that those statements had been made on Feb. 27 rather than in other conversations occurring at roughly the same time. Tr. 3505–3508, 3514, 3534–3537. We cannot see any basis to draw the inference that that recording was tampered with merely from a witness' care not to overstate the clarity of his recollection of the contents of the conversation.

**110**

### 1. *Alleged Inadmissibility Under the Opinion and Firsthand Knowledge Rules*

 Mitchell contends that a number of out-of-court declarations recorded on the tapes are inadmissible because they contain expressions of opinion or statements not based upon the declarants' firsthand knowledge.[213] The simple answer to this contention, as the Government notes in its brief, is that these rules are inapplicable to declarations admissible under the co-conspirator exception to the hearsay rule.[214] *See* Advisory Committee Notes on Proposed Federal Rule of Evidence 801(d)(2) (noting the "freedom which admissions have enjoyed from * * * the restrictive influences of the opinion rule and the rule requiring firsthand knowledge," and "the apparently prevalent satisfaction with the results"); C. McCormick, *supra* § 18, at 42 and cases cited n. 42, § 263, at 632 and cases cited n. 29, § 264, at 632–633 and cases cited n. 32; 4 J. Wigmore, *supra,* § 1053(3).[215]

### 2. *Alleged Inadmissibility as Hearsay Falling Outside the Co-Conspirator Exception*

 Mitchell next contends that numerous excerpts on the tape recordings constitute mere narratives of past events, rather than statements made in furtherance of the conspiracy, and hence fall outside the co-conspirator exception to the hearsay rule. We agree with the point that mere narratives of past events are not admissible

hearsay statements. But as applied to the facts in this case, the argument is of limited value to Mitchell.

The conspiracy at issue required the coordination and control of a large number of individuals who had knowledge of the events that were being covered up. It also required the conspirators to make regular strategic decisions on how best to proceed to prevent the full story of "Watergate" from becoming known to the press, prosecutors, Congress, and the public. The tape recordings thus contain discussions of many aspects of Watergate strategy: what would happen if particular individuals were to talk, *e. g.,* Tape Tr. 195, how much knowledge those individuals possessed, *e. g.,* Tape Tr. 306, who was likely to volunteer or be compelled to talk, *e. g.,* Tape Tr. 213–214, 306, 310, what individuals could be dissociated from any responsibility for reprehensible or illegal activity, *e. g.,* Tape Tr. 147, 265–267, 303, 458–459, whether certain officials should assert executive privilege, *e. g.,* Tape Tr. 193–194, whether public statements should be issued and what they might contain, *e. g.,* Tape Tr. 57, whether it was feasible to raise and distribute hush money, *e. g.,* Tape Tr. 131–132, 179, 189–191, whether promises of money or aid had been extended to particular persons, *e. g.,* Tape Tr. 325, and so forth, see *e. g.,* Tape Tr. 64, 72, 82, 86, 89–91, 130, 135, 311.

As the threads of the cover-up began to unravel, it became increasingly important

---

**213.** Because all of the challenged excerpts purport to be statements or observations of the declarants themselves, rather than repetition of other out-of-court declarations, the objection to the admission of these excerpts must be based on the firsthand knowledge and opinion rules, rather than on a claim that these hearsay declarations among co-conspirators contain a second layer of hearsay. *See* C. McCormick, Handbook of the Law of Evidence § 10, at 20–21 (Cleary ed. 1972).

**214.** It is noteworthy that Mitchell's reply brief makes no attempt to refute the Government's position and presents no further argument along these lines.

**215.** The rationales for exempting admissions from these rules are several. The inapplicability of the opinion rule rests upon the modern recognition that this rule is one of preference

for concrete testimony rather than one of exclusion; since there is no opportunity to interrogate an out-of-court declarant at the time of his declaration to obtain more concrete testimony, application of the rule is inappropriate. C. McCormick, *supra* note 213, § 264, at 632–633. As to the firsthand knowledge rule, the rationale for exempting admissions is that those which become material in litigation ordinarily pertain to a matter of some importance to the declarant as to which he is likely to have taken steps to obtain reliable information. *Id.* § 263, at 632. And, as to both rules, the exemption for out-of-court admissions reflects the likelihood that a party (or, in the case of co-conspirators, someone whose statement is attributable to a party) has important information that may be unknown to his opponent. *Id.*

to review what had taken place in order to identify and shore up the loose ends. It became critical for the conspirators to try to ensure that any story they wished to present would not ring false and that any action they were considering would not backfire, a strategy whose success required total familiarity with the facts.[216]

■ In a conspiracy in which consideration of alternative strategies played so central a role,[217] statements which narrate past events are not necessarily "mere narratives" in the usual sense of that phrase. Rather, they can constitute activity that is plainly and importantly "in furtherance of" a conspiracy, and thereby be admissible under the co-conspirator exception to the hearsay rule. *See, e. g., United States v. Annunziato*, 293 F.2d 373, 380 (2d Cir.), *cert. denied*, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); *Zamloch v. United States*, 193

F.2d 889, 890–891 (9th Cir.), *cert. denied*, 343 U.S. 934, 72 S.Ct. 770, 96 L.Ed. 1342 (1952).

■ We have reviewed each of the excerpts to which Mitchell objects in context. Although most of the 39 excerpts contain statements of past facts, almost all of these statements are integral parts of the continual strategy sessions that took place in the White House concerning what to do *in the future* about Watergate. Only four of the excerpts strike us as possibly falling outside of the "in furtherance" requirement.[218] But even were we to assume that it was error to admit these excerpts, the error is clearly harmless.[219]

The evidence of Mitchell's participation in the conspiracy was overwhelming. As noted in our summary of the evidence *supra*, Mitchell was involved in the conspiracy from its inception on June 17 and played a

---

**216.** *Compare* the old saw: "I don't lie because my memory isn't good enough."

**217.** The following exchange, which directly followed a discussion on the subject of Watergate strategy, reflects the extent to which Ehrlichman and Haldeman and President Nixon—whose conversations constitute the great bulk of the tape recordings that were introduced into evidence—were involved in planning strategy on "Watergate":

> EHRLICHMAN: Oh, no. I was working on something I'll tell you about here.
> PRESIDENT: What did you do?
> EHRLICHMAN: Uh, well, not much last night.
> PRESIDENT: You mean another subject?
> EHRLICHMAN: Oh, no. No, this—
> HALDEMAN: There is no other subject. (Laughs)
> EHRLICHMAN: This week there's no other subject.
> PRESIDENT: Yeah.

Tape Tr. 348.

**218.** *See* Tape Tr. 51, 318, 588, 642–644.

**219.** Mitchell also objects to the admission of hearsay declarations of co-conspirators on the theory that any conspiracy of which he was a member had ended by March of 1973, at which time Nixon, Ehrlichman, Haldeman, and Dean were considering a plan to make Mitchell the "fall guy." He alleges that this activity constituted a second conspiracy, of which he was not a member, and hence the excerpts pertaining to it could not be admitted against him under the co-conspirator exception to the hearsay rule.

Although the only document in the Joint Appendix in which Mitchell objects to the admissibility of certain portions of the tapes does not mention this argument, J.A. 606–611, his counsel appears to have made this argument orally on at least one occasion, Tr. 3320. The District Judge, however, ruled the tapes admissible over this objection. We believe that there was no error in his finding sufficient evidence of a single and continuing conspiracy of which Mitchell was a member to permit the jury to listen to the excerpts in question. As the Government argues, the abortive plan to have Mitchell step forward to take the blame was compatible with the conspiracy's central objective—to cover up any information that might embarrass the Nixon White House. When some information began to become public, it was logical and foreseeable that the conspirators would next try to limit the number of people whom that information might implicate, and having Mitchell assume the blame was one way to limit the vulnerability of others. But even then Mitchell was to be given veiled assurances of clemency if he agreed to go along with the plan. Perhaps most important, when this plan was not executed Mitchell remained a loyal member of the conspiracy in his later appearances before the grand jury and the Senate committee. Finally, there was no evidence that Mitchell made any attempt whatsoever to withdraw from the conspiracy. Thus there was ample evidence—independent of the tape recordings themselves—to support the existence of a single conspiracy to which Mitchell belonged and which extended into the summer of 1973.

central role in virtually every stage. The Government is entirely correct when it states at page 37 of its brief that

> [t]here was no aspect of the obstruction in which [Mitchell] was not involved; the attempt to "spring" McCord; the false press release; the destruction of documents; the Magruder "cover story"; the attempted misuse of the CIA; the "hush money" payments; the veiled offers of clemency; and, finally, the false statements and perjurious testimony.

And his complicity in these events was irrefutably established at trial through the testimony of Dean, Magruder, LaRue, and Kalmbach, as well as co-defendants Haldeman and Ehrlichman.

Finally, contained on the excerpts *that were* properly admitted were a large number of statements by Dean, Nixon, Ehrlichman, and Haldeman that fully implicated Mitchell in the crimes of which he was convicted.[220] Any incriminating declarations on the four excerpts in question merely tracked the substance of a much larger number of declarations that were properly admitted. In light of this fact and the overwhelming evidence of Mitchell's guilt, any error that may exist is clearly harmless beyond any reasonable doubt.[221]

We have considered all of Mitchell's arguments regarding the admission of the tapes, and we believe that none of them identifies any prejudicial error.

## XI. THE JURY INSTRUCTIONS

 Haldeman raises many challenges to the court's instructions to the jury, a

number of which are insubstantial and will not be discussed.[222] The other alleged errors, though of more substance and considered at length herein, do not constitute reversible error.

### A. *The Specific Intent Instruction*

Haldeman raises a number of arguments which he contends demonstrate that the District Court failed to give a clear and correct definition of the essential element of specific intent. His major points appear to be: (1) the court failed to emphasize specific intent as an element of each offense charged; (2) the court failed to distinguish specific intent from general intent; and (3) the placement of the specific intent instruction tended to minimize its impact. For the reasons explained below, we find no error in the judge's charge to the jury on this subject.

 First, it becomes clear upon reading the entire charge (Tr. 12356–12415) that the jury was instructed with respect to each count that they must find the presence of specific intent as a prerequisite to returning a verdict of guilty. The judge first addressed the charge of conspiracy, telling the jury that one of the essential elements of the offense is "[t]hat each Defendant knowingly participated in this conspiracy *with the intent to commit the offense* or the fraud which was the object of the conspiracy * * *." Tr. 12364 (emphasis added). This is a correct statement, for the specific intent required for the crime of conspiracy is in fact the intent to advance or further the unlawful object of the conspiracy.[223] But the judge went on to give a

---

**220.** *See, e. g.,* Tape Tr. 64, 82, 86, 123, 131–132, 135, 146, 189–190, 195, 245, 265, 267, 325, 350–351, 391, 458–459, 480–481.

**221.** For reasons stated at pp. 126–127 n.200 of the Government's brief, we find no prejudicial error in the prosecution's summation before the jury.

**222.** For example, appellant's argument that the trial court erred in not instructing the jury that the perjuries before the Senate Select Committee were not part of the "means" of the conspiracy, Haldeman br. at 119, is incorrect in that Count 1, ¶ 15(d) of the revised indictment

specifically alleges that "[t]he conspirators would give false, misleading, evasive and deceptive statements and testimony" as one of the means of carrying out the conspiracy. This general allegation was sufficient to support the admission of the testimony before the Senate Committee and the instruction thereon as given.

**223.** *Direct Sales Co. v. United States,* 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943); Note, *Developments in the Law of Criminal Conspiracy,* 72 Harv.L.Rev. 920, 935 (1959). *Cf.* 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 29.05 (1970).

more comprehensive instruction on the meaning of "specific intent":

> The Government must also prove, as part of the second element of the crime of conspiracy, that each Defendant who allegedly participated in the conspiracy charged did so with criminal intent.
>
> "Intent" means that a person had the purpose to do a thing; it means that he made an act of the will to do the thing; it means that the thing was done consciously and voluntarily and not inadvertently or accidentally.
>
> Now, some criminal offenses require only a general intent. Where this is so and it is shown that a person has knowingly committed an act which the law makes a crime, intent may be inferred from the doing of the act. Other offenses, *such as this one* [conspiracy], require a specific intent. Specific intent requires more than a mere general intent to engage in certain conduct or to do certain acts. A person who knowingly does an act which the law forbids intending with bad purpose either to disobey or disregard the law, may be found to act with specific intent.

Tr. 12367–12368 (emphasis added). The court's charge on this point was nearly a verbatim statement of the applicable D. C. Standard Jury Instruction,[224] which we specifically approved in *United States v. Moore,* 140 U.S.App.D.C. 309, 311, 435 F.2d 113, 115 (1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1376, 28 L.Ed.2d 647 (1971). The District Court went on to emphasize that since the defendants "claim[ed] they lacked the specific intent to join the alleged conspiracy," the jury had to be "satisfied beyond a reasonable doubt that a Defendant possessed the specific intent to join the conspiracy" in order to find that defendant guilty of Count 1. Tr. 12370.

 The jury instructions thus clearly spelled out for the jury that specific intent was an essential element of the crime of conspiracy charged under Count 1. Haldeman, however, argues that because the definition of specific intent does not appear in the same place as the recital of the elements of the crime of conspiracy, the jury could have been confused into believing that only general intent was required to

---

Some legal writers have contended that two intents are required for the crime of conspiracy: an intent to agree and an intent to achieve the object of the agreement (and thus of the conspiracy). Harno, *Intent in a Criminal Conspiracy,* 89 U.Pa.L.Rev. 624, 631 (1941). *Accord,* 1 Wharton's Criminal Law and Procedure § 85 (R. Anderson ed. 1957); *Developments in the Law of Criminal Conspiracy, supra* at 935. Haldeman contends that the trial judge here instructed the jury only on the necessity of finding the latter type of specific intent, and never charged the jury to determine whether each appellant had the specific intent to agree. Haldeman br. at 131. This argument derives some weight from the record, for although the judge did at one point instruct the jury that "if you are not satisfied beyond a reasonable doubt that a Defendant possessed the specific intent to join a conspiracy, you should find that Defendant *not guilty* on that charge," Tr. 12370, he omitted any reference to specific intent to agree when defining the intent required. Tr. 12367–12368. On the other hand; the judge did point out that each defendant must be found to have acted *wilfully and knowingly,* Tr. 12368–12369, and told the jury that "[y]ou may infer that a person ordinarily *intends* the natural and probable consequences of acts knowingly done or knowingly omitted." Tr. 12369 (emphasis added). *This might be read as in* essence requiring the jury to find a specific intent to agree, especially in conjunction with the above-quoted passage from Tr. 12370.

We need not decide this issue, however, since Haldeman did not raise it at trial. *Compare* J.A. 714–715 (Haldeman's requested instruction on specific intent) *with* J.A. 723 (Mardian's requested instruction on intent). *See* Fed.R. Crim.P. 30. Nor can we find plain error here as required by Fed.R.Crim.P. 52(b), since the substance of the instruction was given. Moreover, it is questionable whether the court need instruct the jury on the necessity of finding both intents. On the facts of this case, the formative agreements to join were so wrapped up in the stated attempts to achieve the unlawful objects that the specific intent required for both phases of the conspiracy were clearly deducible from the same evidence. *See* 1 Wharton's Criminal Law and Procedure § 85 (R. Anderson ed. 1957); *cf.* 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 29.05 (1970); District of Columbia Bar Ass'n, Criminal Jury instructions for the District of Columbia 4.92 (2d ed. 1972) (hereinafter cited as D.C. Criminal Jury Instructions).

224. D.C. Criminal Jury Instructions, *supra* note 223, No. 3.01.

convict on that charge. We cannot accept that contention, for the instructions are to be examined as a whole on appeal.[225] It could be most disruptive and confusing if the judge were required to interrupt his identification of the elements of an offense with definitions of the terms involved. Doubtlessly, some might be able to improve the organization of the charge but we find no error in this portion of it. Here, the judge indicated the type of intent required for conspiracy every time the subject came up[226]; the fact that he occasionally failed to use the word "specific"[227] and only once defined "specific intent" in great detail is not ground for reversal.

Similarly, the instruction on Count 2, the obstruction of justice count, was clear as to the need for specific intent. The judge told the jury:

I have already instructed you on what we mean when we use the words, "specific intent," "knowingly," and "wilfully." These words center on the purpose an

individual has when he does something, that is, his intent, his will. *Specific intent is an important element of the crime charged in Count Two.* To convict any Defendant charged in Count Two, you must find, *in addition to the other elements,* that he had the specific intent to obstruct, impair, or impede the due administration of justice and that his endeavor was not accidental or inadvertent.

Tr. 12381 (emphasis added). The argument, raised by Haldeman,[228] that there was something prejudicial in the court's failure to use the words "necessary" or "required," or in failing to include the phrase "with bad purpose either to disobey or disregard the law" when referring to specific intent, is insubstantial in light of the above-quoted language. Specific intent is plainly identified not only as an "element" of the offense (and therefore "necessary") but also as an "*important* element." And since the requisites of a finding of specific intent (including the necessity of an evil purpose) had been explained earlier and were cross-refer-

225. *United States v. Moore,* 140 U.S.App.D.C. 309, 312 nn.3, 5, 435 F.2d 113, 116 nn.3, 5 (1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1376, 28 L.Ed.2d 647 (1971). *Accord, United States v. Hollinshead,* 495 F.2d 1154, 1156 (9th Cir. 1974); *Winchester v. United States,* 394 F.2d 489 (9th Cir. 1968); *Howard v. United States,* 128 U.S.App.D.C. 336, 340, 389 F.2d 287, 291 (1967); *Cohen v. United States,* 378 F.2d 751, 755 (9th Cir.), *cert. denied,* 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967).

226. The main distinction between specific and general intent is the element of bad or evil purpose which is required for the former. Thus a person who knowingly commits an act which the law makes a crime may be said to have general intent, while the person who commits the same act with bad purpose either to disobey or disregard the law may be said to have specific intent. *United States v. Moore, supra* note 225, 140 U.S.App.D.C. at 311, 435 F.2d at 115. *Accord, James v. United States,* 366 U.S. 213, 221, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); *United States v. Krosky,* 418 F.2d 65, 67 (6th Cir. 1969); *People v. Marsh,* 58 Cal.2d 732, 743, 26 Cal.Rptr. 300, 307, 376 P.2d 300, 307 (1962); *People v. Aday,* 226 Cal.App.2d 520, 38 Cal.Rptr. 199, 208 (1964). As is stated in 1 E. Devitt & C. Blackmar, *supra* note 223, at § 13.03:

To establish specific intent the government must prove that the defendant knowingly did an act which the law forbids, (or knowingly

failed to do an act which the law requires,) *purposely intending to violate the law.*

(Emphasis added.) This is not to say, however, that the accused must have known he was violating a specific statute, *see United States v. Feola,* 420 U.S. 671, 686–696, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), but only that he knew he was acting wrongly or violating the law in general when he acted.

In the present case, the judge's numerous references to the type of intent required all observe this distinction. The judge repeatedly told the jury either that they must find "specific intent," Tr. 12367, 12370, 12372, 12378, or that they must find an "intent to commit the *offense * * ** which was the object of the conspiracy." Tr. 12364 (emphasis added). *See also* Tr. 12366, 12367, 12371, 12378. In one place the judge did depart from this form and said, "If you find that a Defendant's intent was innocent, you must find him not guilty. If you find that his intent was corrupt, you may find him guilty if you also find that the other elements of the offense have been proved beyond a reasonable doubt." Tr. 12382–12383. But the judge defined "corruptly" as "having an evil or improper purpose or intent," Tr. 12382—*i. e.,* as having specific intent.

227. *See* citations to transcript in note 226 *supra.*

228. Haldeman br. at 125, 132.

enced here, the failure to define the term in detail again does not constitute error. Once a proper instruction is given, it need not be fully repeated on every subsequent occasion when it is referred to in listing the requirements for conviction.[229] This point also disposes of the contentions that the District Court acted improperly in making only "shorthand" references[230] to "specific intent," without defining the term, when instructing on the perjury and false declarations counts. Haldeman br. at 126.

The second group of arguments made against the court's specific intent instruction is that it failed to distinguish specific intent from general intent.[231] See, e. g., Haldeman br. at 129–130. Ignoring the careful distinction drawn between the two concepts by the trial judge when he defined "specific intent" for the jury, see text at 147 supra, appellant criticizes the use both of the "natural and probable consequences" instruction[232] and the instruction to consider "all of the circumstances"[233] as creating the impression "that it was permissible to infer specific knowledge or intent solely on the basis of equivocal criteria, and without regard to the totality of the circumstances." Haldeman br. at 129 (emphasis added). See also id. at 127.

Charging that the jury could consider "all of the circumstances" was clearly proper. Except in extraordinary circumstances, criminal intent cannot be proved by direct evidence; it is therefore not only appropriate but also necessary for the jury to look at "all of the circumstanc-

---

**229.** *Agnew v. United States,* 165 U.S. 36, 51 (1897); *Grand Trunk Ry. v. Ives,* 144 U.S. 408, 428 (1892); *New York, Lake Erie & Western Ry. v. Winter,* 143 U.S. 60, 75, 12 S.Ct. 356, 36 L.Ed. 71 (1892); *United States v. Fayette,* 388 F.2d 728, 737 (2d Cir. 1968); *United States v. Kelly,* 349 F.2d 720, 760 (2d Cir. 1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); *Estes v. United States,* 335 F.2d 609, 617 (5th Cir. 1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965); *cf. Dranow v. United States,* 307 F.2d 545, 568–570 (8th Cir. 1962). *See generally* 75 Am. Jur.2d *Trial* § 630 (1974); 23A C.J.S. *Criminal Law* § 1304 (1961).

We also disagree with Haldeman that the example used by the trial judge in charging the jury on the meaning of the term "corruptly" in Count 2 ignores completely the element of specific intent. Haldeman br. at 125–126. The allegedly improper statement, reproduced in full, is as follows:

The third essential element [of the crime of endeavoring to obstruct justice, charged in Count 2] focuses on the word, "corruptly." The word, "corruptly", as used in this statute simply means having an evil or improper purpose or intent.

In terms of proof, in order to convict any Defendant of obstruction of justice, you must be convinced beyond a reasonable doubt that the Defendant made some effort to impede or obstruct the Watergate investigation or the trial of the original Watergate defendants.

If you find, for example, that a Defendant participated in the payment of money to the original Watergate defendants *for the purpose of keeping them quiet,* you would be justified in finding that a corrupt endeavor to obstruct the due administration of justice occurred.

Tr. 12382 (emphasis added). Haldeman's argument apparently is that the italicized phrase might have given the jury the impression that they could convict without a finding of specific intent—that is, after finding only that a defendant had acted with the purpose of keeping one of the Watergate burglars "quiet," without finding the further evil purpose of impeding the Watergate investigation. *See note 226 supra.* Such an argument makes no sense in light of the second paragraph quoted above (immediately preceding the example to which objection is made) and in light of the definition of "corruptly." *See note 226 supra.*

**230.** Haldeman br. at 126. *See* Tr. 12387–12388; Tr. 12392.

**231.** For a discussion of the distinction between the two concepts, *see* note 226 *supra.*

**232.** You may consider any statement made, an act done or omitted by a Defendant and all other facts and circumstances in evidence which indicate his state of mind. *You may infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted.*

Tr. 12369 (emphasis added).

**233.** I have already explained in detail what specific intent means. However, let me remind you that you should consider all of the circumstances in evidence that you deem relevant in determining whether the Government has proved beyond a reasonable doubt that a Defendant acted with the required specific intent.

Tr. 12407.

es" in determining specific intent.[234] After all, when all the circumstantial evidence is considered, it might support the defense. The instruction in question was therefore both proper and beneficial to the appellants, since it cautioned the jury against fixing on one or two isolated circumstances as evidence of intent. This is not to say that intent may be *presumed* as a matter of law from the circumstances—*e. g.,* from the commission of the crime itself—but only that intent may be *inferred* from all the circumstantial evidence introduced at trial.

▇ As to the "natural and probable consequences" instruction, we have previously approved this instruction—with the inclusion of the phrase "knowingly done or knowingly omitted" as indicated by the D.C. Criminal Jury Instructions [235]—in *United States v. Moore, supra,* 140 U.S.App. D.C. at 312, 435 F.2d at 116. However, we did so with some reservation. As we point-

ed out there,[236] several circuits have found this instruction to be both useless and misleading; one court has called it "an invitation to reversal." [237] But we did not find the mere use of this instruction, without more, to be reversible error in *Moore.*[238] We considered the charge as a whole and found no plain error,[239] a procedure which finds support in other circuits as well.[240] That approach will be adhered to here, where we also find reversal to be unwarranted. In this case the phrase "knowingly done or knowingly omitted" was included in the charge on this point, although we note that the final sentence of D.C. Standard Criminal Instruction 3.02 [241]—a sentence which was inserted by the drafters to help assure proper application of the "natural and probable consequences" portion of the instruction [242]—was not used here.[243] Also, we note that, as in *Moore,* there was no

---

**234.** *Gallion v. United States,* 386 F.2d 255, 257 (9th Cir. 1967); *Benchwick v. United States,* 297 F.2d 330, 333 (9th Cir. 1961); *Hall v. United States,* 286 F.2d 676, 680 (5th Cir. 1960); *United States v. Nystrom,* 237 F.2d 218, 225 (3d Cir. 1956); R. Perkins, Criminal Law 629 n.40 (2d ed. 1969).

**235.** D.C. Criminal Jury Instructions, *supra* note 223, No. 3.02:

Intent ordinarily cannot be proved directly, because there is no way of fathoming and scrutinizing the operations of the human mind. But you may infer as to the defendant's intent from the surrounding circumstances. You may consider any statement made and act done or omitted by the defendant, and all other facts and circumstances in evidence which indicate his state of mind. You may infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. However, you should consider all of the circumstances in evidence that you deem relevant in determining whether the Government has proved beyond a reasonable doubt that the defendant acted with the required intent.

**236.** 140 U.S.App.D.C. at 311–312 n.3, 435 F.2d at 115–116 n.3.

**237.** *Cohen v. United States,* 378 F.2d 751, 755 (9th Cir.), *cert. denied,* 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967). *See also United States v. Barash,* 365 F.2d 395, 402 (2d Cir. 1966); *United States v. Releford,* 352 F.2d 36, 40 (6th Cir. 1965), *cert. denied,* 382 U.S. 984, 86 S.Ct. 562, 15 L.Ed.2d 473 (1966); *Mann v. Unit-*

ed States, 319 F.2d 404, 409 (5th Cir. 1963), *cert. denied,* 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964); *Chappell v. United States,* 270 F.2d 274, 279–280 (9th Cir. 1959).

**238.** In *Moore,* we found no reversible error in the use of this instruction even though the phrase "knowingly done or knowingly omitted" was not included. 140 U.S.App.D.C. at 312, 435 F.2d at 116. The validity of each instruction must be judged by the particular facts of each case, and whether the instruction was objected to at trial may also be a controlling factor.

**239.** *See* Fed.R.Crim.P. 52(b).

**240.** *Cohen v. United States, supra* note 237; *United States v. Releford, supra* note 237; *Armstrong v. United States,* 327 F.2d 189, 195 (9th Cir. 1964); *Turf Center Inc. v. United States,* 325 F.2d 793, 797 n.5 (9th Cir. 1963); *Sherwin v. United States,* 320 F.2d 137, 151 (9th Cir. 1963); *Baker v. United States,* 310 F.2d 924, 931 (9th Cir. 1962); *Legatos v. United States,* 222 F.2d 678, 687 (9th Cir. 1955); *Bateman v. United States,* 212 F.2d 61, 69–70 (9th Cir. 1954).

**241.** *See* note 235 *supra.*

**242.** Comment, D.C. Criminal Jury Instruction No. 3.02, *supra* note 223.

**243.** *Compare* note 232 *supra with* note 235 *supra.*

objection raised at trial to this instruction.[244] *See* Fed.R.Crim.P. 30. But of controlling importance is our own evaluation of the *entire* charge, from which we have concluded on the facts of this case that the jury was adequately and fairly instructed on the requirement of specific intent.

■ The final group of arguments which Haldeman makes against the court's specific intent instruction is his criticism of its location within the overall charge to the jury. One source of prejudice is said to be the placement of the definition of "specific intent" (quoted in text at ——— of 181 U.S.App.D.C., at 116 of 559 F.2d *supra*) immediately after a discussion of "guilty knowledge" and somewhat before the court's discussion of "natural and probable consequences," which allegedly operated to minimize the impact of the specific intent charge. Haldeman br. at 128. Appellant apparently believes that the jury could be confused by the serial explanation of these similar concepts. However, when the entire charge is read it becomes clear that the judge's order was logical and designed to minimize confusion. First, he explained the elements of Count 1, the conspiracy count; then he defined the legal concepts that the jury would have to employ in considering the first count; and then he proceeded to discuss the other counts, adding definitions or referring back to ones previously made as necessary. By discussing all the similar concepts in one place, the judge could minimize confusion by clarifying the differences between them; and he also avoided confusion regarding the elements of the crime by listing them all at once first, without interruption for definitions of terms. We find no undue potential for confusion here.

■ Appellant's other argument on this point is similar: he contends that, immediately after explaining that specific intent requires a finding that the accused acted "knowingly," the District Judge did an "about-face," Haldeman br. at 123, by stating that "[i]n attempting to show that a defendant acted wilfully, it is not essential that the Government establish that the Defendant knew he was breaking some particular rule or law." Tr. 12368. The judge's statement was correct: a defendant does not have to be aware that he was violating a particular law, such as 18 U.S.C. § 371, so long as he had the conscious intent to do that which the law in fact forbids. *See generally United States v. Feola,* 420 U.S. 671, 686–696, 95 S.Ct. 1255 (1975). Referring to the specific intent required by the crime of obstructing justice in *Caldwell v. United States,* 95 U.S.App.D.C. 35, 37, 218 F.2d 370, 372 (1954), *cert. denied,* 349 U.S. 980, 75 S.Ct. 773, 99 L.Ed. 1260 (1955), we stated:

> The only intent involved in the crime is the intent to do the forbidden act. The defendant "must have had knowledge of the facts, though not necessarily the law, that made" his act criminal.

Again, the placement of a caveat immediately following the specific intent definition in all likelihood tended to clarify the requirements for conviction rather than to confuse the jury.

In summary, we find the specific intent instruction given by the District Court to be adequate and nonprejudicial, and we reject this alleged ground for reversal.

B. *The Instruction on Membership in the Conspiracy*

In instructing the jury on the standards it must follow in determining whether a particular defendant became a member of the conspiracy the court stated:

> Now, this element of participation or membership must be considered and decided with specific and individual reference to the particular Defendant you are considering in the case. This must be emphasized even though conspiracy and membership in a conspiracy involves relationships between participants.
>
> Each Defendant's participation in the alleged conspiracy, if it is to be found, must be established by evidence of the

Defendant's own words, his own actions *and the general course of his conduct.* Tr. 12365 (emphasis added).

▉▉▉▉▉▉ Haldeman, relying on D.C. Criminal Jury Instruction 4.92,[245] contends that the italicized words, "and the general course of his conduct," injected an impermissible element into the charge by suggesting that membership in the conspiracy could be determined on the basis of something other than a particular defendant's own words and acts. We do not so interpret the added words. The correct formulation of this rule is that a particular defendant's connection with a conspiracy must be established by proof *aliunde*—that is, by proof other than the extra-judicial (hearsay) declarations of persons named or charged as co-conspirators or accomplices.[246] Some preliminary determination [247] must be

made as to whether, if the testimony of Government witnesses is accepted as true, each defendant's own acts and statements show a connection with the conspiracy sufficient to justify the admission of the acts and statements of co-conspirators against him. The corollary to this rule is that, once the conspiracy has been established and a particular defendant linked to it by independent evidence, incriminating statements made by a co-conspirator during the pendency and in furtherance of the conspiracy are admissible against that defendant as an exception to the hearsay rule. *See generally* 4 J. Wigmore, Evidence § 1079 (Chadbourn rev. ed. 1972), and cases cited in note 246 *supra.*

▉▉▉▉ Given this purpose to the rule, it is clear that a defendant's own "conduct" may

---

**245.** D.C. Criminal Jury Instructions, *supra* note 223, No. 4.92

 \* \* \* \* \* \*

In determining whether a conspiracy existed, you should consider the actions and declarations of all of the alleged participants. However, in determining whether a particular defendant was a member of the conspiracy, if any, you may consider only his own acts and statements. He cannot be bound by the acts or declarations of other participants unless and until it is established that a conspiracy existed, and that he was one of its members.

 \* \* \* \* \* \*

*See also* 1 E. Devitt & C. Blackmar, *supra* note 223, at § 29.05.

**246.** *Glasser v. United States,* 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Donner,* 497 F.2d 184, 193 (7th Cir.), cert. denied, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 641 (1974); *United States v. Projansky,* 465 F.2d 123, 137–138 (2d Cir. 1972); *United States v. Nall,* 437 F.2d 1177, 1183 (5th Cir. 1971); *United States v. Baker,* 419 F.2d 83, 88–89 (2d Cir. 1969; *Orser v. United States,* 362 F.2d 580, 585–586 (5th Cir. 1966); *Dennis v. United States,* 346 F.2d 10, 16 (10th Cir. 1965), rev'd on other grounds, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); *Newman v. United States,* 331 F.2d 968, 971 (8th Cir. 1964), cert. denied, 379 U.S. 975, 85 S.Ct. 672, 13 L.Ed.2d 566 (1965); *Carbo v. United States,* 314 F.2d 718, 735 (9th Cir. 1963); *Landers v. United States,* 304 F.2d 577, 582 (5th Cir. 1962); *Continental Baking Co. v. United States,* 281 F.2d 137, 153 (6th Cir. 1960); *Taylor v. United States,* 104 U.S.App.D.C. 219, 220, 260 F.2d 737, 738 (1958); *Panci v. United States,* 256 F.2d 308, 311 (5th Cir. 1958); *Montford v. Unit-*

ed States, 200 F.2d 759, 760 (5th Cir. 1952); *May v. United States,* 84 U.S.App.D.C. 233, 246–247, 175 F.2d 994, 1007–1008 (1949); *Minner v. United States,* 57 F.2d 506, 511 (10th Cir. 1932).

**247.** Courts are split on the question of who is to make this preliminary determination. Some courts require the *jury* to determine the defendant's membership in the conspiracy beyond a reasonable doubt based solely on independent proof before proceeding to consider the co-conspirator's evidence. *United States v. Donner,* 497 F.2d 184, 193 (7th Cir.), cert. denied, 419 U.S. 1047 (1974); *Dennis v. United States,* 346 F.2d 10, 16 (10th Cir. 1965), rev'd on other grounds 384 U.S. 855, 86 S.Ct. 1840 (1966); *Newman v. United States,* 331 F.2d 968, 971 (8th Cir. 1964), cert. denied, 379 U.S. 975, 85 S.Ct. 672 (1965); *Landers v. United States,* 304 F.2d 577, 582 (5th Cir. 1962). Other courts require the *trial judge* to initially determine the defendant's membership in the conspiracy based on proof *aliunde,* and employing a less demanding standard than "reasonable doubt," after which the jury may consider *all* evidence in finally determining whether the defendant participated in the conspiracy beyond a reasonable doubt. *United States v. Projansky,* 465 F.2d 123, 137–138 (2d Cir. 1972); *Carbo v. United States,* 314 F.2d 718, 735–738 (9th Cir. 1963). We need not decide which rule will prevail in this circuit, since courts allow the jury to consider a defendant's own "conduct" even under the first, more restrictive rule. *See United States v. Donner, supra* at 193; *Dennis v. United States, supra* at 16; *Newman v. United States, supra* at 971.

be treated in the same manner as his own statements and acts since it is proof independent of the hearsay declarations of co-conspirators; it should therefore be considered in establishing his connection to the conspiracy. The weight of authority supports this.[248] Furthermore, referring to "the general course of his conduct" does not add something impermissible to "words and acts," but rather suggests to the jury that instead of being limited to viewing the "words and acts of the accused" in isolation, it was proper to reflect upon their general course over a period of time and to draw such conclusions therefrom as would be indicated to the jurors. "Conduct" is not something different from "words and acts" but is a pattern perceived from individual or repeated words and acts.

It is seldom that a major case will be tried without some deviation from the approved instructions being fully justified to more closely fit a precise situation in the interest of clarity or desired emphasis. We so view the words which were added here. The questioned portion of the instruction merely called the attention of the jury to the fact that, if they wished, they might be able to arrive at a more perceptive conclusion from the "words and acts" by viewing the "general course" indicated thereby.

· We see no error in the added words. They merely add an element of common sense.

### C. The Scope of the Indictment

A final major objection made to the court's instructions to the jury is that they are alleged to have described the offenses charged by Counts 1 and 2 in language that went beyond the scope of the indictment[249] —thus permitting the jury to find guilt on the basis of facts not fairly charged and therefore not properly before it.

### 1. The Alleged Merger of Counts 1 and 2

In the course of its instructions on the charge of obstruction of justice as set forth in Count 2,[250] the court stated:

> Count Two charges, in substance, that the Defendants Messrs. Mitchell, Haldeman, Ehrlichman and Parkinson, *as well as other alleged conspirators, not Defendants here or conspirators, either one,* corruptly endeavored to influence, obstruct, and impede the due administration of justice. . . .

Tr. 12379 (emphasis added). Haldeman contends that this single reference to "conspirators" in connection with Count 2 introduced "elements of the law of conspiracy into the second count of the indictment, thereby commingling the elements of [the

**248.** *See United States v. Donner, supra* note 247, 497 F.2d at 193; *United States v. Jacobs,* 431 F.2d 754, 761 (2d Cir. 1970); *Dennis v. United States, supra* note 247, 346 F.2d at 16; *Newman v. United States, supra* note 247, 331 F.2d at 971.

**249.** All references in this section are to the revised version of the indictment that went to the jury, which appears at J.A. 113–154.·

**250.** COUNT TWO

The Grand Jury further charges:

1. From on or about June 17, 1972, up to and including the date of the filing of this indictment, in the District of Columbia, and elsewhere, JOHN N. MITCHELL, HARRY R. HALDEMAN, JOHN D. EHRLICHMAN, CHARLES W. COLSON, KENNETH W. PARKINSON and GORDON STRACHAN, the DEFENDANTS, unlawfully, willfully and knowingly did corruptly influence, obstruct and impede, and did corruptly endeavor to influence, obstruct and impede the due administration of justice in connection with an

investigation being conducted by the Federal Bureau of Investigation and the United States Attorney's Office for the District of Columbia, in conjunction with a Grand Jury of the United States District Court for the District of Columbia, and in connection with the trial of Criminal Case No. 1827–72 in the United States District Court for the District of Columbia, by making cash payments and offers of other benefits to and for the benefit of the defendants in Criminal Case No. 1827–72 in the United States District Court for the District of Columbia, and to others, both prior to and subsequent to the return of the indictment on September 15, 1972, for the purpose of concealing and causing to be concealed the identities of the persons who were responsible for, participated in, and had knowledge of the activities which were the subject of the investigation and trial, and by other means.

(Title 18, United States Code, Sections 1503 and 2.)

first and second] charges, broadening the scope of the Indictment, and allowing the jury to convict on both Counts One and Two on the basis of the same evidence." Haldeman br. at 117. We disagree. The italicized portion of the statement is nothing more than a permissible description of the actual status of Charles W. Colson and Gordon Strachan, who were both named as defendants in the conspiracy count and in the count charging obstruction of justice, but who were not on trial at that time. For the court to call attention to the existence of these two men who were "not Defendants here" was desirable and proper. The jury would not consider the statement to be anything more than a reference to the status of these men.[251]

### 2. *"Misuse" of the Central Intelligence Agency (CIA): Count 1*

■ Haldeman next contends that, since the indictment did not specifically allege that "misuse" of the CIA to interfere with the FBI's investigation was part of the conspiracy charged in Count 1,[252] the jury was improperly instructed that they could consider such misuse to convict for conspiracy. Tr. 12377. This allegedly injected a new charge into the indictment. Haldeman br. at 114.

We must disagree with Haldeman's argument that "[n]owhere in the Indictment was any defendant in this case charged with any crime pertaining to the Central Intelligence Agency or with any crime committed, in whole or in part, by reason of alleged 'misuse' of the Agency." Haldeman br. at 111. This is simply incorrect. While it is true that the indictment did not use the words "misuse of the CIA," it is wrong to say that the conspiracy count did not allege facts that, if proved, would constitute misuse of the CIA. Count 1 (the conspiracy

count) of the indictment charged that the defendants unlawfully conspired

> to obstruct justice in violation of Title 18, United States Code, Section 1503 * * and to defraud the United States and Agencies and Departments thereof, to wit, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), and the Department of Justice, of the Government's right to have the officials of these Departments and Agencies transact their official business honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction, all in violation of Title 18, United States Code, Section 371.

Count 1, ¶ 10, J.A. 115–116; and that

> 11. It was a part of the conspiracy that the conspirators would corruptly influence, obstruct and impede, and corruptly endeavor to influence, obstruct and impede, the due administration of justice in connection with the investigation referred to in paragraph three (3) above and in connection with the trial of Criminal Case No. 1827–72 in the United States District Court for the District of Columbia, for the purpose of concealing and causing to be concealed the identities of the persons who were responsible for, participated in, and had knowledge of (a) the activities which were the subject of the investigation and trial, and (b) other illegal and improper activities.

Count 1, ¶ 11, J.A. 116;

> 13. It was further a part of the conspiracy that the conspirators would, by deceit, craft, trickery and dishonest means, defraud the United States by interfering with and obstructing the lawful governmental functions of the CIA, in that the conspirators would induce the

---

251. In any case, the prejudice to appellants from the reference to the conspiracy during the court's charge on Count 2 would be minimal, since, as Haldeman admits, the court could have instructed the jury that any defendant found to be a member of the conspiracy under Count 1 could be found guilty under Count 2 for the obstructive acts of his co-conspirators committed during the course of and in further-

ance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Failure of the court to give such an instruction favored, rather than prejudiced, the appellants.

252. Since the case of Mardian is the subject of a separate opinion, nothing here said relates to the conspiracy charge against him.

CIA to provide financial assistance to persons who were subjects of the investigation referred to in paragraph (3) above, for the purposes stated in paragraph eleven (11) above.

Count 1, ¶ 13, J.A. 117;

15. * * * (g) The conspirators would attempt to obtain CIA financial assistance for persons who were subjects of the investigation * * *.

Count 1, ¶ 15, J.A. 119.

The Overt Acts also contained allegations of the attempted misuse of the CIA:

7. On or about June 24, 1972, JOHN N. MITCHELL and ROBERT C. MARDIAN met with John W. Dean, III, at 1701 Pennsylvania Avenue in the District of Columbia, at which time MITCHELL and MARDIAN suggested to Dean that the CIA be requested to provide covert funds for the assistance of the persons involved in the Watergate break-in.

8. On or about June 26, 1972, JOHN D. EHRLICHMAN met with John W. Dean, III, at the White House in the District of Columbia, at which time EHRLICHMAN approved a suggestion that Dean ask General Vernon A. Walters, Deputy Director of the CIA, whether the CIA could use covert funds to pay the bail and salaries of the persons involved in the Watergate break-in.

J.A. 120–121.

■■■ The unlawful agreement to attempt to use the CIA to interfere with the investigation of the Watergate break-in was thus fairly charged in Count 1 of the indictment as one of the *means* by which the defendants intended to accomplish one of the principal objects of their conspiracy—defrauding the United States of its right to have its officials and agencies transact their business honestly, impartial-ly, and free from corruption or undue influence or obstruction. The indictment was thus sufficient to put the defendants on notice of the charges against them and to enable them to plead an acquittal or conviction in bar of future prosecution of the same offense based on the same CIA evidence. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). The particular means allegedly used were identified. *Cf. Russell v. United States,* 369 U.S. 749, 764–766, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Nance,* 174 U.S.App.D.C. 472, 533 F.2d 699 (1976). Beyond this, it is not necessary for the indictment to include "[t]he particularity of time, place, circumstances, causes, etc., in stating the manner and means of effecting the object of a conspiracy * * *. Such specificity of detail falls rather within the scope of a bill of particulars * * *." *Glasser v. United States,* 315 U.S. 60, 66, 62 S.Ct. 457, 463, 86 L.Ed. 680 (1942). Here, defendants did ask for certain further details in a bill of particulars,[253] and could have requested more information on the alleged means had they desired.

Therefore, the trial judge did not commit error in instructing the jury at the close of trial that

the second part of the conspiracy statute[254] concerns agreements to defraud the United States or any agency of the Government. The Government charges in Count One that these Defendants also conspired to defraud the United States in three ways: First, by attempting to induce the CIA to provide financial assistance to the Watergate defendants; *second, by attempting to get the CIA to interfere with the Watergate investigation being conducted by the FBI;* third, by obtaining and attempting to obtain

**253.** *See* Defendants' Joint Motion for a Bill of Particulars (filed May 1, 1974), at Count 1, ¶¶ 6, 11, 20, Overt Acts, ¶¶ 7, 8.

**254.** 18 U.S.C. § 371 provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

information concerning the investigation from the FBI and the Department of Justice.

Tr. 12383 (emphasis added). While the conclusion that the CIA had been misused might not be the only possible one which could be drawn from the totality of the evidence, it was a permissible conclusion from all the evidence relating to that agency that the defendants did unlawfully conspire among themselves to induce the CIA to prevail upon the FBI to restrict its investigation, and to induce the CIA to furnish financial assistance to those involved in the break-in, so that, *inter alia,* the financing of the Watergate burglars by the Committee for the Reelection of the President, with Mitchell's participation, would be concealed. Such acts clearly constituted part of the means designed to accomplish the alleged object of the unlawful agreement to defraud the Government, and that result was a foreseeable possibility even though its ultimate objective eventually failed. As such, the evidence in question was within the conspiracy charged and its admission, together with the instruction thereon, did not constitute an amendment of the indictment.

 Nor is the propriety of this particular instruction affected by the failure of the trial judge to define the term "misuse of the CIA." This phrase was a reasonably accurate description of the charges in the indictment involving the CIA, and of the evidence in support thereof, which showed that the defendants had attempted to use the CIA to stop the investigation of the Watergate break-in and to use CIA covert funds to assist those guilty of that break-in. The defendants were not charged with a crime of misusing the CIA; rather, the allegations of the conspiracy count accused them, *inter alia,* of misusing the CIA as a means of accomplishing the crime of defrauding the Government, which was clearly defined by the charge on conspiracy.[255] In this sense, *any* use of the CIA to accomplish that end would have been "misuse." It was thus not necessary for the court to further define "misuse" in order to sustain the jury's verdict that the defendants were guilty as charged in Count 1.

### 3. *Misuse of the CIA: Count 2*

Appellants were also convicted on Count 2 of the indictment which charges them with obstruction of justice in violation of 18 U.S.C. § 1503.[256] They understandably make no claim that the evidence was insufficient to support the convictions. Haldeman[257] does claim, however, that the convictions on this count should be reversed

**255.** The court gave a clear instruction on the meaning of "defrauding the United States":

Very simply, it means to deprive the Government of its right to have the officials of its departments and agencies transact their official business honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty and obstruction.

Tr. 12377. *See also* Tr. 12379–12383 on the obstruction charge.

**256.** 18 U.S.C. § 1503 provides:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

**257.** The arguments addressed in this section of the court's opinion were raised in Haldeman's brief and incorporated by reference in the briefs of Ehrlichman and Mitchell.

because of alleged discrepancies between the indictment, the proof, and the jury instructions. We disagree and affirm the convictions on Count 2. Measured against the applicable constitutional and statutory standards, the indictment is perfectly valid and its language easily accommodates both the evidence adduced and the trial court's charge to the jury.

The Fifth Amendment guarantees that prosecutions for serious crime may be instituted only by indictment. In implementing this constitutional guarantee the Supreme Court has recognized that the indictment as a charging instrument has two central purposes—to apprise the accused of the charges against him so that he may adequately prepare his defense,[258] and to describe the crime with which he is charged with sufficient specificity to enable him to protect against future jeopardy for the same offense. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), *rehearing denied,* 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1975); *Russell v. United States,* 369 U.S. 749, 763–764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Debrow,* 346 U.S. 374, 377–378, 74 S.Ct. 113, 98 L.Ed. 92 (1953). It has also been recognized that in order to satisfy the first purpose of giving the defendant notice of the charge against him the indictment must allege the essential elements of the offense. Fed.R.Crim.P. 7(c) provides that:

> The indictment * * * shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. * * * It need not contain * * * any other matter not necessary to such statement. * * *

See also *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Debrow, supra,* 346 U.S. at 376, 74 S.Ct. 113.

Count 2 of the indictment in question here clearly and fully serves both purposes.[259] Particularly clear is the ample notice with which the indictment provided appellants. Adopting the language of 18 U.S.C. § 1503, Count 2 states each of the essential elements of the obstruction of justice offense as well as alleging the period during which the obstruction was carried out, the instruments of justice that were obstructed, and certain of the means that the defendants used. The validity of alleging the elements of an offense in the language of the statute is, of course, well established.[260] *Hamling v. United States, supra,* 418 U.S. at 117, 94 S.Ct. 2887; *United States v. Debrow, supra,* 346 U.S. at 377–378, 74 S.Ct. 113; *United States v. The Brig Neurea,* 60 U.S. (19 How.) 92, 94, 15 L.Ed. 531 (1856). Count 2, however, goes further and provides additional notice as to the details of the charge.

Nevertheless, Haldeman complains that there was an omission from Count 2 that renders it defective. Specifically, he objects to the fact that, although misuse of the CIA was not alleged in Count 2 as one of the means by which the offense was committed, the trial court admitted evidence concerning such misuse and included in the jury instructions the statement that a guilty verdict should be returned on Count 2 if the jury found beyond a reasonable doubt that the defendants had misused the CIA to obstruct justice.[261] Further,

---

**258.** In this respect a defendant's Fifth Amendment right to indictment by a grand jury intersects the Sixth Amendment right "to be informed of the nature and cause of the accusation" in criminal prosecutions.

**259.** *See* note 250 *supra.*

**260.** The general rule that indictments in the language of the statute are permissible does not apply where the statute omits an essential element of the offense, *United States v. Carll,* 105 U.S. (15 Otto) 611, 26 L.Ed. 1135 (1881), or where the statute charges a variety of possible

offenses, *Van Liew v. United States,* 321 F.2d 664 (5th Cir. 1963). An indictment in the language of the statute may also be defective if the statute is in general terms and the indictment fails to specify the offense of which the defendant is accused. *Russell v. United States,* 369 U.S. 749, 764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Simmons,* 96 U.S. (6 Otto) 360, 24 L.Ed. 819 (1877).

**261.** The phrase to which Haldeman objects is in the last paragraph of the trial court's charge to the jury on Count 2:

Haldeman rejects categorically the Government's contention that the evidence and the instructions to which he objects were fairly encompassed within the phrase "by other means" in Count 2's allegations of means by which the obstruction was carried out.

 Haldeman's complaint seems to result, however, from a general misunderstanding of the purpose of the indictment and, especially, from an inflated notion of what must be included therein. Although an indictment must—in order to fulfill constitutional requirements—apprise the defendants of the essential elements of the offense with which they are charged, neither the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every means by which the prosecution hopes to prove that the crime was committed. Impervious to this fact, however, it appears to be the intent of the appellants, abetted by the dissent, to ignore the present state of the law and countermand the Federal Rules of Criminal Procedure which "were designed to eliminate technicalities in criminal pleading and are to be construed to secure simplicity in procedure." *United States v. Debrow, supra,* 346 U.S. at 376, 74 S.Ct. at 115.

 The omission to which Haldeman objects here plainly offers no basis for reversing the Count 2 convictions. As discussed *supra,* the count begins by stating the elements of the offense in the language of the statute. It goes on to provide particulars of the alleged offense, including the instruments of justice obstructed and the means employed. Neither as a matter of common sense nor of legal principle could the defendants have been in any doubt as to the crime with which they were charged.[262]

In asserting that Count 2 has omitted an essential element, it is most unclear what, if any, authority the dissent relies upon. Although *Hamling v. United States, supra,* is quoted, the dissent fails to acknowledge that, in that case, the Supreme Court affirmed the defendants' convictions which were obtained under indictments that, according to the Court, "charged them only in the statutory language of 18 U.S.C. § 1461" (which makes it a crime to mail obscene or crime-inciting matter). 418 U.S. at 117, 94 S.Ct. at 2907. The dissent also quotes from *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), in which the Court reversed convictions under a statute which made it a crime for any person summoned to testify before a committee of Congress to refuse to answer "any question pertinent to the question under inquiry." 2 U.S.C. § 192. The basis of the reversals was the indictments' failure to identify the question under inquiry and the fact that

the very core of criminality under 2 U.S.C. § 192 is pertinency to the subject under inquiry of the questions which the defendant refused to answer. What the subject actually was, therefore, is *central to every prosecution under the statute.* Where guilt depends so crucially upon

Similarly, if you find beyond a reasonable doubt that a defendant knowingly and willfully approved or participated in some other corrupt activity, such as making offers of leniency, clemency or other benefits, making false statements to the FBI, making false statements under oath to the grand jury, *misusing the FBI or CIA,* or other such activity, you may find that defendant guilty on Count Two if you also find beyond a reasonable doubt that his purpose was to influence, obstruct or impede the due administration of justice.

(Emphasis added.)

**262.** As the Second Circuit recently stated in *United States v. Tramunti,* 513 F.2d 1087, 1113, *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975):

An indictment need only provide sufficient detail to assure against double jeopardy and state the elements of the offense charged, thereby apprising the defendant of what he must be prepared to meet. Under this test, an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crimes * * *.

(Citation omitted.)

On the sufficiency of indictments alleging obstruction of justice in the language of 18 U.S.C. § 1503, *see Parsons v. United States,* 189 F.2d 252, 253 (5th Cir. 1951); *and United States v. Bell,* 351 F.2d 868, 874 (5th Cir. 1965) (dicta), *cert. denied,* 383 U.S. 947, 86 S.Ct. 1200, 16 L.Ed.2d 210 (1966).

such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute. 369 U.S. at 764, 82 S.Ct. at 1047 (emphasis added). In this case, by contrast—despite the fact that not even the appellants suggest that the means by which the obstruction of justice was carried out are as central to the prosecution as was the "subject under inquiry" in *Russell*—"other means" were referred to in Count 2.

Rule 7(c), in fact, expressly sanctions indictments in the language to which Haldeman objects. The rule provides that "[i]t may be alleged in a single count that the means by which the defendant committed the offense are unknown or that he committed it by one or more specified means." Further particularization of the means encompassed in the allegations of Count 2 could have been sought by asking for a bill of particulars.[263] *See Glasser v. United States, supra,* 315 U.S. at 66, 62 S.Ct. 457. The record discloses, however, that after initially requesting a bill of particulars as to the meaning of the phrase "by other means," the defendants did not press the request and apparently abandoned it altogether pursuant to an agreement with the Government. Doc. 181 at 21 and Attachment A. Appellants make no bill of particulars point on appeal. Moreover, they at no time moved to strike the phrase from the indictment.[264]

The validity of similarly worded indictments has been upheld in two recent federal cases. In *United States v. Caine,* 441 F.2d 454 (2d Cir. 1971), the court, in affirming convictions of three defendants accused of violating federal mail and wire fraud statutes, rejected defendants' claim that the trial court had improperly permitted introduction of evidence concerning failure to give certain refunds—a charge the defendants argued was not encompassed within the terms of either the indictment or the bill of particulars. The trial court had ruled that such evidence was admissible under the indictment which stated:

> It was further a part of said scheme * * * that the said advertising, as the defendants well knew, would contain false, fraudulent and misleading statements * * * including *among others* * * *.

441 F.2d at 456 (emphasis added). Without deciding whether the trial court could properly have stricken "among others" from the indictment, the Court of Appeals held that the admission of the challenged evidence did not require reversal of the convictions.

In reaching this conclusion, the court relied chiefly on two factors. First, it noted that the introduction of the evidence in question did not constitute surprise, much less prejudicial surprise. *Id.* at 457. Second, the court emphasized the unlikelihood that the defendants had been convicted of charges either rejected or not considered by the grand jury. It stated:

> The grand jury's failure specifically to mention fraud with respect to refunds was most likely due to the belief that further spelling out of defendants' fraudulent scheme was redundant. Given the substantial evidence mustered on the point at trial, it is particularly unlikely that the grand jury consciously rejected such a charge.

*Id.*

Each of these factors is clearly operative in the present case. That the evidence in-

---

**263.** In *United States v. Debrow,* 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953), the Supreme Court reversed the lower court's dismissal of perjury indictments because they had not alleged the name or authority of the persons administering the oaths. In the course of its opinion the Court stated: "The sufficiency of the indictment is not a question of whether it could have been more definite and certain. If the defendants wanted more definite information as to the name of the person who adminis-

tered the oath to them, they could have obtained it by requesting a bill of particulars." 346 U.S. at 378, 74 S.Ct. at 115.

**264.** Similarly, the defendants made no specific exception to the trial court's instruction to the jury that activities involving the CIA could be considered under Count 2—an instruction which we find perfectly valid but which Haldeman now seeks, for the first time on appeal, to assign as error. *See* Fed.R.Crim.P. 30.

troduced under Count 2 did not surprise or prejudice the defendants is beyond question. All of the evidence about which Haldeman complains was admissible under Count 1 (*see* Part XI–C–1 *supra*), and he does not even claim on appeal that appellants were surprised by the trial court's refusal to instruct the jury not to consider such evidence as regards the charges alleged in Count 2. *See Berger v. United States*, 295 U.S. 78, 83, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *Jackson v. United States*, 123 U.S.App.D.C. 276, 359 F.2d 260, *cert. denied*, 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966). Also, as in *Caine*, the possibility that the grand jury either rejected or did not consider the charges in question is negligible.

In *United States v. Mayo*, 230 F.Supp. 85 (S.D. N.Y.1964), a case cited with approval in *Caine*, Judge Weinfeld denied a motion to dismiss the second count of an indictment and rejected the argument that inclusion in the means paragraph of the phrase "among others" invalidated the indictment. *Id.* at 86. The court noted that, because the phrase was included in the means paragraph—much as "by other means" is included in the allegation of means in the present indictment—it went only to the matter of proof to sustain the charges. Judge Weinfeld expressly accepted the prosecution's position that the words "among others" were "to be equated to allegations of overt acts in a conspiracy charge where the government is not required to set forth all the acts relied upon to effectuate the conspiracy." *Id.* at 86.[265] Likewise, the reference to "by other means" in the indictment in question here goes only to the matter of proof and does not constitute a basis for asserting that the notice provided in Count 2 is constitutionally defective.

Haldeman claims, however, that, apart from the issue of sufficiency of notice, the indictment is defective in not performing the second function required of a valid indictment, that of protecting the defendant from the possibility of subsequent prosecution for the same offense. But, in truth, the specific phrase of the indictment about which Haldeman objects increases rather than diminishes the appellants' protection against double jeopardy. By alleging that the obstruction of justice with which the defendants were charged was carried out "by other means" in addition to those specified, the indictment effectively broadens the scope of the acts to which jeopardy attaches and correspondingly reduces the opportunity for subsequent prosecutions of these defendants for the alleged obstruction of justice during the lengthy period alleged in the indictment (June 17, 1972 through March 1, 1974).

Also, in raising the specter of double jeopardy, Haldeman ignores the fact that, by judicial decision and by statute, all defendants have been given recourse to the entire trial record should they ever have to plead former jeopardy. *E. g., Russell v. United States*, 369 U.S. 749, 764, 82 S.Ct. 1038 (1962); 28 U.S.C. § 1732 (1970).[266] Thus the fact that evidence as to misuse of the CIA was admitted to prove that appellants had obstructed justice could certainly be relied on—even though Count 2 did not include, in so many words, reference to misuse of the CIA—in the unlikely event of a subsequent prosecution for the same offense.

Along with the dissent, Haldeman further contends that, as regards misuse of the CIA, there is a fatal variance between the indictment on one hand and the evi-

---

265. Judge Weinfeld distinguished the indictment in *Mayo* from that in *United States v. Pope*, 189 F.Supp. 12 (S.D. N.Y.1960), in which he had granted motions to strike the words "among other things" from the indictment. In *Pope*, unlike *Mayo*, the phrase to which the defendants objected occurred in the *charging* paragraphs of various counts of the indictment. 230 F.Supp. at 86.

266. This development has substantially reduced the threat of double jeopardy for all defendants. 1 C. Wright, Federal Practice and Procedure § 125 at 233 (1969); Note, *Indictment Sufficiency*, 70 Colum.L.Rev. 876, 885 (1970).

dence admitted and the jury instructions given on the other. The whole of the argument on this point rests, however, on an unrealistically narrow interpretation of the language of Count 2. It rests, in particular, on Haldeman's assertion that the phrase "by other means" in Count 2 must be construed *in pari materia*—or, as the dissent prefers to style it, *ejusdem generis*—with the means specifically alleged in Count 2 and that; as so construed, the phrase cannot be read as including misuse of the CIA.

Except for incanting these Latin phrases, however, neither Haldeman nor the dissent cites any authority for the related rules of construction they seek to apply to Count 2. Furthermore, examination of the phrase "by other means" in the context of the entire count demonstrates the inaccuracy of the asserted interpretations. For purposes of analysis, Count 2 can usefully be viewed as consisting of three parts: (1) the elements of the offense of obstruction of justice (stated basically in the words of the statute); (2) the objects of the defendants' obstruction (*i. e.,* the investigation by the FBI and the United States Attorney's office, the grand jury, and the trial of those accused of the original Watergate break-in); and (3) the means by which the obstruction was carried out.[267] The third part of the count, in turn, alleges three different means: (a) by making cash payments; (b) by making offers of other benefits; and (c) by other means. The phrase "by other means" refers back to the other two parts of the count—that is, other means by which the elements of the offense alleged in part one were used to obstruct the instruments

of justice named in part two. There is no reason to think that the phrase was intended to be limited by an *in pari materia* or *ejusdem generis* construction to the other means specified in Count 2. Indeed, if it is so construed it adds little if anything to the second means named, *i. e.,* "offers of other benefits."

The present case is readily distinguishable from *Stirone v. United States, supra,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252, the leading case on variance and one on which Haldeman relies. In *Stirone* the indictment charged the defendant with violating the Hobbs Act [268] by interfering with movement of sand from outside the State of Pennsylvania into the state (where it was to be used to construct a steel processing plant). The trial court, however, permitted the Government to offer evidence concerning not only the sand brought into Pennsylvania from other states but also concerning future steel shipments from the subsequently constructed steel plant in Pennsylvania into Michigan and Kentucky. Also, the trial judge instructed the jury that, as far as the interstate commerce aspect of the charge was concerned, Stirone's guilt could be rested on a finding either (1) that *sand used to build the steel mill* had *been shipped from another state into Pennsylvania,* or (2) that *steel to be manufactured at the mill* was to be shipped in *interstate commerce from Pennsylvania into other states.* The defendant was convicted, but the Supreme Court held that the variance between the pleading and the proof required a reversal.[269]

267. *See* note 259 *supra.*

268. 18 U.S.C. § 1951 (1970).

269. Like appellants, the dissent does not challenge the sufficiency of the evidence to convict under Count 2. Specifically, the dissent concedes, as it must (*see* Govt. Ex., Tape 2–7; Tr. 6123–6126, 2730–2738, and 6610), that the trial record contains substantial evidence of appellants' attempts to misuse the CIA to obstruct justice. It argues, however, that this evidence was admissible only under Count 1. The reasoning appears to be that since evidence of misuse of the CIA does not directly involve Parkinson—who was indicted but not convict-

ed on Count 2—the grand jury did not intend to include misuse of the CIA among the "other means" alleged in that count. In other words, the dissent contends that, under Count 2, the naming of Parkinson and the allegation of misuse of the CIA were mutually exclusive.

This argument only exposes the poverty of the dissent's position. It requires reasoning of the most sophistic sort to allow the validity of the convictions of three defendants to turn on conjecture as to the intent of the grand jury concerning evidence about a fourth defendant who was ultimately acquitted on each count with which he was charged.

Among the significant distinctions between *Stirone* and the present case, the most obvious is that the indictment in *Stirone* alleged that the offense was committed by only one particular means while the evidence admitted and the jury instructions given allowed the defendant to be convicted for committing another offense by another, quite different, means. Here, by contrast, *there was no variance*. The indictment's allegation of "other means" made it more general, fully comporting with the evidence and the instructions. In *Stirone*, in fact, the Court actually suggested that if the indictment had been more general, Stirone's conviction would not have been reversed. The Court observed, "It follows that when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another has been burdened." 361 U.S. at 218, 80 S.Ct. at 274.

 When an indictment is drawn in the general terms suggested by *Stirone*, it is often difficult to know exactly what evidentiary allegations were considered by the grand jury. Here, however, some indication of what was before the grand jury with respect to the CIA and what was intended by the phrase "by other means" in Count 2 is provided by the language of the conspiracy charge in Count 1 and the evidence admitted without objection in support thereof.[270] Both Counts 1 and 2 allege as their purpose concealment from the FBI and the grand jury of the persons responsible for the Watergate break-in. The evidence clearly shows that appellants endeavored to use the CIA in two ways to accomplish this purpose: (1) by providing CIA funds for hush money, and (2) by having the CIA limit the FBI investigation by suggesting that its continuance might uncover some operation of the CIA in Mexico and thereby jeopardize this country's national security. Count 2 specifically charges the hush money means of obstructing justice. The limitation of the FBI investigation means, though not specifically alleged, certainly fits comfortably under "other means" of obstruction just as it does under the general language of Count 1. In fact, the allegations of conspiracy to obstruct justice and to defraud the United States in Count 1 are the basis of the allegations of the substantive offense of obstruction of justice in Count 2. In response to a request which read: "State whether the allegations of obstruction of justice in [Count 2] are encompassed within the obstruction of justice alleged in Count One," the Government said in its bill of particulars, "The substantive violation of 18 U.S.C. § 1503 alleged in Count 2 was among the offenses which were the objects in the unlawful agreement alleged in Count 1." Doc. 177 at 5.[271] Appellants did not challenge this response.

---

Moreover, the dissent errs in assuming that each defendant named in a count must be linked to every means alleged therein. As long as a count properly charges each defendant with having committed the offense stated, it is not also necessary that each defendant, in the course of committing the offense, have employed all of the means named. Indeed, it is not required that all of the means alleged for committing the crime be proved. *See United States v. Lennon*, 246 F.2d 24, 27 (2d Cir. 1957), *cert. denied*, 355 U.S. 836, 78 S.Ct. 60, 2 L.Ed.2d 48. The dissent's apparent insistence on precise correlation between every defendant and every means is without foundation.

In Count 2 the defendants were charged with endeavoring to obstruct justice by making cash payments and offers of other benefits and by other means. The grand jury may have included Parkinson because of the evidence of his participation in cash payments and offers of other benefits. But whatever the reason, it does not lead to the conclusion, asserted by the dissent, that the grand jury did not intend to include misuse of the CIA among the means alleged in Count 2.

270. *See* Part XI–C–1 *supra*.

271. Even if there had been some variance in the proof as to Count 2, it is useful to remember that

[i]n every case of variance it can be argued that the grand jury that returned the indictment as is might not have been willing to return the indictment with the variance. This possibility can never be conclusively eliminated as a matter of abstract logic. Whether there is a reasonable possibility of prejudice, however, should be determined

Also, the variance in *Stirone*, as the Supreme Court stressed, went to the question of jurisdiction. The "two essential elements" of a Hobbs Act violation are, the Court stated, interference with commerce and extortion. "The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference." 361 U.S. at 218, 80 S.Ct. at 274. The inconsistency in the pleadings, the proof, and the instructions made it impossible to determine on appeal whether the jury convicted Stirone of the charge laid in the indictment.

 In this case the basis for federal jurisdiction of the obstruction of justice charge is unambiguous. The indictment explicitly charged that each element of the offense had been committed "in connection with an investigation being conducted by the Federal Bureau of Investigation and the United States Attorney's Office for the District of Columbia, and in connection with the trial of Criminal Case No. 1827–72 in the United States District Court for the District of Columbia * * *." Appellants do not even claim that the evidence or the jury instructions departed from these jurisdictional elements. The evidence amply showed that appellants endeavored to use the CIA to obstruct the FBI investigation.

*Stirone* is further distinguishable in that the variance there in question involved a material time differential. The indictment, that is, alleged interference with interstate commerce as regards past shipments of sand, but the evidence and instructions also referred to future and contingent shipments of "steel from a nonexistent steel mill." 361 U.S. at 219, 80 S.Ct. at 274. Here the payments, offers of other benefits, and misuse of the CIA were alleged to have occurred during the same period. Unlike *Stirone*, this case most definitely did not involve a grand jury that heard evidence only as to past events while the trial also involved evidence as to future events.[272]

Accordingly, we find Haldeman's objections to Count 2 and to the jury instructions given on that count to be without merit.

## XII. THE MOTIONS TO DISQUALIFY JUDGE SIRICA

Well prior to trial, Ehrlichman and Mitchell joined in an affidavit[273] charging Judge Sirica with bias and prejudice and urging his recusal under 28 U.S.C. § 144.[274] The affidavit further asserted that the judge also had a disqualifying interest in the outcome of the cases, and disqualifying relationships to the Special Prosecutor and two defense attorneys, within the contem-

---

with some reference to the real world of juries and grand juries, and the realm of common sense which must guide the administration of the criminal law and rules of criminal procedure. * * *
*Jackson v. United States*, 123 U.S.App.D.C. 276, 280, 359 F.2d 260, 264, *cert. denied*, 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966). Given the overwhelming proof of guilt in this case, the possibility of prejudice is nonexistent.

**272.** As we stated in *Jackson v. United States*:
A court may readily perceive a plausible possibility of prejudice in the contention that a federal grand jury willing to indict an extortioner for his interference with an existing stream of interstate commerce might very well have been unwilling to bring him to the dock for a situation, however grievous, which had no federal implication except in terms of a potential interference with a future line of interstate commerce.
123 U.S.App.D.C. 276, 359 F.2d 260, 263, *cert. denied*, 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966).

**273.** *See* note 278 *infra*.

**274.** Section 144 provides:
Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

plation of 28 U.S.C. § 455 as it then stood.[275] An accompanying motion for recusal[276] asked that the matter be referred to the District Court's Calendar Committee for disposition.[277] Other defendants associated themselves with the attempt to disqualify,[278] relying on either that affidavit or another of like nature subsequently filed.[279]

Judge Sirica refused the request for referral and, deeming the affidavits legally wanting, rejected the motion.[280] This

court *en banc*, one member dissenting, thereafter denied a writ of mandamus ordering Judge Sirica's disqualification,[281] and the Supreme Court declined a review of our action.[282] In due course the cases proceeded to trial before Judge Sirica, and the controversy over recusation is renewed on these appeals.[283] No more now than previously are we impressed by the arguments for disqualification, or by those critical of the methodology by which Judge Sirica addressed and resolved the issue.[284]

**275.** At the time § 455 provided:
> Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein.

*See* note 284 *infra.*

**276.** In addition to § 144 and then § 455, the motion invoked the fair-trial right, secured in federal prosecutions by U.S.Const. amend. V, as a basis for disqualification. Since in our view anything impinging on that right would have more readily violated § 144 or § 455, we do not consider the constitutional implications *per se.*

**277.** "If the Calendar Committee finds that good cause exists for the transfer, it shall cause the case to be reassigned by lot." D.D.C.R. 3–4(d)(1).

**278.** Defendant Charles Colson, the charges against whom were dropped after his plea of guilty in another case, was a joint movant. Defendant Gordon C. Strachan, whose case was later severed for trial and ultimately dismissed, filed a separate motion and affidavit on substantially the same grounds. Defendant Kenneth Wells Parkinson, who ultimately was acquitted, joined in both motions. Appellants Haleman and Mardian did not participate in the effort.

**279.** The second affidavit was Strachan's. See note 278 *supra.*

**280.** *United States v. Mitchell,* 377 F.Supp. 1312 (D.D.C.1974).

**281.** *Mitchell v. Sirica,* 163 U.S.App.D.C. 373, 502 F.2d 375 (*en banc*), *cert. denied,* 418 U.S. 955, 94 S.Ct. 3232, 41 L.Ed.2d 1177 (1974). The petitioners for the writ were appellants Ehrlichman and Mitchell and codefendants Colson and Strachan. *See* note 278 *supra.*

**282.** *See* note 281 *supra.*

**283.** The proponents of disqualification are, once again, Ehrlichman and Mitchell. At no time have Haldeman or Mardian urged Judge Sirica's recusal.

**284.** At the outset, we call attention to two considerations to be borne in mind as our decision on this facet of the appeals is read. The first is that 28 U.S.C. § 455 (1970) was amended in 1974 to the point of virtual repeal and supplanted by a different text. Pub.L. No. 93–512, 93d Cong., 2d Sess., 88 Stat. 1609. *See infra.* The amending act expressly provided that it "shall not apply to the trial of any proceeding commenced prior to the date of this Act * * *." 88 Stat. 1610. The indictment upon which appellants were tried was returned on March 1, 1974, and the trial began on the following October 1. It follows that the new version of § 455, which became effective on Dec. 5, 1974, has no application to these cases.

The second matter is the role projected by the complaining appellants, both in the District Court and here, for the Code of Judicial Conduct promulgated by the American Bar Association in 1972, which superseded the earlier Canons of Judicial Ethics. In April 1973 the Judicial Conference of the United States accepted the Code for federal judges with slight change, resolving that "[t]he adoption of the Code will not abrogate or modify any conflicting provisions of statutes or resolution of the Conference," and, with an exception not relevant here, that "[t]o the extent that any part of the * * * statutes [enumerated in the resolution] or Conference action is less restrictive than the Code, the latter will control." Report of Proceedings of the Judicial Conference of the United States 10 (Apr. 5–6, 1973). The resolution's enumeration of statutes so affected includes the pre-1974 version of 28 U.S.C. § 455 (1970), which undoubtedly was much less restrictive than the Code, *id.* at 11; indeed, amended § 455 substitutes the provisions of Canon 3C of the Code, with two modifications, for the older text. The enumeration does not include 28 U.S.C. § 144 (1970), however, seemingly because the call in Canon 3C(1)(a) of the

## A. The Methodology of Resolution

 We perceive no basis upon which it could be held that Judge Sirica erred in ruling on the legal adequacy of the affidavits himself. We are mindful that the Government did not oppose the movants' effort to get the matter before the Calendar Committee,[285] and we are aware of instances in which motions invoking Section 144 have been submitted to fellow judges for decision.[286] That course, however, was at most permissive. It is well settled that the involved judge has the prerogative, if indeed not the duty, of passing on the legal sufficiency of a Section 144 challenge.[287] Moreover the motion in suit urged not only bias and prejudice under Section 144 but also a vitiating interest and disabling connections under Section 455, and for those connections the latter section required

Judge Sirica's recusal only if it was "improper, in his opinion, for him to sit on" the litigation any longer.[288] As the judge pointed out, "[o]nly the individual judge knows fully his own thoughts and feelings and the complete context of facts alleged. It follows that only he can be certain of the most equitable resolution."[289]

## B. The Section 144 Claims

### 1. Earlier Judicial Activity

 Turning to the affidavits, upon which the endeavor to disqualify was grounded,[290] we examine the claim of bias with an awareness that for present purposes all facts stated with particularity[291] are to be taken as true.[292] There are, first, numerous allegations of activities by Judge Sirica in relation to earlier Watergate proceedings,[293] all of which allegations share a

Code for disqualification where the judge "has a personal bias or prejudice" concerning a party matches identically the language of § 144.

At several points the argument for disqualification of Judge Sirica seeks support in the Code, which the proponents equate with disqualification statutes and which the Government treats as precatory. Since we later conclude that no violation of the Code is indicated here, we do not enter the debate.

285. The Government informs us that its position was simply a preference for a definitive resolution of the disqualification issue before trial. It explains that it did not anticipate pretrial appellate scrutiny of Judge Sirica's ruling on the petition for mandamus, text *supra* at notes 281–282, and was amenable to decision of the question by the Calendar Committee "since the considered judgment of the three-judge panel would be given the heaviest weight on appeal from conviction in a protracted and important case." Government's Response to Petition for Writ of Mandamus at 9.

286. *See, e. g., United States v. Grinnell Corp.,* 384 U.S. 563, 582–83 n.13, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Tenants & Owners in Opposition to Redevelopment v. United States Dep't of Housing & Urban Dev.,* 338 F.Supp. 29, 31 (N.D.Cal.1972).

287. *Berger v. United States,* 255 U.S. 22, 32–35, 41 S.Ct. 230, 65 L.Ed. 481 (1921); *Eisler v. United States,* 83 U.S.App.D.C. 315, 319–320, 170 F.2d 273, 278, *cert. granted,* 335 U.S. 857, 69 S.Ct. 130, 93 L.Ed. 404 (1948), *cert. dismissed,* 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542 (1949); *United States v. Bell,* 351 F.2d 868, 878 (6th Cir. 1965), *cert. denied,* 383 U.S. 947, 86 S.Ct. 1200, 16 L.Ed.2d 210 (1966).

288. *See* note 275 *supra.* *See also MacNeil Bros. Co. v. Cohen,* 264 F.2d 186, 189 (1st Cir. 1959); *Weiss v. Hunna,* 312 F.2d 711, 714 (1st Cir.), *cert. denied,* 374 U.S. 853, 83 S.Ct. 1920, 10 L.Ed.2d 1073 (1963); *Shadid v. Oklahoma City,* 494 F.2d 1267, 1268 (10th Cir. 1974).

289. *United States v. Mitchell, supra* note 280, 377 F.Supp. at 1315.

290. *See Green v. Murphy,* 259 F.2d 591, 593 (3d Cir. 1958).

291. *See* note 311 *infra* and accompanying text.

292. *Berger v. United States, supra* note 287, 255 U.S. at 33, 35, 41 S.Ct. 230, 65 L.Ed. 481; *Tynan v. United States,* 126 U.S.App.D.C. 206, 207, 376 F.2d 761, 762, 2 A.L.R.Fed. 909, *cert. denied,* 389 U.S. 845, 88 S.Ct. 95, 19 L.Ed.2d 111 (1967); *United States v. Tropiano,* 418 F.2d 1069, 1077 (2d Cir. 1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970).

293. As summarized by the District Court, a resume we deem accurate,

defendants have noted an extensive variety of events. In both affidavits defendants quote at length although not always in context, from the record in *United States v. Liddy et al.,* D.D.C., 354 F.Supp. 217, tried by the Court in January, 1973. The statements proffered as facts, claim that the Court expressed a belief that criminal liability extended beyond the seven persons there charged; regarded motivations of those defendants as a crucial issue in the case; questioned defendants entering guilty pleas and witnesses

common legal deficiency. Section 144 expressly specifies "a personal bias or prejudice" for recusal,[294] and the courts have uniformly accepted that language for what it plainly demands: " 'Personal' is in contrast with judicial," said the First Circuit in 1927, "it characterizes an attitude of extrajudicial origin, derived *non coram judice*. 'Personal' characterizes clearly the prejudgment guarded against. It is the significant word of the statute." [295] And as much more

lately the Supreme Court has declared, "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." [296]

 The allegations to which we have referred do not survive this requirement.[297] Every complaint they register de-

concerning their involvement and that of others; expressed disbelief at some of the answers given; read colloquy and testimony occurring out of the jury's presence to the jury; suggested persons whom the prosecutors might consider calling before the grand jury investigating "Watergate"; expressed the hope that the Senate Select Committee on Presidential Campaign Activities would finally resolve matters treated in the case; used provisional maximum sentences to force the cooperation of convicted defendants in the case with investigating authorities; observed, following the statements of one defendant to the effect that others were involved in "Watergate," that it had done the right thing in asking questions at trial; and finally, presided at final sentencing despite the motion of some defendants for disqualification. The affidavits further comment upon the Court's acquaintance, via subsequent proceedings, with evidence potentially relevant to the instant case. The specific instances cited include Court custody of White House documents submitted by John W. Dean, III, copies of which were delivered to the Senate Select Committee on Presidential Campaign Activities and federal prosecutors by the Court; acceptance of a sealed packet from the Special Prosecutor said to contain evidence relating to defendant Strachan; a Court conference with columnist Jack Anderson following publication by Mr. Anderson of grand jury minutes; Court examination of White House tape recordings produced in October, 1973, pursuant to grand jury subpoena; and examination by the Court of materials contained in a report of the June 5, 1972 grand jury filed March 1, 1973, and later forwarded to the House Judiciary Committee. Mention is made as well of the fact that the Court entered an order conferring immunity from prosecution under Title 18 U.S.C. § 6002 on defendant Strachan, compelling the defendant, over his objection, to testify before the Senate Watergate Committee; that the Court has conferred similar witness immunity upon other persons who may testify in this action; that the Court has received the guilty pleas of and will sentence three persons likely to testify herein; and that the Court has met privately on at least two occa-

sions with members of the Watergate Special Prosecution Force.
*United States v. Mitchell, supra* note 280, 377 F.Supp. at 1319–1320 (footnotes, controverting some of the allegations, omitted).

**294.** *See* note 274 *supra.*

**295.** *Craven v. United States,* 22 F.2d 605, 607 (1st Cir.), *cert. denied,* 276 U.S. 627, 48 S.Ct. 321, 72 L.Ed. 739 (1927).

**296.** *United States v. Grinnell Corp., supra* note 286, 384 U.S. at 583, 86 S.Ct. at 1710. Cases reiterating the principle that the prejudice must be personal rather than judicial are legion. *E. g., Tynan v. United States, supra* note 292, 126 U.S.App.D.C. at 209–210, 376 F.2d at 764–765; *Wolfson v. Palmieri,* 396 F.2d 121, 124 (2d Cir. 1968); *United States v. Falcone,* 505 F.2d 478, 485 (3d Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975); *Oliver v. Michigan Bd. of Educ.,* 508 F.2d 178, 180 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed. 449 (1975); *United States v. English,* 501 F.2d 1254, 1263 (7th Cir. 1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 791, 42 L.Ed.2d 811 (1975).

**297.** The complaining appellants contend vigorously for a wholly objective test of Judge Sirica's conduct—in the classic formulation, whether "his impartiality might reasonably be questioned." That, verbatim, is the standard which new § 455(a) sets, by adoption of Canon 3C(1) of the Code of Judicial Conduct, and complete fidelity to that principle is vital. "[T]o perform its high function in the best way 'justice must satisfy the appearance of justice.' " *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), *quoting Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954); "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Commonwealth Coatings Corp. v. Continental Cas. Co.,* 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968). *See also Public Utils. Comm'n v. Pollak,* 343 U.S. 451, 466–467, 72 S.Ct. 813, 96 L.Ed. 1068 (1952) (Frankfurter, J.); *Whitaker v. McLean,* 73 App.D.C. 259, 118 F.2d 596 (1941).

rives from judicial acts by Judge Sirica during his tenure as the officer presiding over a series of criminal proceedings emanating from the Watergate affair.[298] The attitude for which Section 144 mandates recusal is not indicated by prior judicial

rulings,[299] or in-court comments prompted by developments in the case or prior legal proceedings,[300] or the exercise of related judicial functions.[301] Nor can a disabling prejudice be extracted from dignified though persistent judicial efforts to bring

It is clear that new § 455(a) does not apply to the instant cases. *See* note 284 *supra.* The parties are in dispute, however, as to the involvement of the Code of Judicial Conduct. We need not undertake a resolution of that controversy since we conclude that even under the appearance-of-impartiality standard the events in question pass muster.

Most of the activities relied upon were exercises of judicial functions. Viewed in their individual contexts, we do not consider them improper when they occurred, nor is it argued that they were. Should the appearance-of-impropriety standard be woodenly applied to work a judge's disqualification because of earlier legal adjudications entirely proper when made, the result would be truly amazing. As one judge has stated,

[i]f the words "impartiality might reasonably be questioned" and "avoid impropriety and the appearance of impartiality" were to be interpreted to encompass judicial rulings in the course of a trial or other proceeding, . . . then there would be almost no limit to disqualification motions and the way would be opened to a return to "judge shopping", a practice which has been for the most part universally condemned. Certainly every ruling on an arguable point during a proceeding may give "the appearance of" partiality, in the broadest sense of those terms, to one party or the other.

*Lazofsky v. Sommerset Bus Co.,* 389 F.Supp. 1041, 1044 (E.D.N.Y.1975).

For a long time before enactment of new § 455(a) in 1974, the judicial understanding of § 144 and old § 455 was that they were to be confined in operation to extrajudicial conduct or conditions. *See* note 296 *supra* and accompanying text. Nothing we have observed in the legislative history of new § 455(a) suggests that this construction was to be overturned. The Fifth Circuit has concluded that new § 455(a) is to be similarly interpreted, *Davis v. Board of School Comm'rs,* 517 F.2d 1044, 1052 (5th Cir. 1975). Absent clearer guidance as to the congressional intent, we agree, and by the same token, we might add, Canon 3(C)(1) is to be similarly read. The appearance-of-impropriety standard in terms summons a disqualification, not merely when the judge's impartiality might somehow be questioned, but only when it may *reasonably* be questioned. We think reasonableness of the challenge must take due account of the effect which its acceptance will have on the judicial process. So drastic would be the impact that we are unwilling to ascribe to ethi-

cal and legislative formulators of that standard a purpose to direct it toward judicial rulings on questions of law.

Some activities charged to Judge Sirica, of course, are not of that character. Those, we think, when separately examined in their individual contexts, do not reasonably generate a question as to impartiality.

**298.** *See* note 296 *supra,* and note 301 *infra.*

**299.** *Berger v. United States, supra* note 287, 255 U.S. at 31, 41 S.Ct. 230; *Ex parte American Steel Barrel Co.,* 230 U.S. 35, 43–44, 33 S.Ct. 1007, 57 L.Ed. 1379 (1913); *United States v. English, supra* note 296, 501 F.2d at 1263.

**300.** *United States v. Grinnell Corp., supra* note 286, 384 U.S. at 583, 86 S.Ct. 1698; *Wolfson v. Palmieri, supra* note 296, 396 F.2d at 124; *Davis v. Cities Serv. Oil Co.,* 420 F.2d 1278, 1282 (10th Cir. 1970).

Merely because a trial judge is familiar with a party and his legal difficulties through prior judicial hearings * * * does not automatically or inferentially raise the issue of bias * * *. "A mere showing of prior judicial exposure to the present parties or questions will not invoke the section."

*United States v. Beneke,* 449 F.2d 1259 (8th Cir. 1971), *quoting Barry v. Sigler,* 373 F.2d 835, 836 (8th Cir. 1967), in turn *quoting Lyons v. United States,* 325 F.2d 370, 376 (9th Cir. 1963), *cert. denied,* 377 U.S. 969, 84 S.Ct. 1650, 12 L.Ed.2d 738 (1964).

**301.** As Chief Judge of the District Court during the pretrial era of these cases, Judge Sirica had supervisory responsibility over grand jury matters. *See, e. g., In re Grand Jury Subpoena,* 360 F.Supp. 1 (D.D.C.), *modified and mandamus denied, sub nom. Nixon v. Sirica,* 159 U.S. App.D.C. 58, 487 F.2d 700, 19 A.L.R. Fed. 343 (*en banc* 1973); *In re Grand Jury Report,* 370 F.Supp. 1219 (D.D.C.), *mandamus denied, sub nom. Haldeman v. Sirica,* 163 U.S.App.D.C. 154, 501 F.2d 714 (*en banc* 1974). While, as the judge acknowledges, he had occasion to discuss procedural matters with prosecutors before the indictment in these cases was returned, *United States v. Mitchell, supra* note 280, 377 F.Supp. at 1316, 1323, the fact remains that the discussions occurred as a part of his official duties. *Compare Craven v. United States, supra* note 295, 22 F.2d at 607; *United States v. Valenti,* 120 F.Supp. 80, 87 (D.N.J. 1954).

134

everyone responsible for Watergate to book.[302] We do not mean to suggest that a judge's activities during the course of judicial proceedings can never reflect a disqualifying state of mind.[303] We do say that it is not evidenced by the events cited here.

2. *Extrajudicial Statements*

▮ Another branch of the claim of bias stems from references in the Ehrlichman-Mitchell affidavit to alleged extrajudicial utterances by Judge Sirica. One is that the judge "was guest of honor at a party given by the press honoring him on his 70th birthday," at which he "conducted interviews with reporters in which he made statements concerning this case."[304] Another is that "[i]n a televised interview Judge Sirica was quoted as saying he was confident that affiants could get as fair a trial in the District of Columbia as anywhere in the United States, thus prejudging any motion for change of venue which affiants may make."[305] It cannot be gainsaid that public comment bearing specifically upon pending or impending litigation is an activity that judges should scrupulously avoid.[306] In our view, the averments of the affidavit were insufficient to trigger a disqualification in this case.

▮ Section 144 specifies that "[t]he affidavit" supporting a motion thereunder "shall state the facts and the reasons for the belief that bias or prejudice exists,"[307] and it does so for the best reasons. This provision, like the accompanying mandate that counsel of record certify that the affidavit is made in good faith,[308] was designed to guard against groundless claims and the impositions they would inflict on the judicial process.[309] To achieve that end, the courts have consistently held that the affidavit must meet exacting standards. It must be strictly construed;[310] it must be definite as to time, place, persons and circumstances.[311] Assertions merely of a conclusionary nature are not enough,[312] nor are opinions or rumors.[313] And the affidavit "must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment."[314]

---

**302.** "A judge cannot be disqualified merely because he believes in upholding the law, even though he says so with vehemence." *Baskin v. Brown,* 174 F.2d 391, 394 (4th Cir. 1949); *Knapp v. Kinsey,* 232 F.2d 458, 466 (6th Cir.), *cert. denied,* 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1966).

**303.** *Compare, e. g., Offutt v. United States, supra* note 297, *with United States v. Grinnell Corp., supra* note 286, 384 U.S. at 580–583, 86 S.Ct. 1698.

**304.** App. 193.

**305.** App. 193. It will be recalled that somewhat later the defendants were unable to persuade Judge Sirica to remove the situs of the trial from the District of Columbia.

**306.** *See* Code of Judicial Conduct, Canon 3A(6) (1972).

**307.** *See* note 274 *supra.*

**308.** *See* note 274 *supra.*

**309.** *See United States v. Womack,* 454 F.2d 1337, 1341, 24 A.L.R.Fed. 276 (5th Cir. 1972), *cert. denied,* 414 U.S. 1025, 94 S.Ct. 450, 38 L.Ed.2d 316 (1973); *Scott v. Beams,* 122 F.2d 777, 788 (10th Cir.), *cert. denied,* 315 U.S. 809, 62 S.Ct. 794, 86 L.Ed. 1208 (1941).

**310.** *E. g., United States v. Womack, supra* note 309, 454 F.2d at 1341; *Molinaro v. Watkins-Johnson CEI Div.,* 359 F.Supp. 474, 476 (D.Md. 1973); *United States v. Thomas,* 299 F.Supp. 494, 498–499 (E.D.Mo.1968); *Samuel v. University of Pittsburgh,* 395 F.Supp. 1275, 1278 (W.D.Pa.1975).

**311.** *Hodgson v. Liquor Salesmen's Local 2,* 444 F.2d 1344, 1348 (2d Cir. 1971); *United States v. Townsend,* 478 F.2d 1072, 1074 (3d Cir. 1973). *See also Berger v. United States, supra* note 287, 255 U.S. at 34, 41 S.Ct. 230.

**312.** *Action Realty Co. v. Will,* 427 F.2d 843, 844 (7th Cir. 1970); *Griffith v. Edwards,* 493 F.2d 495, 496 (8th Cir.), *cert. denied,* 419 U.S. 861, 95 S.Ct. 113, 42 L.Ed.2d 97 (1974); *Scott v. Beams, supra* note 309, 122 F.2d at 788.

**313.** *Berger v. United States, supra* note 287, 255 U.S. at 34, 41 S.Ct. 230; *Hodgson v. Liquor Salesmen's Local 2, supra* note 311, 444 F.2d at 1348.

**314.** *Berger v. United States, supra* note 287, 255 U.S. at 33–34, 41 S.Ct. 230, 233. *Accord, Hurd v. Letts,* 80 U.S.App.D.C. 233, 234, 152 F.2d 121, 122 (1945); *Wolfson v. Palmieri, supra* note 296, 396 F.2d at 124.

It is clear enough that the allegation that at the birthday party Judge Sirica "made statements concerning this case" [315] fell short of these requirements. It is completely lacking in specificity; not even the substance of the claimed statement is supplied.[316] The further allegation that "[i]n a televised interview Judge Sirica was quoted as" making another statement is not only hearsay with no indication as to its source,[317] but it also lacks the definiteness as to time, place, persons and circumstances that is demanded of an affidavit under Section 144.[318] The affidavit omitted altogether the fact that the televised episode transpired very shortly after appellants' indictment,[319] during this circuit's 1974 Judicial Conference,[320] in an apparently unscheduled and unsought interview, before any motion for change of venue was before the court. Nor does it mention that the statement pertained generally to the quality of justice in the District of Columbia rather than to appellants' case in particular.

Even if we assume that the interview is properly before us, it provides no basis for a finding of bias or prejudice. Judge Sirica candidly acknowledges that he was asked, "[i]s there any doubt in your mind about [the defendants'] abilities to get fair trials?" [321] In reply the judge said, "I think they can get just as fair a trial in the District of Columbia as any federal court in the United States. I have no doubt about that. Thank you." [322] Later during the interview, the judge added, "[w]ell, in my opinion, any defendant, any person who happens to be a defendant in this jurisdiction, in my opinion can get just as fair a trial here as any jurisdiction in the country." [323]

These statements were substantively insufficient to establish bias or prejudice within the meaning of Section 144. By Judge Sirica's appraisal, "[f]airly interpreted, these comments address the quality of the federal judiciary in the District of Columbia and do not concern changes of venue, let alone constitute a prejudgment on motions for change of venue * * * ", [324] "[e]ven, however, construed in the light most favorable to defendants' conclusion, the reported statements reveal only a then current and general impression which existed, as is always the case, in the context of an assumption that an unbiased jury may be found in the district." [325] This appeals to us as an accurate characterization of the import of what was said.

A fundamental premise of our jurisprudential system is that, save in the most extraordinary circumstances, an impartial jury expectably may be convened anywhere in the Nation. Another is that the capability of doing so is always to be presumed

---

**315.** See text *supra* at note 304.

**316.** See *Hodgson v. Liquor Salesmen's Local 2*, *supra* note 311, 444 F.2d at 1348.

**317.** See text *supra* at note 305. *Compare Tucker v. Kerner*, 186 F.2d 79, 23 A.L.R.2d 1027 (7th Cir. 1950), wherein a § 144 motion rested in part upon a magazine article in which the judge was quoted as saying that he did not "have the least bit of confidence in the statements of" a party was not to be considered. "The portion of the affidavit describing and quoting from the article * * * is no allegation of fact insofar as [the judge] is concerned * * *. It is solely the statement of the publication, a third party, and insofar as [the judge] is concerned it is hearsay." *Id.* at 83–84. *And see United States v. Partin*, 312 F.Supp. 1355, 1359–1360 (E.D.La.1970) (allegation based on hearsay).

**318.** See text *supra* at note 311.

**319.** The television interview took place on March 18, 1974, only slightly more than two weeks after the indictment in this case was returned.

**320.** As a member of the Judicial Conference, Judge Sirica was in attendance. It goes without saying that the interview was no part of the Conference program.

**321.** *United States v. Mitchell, supra* note 280, 377 F.Supp. at 1324.

**322.** *Id.*

**323.** *Id.*

**324.** *Id.*

**325.** *Id.*

until the contrary appears. The thrust of Judge Sirica's remarks, obviously based on extensive contacts with juries over his many years as a trial judge, was an opinion that juries in the District of Columbia are fair-minded. Thus, while these thoughts were voiced in an extrajudicial setting—the interview—the informational source upon which they drew—the judge's experience as a judge—was distinctly judicial.[326] And, all circumstances considered, particularly the time at which the comments were made,[327] we think they were not reasonably interpretable as a prejudgment on any issue that might arise in the case. The interview took place very shortly after the prosecution was launched by the indictment, and when it had hardly gotten under way.[328] No motion for change of venue had then been filed; by the same token, no occasion to ponder or focus on grounds therefor had been presented. The statements reflected no assessment of the possible impact of Watergate pretrial publicity, nor any inability or indisposition on the judge's part to objectively weigh and act upon a request to relocate the place of trial should it develop that an unbiased jury could not be assembled in the District of Columbia.

To be sure, Judge Sirica's televised remarks are not completely free of ambiguity, and it is possible to impart into

the first of his two answers a tinge of prejudgment on the forthcoming venue question in this case.[329] But the same may be said for countless other equivocal expressions by judges over the years, which have been held to provide no cause for recusal.[330] And we think that any tendency to attribute bias to Judge Sirica's first answer is fairly dispelled when it is read conjunctively with the second, which manifestly was a generalized observation on the time-proven objectivity of the jury process in the District of Columbia.[331] Equally importantly, a judge's comment is disqualifying only if it connotes a fixed opinion—[332] "a closed mind on the merits of the case.",[333] Though susceptible to differing interpretations,[334] an utterance summons disqualification to avoid either the fact or the appearance of partiality only when it "give[s] fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment."[335] It cannot be said that, viewed together in context for their intrinsic revelation, Judge Sirica's statements rise to that level.

### C. The Section 455 Claims

#### 1. The Alleged Interest

As we have previously indicated,[336] there are two additional theses for disqualifica-

**326.** See text *supra* at notes 294–296. *Compare United States v. Board of School Comm'rs,* 503 F.2d 68, 80–81 (7th Cir. 1974), *cert. denied,* 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86 (1975).

**327.** Judge Sirica's statements are to be viewed in their full context. *Wolfson v. Palmieri, supra* note 296, 396 F.2d at 125; *SEC v. Bartlett,* 422 F.2d 475, 481 (8th Cir. 1971); *Tenants & Owners in Opposition to Redevelopment v. United States Dep't of Housing & Urban Dev., supra* note 286, 338 F.Supp. at 35.

**328.** See note 319 *supra.*

**329.** See text *supra* at note 322.

**330.** E. g., *United States v. Grinnell Corp., supra* note 286, 384 U.S. at 583, 86 S.Ct. 1698; *In re Union Leader Corp.,* 292 F.2d 381, 391 (1st Cir.), *cert. denied,* 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961). *See also United States v. Board of School Comm'rs, supra* note 326, 503 F.2d at 80–81 (extrajudicial statement). It can-

not be assumed that these decisions were insensitive to "the appearance of impartiality," since that has long been a judicial obligation. American Bar Ass'n, Canons of Judicial Ethics, Canon 4 (1924).

**331.** See text *supra* at note 323.

**332.** See *United States v. Grinnell Corp., supra* note 286, 384 U.S. at 583, 86 S.Ct. 1710; E. Thode, Reporter's Notes to Code of Judicial Conduct 61 (1973). And although fixed, an opinion on the law is not disqualifying. *Id.*

**333.** *United States v. Grinnell Corp., supra* note 286, 384 U.S. at 583, 86 S.Ct. at 1710.

**334.** See cases cited *supra* note 330.

**335.** See text *supra* at note 314.

**336.** See text *supra* at note 275.

tion, each sought to be rested on old Section 455,[337] the pre-1974 version applicable to these cases.[338] As to the first of these, the Ehrlichman-Mitchell affidavit refers to "the extensive press and media coverage of Judge Sirica's activities in connection with the supervision of the Grand Jury and the trial of the 1973 Watergate case" and concludes therefrom that "Judge Sirica's public image and reputation have become inextricably intertwined with the prosecution of the Watergate matter, a fact of which he is not unaware." [339] The affidavit then attributes to Judge Sirica, as a further result, "a personal interest in the outcome of this case which affiants believe will make it impossible for him to conduct their trials in the required atmosphere of judicial impartiality." [340] This argument misinterprets the statute and mischaracterizes the judge.[341]

To be sure, pre-1974 Section 455 commanded recusal in any case in which the judge had "a substantial interest." [342] We know that pecuniary interests were encompassed [343] and it may be that some types of economic interests also were. But we have been referred to nothing, nor have we found anything, suggesting that the statute embraced any "interest" of the sort laid to Judge Sirica by the affidavit.[344] We cannot believe that it did, for unless confined to interests emanating from extrajudicial sources, the prohibition would have had a reach far beyond anything Congress could rationally have contemplated. Judge Sirica's public image was achieved by dint of his judicial activity and, like any other judge, he obviously had an interest in maintaining his hard-earned reputation. If that interest were disqualifying, no judge who has achieved acclaim as a judge would ever sit again.[345] It matters not that in the

337. See note 275 supra.

338. See note 284 supra.

339. App. 192 (footnote omitted).

340. App. 192–193. The affidavit alleges, inter alia, Judge Sirica's cooperation in the preparation of Time Magazine's cover story of Jan. 7, 1974, featuring him as "Man of the Year;" allowance of media sketch artists into his chambers; and the 70th birthday party and television interview to which we have adverted (text supra at notes 304, 305). App. 193.

341. Understandably, Judge Sirica responded to the personal-interest theory. He said:

> Defendants apparently draw from [the] circumstances [alleged] a conclusion that the Court has developed a personal stake in the conviction of defendants at bar, and relies upon such convictions for some form of "vindication." Defendants conjecture on this point is wholly inappropriate. The Court feels no need for vindication of any sort and seeks none. The Court's sole interest here, as always, is a professional interest in the proper administration of justice. There is nothing in the alleged facts propounded by the defendants to reasonably support a contrary conclusion. In fact, their own reference to public reports and comment which both praise and assail the Court for the same action, reveals the fallacy of looking to public opinion for "vindication." Defendant's [sic] argument lacks any merit whatsoever.

United States v. Mitchell, supra note 280, 377 F.Supp. at 1323. While we note that old § 455, unlike § 144, did not purport to require that

factual allegations of an affidavit seeking disqualification be taken as true, we adjudicate this aspect of the § 455 claim without any dependence whatever upon Judge Sirica's refutation.

342. See note 275 supra. Disqualification of a judge was mandatory, in the language of old § 455, when "he has a substantial interest, has been of counsel [or] is or has been a material witness." E. g., Laird v. Tatum, 409 U.S. 824, 828, 93 S.Ct. 7, 10, 34 L.Ed.2d 50 (1972) (Rehnquist, J.). Disqualification under the remaining portion of old § 455 was a matter involving a substantial element of judicial discretion. See cases cited supra note 288.

343. E. G., In re Grand Jury Investigation, 486 F.2d 1013, 1016 (3d Cir. 1973), cert. denied, 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974); Adams v. United States, 302 F.2d 307, 310 (5th Cir. 1962); United States v. Bell, supra note 287, 351 F.2d at 878.

344. Nor does it appear that the interest denied sitting judges by the Code of Judicial Conduct and the present § 455(b)—which embody the widest restraints on judges' activities thus far devised—is so broad. See 28 U.S.C. § 455(b)(4), (5)(iii), (c), (d)(iv) (Supp. V 1975); American Bar Association, Code of Judicial Conduct, Canon 3C(1)(c), (d)(iii), (2), (3)(c) (1972); E. Thode, Reporter's Notes to Code of Judicial Conduct 63–67 (1973).

345. Compare note 297 supra.

public eye Judge Sirica may be a judicial activist. Already we have, in another context, commended his quest for truth,[346] and what we said then applies equally now.

### 2. *Past Relationships With Counsel*

 The remaining argument under old Section 455 is predicated on past relationships between Judge Sirica and attorneys who were to actively participate in the trials under review. Nearly a decade ago, while United States Attorney for the District of Columbia, Mr. David G. Bress, one of trial counsel for defendant Mardian, opposed petitions for writs of mandamus attacking the judge's rulings in three cases.[347] Much more lately, Mr. John J. Wilson, one of appellant Haldeman's counsel, appeared at this court's request on a criminal appeal as *amicus curiae* in support of action taken by Judge Sirica,[348] and sought rehearing *en banc* following a panel's decision adverse to that action. In 1974 the Special Prosecutor, who has represented the Government throughout the instant litigation, opposed a petition for writs of mandamus and prohibition directed toward Judge Sirica's release of a secret grand jury report and accompanying evidence to the House of Representatives.[349] The statutory basis for this effort to disqualify is said to be the provision of pre-1974 Section 455 requiring a judge to step down when he "is so related to or connected with any party or his attorney as to render it improper, in his opinion, for

him to sit on the trial * * * or other proceeding therein."[350] By our lights, none of the cited episodes involved such a relationship between counsel and Judge Sirica as to necessitate the result contended for.

 The petition seeking a writ of mandamus or prohibition to control a ruling of a District Judge is a relatively frequent occurrence in this circuit. Active defense of the ruling by counsel for the litigant favored is commonplace,[351] and we have discerned no reason to discourage the practice. Although the petition in such a proceeding ordinarily names the involved judge as sole respondent, where its sole purpose is to obtain a determination on the intrinsic merits of a judicial act, we have recognized that the judge is "at most only * * * a nominal party with no real interest in the outcome."[352] It is ostensibly in that view that the Federal Appellate Rules provide that "[a]ll parties below other than the petitioner shall also be deemed respondents for all purposes,"[353] and that "[i]f the judge or judges named respondents do not desire to appear in the proceeding, they may so advise the clerk and all parties by letter * * * *"[354]

 Similarly, on widely scattered occasions when no party to an appeal from the District Court undertakes to support the decision under review, this court may appoint an attorney as *amicus curiae* to defend that decision. The whole purpose in

---

**346.** "Judge Sirica's palpable search for truth * * * was not only permissible, it was in the highest tradition of his office as a federal judge." *United States v. Liddy,* 166 U.S.App. D.C. 95, 109, 509 F.2d 428, 442, 28 A.L.R.Fed. 1 (*en banc,* 1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975). *See also United States v. McCord,* 166 U.S.App.D.C. 1, 14, 509 F.2d 334, 347 (*en banc* 1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

**347.** The instances referred to by the complaining appellants are *Illinois Scientific Devs., Inc. v. Sirica,* 133 U.S.App.D.C. 249, 410 F.2d 237 (1968); *Ross v. Sirica,* 127 U.S.App.D.C. 10, 380 F.2d 557 (1967); *Filmon Process Corp. v. Sirica,* 126 U.S.App.D.C. 395, 379 F.2d 449 (1967).

**348.** The litigation was *United States v. Ammidown,* 162 U.S.App.D.C. 28, 497 F.2d 615 (1973).

**349.** The case was *Haldeman v. Sirica, supra* note 301.

**350.** *See* note 275 *supra.*

**351.** By Judge Sirica's count, there were at least 45 such instances between mid-1968 and April 30, 1974. *United States v. Mitchell, supra* note 280, 377 F.Supp. at 1324–1325 & n. 10.

**352.** *United States v. King,* 157 U.S.App.D.C. 179, 183, 482 F.2d 768, 772 (1973), *and see* cases there cited at n. 24.

**353.** Fed.R.App.P. 21(b).

**354.** *Id.*

doing so is to give the court the benefit of the District Judge's wisdom on the point at issue. In no sense is the judge placed in the position of a litigant, nor is his situation significantly different from what it is when the defense is undertaken by counsel for one who is already a party to the litigation.

We do not find the relationship normally existent between judges and counsel in those instances any need for recusal upon resumption of the litigation in the District Court.[355] So far as we are aware, it has never been suggested that a judge participating in a case prior to a contested appeal should step out of post-appeal proceedings simply because counsel include one or more who endeavored to rescue the judge in this court. We are unable to detect any real difference between that everyday event and those for which Judge Sirica's disqualification is now urged.[356]

Then, too, recusal of a judge for a relationship to or connection with counsel for a litigant was, in the language of old Section 455, to occur only when it was such "as to render it improper, in his opinion, for him to sit on the trial * * * or other proceeding therein." [357] It is well settled that the question of disqualification on that account was a matter basically committed to the judge's conscience.[358] A decision contrary to recusal, so grounded in the judge's personal view of his continuing ability to act impartially, is reviewable on appeal only if it amounts to an abuse of sound judicial discretion.[359] We find nothing of that sort here, nor justification for the complaint of Judge Sirica as the trial judge.[360]

355. We are advertent to the decision in *Rapp v. Van Dusen,* 350 F.2d 806 (3d Cir. *en banc* 1965), that a judge represented on appellate review of his order by counsel for the successful parties should not sit in subsequent phases of the litigation. This holding was, however, an exercise of the court's supervisory authority over District Judges in its circuit, and the court made clear that it did not decide whether that result was required by old § 455. *Id.* at 810, 814.

356. The situation here differs radically from that presented in *Texaco, Inc. v. Chandler,* 354 F.2d 655 (10th Cir. *en banc* 1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1066, 15 L.Ed.2d 853 (1966), where it was held that old § 455 necessitated disqualification of a judge in a suit in which the plaintiff was represented by the same lawyer who was simultaneously representing the judge in a civil damage action.

357. *See* note 275 *supra.*

358. *See* cases cited *supra* note 288.

359. This standard of review follows inescapably from the fact that old § 455 made disqualification, on account of relation to or connection with a party or attorney, a question or propriety to be resolved by the involved judge "in his opinion." *See* cases cited *supra* note 288. "[T]he statute made the judge himself the sole decider of the substantiality of interest or of the relationships which would be improper and lead to disqualification." S.Rep. No. 93–419, 93d Cong., 2d Sess. 2 (1973); H.R.Rep. No. 93–1453, 93d Cong., 2d Sess. 2 (1974), U.S. Code Cong. & Admin.News 1974, pp. 6351, 6352. And while the new § 455 substitutes "an objective test, it is not designed to alter the standard of appellate review on disqualification issues. The issue of disqualification is a sensitive question of assessing all the facts and circumstances in order to determine whether the failure to disqualify was an abuse of sound judicial discretion." S.Rep. No. 93–419, 93d Cong., 2d Sess. 5 (1973); H.R.Rep. No. 93–1453, 93d Cong., 2d Sess. 5 (1974), U.S.Code Cong. & Admin.News 1974, p. 6355. *Accord, Davis v. Board of School Comm'rs, supra* note 297, 517 F.2d at 1052.

360. Judge Sirica felt that he had "an obligation to deny insufficient recusal motions." *United States v. Mitchell, supra* note 280, 377 F.Supp. at 1325, *quoting In re Union Leader Corp., supra* note 330, 292 F.2d at 391. The judge declared that "[t]here is as much obligation upon a judge not to recuse himself when there is no occasion as there is for him to do so when there is." *Id.* That certainly was the concept of a judge's responsibility under § 144 and pre-1974 § 455. *Laird v. Tatum, supra* note 342, 409 U.S. at 837, 93 S.Ct. 7; *Tynan v. United States, supra* note 292, 126 U.S.App. D.C. at 209, 210, 376 F.2d at 764, 765; *Eisler v. United States, supra* note 287, 83 U.S.App.D.C. at 320, 170 F.2d at 278; *Wolfson v. Palmieri, supra* note 296, 396 F.2d at 124. One of the purposes of new § 455, however, is to eliminate the "duty to sit." S.Rep. No. 93–419, 93d Cong., 2d Sess. 5 (1973); H.R.Rep. No. 93–1453, 93d Cong., 2d Sess. 5 (1974). But

[w]hile the proposed legislation would remove the "duty to sit" concept of present law, a cautionary note is in order. No judge, of course, has a duty to sit where his impartiality might be reasonably questioned. However, the new test should not be used by judges to avoid sitting on difficult or controversial cases.

## XIII. CONCLUSION

Having considered all of the arguments raised by each of the appellants, we conclude that there was no reversible error in this case. We therefore affirm the convictions of Haldeman, Ehrlichman and Mitchell for conspiracy as charged in Count 1 and obstruction of justice as charged in Count 2. We also affirm the individual convictions of Mitchell under Counts 4, 5 and 6; Haldeman under Counts 7, 8 and 9; and Ehrlichman under Counts 11 and 12.

*Affirmed.*

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

My views concur with those expressed in the majority opinion, in which I have participated, except with respect to the issues of pretrial publicity and the convictions on Count 2.

### PRETRIAL PUBLICITY

If ever in the history of our country there was a criminal case which by law had to be transferred to another place for trial because of prejudicial pretrial publicity *alone,* this is that case. When this case was before us prior to trial, I stated that the venue should have been changed to some place other than the District of Columbia. I adhere to that position. The trial court here denied a timely pretrial motion for change of venue and in so doing denied defendants one of their most basic constitutional rights—the right to a fair trial. Under the rule that this court ordinarily applies we should therefore reverse the convictions and grant a new trial.

The majority opinion in this case applies a double standard that results in denying the defendants a right which the Constitution and the Supreme Court have secured to all criminal defendants in United States federal courts, the right to have their request for a change of venue determined by the *federal* standard. The majority goes on to make an inadequately thin and erroneous analysis of the question of whether the publicity in the Washington, D.C. area was so exceptionally overwhelming on its face as to require changed venue at defendant's request. Finally, in exploring the question of whether the jury candidates reflected actual bias, the majority, with no depth of analysis, erroneously evaluates the *voir dire* proceedings.

### I. THE CRIMES AND THE RESPONSIBILITY OF THE COURT

The crimes for which the appellants are convicted are flagrant. The convictions encompass callous disregard of duty, in some cases sworn duty, to our country. Our era is as perilous as any in our country's brief history, and the crimes in this case paralyzed our executive branch, denying us national leadership in an era when leadership was vitally needed.

The duty of this federal court is to apply the federal criminal law, as secured under the Constitution and laws of the United States, to the cases of the appellants. The very system of laws which were betrayed in the crimes charged must not be manipulated to obtain convictions in this particular case. Such manipulation is a disservice. It can in the end harm our Republic in the same manner as the acts that created this case in the first place.

The men here have exactly the same rights as any other defendants indicted in federal court, neither more nor less.

At the same time, in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice. *Id.·* (emphasis in original).

## II. THE PRETRIAL PUBLICITY IN WASHINGTON

### A. *The Scope and Duration in General*

The majority gingerly refers to the pretrial publicity in these terms:

> . . . the pre-trial publicity in this case, although massive . . . (Majority opinion at —— of 181 U.S.App.D.C., at 61 of 559 F.2d)

and,

> Without attempting to deny that the pretrial publicity in this case was extraordinarily extensive . . .. (Majority opinion, note 34)

These allusions, very substantially understated as they are, are all the majority has to say on the scope of the publicity. They border on casualness. They shut out the truth.

Actually, the pretrial publicity in this case is unequivocally unique in American history. Its duration and level of sustained media attention from June 18, 1972, the day after the arrests following the Watergate break-in, to May 1, 1974, the date of the appellants' first motion for changed venue (Docket entry 56), swelling in an ever increasing crescendo, admits of comparison only with the media coverage for outbreaks of war. Indeed, the sustained daily coverage accorded this case on television and in newspapers finds parallel in recent memory only with the daily coverage of the war in Vietnam.

The crush of publicity was unprecedented, from the opening build-up at the Senate hearings, through the Presidential pre-impeachment proceedings, and continuing up to the time of the beginning of the instant trial. This opinion is not concerned with subsequent publicity because it could not affect the sequestered jury. Statistical findings on the extent of the national publicity are not in the record, and do not yet appear to be available in the literature.

### B. *The Level of Coverage in Washington, D.C.*

The record here discloses a great volume of clippings from the papers in the Washington, D.C. area and a set of anecdotal comments. These materials suffice to make the point even though national statistics were not available. The Appendix submitted by Mr. Parkinson in an additional change of venue motion on May 1, 1974, contains selected clippings principally from the Washington Post, the Washington Evening Star and Daily News, and the New York Times for the period June 18, 1972, to May 1, 1974, and comprises four boxes (Docket entry 84, Appendix A, Folders 1–37). It can be conservatively estimated that that submission alone contains over *50,000 column inches* from the Washington Post and the Washington Evening Star and Daily News of pretrial publicity. *This is an average of some 30 to 120 column inches per day, day in and day out,* for the Washington, D.C. area *from Washington, D.C. papers alone.*[1]

The Watergate Special Prosecutor himself says flatly:

> No group of prosecutors and supporting personnel ever have labored under greater public scrutiny.

Watergate Special Prosecution Force Report 1 (1975). And,

> By the time of Archibald Cox's appointment as Special Prosecutor, "Watergate" had become the major journalistic event in the nation.

*Id.* at 227. With respect to the non-newspaper and non-broadcast record alone he states:

---

1. This estimate follows from finding the average number of column inches per file page in ten inches of the file, then extrapolating that figure to all four boxes. A sampling showed an average of 15.4 column inches per file page, with 1370 file pages in a ten-inch sample. There are at least 40 inches of files in the four boxes, for a total of 84,392 column inches. Reducing this by one-third to allow for scat-

tered New York Times and other clippings, a figure of 56,262 column inches results. This averages to some 80 column inches per day for the 682 day period, but the intensity of the coverage fluctuates about plus or minus 60% around the 80 column inch/day figure over the period, for a daily average of some 30 to 120 column inches.

approximately a quarter of a million pages of Watergate facts already exist for public consumption. This material includes the public hearings and published reports of the Senate Select Committee on Presidential Campaign Activities and the House Judiciary Committee, other existing and forthcoming reports of Congressional committees, the voluminous records of the criminal trials resulting from [the Watergate Special Prosecution Force's] investigations, evidence obtained in several civil suits, and numerous books and articles analyzing the events of "Watergate" from a variety of perspectives.

*Id.* at 2.

The majority opinion at footnote 34 states that:

we note that appellants' submissions overstate the amount of publicity by including, apparently, every story concerning the many difficulties of the last years of the Nixon administration, whether or not those stories discussed appellants. We also note that the overwhelming bulk of the publicity dealing with the conspiracy related to information properly brought out at trial.

But the essential point is that the amount of pretrial publicity that *did* discuss these cases has never before been equalled. The coverage *in Washington, D.C. by Washington papers alone,* without considering the additional tally of television and radio coverage, worked as an indivisible whole, casting "All the President's Men" as criminals. The implication from the majority, that the individual reader does not link publicity in such a manner, is contrary to fact. The effect of the mass of publicity is indivisible. The majority's apparent suggestion that "conspiracy related information" is the only relevant information is also incorrect. The cumulative effect of the publicity was inexorably to create a poisoned body of public opinion of massive proportions particularly in the District of Columbia, from which the jury was drawn.

Moreover, with respect to so-called "conspiracy related information" significant portions of such information did not come into the trial. For example, *Washington newspapers made the following statements about Watergate matters in the April 19 to May 18, 1973 period alone:*

". . . breaking the rules of decent political competition—paying youngsters to infiltrate opposition headquarters, corrupting them to pretend . . . ." (Haldeman App. 2–3)

" '. . . Honesty and following those orders [from Haldeman and Ehrlichman] were inconsistent.' " (Haldeman App. 4)

". . . nothing the President's men would not do to promote Mr. Nixon's interests. . . . There lies the logic of . . . the sabotage campaign . . . ." (Haldeman App. 6)

". . . lie and cheat and corrupt the institution of government . . . ." (Haldeman App. 7)

". . . Mardian used government gum shoes to stake out my house and tail me . . . ." (Haldeman App. 16)

". . . Mitchell tried in 1969 to influence a ruling from two Supreme Court justices in a set of wiretapping cases." (Haldeman App. 21)

". . . He [Haldeman] stayed behind the scenes, using loyal aides to do the dirty work . . . ." (Haldeman App. 35)

". . . elaborate, continuous campaign of illegal and quasilegal undercover operations conducted by the Nixon administration since 1969 . . . under the direct supervision of . . . H. R. (Bob) Haldeman, . . . John N. Mitchell and Robert C. Mardian . . . ." (Haldeman App. 37–38)

"The Use of the Secret Service to obtain information on the private life of at least one Democratic presidential candidate in 1972." (Haldeman App. 38)

". . . possession of Sen. Thomas Eagleton's confidential health records by Ehrlichman and the use of paid 'vigilante squads' by the White House and Justice Department to conduct illegal wiretapping, to infiltrate radical organizations for provocation and to conduct political espionage." (Haldeman App. 40)

The simple statistic of an average of 30 to 120 column inches of coverage per day for a two-year period, in local Washington papers alone, is staggering even without considering any other form of media coverage. It has no apparent parallel in legal history. It cannot be mincingly alluded to in the course of disposing of this case, for it goes to the heart of the question of whether appellants were accorded their constitutional right to a fair trial.

### C. *Comparison of Washington With Other Areas*

Since appellants sought change of venue from Washington, D.C. on the basis of pretrial publicity, the first question is whether the coverage in Washington, D.C. was exceptionally heavy as compared to the rest of the country.

The record does not disclose data on television and radio coverage of Watergate, but it is probably accurate to assume that, roughly, the television and radio coverage of Watergate was at least as extensive in Washington, D.C. as elsewhere, particularly since much of the television coverage was on day-long nationally televised Senate hearings and evening news shows. If there is error in this assumption, it probably understates the coverage in the Washington, D.C. area.

The distinguishing factor thus becomes the newspaper coverage. The evidence is ample that the press coverage in Washington, D.C. was substantially heavier than elsewhere in the country. More importantly, there is no evidence or analysis in the record or the majority opinion indicating that the newspaper coverage in the rest of the country was even roughly as extensive as it was in Washington.

The Washington Post stood at the center of the disclosure. It accorded massive coverage to Watergate. The Special Prosecutor notes the key role of the Washington Post. In writing of the events after Mr. Cox's appointment to head the prosecution forces he says:

> The Senate Select Committee hearings, which had begun a week earlier, were covered live daily by the major networks, enabling millions of Americans to witness the unfolding of the scandal. Inspired or embarrassed by the persistent investigative reports of the *Washington Post*, many reporters assigned to cover the affair scrambled frantically in the competition to discover and reveal new examples of executive branch misdeeds.

Watergate Special Prosecution Force Report 227 (1975). He also notes a reminder of the Washington Post's exceptional vigor in digging into Watergate matters:

> Fortunately, [the Watergate Special Prosecution Force] experienced very few suspected leaks. In August 1973, it was discovered that some information discarded as trash had made its way to the *Washington Post*. A shredder was purchased to prevent any such experience in the future.

*Id.* at 230.

More importantly, there is the evidence that the newspaper coverage *alone* in Washington, D.C. stayed at an average level of 30 to 120 column inches a day, accumulating to a total of some 50,000 column inches for the entire 22 month period between disclosure of the break-in and the May 1, 1974 change of venue motion. The Government's response to the motion (Docket No. 142) certainly offers no argument that the newspaper coverage elsewhere in the country was the same as in Washington, D.C. Judge Sirica, in his disposition of the motion, makes no suggestion that the coverage was the same (Hearing of June 12, 1974, Docket No. 180).

The most compelling evidence of the exceptional level of newspaper coverage in Washington, D.C. is the Sindlinger Affidavit, attached to the May 1, 1974, Change of Venue Motion (J.App. 284, Docket No. 56). The affidavit presents a public opinion survey that examined the question of pretrial publicity in the Watergate case. The affidavit is appended to this dissent as Appendix A. The survey results show, at pp. ——–—— of 181 U.S.App.D.C., at pp. 178–179 of 559 F.2d that *Washington,*

*D.C. was the only sampled source where newspapers were found to be the most important influence on public opinion.* The data is presented as follows:

In thinking of your own opinions with regard to the guilt or innocence of the defendants in the cases we have been talking about—what do you think has most influenced you—what you have read in the newspapers or what you have read in magazines, or your own political position?[2]

| | [U.S.] | [D.C.] | [Delaware] | [Indianapolis area] | [Richmond area] |
|---|---|---|---|---|---|
| Newspaper | 37% | 58% | 39% | 28% | 25% |
| Television | 58% | 46% | 62% | 51% | 65% |
| Magazines | 7% | 16% | 17% | 9% | 11% |
| Radio | 5% | 11% | 9% | 4% | 3% |
| Political Position | 6% | 11% | 3% | 4% | 4% |
| Personal Decision | 13% | 14% | 15% | 15% | 8% |
| Don't Know | 6% | 4% | 4% | 6% | 8% |

In the nation as a whole and in the three other sampled areas, television was clearly the most influential factor. The validity of the poll has not been challenged. The methodology is set forth in the affidavit and speaks for itself. In its response to the change of venue motion, the Government said simply ". . . we do not find it necessary to take issue here with the study's methodology . . ." (Docket No. 142 at 9).

Thus, even with the generous assumption that television and radio coverage in Washington was at the national average, the effect of the Washington *newspaper coverage alone* was far more substantial than elsewhere in the country.

## III. THE EFFECT OF THE WASHINGTON, D.C. PUBLICITY AS OF MAY 1, 1974

The venue question poses the additional and central issue of the *effect* of the publicity as of the time of the change of venue motion. There are two factors that were evident in the record as presented to the District Judge on May 1, 1974.

The first factor is that the coverage of the case in Washington, D.C. alone far exceeded the coverage elsewhere in the nation. This alone called at least for inquiry into the comparison of Washington, D.C. coverage with coverage in other parts of the United States. Neither the District Court nor the Government initiated such an inquiry.

The second factor before the Judge was the result of just such an inquiry, which was set forth in the survey described in the Sindlinger Affidavit (Appendix A). The sample population was drawn from those responding that they were registered to vote, and therefore eligible to serve on a jury in their area. 93% of the Washington, D.C. population was found to know of the indictments. 73% of those people were found to have an opinion of guilt or innocence—a proportion 15% more than the corresponding national average and 23% more than in one other sampled area, closeby Richmond, Virginia. Moreover, the proportion of the total Washington, D.C. population that thought the appellants here to be in fact guilty was about 61% (84% of 73%), significantly higher than the corresponding national average of about 43%. (75% of 58%, Appendix A at —— of 181 U.S.App. D.C., at 179 of 559 F.2d).[3]

---

**2.** Multiple answers were recorded in more than one category. As a consequence, the totals of all answers to these questions will exceed 100%. (N.3 in Sindlinger Affidavit).

**3.** The probability of the observed difference (between the percentage of persons believing the defendants guilty in the Washington and in the national samples) being due to chance fluctuation is less than one one-hundredth of one per cent, using accepted statistical theory.

The unrefuted evidence of singularly heavier coverage in Washington, D.C. and of substantially heavier impact of the coverage in Washington (pretrial bias) could only impel a decision by the District Court Judge to move the jury selection and trial to another location in the United States, with either the same or another judge. No other area could have been as biased as Washington, D.C., and many areas could have been substantially less biased and have left no doubt about the fairness of the trial from the standpoint of venue.

This result was especially favored because of the conclusion that fairly leaps from the survey results in the Sindlinger Affidavit: much of the entire country *already thought* the appellants guilty. At the *very least* a court would be expected to remove the trial from a locale where 61% of the populace had concluded *guilt* to a locale where only 43% or less had so concluded; there must have been many such locales, since the national average was 43% (Appendix A at 6). In Richmond, Virginia, only 37½% considered that defendants were guilty. (75% of 50%, *id.*) This was not a situation where many had not heard of the case, or where many had no conclusion one way or the other. Here, on the face of an unrefuted and apparently accurate poll, most people in Washington, D.C., some 61%, in their own minds *had already completed the trial and returned a verdict of guilty,* while only some 2% of the city had formed an opinion of innocence. (*Id.* at 6). The appellants' plea was not to go where most residents had not heard of the indictments or had not formed some opinion, for their evidence disclosed no such place. The plea was to go to a place where where less than one-half the potential jurors had formed an opinion that they were *guilty,* with the rest withholding judgment.

It was possible for the Judge to travel with this case; any conviction he may have had as to the necessity that he preside need not have been violated.

## IV. THE LEGAL STANDARDS

In weighing the foregoing evidence on pretrial publicity, the District Court and this court are required to apply the law that governs the change of venue question. The law on the matter is established in four categories. First, there is the law applicable to federal cases, as set by the Supreme Court and the Circuit Courts of Appeals under their supervisory power over the District Courts, and, in the case of the Supreme Court, over the Circuit Courts of Appeals as well. Second, there is the law applicable to all courts, state or federal, under the Constitution. Within each of these two categories there is a division between two types of venue-change decisions for pretrial publicity. One is the category in which prejudice to the defendant is found to exist presumptively, because of extraordinary circumstances of coverage. The second is the category in which, although prejudice cannot be declared presumptively, the *voir dire* of prospective jurors discloses sufficient prejudice to warrant changed venue. This produces the four categories of analysis: (1) federal and (2) constitutional, and (3) presumptive and (4) actual.

The case law establishing these categories is clear-cut. There is a federal supervisory standard, in addition to a constitutional standard, in these cases, which would assure fair trials by an application of the rule of presumptive prejudice or through identification of actual prejudice. This is made clear in *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), and reiterated in *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), where the Court wrote, discussing *Marshall:*

> The defendant in *Marshall* was convicted of dispensing certain drugs without a prescription. In the course of the trial seven of the jurors were exposed to various news accounts relating that Marshall had previously been convicted of forgery, that he and his wife had been arrested for other narcotics offenses, and that he

had for some time practiced medicine without a license. After interviewing the jurors, however, the trial judge denied a motion for a mistrial, relying on the jurors' assurances that they could maintain impartiality in spite of the news articles.

Noting that the jurors had been exposed to information with a high potential for prejudice, this Court reversed the conviction. *It did so, however, expressly "[i]n the exercise of [its] supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts," and not as a matter of constitutional compulsion. Id.,* at 313 [79 S.Ct. at 1173].

421 U.S. at 797, 95 S.Ct. at 2035 (footnote omitted) (emphasis added).

The Court in *Murphy* was addressing itself to the constitutional standard applicable to state trials. The Court went on to survey the scope of the constitutional standard, as opposed to the federal supervisory standard:

Petitioner relies principally upon *Irvin v. Dowd,* 366 U.S. 717, [81 S.Ct. 1639, 6 L.Ed.2d 751] (1961), *Rideau v. Louisiana,* 373 U.S. 723, [83 S.Ct. 1417, 10 L.Ed.2d 663] (1963), *Estes v. Texas,* 381 U.S. 532, [85 S.Ct. 1628, 14 L.Ed.2d 543] (1965), and *Sheppard v. Maxwell,* 384 U.S. 333, [86 S.Ct. 1507, 16 L.Ed.2d 600] (1966). In each of these cases, this Court overturned a *state court conviction* obtained in a trial atmosphere that had been utterly corrupted by press coverage.

In *Irvin v. Dowd* . . . the Court readily found *actual prejudice* against the petitioner to a degree that rendered a fair trial impossible.

Prejudice was *presumed* in the circumstances under which the trials in *Rideau, Estes,* and *Sheppard* were held. . . . In *Rideau* the defendant had "confessed" under police interrogation to the murder of which he stood convicted. A 20-minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place. In reversing, the Court did not examine the *voir dire* for evidence of

actual prejudice because it considered the trial under review "but a hollow formality"—the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras.

*Id.* (emphasis added).

The federal supervisory standard provides broader protection against prejudice than the constitutional standard. Concurring in *Murphy, supra,* Mr. Chief Justice Burger wrote:

I agree with Mr. Justice BRENNAN [dissenting] that the trial judge was woefully remiss in failing to insulate prospective jurors from the bizarre media coverage of this case and in not taking steps to prevent pretrial discussion of the case among them. *Although I would not hesitate to reverse petitioner's conviction in the exercise of our supervisory powers, were this a federal case,* I agree with the Court that the circumstances of petitioner's trial did not rise to the level of a violation of the Due Process Clause of the Fourteenth Amendment.

421 U.S. at 803–04, 95 S.Ct. at 2038 (emphasis added). And in *Rideau, supra,* Mr. Justice Clark wrote, dissenting:

. . . if this case arose in a federal court, over which we exercise supervisory powers, I would vote to reverse the judgment before us.

373 U.S. at 728, 83 S.Ct. at 1420.

Recently, an opinion by Judge Bazelon emphasized that federal appellate courts have the duty to impose supervisory standards over criminal cases, *United States v. Pinkney,* 179 U.S.App.D.C. 282, 551 F.2d 1241 (1976) n.50, but, for some unexplained reason, the majority does not conform to that exhortation in this case, where the supervisory standard has been promulgated by the Supreme Court.

The foregoing makes three unequivocal points. First, there is a category of presumptive prejudice to which a federal supervisory standard applies. Second, that standard assures a defendant more protection against prejudicial pretrial publicity

than the constitutional standard. Finally, one example of the presumptive federal standard is found in *Marshall, supra,* under which

. . . persons who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced.

*Murphy v. Florida,* 421 U.S. at 798, 95 S.Ct. at 2035.

## V. APPLICATION OF THE STANDARDS

### A. *The District Court*

The District Court disposed of the question of presumptive prejudice at the June 12, 1974, motions hearing. In doing so it did *not* distinguish between a federal and a constitutional standard, and it did *not* examine or attempt to apply the law of presumptive prejudice.

THE COURT: Now you are talking about change of venue, where would you suggest the case be sent to for trial? Do you know of any place in the country?

MR. BOYER [Mr. Spencer Boyer, for Mr. Ehrlichman]: *Any place other than the District of Columbia, Your Honor.*

THE COURT: What do you mean by anyplace other than the District of Columbia? Alexandria—across the river?

MR. BOYER: No, Your Honor.

THE COURT: Where?

MR. BOYER: What we are asking for is of course that would depend on several things. That would of course be determined by this Court. That would also depend upon the calendar of the other districts. We would be willing to assist the Court in any manner to find out any district which would be out of the immediate environs of the District of Columbia to see whether or not their calendar could accommodate a trial of this length, complexity, and scope.

THE COURT: Now let's talk about some highly publicized cases that have been tried in the country. Let's go back many years, probably before your time, the trial of Richard Hauptman, involving the kidnap of the Charles Lindberg baby in New Jersey. I remember the trial

very well, highly publicized. *Of course in those days we didn't have radios to the efficiency we have now, or television.* We had newspapers, frontpage story everyday all over the country.

Senator Kennedy was killed out in California, a highly publicized case. The Manson trial. Recently I had two murder trials here that I presided over, highly publicized for weeks—the Ammidown case, one of the most brutal murder-rape cases ever tried in the history of our court, or probably any court in the country; and the Lee case, a companion case. *Now the test is going to be whether or not after voir dire examination by the Court you can obtain, you can empanel a jury say under oath not only having read or heard or listened to matters concerning the case that they could decide this case on the evidence and the law of the case. It comes down to that.*

Tr. June 12, 1974 (Docket No. 180) at 431–33 (emphasis added). The final sentences reveal that the District Court intended *no examination at all* to determine if the amount and nature of the presumptive prejudice violated the supervisory standard applicable in federal courts. And in fact it did not indulge in any such examination.

Later in the hearing the District Judge showed again that presumptive prejudice was not a consideration:

We have 800,000 people approximately living in the District of Columbia. *And if we can get a jury—and this is going to be the test in my opinion—*[which] *can* truthfully say they have heard some parts of those hearings but have not formed an opinion from what they heard or read, or heard commentators talk about, they can truthfully say they can sit on this case even though it may be a protracted case and could render a verdict after all the evidence is in, based on the evidence and law of the case, render a verdict based solely upon the evidence and law of the case. Until we try that out how is a judge going to determine on the arguments that have been made, the Court's knowledge of prior sensational

cases that have been tried in the country, protracted cases there and here, we have had many of them right in this district, how are you going to know whether you can get a jury unless you tried first?

Now, if you try as I have indicated and you can't get them, that is one thing. If we are able to empanel an unbiased jury that is another thing. How are you going to know unless you try? I would like to hear you on that.

MR. BOYER: *Your Honor, as I indicated earlier, that several of the cases and several of the imperical [sic] studies, for example, the Broader Study on Voir Dire Examinations and Imperical [sic] Study, and in fact the ABA standards which I quoted earlier, recommend that the Court strongly protect the defendant before the trial, not to place too much emphasis on the whole concept of voir dire, especially where there has been the pervasive publicity as that as has been engendered by this particular case.*

*The problem with voir dire is that it is going to be very difficult, especially here in the District of Columbia, to determine whether the juror is consciously or subconsciously harboring prejudice against the defendants because of the widespread media.*

The Court earlier asked me a series of questions as to what was the distinction between some of the more celebrated cases where there was not a change of venue and this particular case. So I may submit to the Court that the circumstances Mr. Green has indicated, that this is an unprecedented case, these are as Your Honor earlier indicated, the personal friends and aides of the President, and this has been an on-going saga of more than two years whereas in many of the cases that you referred to there were but in a moment—in the Ammidown case and the Lee case, even though they were celebrated cases here in the District of Columbia—nowhere and by no stretch of the imagination—

THE COURT: —how about the case I tried which took me ten months to try? The longest case ever tried in the history of this court since 1801. It got quite a lot of publicity, incidentally. It was a civil antitrust suit against all the major railroads in the country and was publicized pretty well. It was not a murder case. We got a jury in that case and the jury sat eight months.

MR. BOYER: May I submit to the Court we are dealing with apples and oranges.

THE COURT: Wait a minute. Let me ask you a question. Do you suppose everybody that listens to radio and television commentators pro and con, everybody, or the majority of the people, have made up their mind that President Nixon is wrong in this whole matter or anyone of these defendants are all wrong and that they are guilty of things? Don't you think there are millions of people in this country now at this moment think the President has done nothing wrong and done everything according to his duties? And vice versa many other people might think otherwise. And about any of these defendants that have been highly publicized. Don't you think there are millions of people that do not believe they done anything wrong?

MR. BOYER: Your Honor, *those millions of people don't live here in the District of Columbia.*

*Id.* at 435–37 (emphasis added). The Sindlinger Affidavit demonstrates the truth of the last observation.

The "ABA standards" referred to in the foregoing exchange are at ABA Standards Relating to Fair Trial and Free Press 119–28 (Approved Draft) (1966). The commentary therein reviews the pre-*Murphy-Rideau* cases and succinctly states the error of the District Judge's approach in this case.

The judicial attitude has taken the form of great deference to the discretion of the trial judge, even when there is evident dissatisfaction with his decision, *of equating the ability to impanel a jury with the absence of any need for other relief, and of insisting that the defendant establish actual prejudice on the part of virtually the entire community.*

*Id.* at 121–22 (emphasis added). The ABA Standards were printed in 1966. They illuminate the issues here. The pertinent standard is:

A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. This determination may be based on such evidence as qualified public opinion surveys or opinion testimony offered by individuals, or on the court's own evaluation of the nature, frequency, and timing of the material involved. *A showing of actual prejudice shall not be required.*

*Id.* at 119 (emphasis added). In commentary, the ABA authors wrote:

As shown by such cases as *People v. Martin* [19 App.Div.2d 804, 243 N.Y.S.2d 343 (1st Dep't 1963)], *Delaney v. United States* [199 F.2d 107 (1st Cir. 1952)], and *Rideau v. Louisiana* [373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)], there are occasions when the inherently prejudicial nature of the material, coupled with knowledge of its wide dissemination in the community, requires the granting of relief without elaborate soundings of community sentiment. In such instances, change of venue may be particularly appropriate when it can be shown that the news coverage has been far less pervasive in some other locality within the jurisdiction.

*Id.* at 126 (footnotes omitted).

As to the opinion poll, the District Judge says simply, "You know polls can be wrong too. We remember the famous election when Governor Dewey ran against President Truman. . . . *I have great faith in the jury system.*" (Docket No. 180 at 437) (emphasis added). But this statement reflects categorical rejection without consideration of the Supreme Court rule on presumptive prejudice. In light of *Murphy* and *Marshall* the law is now that presumptive prejudice is a factor that must be examined in venue decisions. The District

Court therefore committed reversible error in declining even to consider the factor. If the federal standard for presumptive prejudice exists at all, it requires the trial court to recognize the *possibility* of presumptive prejudice. Further, on the facts of this case, the presumptive prejudice existing in the District of Columbia, which is demonstrated by Appendix A and the newspaper clippings, mandated a change of venue to a more favorable venue.

### B. *The Majority Opinion*

The majority opinion states:

We believe, however, that it is inappropriate to attempt to formulate a supervisory power standard for concluding that a fair jury cannot be selected.

Majority opinion at —— of 181 U.S.App. D.C., at 62 of 559 F.2d. The Supreme Court, however, *has* formulated a supervisory standard in venue matters. The present Chief Justice and Mr. Justice Marshall and Mr. Justice Clark have so written. 421 U.S. at 798, 804, 95 S.Ct. 2031; 373 U.S. at 728, 83 S.Ct. 1417. The majority should acknowledge that it exists and apply it.

The reasoning of the majority opinion turns on the notions that identifying and applying such a standard would be hard to do (Majority opinion at —— – —— of 181 U.S.App.D.C., at 62–63 of 559 F.2d), the trial would not be fairer (*id.* at —— – —— of 181 U.S.App.D.C., at 63 of 559 F.2d), and that, after all, if trial courts are permitted to deny changes of venue for presumptive prejudice and to go on to the *voir dire*, more information on prejudice would be available (*id.* at —— – —— of 181 U.S. App.D.C., at 63 of 559 F.2d).

It is true that *voir dire* is potentially a valuable tool for discovery of prejudice, but that observation is irrelevant to the issue of whether a supervisory or constitutional standard is to apply in weighing the information on prejudice. Also, as held in *Marshall, supra*, there are cases in which *voir dire* is pointless. Further, the trial could not help but tend to be more fair if the venue were laid where *only 37½%* of the

people (as in Richmond) already thought the defendants guilty, instead of *some 61%* (as in the District of Columbia), and there is no doubt that many communities could have been found where the presumptive prejudice was substantially less.

As to the standard, the court here is simply walking away from its duty. The majority thus whisks the law away at whim.

The appellants here are criminal defendants in federal court. They have a right to be judged by federal standards—the same as all other federal defendants. Federal judges have a sworn duty to apply federal standards, as denominated by the Supreme Court, to the facts of this case. The federal judges here have not done so. No consideration whatsoever has been given to the existence of potential prejudice above the bare minimum constitutional obligation.

## VI. THE LAW APPLIED TO THE MAY 1, 1974 MOTION

The task of this court is to apply the federal supervisory standard for presumptive prejudice to the facts of this case.

### A. *The Remedy*

The first step in analysis is to clarify the precise remedy and to identify its costs. The remedy was *not* delay. It was *not* a continuance. It did *not* entail additional national agony in delaying the trial and its resolution. The remedy was simply for the trial to be held in practically any place other than Washington, D.C. Moreover, the District Judge was not barred from himself travelling with the case and trying it. The interests of the country in a prompt trial and supervision of a fine judge were simply not at stake. To say that they were is to completely evade the law as to change of venue. The fact is that had such change of venue been made, the issue of the fairness of the trial, on the venue point, would have been completely obliterated from the case. Why the Government and the trial court would want to hazard a criminal trial in which the evidence of guilt was as strong as it was here by insisting on trial in a

jurisdiction where presumptive prejudice existed to the extent that it did here, defies reason. Delay and the selection of the judge were not issues, and the issue of possible additional trial costs in the new venue was not raised (Docket Nos. 142, 180).

The Government had absolutely nothing to lose by trying the case in a community where presumptive prejudice was at a minimum, and to say that it did have something to lose is to admit that the case should have been transferred.

A factor that compelled use of the simple venue safeguard in this case was that the United States Senate had expressly chosen to televise its hearings in *spite* of the Watergate Special Prosecutor's request, out of concern for defendants' fair trial rights, that there be *no* television coverage. The Senate reported:

The committee's interest in televised hearings was not to obtain publicity for publicity's sake. The facts which the committee produced dealt with the very integrity of the electoral process; they were facts, the committee believed, the public had a right to know. Most citizens are not able personally to attend the working sessions of their Government. Although thousands of people spent short periods in the Caucus Room during the hearings, these visitors represented only a small percentage of the electorate. Thus, it was desirable that every citizen be able to view the hearings, if not in the Caucus Room, then in his home or place of business. The ability to read about the hearings in the printed media was not sufficient. The full import of the hearings could only be achieved by observing the witnesses and hearing their testimony.

It was for this reason that the committee opposed the efforts in Federal court of Special Prosecutor Cox to proscribe television and radio coverage of the testimony of Magruder and Dean. *The Special Prosecutor's expressed concern was that public hearings might prejudice future criminal trials.* It was the committee's position that they would not, but, *even if they did, it was more important in*

*this period of crisis and national concern that the full facts be promptly made known.* The public should not have to wait a year or more until the Watergate trials were over to know the scope of the corruption in its Government.

S.Rep. No. 93–981, 93d Cong., 2d Sess. XXXI–XXXII (1974) (emphasis added). This statement speaks for itself and indicates that the Senate hearings were unconcerned with the prejudice they might cause to future criminal trials. Given this decision, and the nationally televised and printed coverage it created, simple fairness commanded that the trial be located in some community where there lay a minimum prejudgment of guilt.

One other element of cost should be explicitly stated. It is the cost now, in 1976, of reversing the convictions for a retrial of these cases where the Government's evidence is massive. The cost includes reopening old wounds. The cost may also include public exasperation and disillusionment. The cost certainly would include the dollar outlays for a new trial. *But the existence of the federal supervisory rule requires such disposition and the only court in this land that can alter the existing rule is the Supreme Court of the United States.* The law is otherwise clear, and this court is bound to apply it. Our constitutional guarantee of a fair trial includes the absolute right to an open-minded jury and, as the Supreme Court held in *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), with respect to the right to be tried *only* on felonies charged in an indictment by a grand jury, the denial of such right cannot be treated as harmless error.

### B. *The Supervisory Standard and the Publicity in this Case*

We know that the proposition in *Marshall,* a federal case, is that

. . . persons who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced.

421 U.S. at 798, 95 S.Ct. at 2035. In this case, as stated *supra,* the defendants were the subjects of a massive wave of media coverage which is without parallel in legal history, which was extraordinarily heavy in Washington, D.C., and which, on the unrefuted record, *led some 61% of Washington, D.C. area residents to conclude that the defendants were guilty, before trial, with only some 2% believing them innocent and the rest withholding judgment.* On the same record, to a level of statistical near-certainty, this was not the case in such other locales as Delaware, Southern Indiana, and Richmond, Virginia.

The Washington press commentary included substantial, unending vituperative statements, of which these were typical:

. . . Honesty and following those orders [from Haldeman and Ehrlichman] were inconsistent.

. . . He [Haldeman] stayed behind the scenes, using loyal aides to do the dirty work . . .

*See* p. —— of 181 U.S.App.D.C., p. 142 of 559 F.2d, *supra.* The newspapers were saturated with adverse comments, political satire and cartoons, and even a comic strip attacked the defendants.[4]

This was *not* a case in which the defendants were asking to go somewhere where the jury pool would represent a clean or neutral slate: it is a case in which they sought simply to go someplace where the smallest possible portion of the jury pool had concluded in advance that they were *guilty.*

Additional high dollar costs, delay, and change of judge were not involved.

In determining the proper applicability of the supervisory standard declared in *Marshall,* that case cannot be distinguished from this case on the basis that the jurors had improperly learned of a prior *conviction* of the defendant, instead of some other adverse information, because *Rideau,* which was a constitutional case, was reversed

---

**4.** *See, e. g., Doonesbury* comic strip in The Washington Post, Aug. 13, 1974, § B at 10; *id.,* Aug. 12, 1974, § B at 8; *id.,* July 27, 1974, § E at 50; *id.,* July 25, 1974, § F at 16; and *Herblock* cartoons in *id.,* Aug. 11, 1974, § C at 6; July 28, 1974, § C at 6.

where the publicity did not involve any conviction. The federal supervisory standard is broader than the constitutional standard and can be violated by the possibility of prejudice in any form. Jury prejudice is not limited to publicity of a conviction or a confession.

The disclosure in *Rideau* involved a confession on television before some 106,000 viewers in three separate showings in a population of some 150,000, or nearly two thirds of the populace, assuming some small allowance for overlap in the audience among the three showings. 373 U.S. at 724, 83 S.Ct. 1417. In this case the principal defendants were dismissed from high office in a wave of publicity that led *nearly two thirds of the population of Washington, D.C. to believe they were guilty before trial.* Moreover, *eight of the twelve ultimate jurors actually viewed* portions of the television hearings from which the Senate perjury counts were brought (Tr. 634, 842, 937, 1181–82, 1355, 1427, 1680, 1911). There was therefore the obvious possibility that these *jurors* in the case were actual *witnesses to the charged crime*, a frequent cause for disqualification as a juror. The adversary nature of those hearings may have created fixed impressions in the viewers and turned them into partial partisans for one side or another. They may have tended to side with Senator Ervin as many did. The percentage of nearly two thirds is the same in both *Rideau* and this case. In *Rideau*, the Supreme Court said that for the people exposed to the publicity, the publicity *was* the trial. 373 U.S. at 726, 83 S.Ct. 1417. The same might be said of the Senate Hearings as presented on television. And *Rideau* was a *state* court trial and therefore, a constitutional case. If percentages are to govern there, then it is even clearer that they should govern in a *federal* case, where a broader standard than the constitutional standard applies.

C. *The Evidence from the Voir Dire*

The majority opinion explores the *voir dire* that was actually held subsequent to the denial of the change of venue motion.

The *voir dire* confirms the conclusion from the evidence that the venue should have been changed at the beginning of the case, on the basis of presumptive prejudice.

The *voir dire* began with preliminary questions directed to groups of members of the venire, in order to explore such matters as reading the indictment, determining if any person on the venire knew participants in the trial or if they might tend to disbelieve a witness because the witness had pleaded guilty in another case, and to inquire into scheduling or medical difficulties that would prevent those on the venire from serving. Tr. 1–541.

The court then asked a standard set of questions of members individually. This individual questioning produced the panel of twelve that was ultimately charged with the case. Because of the importance of the context and sequence of this individual questioning, and as a typical example for ease of reference, the individual *voir dire* of one of the twelve jurors, John Hoffar (Tr. 928–49), is set out as Appendix B to this opinion. (Hereafter Hoffar *Voir Dire*. The other eleven jurors were Gladys Carter (Tr. 607–19), Roy Carter (Tr. 619–34), Ruth Gould (Tr. 832–51), Anita King (Tr. 1075–97), Marjorie M. Milbourn (Tr. 1172–1216), Vanetta M. Metoyer (Tr. 1216–29), Dock Reid (Tr. 1350–61), Jane M. Ryon (Tr. 1420–42), Thelma L. Wells (Tr. 1673–96), Sandra Y. Young (Tr. 1876–1901), and Helen D. Pratt (Tr. 1901–17).

1. The Role of *Voir Dire* and the Facts of *Rideau*

The first and singular aspect of the *voir dire* is that it confirms the pervasiveness of the coverage of this case in Washington, D.C. The trial judge says flatly:

Think of it. The publicity that break-in got. *I said, this is incredible.*

Tr. 487 (emphasis added). And:

*If anybody gets on the stand and tells me they never heard of this case or read about it, I will exercise a challenge for cause. That is how I feel about it.*

*Id.* (emphasis added).

The heart of the problem thus created is encapsulated by the authors of the ABA

Standards Relating to Fair Trial and Free Press:

> It has in many jurisdictions been common practice for denial of such a [change of venue] motion to be sustained if a jury meeting prevailing standards could be obtained. There are . . . difficulties with the approach . . . many existing standards of acceptability tolerate considerable knowledge of the case and even an opinion on the merits on the part of the prospective juror. And even under a more restrictive standard, *there will remain the problem of obtaining accurate answers on voir dire—is the juror consciously or subconsciously harboring prejudice against the accused resulting from widespread news coverage in the community?* Thus if change of venue and continuance are to be of value, *they should not turn on the results of the voir dire;* rather *they should constitute independent remedies designed to assure fair trial when news coverage has raised substantial doubts about the effectiveness of the voir dire standing alone.*

ABA Standards, *supra* p. 21, at 126 (emphasis added).

The indisputable fact in the majority's own analysis of the *voir dire* is that the exposure of the venire and final jurors to prejudicial pretrial publicity in this case was at least as heavy as the exposure of the venire and final jury in *Rideau.* We already know, from the unrefuted record, that not only had well over two thirds (93%) of the entire Washington, D.C. population been exposed to the publicity, as in *Rideau,* but nearly two thirds *thought the defendants guilty.* The majority writes:

> Appellants claim that 52% of the veniremen questioned individually had an inclination, "ranging in intensity from mere suspicion to absolute certainty," toward a belief in guilt. Mitchell br. at 96. The Government maintains that only 8% of those questioned indicated an opinion of guilt that could not be set aside. In all, the Government identifies 29% of the venire as having had an opinion of appellants' guilt and another 7% as possessing an "arguable predisposition against defendants." Govt. br. at 243.

Majority opinion at —— of 181 U.S.App. D.C., at 70 of 559 F.2d n.56. But this is exactly the argument which was rejected by the majority in *Rideau.* As Mr. Justice Clark wrote there, *dissenting* from the majority's finding of presumptive prejudice:

> The most crucial evidence relates to the composition of the 12-man jury. Of the 12 members of the panel only three had seen the televised interview which had been shown almost two months before the trial. The petitioner does not assert, and the record does not show, that these three testified to holding opinions of petitioner's guilt. They did testify, however, that they
>
> > "*could lay aside any opinion, give the defendant the presumption of innocence as provided by law, base their decision solely upon the evidence, and apply the law as given by the court.* As the judge stated in his per curiam: 'They testified they could do so notwithstanding anything they may have heard, seen or read of the case.'"
> > *State v. Rideau,* 242 La. 431, 462, 137 So.2d 283, 295.

> \* \* \* \* \* \*

> The determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge. And when the jurors testify that they can discount the influence of external factors and meet the standard imposed by the Fourteenth Amendment, that assurance is not lightly to be discarded.

373 U.S. at 732, 733, 83 S.Ct. at 1422. Nevertheless, the *majority* of the Supreme Court in *Rideau* found *presumptive prejudice* in that constitutional case and thereby held that the trial court should have granted a change of venue before the *voir dire* was ever reached. In this supervisory case, with its broader standard, and with the virtually costless remedy of a simple and prompt change of venue upon defendants' motion, the result is *a fortiori* the same. The case law leaves no other exit. To ar-

gue otherwise is to play shell games with the cases and to avoid the duty of the court.

## 2. The Futility of *Voir Dire* in this Case

The purpose of *voir dire* is to enable court and counsel to engage in a rational analysis of a potential juror's attitudes regarding a case. Conclusory and ultimate questions of the nature of "Are you unfairly biased in this case?" are next to useless in such an inquiry.

In the *voir dire* the trial court restricted its inquiry to what the candidate remembered *in particular* from the pretrial publicity:

> THE COURT: Look, listen, all of you know I have been in this case—not this particular case, the so-called Watergate affair, since 1972, I think.
>
> I heard and listened, I have known Mr. Mardian, Mr. Mitchell, favorably, Mr. Parkinson. I listened to some of the testimony and if you asked me under oath what did Mr. Mitchell say on a certain date, what did Senator Irvin [*sic*] say on a certain subject to him, I couldn't conscientiously tell you under oath.
>
> *And I think that is the reaction of the average person. People soon forget. The old saying there is nothing staler than yesterday's news.*
>
> *Unless something particular comes out which stands out in a person's mind,* and I remember the incident of my good friend John Wilson about the Jap situation, that I remember. I will never forget that.
>
> MR. WILSON: I wish you hadn't mentioned that.
>
> MR. FRATES: Again, for the record, Your Honor, we want to challenge that juror and all remaining jurors for cause on those grounds set out in our motion *on the massive pretrial publicity.* And may we have that as a standing objection to each one?
>
> THE COURT: Yes.

Tr. 509–10 (emphasis added). As put to Juror Hoffar, the court's question was:

> Does anything you may have heard or discussed about this matter *particularly* stand out in your mind? Any one thing or several things?

Hoffar *Voir Dire* at 932 (emphasis added), Appendix B *infra* at —— of 181 U.S.App. D.C., at 181 of 559 F.2d. As for the other jurors, to the same effect, *see* Tr. 610, 623, 836, 838, 1079, 1176, 1219, 1352, 1423, 1428, 1678, 1882, 1907.

In thus restricting its inquiry to *particular* instances, the trial court was helpless in the face of the permanent psychological impact that the whole of the absolutely unprecedented publicity in this case had in the Washington, D.C. area. Given the gigantic scale of the case, the years of publicity, and the inevitable blurring of the avalanche of detail, the restriction of inquiry to particular instances, although earnest and well-meant, was useless. What the court did not recognize was that people forget particulars but do form lasting general opinions and impressions.

Rudolf Flesch, author of Why Johnny Can't Read, explains the futility of the trial court's approach in The Art of Clear Thinking (Collier-MacMillan) 165–66 (1969):

> During World War II, a team of psychologists studied the propaganda effect of orientation films. Among other things, they tried to find out whether films changed the opinions and attitudes of soldiers who saw them, and whether and how these changes lasted. They had a hunch that the effect of the films would gradually wear off and that after some time, soldiers would forget the factual details and revert to their original opinion.
>
> This idea may seem rather obvious to you. It seemed obvious to the psychologists too—but, being scientists, they decided to test it anyway. So they gave the soldiers a test after one week and another test after nine weeks.
>
> As expected, the soldiers had forgotten most of the facts in the film during those eight weeks. But, "clearly contrary to the initial expectation," the general propaganda effect of the film—*the opinion change*—had considerably *increased* [emphasis in original] between the first and the second test. There was not the

slightest doubt about it: the soldiers had forgotten the details of the film but its message had sunk in deeper.

The research team cheerfully accepted this unexpected fact and immediately proceeded to account for it by a hypothesis. They found that it could be explained through a theory by the British psychologist, Bartlett, published in 1932. Bartlett had written that *"after learning, that which is recalled tends to be modified with lapse of time in the direction of omission of all but general content and introduction of new material in line with the individual's attitudes." In other words, as time passes, we're apt to forget details but reinforce* ["reinforce" emphasized in original] *what we remember of the general idea.*

(Emphasis added). Thus, the circumstance that prospective jurors stated they could not recall particulars did not negate the strong possibility that they had formed and retained some general opinions about what they had seen and heard.

Given the record of the unequalled blanket press coverage and the Sindlinger Survey results, Judge Sirica's vow to challenge any person disavowing knowledge of this case, and the jurors' uniform affirmation of familiarity with the case (Tr. 610, 623, 836, 932, 1079, 1176, 1219, 1352, 1423, 1677, 1881, 1907), there is no question that "learning" in the psychological sense had taken place. General and ingrained attitudes were all that remained. Not one of the jurors had any "particular" recollections, save for Juror Gould's single recollection that the "tape part" was important (Tr. 610, 623, 836–51, 932, 1080, 1176, 1220, 1352, 1423, 1678, 1882, 1907). In fact, in juror Milbourn's case the exchange was:

THE COURT: Does anything that you may have heard or discussed about this matter particularly stand out in your mind that you can recall or do many things stand out?

JUROR MILBOURN: *There is so much that I wouldn't know.*

THE COURT: You couldn't recall one particular thing, is that correct?

JUROR MILBOURN: No.

*Id.* at 1176 (emphasis added). This demonstrates the fallacy of the court inquiring about particulars and refusing to ask *what* opinions were held.

And in Juror Ryon's case:

THE COURT: Now, does anything you may have heard or discussed about this matter particularly stand out in your mind?

JUROR: (No response.)

THE COURT: Is there anything that stands out?

JUROR: I am sorry to say that I don't really, you know, *remember everything I heard.*

*Id.* at 1423 (emphasis added). In *none* of the cases, not in Juror Gould's, Milbourn's, Ryon's, or in any other juror's case, was the response to the question of "particular" recollection followed up to learn what, if any, opinion they did hold, notwithstanding the defendants' standing objection that some such effort be made. *Without the data from such inquiry, defendants could not test the juror's conclusory statement that he could try the case fairly.*

Worse, the failure to inquire into what opinions the prospective jurors did hold gave free rein to the tendency of the jurors toward "omission of all" evidence,[5] except evidence conforming to the original (prejudicial pretrial) publicity.

This case is unique—*every one* of the actual jurors had been exposed to the pretrial publicity; most had witnessed the Senate hearings on television, but over time, *of course* the "particular" details faded in their minds. This being so, when the court limited its questioning to whether anything *particular* stood out, it deprived defendants of those tools for finding possible prejudice in the jury that would have been provided by a more penetrating *voir dire*. But this is only to say that this case is one involving presumptive prejudice, a category already defined by the law, and for which a simple and virtually costless remedy, timely re-

---

5. This tendency was documented in The Art of Clear Thinking, *supra.*

quested by defendants, was available to the trial court: change of venue.

### 3. Coaching By the Trial Court

Judicial notice may be accorded the fact that, once there has been a screening for those who cannot serve due to medical reasons or personal schedule, many persons on the venire wanted to be picked to serve. The desire is a natural and understandable one. The regular compilations of comments of jurors accumulated by the District Court in this circuit attest to this fact.

For this reason, however, and generally, the trial court should steer clear of giving the prospective juror leading suggestions of suitable answers to be given to accomplish that objective. The obvious first danger to avoid is to not tell a prospective juror the legal standard by which impartiality will be judged *before the question itself is asked.* The Hoffar *Voir Dire* is typical and instructive.

The trial court begins by reminding the juror, before the parties and counsel, that his or her selection is at issue:

> This is . . . to determine whether or not you have the qualifications to be selected to be on this jury . . .

Hoffar *Voir Dire* at 928–29, Appendix B *infra* at —— of 181 U.S.App.D.C., at 179 of 559 F.2d. Then, the first question on bias is asked in a phrase that warns the juror that, of course, the juror has not yet heard the evidence:

> Do you believe at this very moment, and *without having heard any of the evidence* . . . that any Defendant in this case is *guilty* . . .?

*Id.* at 930, Appendix B *infra* at —— of 181 U.S.App.D.C., at 180 of 559 F.2d (emphasis added). That is a loaded question. The natural inclination, unless a very strong opinion of guilt is held, would be to deny that one believed a person to be guilty, without having heard any of the evidence. The simple inquiry should be, "Do you presently have an opinion as to the guilt of any defendant in this case?" The trial court goes on to say,

> Now . . . I am going to question you as to what you heard or read about the case to decide if you can be qualified to serve . . .

*Id.* at 931, Appendix B *infra* at —— of 181 U.S.App.D.C., at 180 of 559 F.2d. And,

> . . . *we would like to get a jury where each juror is able to put aside anything he or she may have read or heard and any opinion* . . . *and decide* . . . *solely on the evidence* . . . *and* . . . *instructions* . . .
>
> *Now, I want to be sure, and counsel on both sides want to be sure, that you can decide this case* for yourself *based solely from what you hear in this courtroom* at the proper time.

*Id.* (emphasis added). And,

> Now the Government and the Defendants in this case are entitled to have this case decided on its merits, that is, on the evidence presented in open Court and pursuant to the law as the Court will try to explain it to the jury at the end of the case. *You must not be influenced, of course, by any events that transpire outside of the courtroom.*

*Id.* at 938, Appendix B *infra* at —— of 181 U.S.App.D.C., at 183 of 559 F.2d (emphasis added). Thus, the prospective juror was told how to answer the court's questions if he wanted to serve.

Later, of course, followed the Court's question:

> THE COURT: Does any reason whatsoever suggest itself to you at this time why if you are selected to serve on this jury you feel you could not listen to the evidence objectively and the testimony and at the proper time render or vote for a verdict or join in a verdict which will be based in your opinion *solely upon the evidence that will be offered in open Court* and the instructions on the legal principles involved of the law, in other words, applicable to the case?
>
> JUROR HOFFAR: No, sir.
>
> THE COURT: No reason whatsoever?
>
> JUROR HOFFAR: None that I can think of offhand.

*Id.* at 940, Appendix B *infra* at —— – —— of 181 U.S.App.D.C., at 183–184 of 559 F.2d (emphasis added). The answer was plainly that earlier suggested.

The defendants had objected to this technique:

> MR. STRICKLER: I have one observation which I would like to make.
>
> We are asking the jurors factual questions to elicit facts. I believe Your Honor has approached this by way of telling them that the law is in advance which, in effect, can suggest an answer to these jurors and on the subsequent groups that come in I would like to request the Court not to give them the law which may suggest an answer, but just go after the facts.
>
> THE COURT: I will just have to use my own judgment and do what I think at the time is right.
>
> I will keep your request in mind.

Tr. 537.

But the objectionable practice continued. Advertently or not, these preambles to key questions could only add to the possibility of biased, unrevealing, and conclusory responses. The *voir dire* was thus improper and unrevealing of critical attitudes. Certainly, with 93% of the venire having prior knowledge of the case (Appendix A at —— of 181 U.S.App.D.C., at 178 of 559 F.2d), at some point the prospective jurors should have been asked: "What opinion did you reach?" They must have arrived at some opinion, and the parties were entitled to know what that opinion was.

4. The Trial Court's Standard of Juror Neutrality

The standard of neutrality used in this case was stated by the trial court:

> Does any reason whatsoever suggest itself to you at this time why if you are selected to serve on this jury you feel you could not listen to the evidence objectively and the testimony and at the proper time render or vote for a verdict or join in a verdict which will be based in your opinion solely upon the evidence that will be offered in open Court and the instruc-

tions on the legal principles involved of the law, in other words, applicable to the case?

Hoffar *Voir Dire* at 940, Appendix B *infra* at —— – —— of 181 U.S.App.D.C., at 183 of 559 F.2d. But this misses the complete test of neutrality by a significant omission. Particularly in notorious cases, saturated with publicity, the accurate test includes the prerequisite that the prospective juror at the *outset* of the case have no opinion as to guilt "*which would require evidence to remove.*" *Beck v. Washington*, 369 U.S. 541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962) (emphasis added).

In the June 12, 1974 hearing on the change of venue motion, the trial court pointed out how the *voir dire* was used in other highly publicized trials in which he participated. *Supra*, pp. ——, —— of 181 U.S.App.D.C., pp. 147, 148 of 559 F.2d. Reference to still other notorious cases is instructive as to the use of an accurate and scrupulous test of neutrality. Perhaps no better example lies in our legal history than the trials resulting from the Teapot Dome Scandal.

Prior to the Watergate affair, the investigations and trials of the principals in the Teapot Dome Oil Scandal generally held the modern day American record for sustained interest and publicity. Of course, today, with television, wider radio reception, and the entire news media vying with each other in what has come to be called investigative journalism, the publicity resulting from the Watergate break-in, the trial of the participants, the Senate (Ervin) Investigating Committee, the House impeachment hearings, the resignation of the President, the issuance of a presidential pardon, and the subsequent indictment and trial of appellants has far exceeded that of Teapot Dome.

The present case, involving as it does high federal officials in a criminal trial with substantial political overtones and a tremendous amount of pretrial publicity are in those respects similar to the Teapot Dome trial of Albert B. Fall, Secretary of the Interior in the Harding administration (*Fall*

*v. United States*, 60 App.D.C. 124, 49 F.2d 506, *cert. denied*, 283 U.S. 867, 51 S.Ct. 657, 75 L.Ed. 1471 (1931)). Because of these similarities it is relevant to consider the procedures followed in selecting the Fall (Teapot Dome) jury.

Secretary Fall was tried on a charge of bribery for allegedly receiving $100,000 from Edward L. Doheny to influence his decision in awarding the construction contract for certain oil storage tanks in Hawaii and for the delivery of "royalty oil" from Naval oil reserves to the corporation of which Mr. Doheny was president.[6] The publicity this case received was extensive and extended over many years. Consequently, when the trial of Secretary Fall on the bribery charge began on October 7, 1929, a great many of the jurors indicated that they had previously read about the charges in the newspapers and had heard it on the radio and in general conversation. The influence of this pretrial publicity on the panel drawn for jury service was thus an issue when the jury was selected. Consequently, they were all interrogated as to the effect of such prior knowledge and publicity. A number of the veniremen indicated that they had formed an opinion, and it is important and relevant to note the standard that the trial court applied in determining whether the prospective jurors were to be considered sufficiently impartial to try the case.

Without exception, the standard applied was whether the prospective juror had an opinion at the time he was examined that would *take any evidence to set aside*. If his mind was in that state he was excused by the court without any further argument.

The following references to the *voir dire* in that trial indicate the standards and interrogation procedures that were applied by the court, the defense, and the prosecutor in seeking an impartial jury. The first juror to indicate that he had an opinion was asked, "When you came into court today you did not have an open mind?" His reply was that it would take evidence to remove the opinion that he already had. He was thus, without more, challenged and excused (Tr. 12–13).[7]

The next juror that indicated he had formed *any* prior opinion was asked whether he would "require evidence to remove that opinion" (Tr. 17), and when he indicated that he would he was excused. One juror who admitted to a "slight opinion" only, but who on further inquiry indicated that he would want "evidence to reverse" that slight opinion, was challenged and excused notwithstanding his assertion that he could lay aside that slight opinion. In contesting the challenge of this juror by the defense, one of the prosecutors, Mr. Roberts (later Justice Roberts), stated the standard he thought should be applied when he addressed a question to the juror, inquiring whether that juror could utterly lay aside any opinion formed tentatively *at the start*, listen to the case from start to finish, and form an opinion from the evidence and that only. The juror replied "I think so" (Tr. 47–48), but he was nevertheless stricken and excused by the court on the challenge of the defense because he had previously indicated it would take some "evidence to reverse" his opinion. Another juror who stated that he had heard about the case was asked whether he would go "into the jury box . . . with a clear mind" (Tr. 59). This is an entirely different standard from that used here of inquiring whether the venireman had a "fixed opinion" that would prevent him from following the court's instructions "*at the end of the case.*"[8]

---

6. The trial was in the Supreme Court of the District of Columbia (the predecessor to the U.S. District Court for the District of Columbia) on Criminal No. 42304 on the indictment returned June 30, 1924.

7. References are to the October 7, 1929 transcript in the U.S. Archives in the case in the Supreme Court of the District of Columbia, No. 42304, entitled *United States v. Albert B. Fall.*

This case involved the indictment returned June 30, 1924 for violation of the bribery section of the criminal code, *i. e.*, § 117 of the penal code, 18 U.S.C. § 207 (35 Stat. 1109).

8. Hoffar *Voir Dire* at 939, Appendix B *infra* at —— of 181 U.S.App.D.C., at 183 of 559 F.2d.

Another venireman indicated that from reading newspapers, he had formed an opinion "in a way" (Tr. 75–76), which he could not lay aside notwithstanding the fact that this was only a slight opinion. He was interrogated about it, and when he indicated that he could not "keep it out of the case," he was excused (*id.*). Had he been asked whether he could follow the court's instructions at the *end of the case* he might have answered yes, and by the standard here applied he would not have been considered disqualified.[9]

Another venireman, who was excused, stated that he read quite a bit and formed an opinion, and he was asked whether he would be "starting afresh." He replied "I would be going in with a little load on my shoulder." When this situation developed, Mr. Roberts inquired "without the Government having opened its mouth or offered any evidence, you would be inclined to think that you would want to hear what the defense would have to say." "Yes." *Excused* (Tr. 100).

Another venireman admitted that he had read newspapers five years previously and that he would have formed an opinion at that time, but he stated: "Don't know that I formed an unalterable opinion." He was then asked if he "would want some evidence before [his opinion] could be changed." His affirmative answer resulted in his discharge from the jury (Tr. 112).

It is clear from this history of the Teapot Dome trial that the court applied the standard that, regardless of the strength of the opinion held by the venireman, if it would take any evidence to set aside that opinion, the venireman did not possess the requisite open mind *at the start of the trial* that was required of a juror in a criminal case and was not qualified to sit on the jury.

Because of the Supreme Court's several citations of the specific question as to whether it would take evidence to set aside a juror's opinion, the importance of that question in this case is evident. As noted, the allusion in *Beck, supra,* was to an opinion "*which would require evidence to remove.*" In *Irvin v. Dowd, supra,* the Court wrote:

> Two-thirds of the jurors had an opinion that petitioner was guilty and were familiar with material facts and circumstances involved, including the fact that other murders were attributed to him, some going *so far as to say that it would take evidence to overcome their belief.*

366 U.S. at 728, 81 S.Ct. at 1645 (emphasis added). It thus appears that the *voir dire* there inquired according to the proper standard. The foregoing passage from *Irvin v. Dowd* is specifically noted in *Murphy, supra,* 421 U.S. at 798, 95 S.Ct. 2031.

However, unlike the interrogation of the venire in the Teapot Dome case, the *voir dire* here generally tended to be confined to questions that sought in a black or white way to determine whether the person being questioned had a *definite* opinion as to guilt or innocence rather than attempting to ferret out what in-between views and leanings he did have based on all he had seen and heard. The broader inquiry, however, was necessary in order to permit counsel to form the judgments necessary for an intelligent exercise of their challenges to the venire. But the court relied on bare statements by the juror that he did not "have any prejudice, bias, sympathy or *fixed* opinion" and that he could "render a fair and impartial verdict . . .." (emphasis added). (Hoffar *Voir Dire* 939, Appendix B *infra* at —— of 181 U.S.App.D.C., at 183 of 559 F.2d). The defense objected to this:

> MR. WILSON: May it please the Court, it is very obvious to me this juror has not been forthright with you.
>
> THE COURT: If it is obvious to you, it is not obvious to me, Mr. Wilson.
>
> MR. WILSON: I am the one to be concerned about it.
>
> THE COURT: I am just as concerned as you are that these men get a fair trial in my courtroom, I want you to understand that.

---

9. *Id.*

MR. WILSON: I understand that, but it helps us a lot if you will find out what he—he equivocated with you as to whether he heard it discussed and if it was discussed, he at one time said, sure, they are guilty and some other time somebody advocated to the contrary and said they weren't guilty. *This man stopped short of the crucial answers. If he has not an opinion, he has got a view.* It is just as clear to me as it is possible to be.

THE COURT: Obviously, he is not one of these so-called intellectuals but I think he is a man that has good common sense and that to me is important.

Let's proceed.

*Id.* at 946–47, Appendix B *infra* at —— — —— of 181 U.S.App.D.C., at 186 of 559 F.2d (emphasis added). Hoffar was then called back for additional questioning, but again the interrogation related to opinions on "guilt or innocence." When the one question was asked whether he had an "open mind" and the reply was, "As far as forming *a definite opinion*, I have an open mind" *id.* at 945, Appendix B *infra* at —— of 181 U.S.App.D.C., at 185 of 559 F.2d (emphasis added), no attempt was made to determine from this equivocal answer how far his mind was short of a *definite* opinion or whether he held any opinions that might take evidence to erase.

The relevance of the court's disposition on the basis of whether one is an "intellectual" or has "common sense" is not apparent. The issue was the scope of the questioning.

The trial court's questioning in most instances simply did not probe sufficiently to permit counsel to have a fair opportunity to obtain a jury that was assuredly qualified under the proper standard. Given the trial court's rejection of the change of venue motion and its own protestation that it would rely heavily and exclusively on the *voir dire, supra,* p. —— of 181 U.S.App. D.C., p. 147 of 559 F.2d, the standards of the Teapot Dome court were the least that defendants were entitled to under the law.

5. The Real Possibility of Political Prejudice

Political bias can also be a basis for prejudice, and so can itself be a basis for changed venue. This is made clear in *United States v. Dennis,* 183 F.2d 201 (2d Cir. 1950), *aff'd,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed.1137 (1951), a case in which Dennis was charged with conspiring to organize the Communist Party of the United States to overthrow the government of the United States by force and violence, in violation of Section 3 of the Smith Act, 18 U.S.C. § 2385. In rejecting appellant's claim that it was impossible to seat an impartial jury, the court wrote:

> It was not as though the prejudice had been local, so that it could be cured by removal to another district; . . .

183 F.2d at 226 (emphasis added).

The public record is that Washington, D. C. is unique in its overwhelming concentration of supporters of the Democratic Party, as opposed to the Republican Party to which the defendants here belonged. The Statistical Abstract of the United States (1973) indicates that the candidate of the Democratic Party for President in 1968 received 81.8% of the total vote cast in the District of Columbia and in 1972 received 78.1% of that vote. The closest state to the District of Columbia in the 1968 election was Massachusetts with 63% of the vote cast for the Democratic Party candidate for President and in 1972 with 54.2% of the vote cast for President. *Id.* at 367. Thus in 1972 the vote for President indicates that the voters of the District of Columbia favored the candidate of the Democratic Party by 44% more than the voters in the next most Democratic presidential voting area in the union. In 1972 the voter turnout in the District of Columbia was 31.5%, but a sample of that magnitude of the population is certainly indicative, and *four* of the sitting jurors had participated in or contributed to campaigns (Tr. 634, 834, 1174, 1674). The trial court here denied defendants' request to know to which party contributions were made (Tr. 568), whereas Teapot Dome jurors were interrogated as to "whether politics or political parties" would affect their

decision.[10] A pro-Democratic bias could imply presence of some anti-Republican bias and vice versa. Such potential prejudice should certainly have been explored. This is particularly so because according to the Sindlinger Affidavit, 11% of those polled in the District of Columbia stated that their "opinions with regard to the guilt or innocence of the defendants" was "most influenced" by their "own political position." This 11% figure for the District of Columbia was nearly twice the 6% figure for the United States as a whole and nearly three times the figure for Richmond (4%), Indianapolis (4%), and Delaware (3%) (Appendix A at —— of 181 U.S.App.D.C., at 179 of 559 F.2d).

This case differs from *Dennis* in that in Washington, D. C., there most emphatically *does* appear to be a unique island of political bias, and in this case, with its massive political aspects, it would be futile to ignore the possibility that prior to the trial potential jurors may have formed prejudgments of the case based on their political affiliation or leanings. The obvious possibility of an extraordinarily high concentration of bias against the Republican Party defendants, in light of the simple and virtually costless venue remedy available to the trial court, buttressed the facts which required changed venue.

## CONCLUSION

It is submitted that there is no principled basis upon which the presumptive prejudice in this case can be distinguished from that in *Rideau* and *Marshall*. The law is that the defendants should have been granted a change of venue on the basis of their May 1, 1974 motion. The law, as it has always previously been applied by this court, is also

that this case must be reversed and a new trial granted because of that error.

## THE CONVICTIONS ON COUNT 2

### I. MISUSE OF THE CIA

The remainder of this opinion must deal with a mystery. All my colleagues normally are very quick to notice plain error, particularly in courts' instructions. So, one must wonder why they insist here upon affirming a conviction on just one count that involves obvious plain error in the court's instructions: the error being that the trial court instructed the jury they could return a guilty verdict on the offense charged in Count 2 *solely* on the ground the defendants committed an offense *not charged* in Count 2 of the indictment returned by the Grand Jury.

It is relatively unimportant to the appellants whether the convictions on Count 2 are upheld because the sentences are concurrent and the conviction on Count 1 involves a *consummated* conspiracy to obstruct justice and to defraud the government agencies. Thus, for this court to act appropriately on the error would not involve any lesser sentence or in any way lessen the nature of the convictions. But it is of the gravest moment what my colleagues do to the law because that will be applied to future cases. We should not confound the law on indictments in this circuit. We are not writing law just for this case alone. Our error will come back to plague us in future cases and the public will eventually suffer.

### II. THE HUSH MONEY COUNT

Count 2 of the indictment is the so-called "hush money" count.[11] It charges that the

10. Tr. 52.
11. The entire text of Count 2 is as follows:
The Grand Jury further charges:
1. From on or about June 17, 1972, up to and including the date of the filing of this indictment, in the District of Columbia, and elsewhere, JOHN N. MITCHELL, HARRY R. HALDEMAN, JOHN D. EHRLICHMAN, CHARLES W. COLSON, KENNETH W. PARKINSON and GORDON STRACHAN,

the DEFENDANTS, unlawfully, willfully and knowingly did corruptly influence, obstruct and impede, and did corruptly endeavor to influence, obstruct and impede the due administration of justice in connection with an investigation being conducted by the Federal Bureau of Investigation and the United States Attorney's Office for the District of Columbia, in conjunction with a Grand Jury of the United States District Court for the

named defendants obstructed the due process administration of justice in order to conceal the identities of persons who were involved in the so-called Watergate break-in offenses being investigated by the Grand Jury. The basic offense charged in the indictment is that the offense was committed:

> . . . *by making cash payments and offers of other benefits* to and for the benefit of the [Watergate break-in] defendants . . . and to others . . . for the purpose of concealing and causing to be concealed the identities of the persons who were responsible for, participated in, and had knowledge of the activities which were the subject of the [grand jury] investigation and trial, *and by other means.*[12]

(Emphasis added). In the indictment this alleged offense followed Count 1, the conspiracy count.

On its face, Count 2 does not specifically allege that the defendants *misused the CIA* in any way in their obstruction of justice. Basically it charges an attempt to obstruct justice by concealing the identity of those responsible for initiating the Watergate break-in *through* (1) *payments of "hush money"* and (2) offers of moderate sentences or eventual pardons, (3) *"and by other means."* During the trial substantial testimony was admitted *on the conspiracy count* that might fairly be characterized as indicating that the defendants did misuse that agency in an attempt to defraud the government. This evidence was admissible to prove the allegations of Count 1 that such acts constituted one of the means used by the appellants in their *conspiracy to defraud the United States.*[13]

## III. THE INSTRUCTION

At the close of trial, however, notwithstanding the absence of any reference in Count 2 to the use of any government agency in causing the unlawful obstruction of justice, the court instructed the jury as follows:

> Similarly, if you find beyond a reasonable doubt that a Defendant knowingly and wilfully approved or participated in some other corrupt activity, such as making offers of leniency, clemency or other benefits, making false statements to the FBI, making false statements under oath to the Grand Jury, *misusing the FBI or CIA*, or other such activity, you may find

District of Columbia, and in connection with the trial of Criminal Case No. 1827–72 in the United States District Court for the District of Columbia, by making cash payments and offers of other benefits to and for the benefit of the defendants in Criminal Case No. 1827–72 in the United States District Court for the District of Columbia, and to others, both prior to and subsequent to the return of the indictment on September 15, 1972, for the purpose of concealing and causing to be concealed the identities of the persons who were responsible for, participated in, and had knowledge of the activities which were the subject of the investigation and trial, and by other means.

(Title 18, United States Code, Sections 1503 and 2.)

**12.** *See* n.1, *supra.*

**13.** The conspiracy count alleged that the defendants unlawfully conspired to defraud the United States Government (and various agencies thereof, including the CIA) of its right to have the officials of those departments and agencies transact their official business honestly and impartially, free from corruption, fraud,

improper and undue influence, dishonesty, unlawful impairment and obstruction. Indictment, Count 1, ¶ 10, J.App. 115–16. The first count also alleged that it was a part of the conspiracy that the conspirators would, by deceit, craft, trickery and dishonest means, defraud the United States by interfering with and obstructing the lawful governmental functions of the CIA by inducing that agency to provide financial assistance to those involved in the Watergate break-in. Indictment, Count 1, ¶ 13, J.App. 117. Two *overt acts* also alleged that in furtherance of the conspiracy and to effect the objects thereof, on or about June 24, 1972, Mitchell and Mardian suggested to Dean that the CIA be requested to provide cover funds to assist those involved in the Watergate break-in, Indictment, Count 1, Overt Act ¶ 7, J.App. 120, and that Ehrlichman on or about June 26, 1972, at a meeting in the White House with Dean approved the suggestion that Dean ask the Deputy Director of the CIA whether that agency could use cover funds to pay the bail and salaries of those involved in the Watergate break-in. Indictment, Count 1, Overt Act ¶ 8, J.App. 71.

that Defendant guilty on Count Two if you also find beyond a reasonable doubt that his purpose was to influence, obstruct or impede the due administration of justice.

Tr. 12,383 (emphasis added). The jurors were thereby instructed that *any* evidence of the *misuse of the CIA* that was admissible to prove the conspiracy alleged in Count 1 could do double duty and also serve as the *sole* basis for their returning a guilty verdict on Count 2. Appellants point out the obvious error in such instruction, *i. e.*, that the Grand Jury had not included defrauding an agency of the United States in the "hush money" obstruction of justice charged in Count 2 and that it was thus reversible error to charge that "misuse of the CIA" *alone* could constitute the offense *charged in Count 2.*

## IV. THE GOVERNMENT'S CONTENTION

On this point the Government contends that such evidence was admissible because the indictment charged that the offense was also committed "by other means," and that the defendants were not surprised by this evidence.[14] It is obvious, however, that the judge's instruction improperly did allow the jury to convict under Count 2 on a charge that was not contained in the indictment. Normally my colleagues would reverse the conviction on this single count and affirm the judgment on the remaining counts. To say that the defendants were not surprised by the evidence is to answer a claim not raised. No party claims surprise by the evidence. It was clearly admissible as part of the proof of Count 1—but it was

not relevant to any offense charged in Count 2. If surprise is necessary, all parties were clearly surprised by the *instruction* that the jury could *misuse evidence* of an offense that was not charged to return a guilty verdict on another offense.

## V. APPELLANTS' CONTENTIONS

In response to the Government's contention that sole reliance on such "misuse of the CIA" evidence was permissible, appellants contend it was plain error because the allegations of "other means" in Count 2 of the indictment did not refer to or include any charge beyond the payment of "hush money" or offering other benefits and does not permit the use of evidence to support the charge that is not similar to the "*other* means" charged in the indictment. As appellants frame the point, obstructing justice by "misusing the CIA . . . is not *in pari materia* with the allegations that [defendants] . . . made cash payments and offers of other benefits to the [Watergate break-in] defendants. . . ." Haldeman Brief at 116.

## VI. EJUSDEM GENERIS

The term *in pari materia* is generally used to refer to statutes on the same subject matter.[15] Appellants' point in this respect more precisely relies upon the interpretative rule of *ejusdem generis* which is applicable when, as here, the general language of "other means" follows the enumeration of the specific categories of (1) cash payments and (2) offers of other benefits.[16] Under such circumstances, there being no contrary reference, the law holds that the ordinary meaning thereby intended

**14.** Government Brief at 133 n. 210: "[T]he argument only could have merit if [the defendant] has been surprised by proof of the 'other means' and thus did not have adequate warning in order to prepare his defense. There was no surprise here."

**15.** *United States v. Stewart,* 311 U.S. 60, 64, 61 S.Ct. 102, 85 L.Ed. 40 (1940); *Northern Pac. Ry. v. United States,* 156 F.2d 346, 350 (7th Cir. 1946), aff'd, 330 U.S. 248, 67 S.Ct. 747, 91 L.Ed. 876 (1947); *Brown v. Gilligan, Will & Co.,* 287 F.Supp. 766, 775 (S.D.N.Y.1968); *People v. Hale,* 156 Cal.App.2d 478, 481, 319 P.2d 660, 662 (1957); *Fitzgerald v. State,* 220 Iowa 547,

551, 260 N.W. 681, 683 (1935); *Ricci v. Ricci,* 96 N.J.Super. 214, 225, 232 A.2d 709, 715 (1967); Black's Law Dictionary 1270 (4th ed. 1968); 2A Sutherland Statutory Construction § 51.01 (4th ed. C. Sands 1973).

**16.** This rule applied in the interpretation of statutes and other written documents, declares that, unless otherwise indicated, when general words follow an enumeration of particular classes of persons or things the general words will be construed as applying only to the same general class as those previously enumerated. *United States v. Baranski,* 484 F.2d 556, 566–67 (7th Cir. 1973); *Bumpus v. United States,* 325

is that the general words refer to other acts of the same nature, class or kind as those previously stated.[17] As the majority opinion recognizes, the "by other means" phrase "refers back" to acquire its meaning. Majority opinion at —— of 181 U.S.App.D.C., at 127 of 559 F.2d.

Otherwise stated the interpretative rule of *ejusdem generis* applies. Under this rule, the "other means" alleged in the closing phrase of Count 2 is to be given its normal meaning referring to other "means" of the same general class as those previously alleged, *i.e.*, to payments of money and offers of other benefits. But the majority attempts to avoid the rule and the natural implication and intention indicated by the phrase "by other means," by arguing that "if it [the phrase] is so construed it adds little if anything to the second means named, *i.e.*, offers of other benefits." *Id.* That is precisely what it should do—add little—particularly in an indictment where *some* factual specificity is required. It should not open up a door bigger than the barn, but that is what the majority contends. Nor is it superfluous. It should be remembered that the concluding phrase is *not* restricted to the "offers" but also applies to "making cash payments." Giving the phrase "other means" its normal mean-

ing of limiting it to acts that are *similar* to making cash payments and offers of other benefits would permit the introduction of evidence of *consummated benefits* which were not just offered, to cite only one possibly material application of the phrase. In like vein, it would be permissible to introduce the equivalent of cash payments made by checks, credit cards, etc.

While *ejusdem generis* is not applied where a different intention is indicated, it is particularly applicable in interpreting this indictment because no contrary intent is indicated. To say that the phrase "by other means" was intended to embrace undefined extraneous matter would be to suddenly depart from the particular to the general—from the particular subject of specified benefits into a general field of wide and indefinite scope so that *any* evidence of obstruction of the investigation by the Grand Jury or FBI would be admissible. Sound criminal pleading does not permit such free wheeling with the factual allegations of an indictment. Heretofore, the established law required indictments to be more informative than that.[18]

The "by other means" allegation must thus be interpreted to authorize only proof of other criminal acts which were similar to

---

F.2d 264, 267 (10th Cir. 1963); *Campbell v. Glacier Park Co.*, 381 F.Supp. 1243, 1250 (D. Idaho 1974); *United States v. Brown*, 309 A.2d 256, 258 (D.C.App.1973); Black's Law Dictionary, *supra* note 15, at 608; 1 Bouvier's Law Dictionary 979 (3d rev. ed. F. Rawle 1914); 2A Sutherland Statutory Construction, *supra* note 15, at § 47.17.

17. *Weyerhauser S.S. Co. v. United States*, 372 U.S. 597, 600–01, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963); *Garner v. Louisiana*, 368 U.S. 157, 167–68, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961); *Cleveland v. United States*, 329 U.S. 14, 18, 67 S.Ct. 13, 15, 91 L.Ed. 12 (1946). "Under the ejusdem generis rule of construction the general words are confined to the class and *may not be used to enlarge it*" (emphasis added); *United States v. Salen*, 235 U.S. 237, 249, 35 S.Ct. 51, 59 L.Ed. 210 (1914). "[U]nless there is a clear manifestation to the contrary, general words, not specific or limited, should be construed as applicable to cases or matters of like kind with those described by the particular words." *United States v. Stever*, 222 U.S. 167, 174, 32 S.Ct. 51, 53, 56 L.Ed. 145 (1911).

18. If this indictment were to be interpreted as the Government urges, vital constitutional rights of the defendants would be denied. Even though the law has moved away from "rules of technical and formalized pleading which . . . characterized an earlier era," *Russell v. United States*, 369 U.S. 749, 762, 82 S.Ct. 1038, 1046, 8 L.Ed.2d 240 (1962), a certain degree of the factual specificity is still required in an indictment. As the Supreme Court recently held: " 'Undoubtedly the language of the statute may be used in the general description of an offence, *but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.' United States v. Hess*, 124 U.S. 483, 487, [8 S.Ct. 571, 573, 31 L.Ed. 516] (1888)," *quoted with approval in Hamling v. United States*, 418 U.S. 87, 117–18, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). *See also United States v. Nance*, 174 U.S.App.D.C. 472, 533 F.2d 699 (1976). It has long been recognized that where the statutory definition of an offense includes generic terms, the indictment must descend to particulars and specify

or of the same general character as obstructing justice "by making cash payments, and offers of other benefits."

## VII. THE COURT'S INSTRUCTION

Therefore, the court's instruction, which informed the jury that they could return a

the species. *United States v. Cruikshank*, 92 U.S. 542, 558, 23 L.Ed. 588 (1875).

The rationale for this requirement is that, under the Sixth Amendment every accused person has a "right . . . to be informed of the nature and cause of the accusation" and under the Fifth Amendment and Fed.R.Crim.P. 7(a), offenses such as are here involved must be prosecuted by a grand jury indictment. After the grand jury has returned its indictment, the charges may not be broadened or amended by the court or the prosecutor—only the grand jury itself can do that. *Stirone v. United States*, 361 U.S. 212, 216, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *Ex Parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). If the indictment is phrased in vague language, there is a danger that the defendant may be tried on charges never presented to the grand jury, in violation of the Constitution. See *Norris v. United States*, 281 U.S. 619, 622, 50 S.Ct. 424, 74 L.Ed. 1076 (1930). Thus, the Supreme Court has set out two tests of a valid indictment: (1) whether it contains the *factual elements* of the offense charged and fairly informs the defendant of the charges against which he must defend; and (2) whether it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hamling v. United States, supra* at 117, 94 S.Ct. 2887; *Russell v. United States, supra* at 763–64, 82 S.Ct. 1038; *United States v. Debrow*, 346 U.S. 374, 376, 74 S.Ct. 113, 98 L.Ed. 92 (1953); *Hagner v. United States*, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861 (1932).

In the present case, *the statute proscribing obstruction of justice is in generic terms:* "Whoever corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined . . .." 18 U.S.C. § 1503 (1970). Recognizing this, the Grand Jury descended to factual particulars and specified the *general character* of the acts by which a particular process of justice (a grand jury investigation) was allegedly obstructed. Such factual specificity was necessary to inform the defendants of the crime with which they were charged, to enable them to plead a conviction or acquittal thereon against a future prosecution for the same offense, and to permit the court to determine the facts necessary for conviction.

Count 2 of the indictment would not have been sufficient if it had *only* alleged that the defendants obstructed a grand jury investiga-

guilty verdict if they found any "misuse of the CIA" constituted an impermissible amendment of the indictment. This amounts to reversible error because it permitted the jury to find guilt on Count 2 *solely* on the evidence of the unalleged misuse of the CIA to curtail the FBI investiga-

tion by various (unspecified) means. By the same logic, it would not be sufficient if we interpreted "other means" to mean "any other (unspecified) means." An indictment drawn in either of these terms would fail both of the above-mentioned tests. First, it would not fairly inform the defendants of the charges against them. In *United States v. Nance, supra*, we found an indictment for false representations to be fatally deficient because, although it alleged that representations were made, it did not specify what they were. This left it open for the United States Attorney to insert the vital part of the indictment without reference to the Grand Jury, op. at 474 of 174 U.S.App.D.C., at 701 of 533 F.2d, and thus to prosecute the defendants on the basis of evidence never presented to the Grand Jury and which the defendants never had any notice would be used to substantiate the particular charge. Similarly here, if we were to interpret "by other means" as a vague, general allegation as the majority contends may be done, the Government would have been allowed to introduce evidence—such as acts of the defendants which defrauded the government by misusing the CIA to interfere with the FBI investigation or even acts not mentioned in Count 1—that the Grand Jury never intended to include as part of the offense in Count 2. Such acts differed materially in character from the specific acts which were alleged, and they were not referred to in the indictment that the Grand Jury returned.

Second, the defendants would not legally be entitled to argue that a conviction or acquittal on Count 2 constituted a bar to a future prosecution on charges of obstructing justice by using the CIA to block the FBI's investigation, since the indictment makes no mention of that offense. Likewise, there would be no assurance that the evidence offered as factual basis in court in proof of the count was the same as that which the prosecutor presented to the Grand Jury. This error is fatal under *Stirone, supra*.

For these reasons, interpreting Count 2 here to allow a conviction on the charge of obstruction of justice to be based *solely* on the evidence that appellants defrauded the government by misusing the CIA to delay the investigations into the Watergate break-in violates appellants' constitutional rights under the Fifth and Sixth amendments. In order to avoid such constitutional error, the "other means" allegation of the indictment must be construed in accordance with the rule of *ejusdem generis*.

tion, which succeeded in delaying that investigation from June 23 to July 6, 1972.[19] This latter category of evidence was emphasized more than the unsuccessful attempt to obtain covert funds and was the first principal point argued by the prosecutor in his summation to the jury.[20] Thereafter, the court instructed the jury that they could find the defendants guilty on Count 2 of obstructing justice if, solely apart from any other evidence, they found that they were *"misusing the FBI or CIA."*

This charge to the jury definitely instructed that *any* misuse of either would be a sufficient basis for a guilty verdict. As stated above, this was error. The factual allegations of Count 2 cannot be construed as giving appellants any notice of the wholly unspecified charge upon which the court instructed the jury they could find appellants guilty on that count. For us to hold otherwise would have the effect of changing Count 2 from one based on claims of "hush money" and other offers of clemency

(hush offers), to one based on *obstruction by defrauding a government agency.* If the Grand Jury had intended that appellants should be prosecuted on the latter theory it would have been specifically included "defrauding an Agency of the United States" in the count along with the hush money and clemency allegations.

In *United States v. Alston,* 179 U.S.App. D.C. 129, 551 F.2d 315 (1976), Judge Bazelon, in reversing for a defect in a court's instructions, raised *sua sponte* on appeal, said:

> It may be argued that we should overlook minor variations from standard instructions because jurors do not pay much attention to instructions anyway. Counsel's failure to object, the argument runs, further supports this view.
>
> It would be to abdicate our responsibility to ensure the fair administration of criminal justice to conjecture that jurors

---

**19.** *See, e.g.,* Government Brief at 16–18. By contrast, the "hush money" and other offers allegations of the indictment *would* permit the introduction of evidence on Count 2 that Mitchell and Mardian suggested to Dean that the CIA be requested to provide covert funds so *payments of money* could be made to assist those involved in the Watergate break-in, Tr. 2729–30, 6610, and that Ehrlichman, at Dean's suggestion, approved asking the Deputy Director of the CIA for such funds. Tr. 2730–31, 2733–37, 6135–36, 6141. Such evidence *is* of the same general character as is the charge in Count 2 of the indictment that appellants corruptly endeavored to obstruct justice "by making cash payments." This was only an *attempted* misuse of the CIA. It never succeeded.

**20.** In closing the prosecutor argued:

> Mr. Haldeman then said it is the President's wish that General Walters go to the Acting Director of the FBI and explain to him that the pursuit of this investigation in Mexico might uncover some CIA assets or channeling. And since the five suspects had been arrested, it would be better that this matter were not purshed [*sic*] further since it might uncover some operation of the CIA.
>
> Utterly, totally, completely false. It might uncover a connection between the Committee to Re-elect the President and the Watergate burglars, and if you have any doubt about it, get the tape and listen to the tape of June 23 which is Government Exhibit 1 if you

have any doubt about what they were afraid would be uncovered.

Tr. 11,580.

> He marches out of the White House and marches over to see Mr. Pat Gray over at the Department of Justice Building and he says to Mr. Gray: Look, you have got five people arrested and if you go into Mexico, you might uncover some CIA assets or operations. Since you got five arrested it is best to taper off the investigation now.
>
> That is what happened, ladies and gentlemen of the jury. And let me just tell you what Mr. Haldeman said on the stand about that sad episode. He is asked this: Now you say the reason for calling the CIA in was to get the FBI to stop the investigation was for this motive to avoid political embarrassment? Answer: That is my understanding, yes.

Tr. 11,581.

> As a result, members of the jury, as a result of Mr. Haldeman's, Mr. Ehrlichman's and Mr. Nixon's directions the FBI investigation was thwarted for two weeks—from June 23 until July 6th.
>
> Ladies and gentlemen of the jury, as I mentioned a while ago, *it is the corrupt endeavor to obstruct justice that is the offense.* If it were thwarted for two seconds, or two minutes, or ten minutes, or two weeks as it was, it is irrelevant. It was thwarted, it was stopped, it was killed in its tracks for two weeks and that is the obstruction of justice.

Tr. 11,582 (emphasis added).

do not heed instructions, or to find error nonprejudicial solely because of counsel's silence. An instruction central to the determination of guilt or innocence may be fatally tainted by even a minor variation which tends to create ambiguity.[21]

## VIII. THE RULE IN STIRONE V. UNITED STATES

Normally, in view of the strength of the evidence on Count 2 as charged, one would consider that the error we have pointed out could be considered harmless. That was my original approach to the problem and the conclusion of my original draft of this phase of the majority opinion, but I eventually found such disposition to be prevented by the authority and logic of Justice Black's opinion in *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). In that case the Supreme Court held that where a jury was instructed that they could base a conviction *solely* on a finding of an offense not charged in the indictment the conviction must be reversed, *regardless of the harmless error rule*, because the defendant had an absolute right to be tried only on felony offenses charged by the grand jury.

The indictment in *Stirone* charged a Hobbs Act offense of unlawfully interfering with interstate commerce involving the shipment of *sand* for a ready-mix concrete plant, brought into Pennsylvania from other states. During the trial, in addition to evidence of the impairment of commerce in sand, evidence was also admitted, over objection, of a potential effect on interstate commerce involving shipments of steel from a plant in Pennsylvania into other states. This commerce in steel was not alleged in the indictment. And there, as here, the judge charged the jury that it could return a guilty verdict *solely* on a finding of the offense that was *not* charged in the indictment, *i.e.*, that the concrete was used for constructing a steel mill which would manufacture *steel* to be shipped in interstate commerce. The Supreme Court held [22] that the indictment properly charged an offense with respect to the sand, but that it was error to instruct the jury that they could convict *solely* on the basis of the uncharged steel shipments, and that *the error could not be dismissed as merely an insignificant variance between allegation and proof and thus harmless error* as in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

The court reasoned, in view of the trial court's instruction, that it could not be said with certainty that Stirone was not convicted "solely" on the offense charged by the grand jury in the indictment. That is the precise situation here. Thus, while the trial court in *Stirone* did not formally amend the indictment, "the effect of what it did [by the instruction] was the same [and that] variation between pleading and proof . . . destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." 361 U.S. at 217, 80 S.Ct. at 273.

It was the denial of the constitutional right of every defendant to be tried only on charges laid by a grand jury that led to the reversal in *Stirone:*

> If you *have a reasonable doubt* that a defendant's intent was *corrupt,* you must find him *not guilty.*

The strictness of *Alston* should raise a similar doubt about the charge on intent and certainly would direct a reversal for the "misusing the CIA" instruction. Thus if *Alston* were good law, which I doubt, this case should be reversed too on the same ground. The failure of my colleagues to even consider the application of this *recent decision* to this case further puzzles me.

---

**21.** The court here charged the jury on criminal intent:

> If you *find* that a defendant's intent was innocent, you must find him not guilty.

(Tr. 12,382) (emphasis added). In *United States v. Alston, supra,* the court found that the jury had not "fully understood the interplay between the 'identification' and 'alibi' instructions"; *i.e.*, that the Government had to prove the identity of the defendant beyond a reasonable doubt, but the defendant did not bear the same burden as to "alibi." The same difference exists here between proving guilt and innocence. If *Alston* were applied here the instruction on *intent* should have been:

**22.** 361 U.S. at 215, 80 S.Ct. 270.

*Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error.* Compare *Berger v. United States,* 295 U.S. 78 [55 S.Ct. 629, 79 L.Ed. 1314]. *The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge. Thus the basic protection the grand jury was designed to afford is defeated by a device or method which subjects the defendant to prosecution for interference with interstate commerce which the grand jury did not charge.*

361 U.S. at 217–18, 80 S.Ct. at 274. (emphasis added).

The factual situation here is indistinguishable from that in *Stirone.* Had the grand jury intended to indict defendants in Count 2 for obstructing justice by a defrauding of federal agencies through their misuse they would certainly have included such charge in the indictment. The evidence thereof was sufficiently voluminous so that we cannot assume that it was overlooked, and we are fortified in this conclusion by the several allegations in the conspiracy count (Count 1) that effectively charged misusing the CIA (defrauding an agency of the United States).

The conspiracy count also charged obstruction of justice (18 U.S.C. § 1503) as the *first* object of the conspiracy, and because of appropriate allegations, the evidence of obstructing justice through misuse of the CIA could be relied upon in proof of the conspiracy count. But the more specific allegations of Count 2, because they never alleged a misuse of the federal agencies, did not permit the court to instruct the jury that the evidence which was only admissible on Count 1 could do double duty and also furnish the basis for finding the defendants guilty on Count 2 of obstructing justice.

The further assertion is made by the majority opinion that appellants were not prejudiced by the court's erroneous instruction because of the overwhelming proof of guilt.

But the teaching of *Stirone* is that *where there is overwhelming proof of guilt of an offense not charged in the indictment returned by the grand jury the conviction on that count must be reversed.*

## IX. THE APPLICATION OF STIRONE

Under *Stirone* the judgments of conviction on Count 2 should therefore be reversed. This in no way would interfere with the conviction on any other count nor would it result in any diminution of the sentence of any defendant. My colleagues have normally been very alert to correct such elementary errors, particularly when the overall sentence would not be affected in any way, but as above stated, for some unexplained reason they do not seem to be similarly motivated by the error in this count. A defendant could not know he was charged with obstructing justice by *defrauding a government agency* (e. g., the CIA), if the indictment alleged he obstructed justice by *making cash payments and promises of benefits* and by other *similar* means.

## X. THE NECESSITY FOR FACTUAL ALLEGATIONS

In discussing this issue the majority opinion gets lost between Rule 7 and the decided cases and never come to grips with the requirement that "the essential *facts* constituting the offense charged" must be stated in the indictment. Rule 7(c) Fed.R.Crim.P. In a clever play on words the majority substitutes "elements" for "facts" to attempt to obviate the requirement that elements must be *factually* alleged. The cases cited by the majority are better authority for the converse of its assertion. For instance, consider the recent decision in *Hamling v. United States,* 418 U.S. 87, 117–18, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974):

"Undoubtedly the language of the statute may be used in the general description of an offense [*i. e.,* the elements], *but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific*

*offense, coming under the general description*, with which he is charged." *United States v. Hess*, 124 U.S. 483, 487 [88 S.Ct. 571, 573, 31 L.Ed. 516] (1888). (Emphasis added). No further authority is needed to point out the error of the majority's position on this point. To state, as the majority does, that *Hamling* charged the offense "only in the statutory language of 18 U.S.C. § 1461" is erroneous. A mere look at the opinion in the Ninth Circuit discloses that in *each count* the *specific* "*Brochure*" which was allegedly obscene was specifically referred to. 481 F.2d at 307. What greater *factual* specificity was needed? The law just does not permit the complete absence of *factual* allegations in indictments that the majority now claims. Also, *Russell v. United States*, 369 U.S. 749, 764, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962):

> Where guilt depends so crucially upon such a *specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute.*

(Emphasis added).

In a conclusory statement, which does not state the particular objection to which it refers, the majority asserts that "Rule 7(c), in fact, expressly sanctions *indictments* in the language to which Haldeman objects," Majority opinion at —— of 181 U.S.App.D.C., at 125 of 559 F.2d (emphasis added). This amounts to a finesse and a failure to deal with the real complaint. Appellants do not attack the *indictment.* The indictment is good. It alleges certain specified crimes. Appellants do attack the court's *instruction* because it exceeded the indictment. So much for the attempt to divert the discussion to issues that nobody is raising.

Basically, the majority, by direction and indirection, is attempting to assert that requiring an allegation of defrauding the government by misuse of the CIA concerns only an evidentiary particular—a means—and any deficiency may be cured by a bill of particulars. *Glasser v. United States*, 315 U.S. 60, 66, 62 S.Ct. 457, 86 L.Ed. 680 (1942) is relied upon (Majority opinion at —— of 181 U.S.App.D.C., at 125 of 559 F.2d), and along with *Burton v. United States*, 202 U.S. 344, 372–73, 26 S.Ct. 688, 50 L.Ed. 1057 (1905), is frequently cited for the proposition that "particulars need not be included in an indictment." I agree wholeheartedly, but we are *not* talking about particulars or evidentiary details when we talk about requiring an allegation of "defrauding the government"—that is a basic factual allegation of a specific crime which must be charged by a grand jury or not at all. A mere glance at *Glasser* and *Burton* will convince anyone that my colleagues' view of the law is incorrect. What *Glasser* is talking about is that

> [T]he *particularity* of time, place, circumstances, causes, etc., in stating the manner and means of effecting the object of a conspiracy . . . is not essential to an indictment. *Crawford v. United States*, 212 U.S. 183 [29 S.Ct. 260, 53 L.Ed. 465].

315 U.S. at 66, 62 S.Ct. at 463 (emphasis added). But that is a far cry from holding that a general statement of the specific *factual* allegation that identifies the offense is not required. Such is a requirement. When one examines the extensive *factual* allegations (set out in n. 23) that were made in the *Glasser* indictment, it is apparent that my colleagues are wide of the mark on this point.[23] The factual allega-

---

**23.** The Seventh Circuit decision in *Glasser* described the *factual* allegations of the indictment. They were very lengthy and we set them out only to *prove* the gross distortion of principle indulged in by the majority.

The indictment in substance charged that the defendants and divers other persons to the grand jurors unknown, conspired to defraud the United States of and concerning its governmental function to be honestly, faithfully and dutifully represented in the Courts of the United States by an Assistant United States Attorney, to prosecute certain delinquents for crimes and offenses cognizable under the authority of the United States as the same should be presented and determined according to law and justice, free from corruption, improper influence, dishonesty or fraud, and more particularly its right to a conscientious, faithful and honest representation of its interest in certain suits and causes brought and pending in the United States in

tions in the *Burton* indictment were even more extensive.[24]

It can be seen from the foregoing cases that the specific *factual* allegations of those indictments did identify the offenses and that what the cases hold is that it is not necessary to allege *detailed evidence.* That is *not* this case. The majority opinion would support an indictment that charged

Haldeman on or about June 7, 1972 in the District of Columbia violated 18 U.S.C. § 1503 by interfering with the Grand Jury investigation of the Watergate break-in and thereby did corruptly obstruct the due administration of justice by various means.

Such indictment does not allege the "essential *facts* constituting the offense," and the Grand Jury so recognized. It accordingly alleged *facts* to identify the specific offense it was charging, *i. e.*:

[Defendants] . . . did corruptly . . . obstruct . . . and . .

corruptly endeavor . . . to obstruct . . . the due administration of justice in conjunction with an investigation . . . *by making cash payments and offers of other benefits* . . . for the purpose of concealing . . . the identities of the persons who were responsible for . . . the activities [being investigated] . . . and by other means.

(Emphasis added). *All* these facts are necessary to *identify* the particular offense with which defendants were charged.

Merely saying that the defendants are charged with obstructing justice in the Grand Jury investigation is obviously insufficient to allege the *factual* elements that are essential to a valid indictment. It was necessary to allege that the defendants did this "by making cash payments and offers of other benefits" for the stated purpose. These facts *identify* the offense, not merely the target or objective. They are *not* evi-

the Northern District of Illinois by promising, offering, causing and procuring to be promised and offered, money and other things of value to an officer of the United States, and to persons acting for and on behalf of the United States in an official function under and by authority of a department and office of the Government of the United States, with intent to influence his decision and action on certain questions and causes which were at times pending, and which were by law brought before such officer in his official capacity, and with the intent to influence to commit and in committing, and to collude in committing certain frauds on the United States, and to induce such officer to do and to omit from doing certain acts in violation of his lawful duty.

The indictment further alleged that Glasser was an Assistant United States Attorney for the Northern District of Illinois, employed to prosecute all delinquents for crimes and offenses cognizable under the authority of the United States, and as such he did act for and on behalf of the United States in certain official functions under and by authority of the Department of Justice of the United States, and as such officer he had certain decisions to make and actions to take on certain questions, causes and proceedings brought before him in the performance of his duties as such Assistant United States Attorney; that it was part of the conspiracy that the defendants would solicit certain persons named in the indictment, charged with violating or about to be charged with violating the

laws of the United States, to promise or cause to promise money to be paid or pledged to the defendants to be used to influence and corrupt Glasser in his official capacity in his decisions on certain questions, causes and proceedings, with the intent that the defendants would accept and use said money to corruptly, wrongfully and improperly influence Glasser in his decisions and thus allow a fraud to be committed on the United States in violation of his lawful duties as an Assistant United States Attorney.

The indictment further alleged that Glasser would meet and hold conversations with the other defendants and inform them what they should do to carry out the conspiracy and would instruct them as to what steps or action each of them would take in the matters in which he was representing the United States Government and thus Glasser conspired with the other defendants to defraud the United States of and concerning its governmental function to be honestly, faithfully and dutifully represented in the courts of the United States by an Assistant United States Attorney.

*United States v. Glasser,* 116 F.2d 690, 695–96 (7th Cir. 1941).

**24.** It takes three and one-half pages in the Supreme Court reporter to describe the factual allegations of the indictment, *Burton v. United States,* 202 U.S. 344, 361–65, 26 S.Ct. 688, 50 L.Ed. 1057 (1905).

dentiary details, they are allegations of general facts that describe the essential facts of the *particular offense.*

A similar allegation of "defrauding the CIA" was necessary if *evidence* of "misuse of the . . . CIA" *alone* was to constitute an offense. *"Misusing"* the CIA might be an evidentiary detail if it were admissible under some more general factual allegation, but unless there is an allegation that defendants *"defrauded the CIA"* as an agency of the United States, such evidence is not relevant to any offense that *is factually charged in the indictment.* It is obviously wide of the law to permit a conviction to stand on evidence of "misusing the . . CIA" where there is *no allegation whatsoever* that the *CIA was defrauded.* Thus, the requirement that the indictment contain such general factual allegation before evidence of misusing the CIA *alone* can furnish the basis for a conviction on that count does not concern an evidentiary particular.

## XI. THE INTERPRETATION OF THE INDICTMENT

Nor is the interpretation of the indictment by my colleagues a permissible one. *Ejusdem generis* is clearly applicable and the requirement for the application of this elementary rule cannot be dismissed with a trite objection to "incanting these Latin phrases" (Majority opinion at —— of 181 U.S.App.D.C., at 127 of 559 F.2d). If that constituted any semblance of a viable judicial answer any judge could dispose of *habeas corpus, corpus delicti* and *res judicata* by a mere stroke of the pen. My colleagues in this opinion certainly obliterate *stare decisis* with respect to the law on indictments. Who knows, maybe *dominus vobiscum* and *e pluribus unum* are next on their list. However, *ejusdem generis* is clearly applicable here and I am surprised with my learned colleagues' unfamiliarity with this very elementary, but basic, rule of construction. *Ejusdem generis* does nothing more than apply the normal meaning of such words in such context. My colleagues, however, claim

By alleging that the obstruction of justice with which the defendants were charged was carried out "by other means" in addition to those specified, the indictment effectively broadens the scope of the acts to which jeopardy attaches and correspondingly reduces the opportunity for subsequent prosecutions of these defendants for the alleged obstruction of justice during the lengthy period alleged in the indictment (June 17, 1972 through March 1, 1974).

Majority opinion at —— of 181 U.S.App. D.C., at 126 of 559 F.2d. The majority would thus broaden the indictment beyond the facts alleged. Just where it would stop they do not say. They would permit the conviction of defendant at trial on the basis of *any* evidence of obstruction, whether it was alleged or not, and they would bar *any* subsequent prosecution for obstruction of justice which defendants committed during this period. This is patently an erroneous statement and application of the law. The massiveness of its error defies description.

For instance, assume defendants were acquitted on Count 2 and it was discovered before trial that they had caused the killing of a material witness, Mrs. Hunt, so she could not testify against them before the Federal Grand Jury. There would be no doubt that they could subsequently be charged with so obstructing federal justice. Or assume it was discovered before trial that the defendants had threatened several Grand Jurors who were hearing the case and those jurors had obstructed the Grand Jury investigation. Certainly such offense could be indicted after the trial. And I challenge the majority to state, if either of such offenses were discovered prior to trial, that they *could* be proved under the allegations of Count 2. To say that evidence of such offenses could be admitted under an indictment charging the *making of cash payments and offers of other benefits and other means, and that a conviction could rest solely on evidence of the subsequently discovered offenses* of murder and jury tampering, is patently ridiculous. The majority opinion thus grossly misstates the

law. It will be very hard to live with this law in the future.

## XII. THE INTENT OF THE GRAND JURY

It is also rather clear, if one studies the indictment, that the Grand Jury never intended to include the charge of obstructing justice by delaying the investigation through a defrauding of the CIA as part of the obstruction of justice alleged in Count 2. A mere reading of Count 1 plainly shows that the Grand Jury charged that one object of the conspiracy was "to defraud the . . . CIA," but after that allegation was made in Count 1, the Grand Jury made absolutely *no mention of the CIA* in Count 2. So the Grand Jury was thoroughly aware of the facts. Had it intended to include such activities in the obstruction of justice count all that was required was to insert in the indictment:

by defrauding the Central Intelligence Agency, an agency of the United States

after the phrase "September 15, 1972." Such would be a general *factual* allegation and obviously is *not* an evidentiary particularization. But no such allegation was made.

Because of the extreme prominence of the CIA activities in the charged offenses one cannot argue that the grand jury forgot them. It rather appears that it considered that Count 1 sufficiently set forth the offense they wished to indict upon, particularly because it alleged a *consummated* conspiracy. The Grand Jury could thus have been motivated not to follow the practice, which is much objected to by some, of charging both a *consummated* conspiracy and a substantive offense to commit the same crime.

This result may also have been dictated by the peculiar statutory status of the offense of defrauding an agency of the United States. There is no such general *sub-* *stantive* offense in the federal statutes. Such acts are only covered in the conspiracy statute which makes it an offense to "*conspire* either to commit any offense against the United States, *or to defraud the United States, or any agency thereof* . . ."[25] The statute thus places defrauding a United States agency in a different category from any other "offense against the United States." The only offense is *conspiracy* to defraud the United States. Merely defrauding the United States is not a substantive offense. It may have been because of this *peculiar* status of the offense that the Grand Jury was motivated not to complicate Count 2, but my colleagues seek to load everything into Count 2. In doing so they plainly commit error.

The failure of the indictment to include "perjury" in its factual charges alleged in Count 2 is another indication that the Grand Jury intentionally excluded misuse of the CIA from Count 2. Misuse of the CIA and perjury were both specifically alleged as objects of the conspiracy charged in Count 1 and both were equally probative on the issue of obstructing justice, but the Grand Jury never included either charge in Count 2. Had the Grand Jury intended the perjuries to be included in the factual elements of the obstruction charge it would have alleged "perjury" at least. All that would have been needed was the one word added to the indictment. And it cannot be said that the Grand Jury overlooked "perjury" because all the other twelve counts of the indictment *did* include some allegation of perjury or misstatement. The conclusion is thus irrefutable that the Grand Jury did not intend to include in Count 2 accusations of offenses that were made elsewhere in the indictment but which were completely omitted from Count 2.

Another reason which makes it clear why the Grand Jury did not intend to include defrauding the CIA in Count 2 is that *Par-*

---

**25.** 18 U.S.C. § 371 provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

*kinson* was named as a defendant in that count and *there was never any suggestion of any evidence linking him to the alleged efforts to delay the investigation by defrauding the CIA.* And since Parkinson could not be so charged, and the indictment did not so charge, it follows that the other co-defendants were not so charged because it was a joint count. Thus, when the court instructed the jury that Parkinson and all the others could be convicted of obstructing justice *solely* because of the alleged "misuse of the . . . CIA," it was authorizing a guilty verdict against Parkinson and all the other defendants for an offense with which none of them had been charged. That cannot be done. Rather, it is being done, but it should not be done.

Acutely conscious of the evidentiary limitations, the Grand Jury drafted a neat count in which the offense was stated to have been committed by making cash payments, offers of other benefits, and by other *similar* means. Its handiwork should not be marred by an improper instruction and an unsound appellate affirmance—that would be impossible to live with.

## XIII. THE BILL OF PARTICULARS

Also, contrary to the majority opinion, there is *nothing* in the record to support the assertion that appellants *"abandoned the request"* for a "bill of particulars as to the meaning of the phrase 'by other means' . . . *presumably because it had been satisfied."* Even if they had there is no claim by the Government that it ever asserted a right or an intent to introduce evidence that the investigation was delayed through a defrauding of the CIA in support of Count 2 where such offense was not alleged.

Further, in an attempt to justify the admission of the evidence of misusing the CIA that was alleged in Count 1 in proof of the substantive offense charged in Count 2 the majority seek refuge in a reply made in a bill of particulars:

In response to a request which read: "State whether the allegations of obstruction of justice in [Count 2] are en-compassed within the obstruction of justice alleged in Count One," the Government said in its bill of particulars, "The substantive violation of 18 U.S.C. § 1503 alleged in Count 2 was among the offenses which were the objects of the unlawful agreement alleged in Count 1." Doc. 177 at 5. Appellants did not challenge this response.

Majority opinion at —— of 181 U.S.App. D.C., at 128 of 559 F.2d. This proves exactly nothing so far as this appeal is concerned. The fact that the substantive offense of obstructing justice by making cash payments, offers of benefits and by other *similar* means, as alleged in Count 2, was among the objects of the conspiracy charged in Count 1 does not make all the objects of the conspiracy as *alleged* in Count 1 part of the substantive offense charged in Count 2. No person ever contended that the substantive offense alleged in Count 2 was *not* among the objects of the unlawful conspiracy alleged in Count 1. It is exactly the *reverse* of this that the majority would have to prove to sustain their position, i.e., that the conspiracy to misuse the CIA to limit the FBI investigation as charged in Count 1 *was* included in the offense charged in Count 2. This the majority has not demonstrated and its feeble attempt to confuse the issue by referring to a converse situation is proof of the lack of merit in its position.

## XIV. THE "BY OTHER MEANS" ALLEGATION

That appellants did not move to strike "by other means" from the indictment proves nothing. There was nothing improper or illegal about the use of the phrase. The defendants had a perfect right to assume it would be given its normal meaning and construed to refer to "other *similar* means" and as such it was unobjectionable. As above stated, the abuse of the phrase was not by its inclusion in the count but by the court's interpretation of it in its closing instruction.

*United States v. Caine,* 441 F.2d 454, 456 (2d Cir. 1971) and *United States v. Mayo,*

230 F.Supp. 85 (S.D.N.Y.1964) are not to the contrary. In *Caine* the indictment charged that a particular *specified* advertisement was fraudulent that included 12 specific false advertising claims "among others." Obviously the others referred to other false claims *in the advertisement specified in the indictment.* No further factual allegation was necessary and the indictment was upheld, partially on the ground that such evidence was legally admissible "for at least some purposes." 441 F.2d at 456–57. The lack of relevance of *Caine* to this case is obvious.

As for *Mayo*, the decision held that an allegation "among others" to be proper because in the context of that indictment *it did not constitute*

> an impermissible delegation of authority to the prosecutor which enabled him to enlarge the grand jury accusation.

230 F.Supp. at 86. The phrase there was included in a paragraph which went "to the matter of proof to sustain the charges"; *i.e.*, to evidence. Here, the majority seeks to use the phrase "by other means," not to support the introduction of "matter of proof to sustain the charges," as in *Mayo*, but as a wedge to *enlarge* the Grand Jury charges to include a different factual offense than the ones alleged in the indictment.

In any event, no person contends that the phrase is invalid, but only that it should be given the meaning the Grand Jury obviously intended. The Grand Jury never intended to include defrauding the government by delaying the investigation in Count 2. Had it so intended the very competent prosecutors were more than sufficiently knowledgeable to accomplish that result.

## XV. THE CONSPIRACY ARGUMENT

My colleagues also make the weird contention that the instruction as to *Count 2* was unobjectionable because the evidence was admissible under *Count 1.* That is an unbelievable argument—to assert that defendants are not prejudiced by convictions on two counts on the basis of evidence that is admissible only on one count. I will be anxiously waiting for my colleagues to apply that law in the future to other cases.

Actually the majority has hit *exactly* upon what it is trying to do by its CIA argument. It is trying to make a second *conspiracy* count out of Count 2. In the heat of the trial the court made the same mistake and instructed the jury: "Count Two charges all of the defendants except Mr. Mardian with actually carrying out the agreement to obstruct justice *which is charged in Count One.*" (Tr. 12,378) (emphasis added). But the Grand Jury knew it could not hold the acts of certain defendants *in a substantive offense* against other defendants, as is done in a conspiracy count with acts of coconspirators committed in furtherance of the conspiracy. It refused to charge in the obstruction count that Parkinson participated in delaying the investigation by a defrauding of the CIA because he was not in any way involved in any of the CIA activity. Since the Grand Jury never so charged Parkinson in that count it never charged any of his co-defendants that were named in the count.

It is elementary law that absent a cross-reference one count in an indictment cannot be amended at trial to insert allegations from another count. One would have though it was *not* necessary to assert such an elementary rule of law to this court. Nevertheless the majority opinion contends:

> In fact, the allegations of *conspiracy* to obstruct justice and to defraud the United States in Count 1 *are the basis of the allegations of the substantive offense of obstruction of justice* in Count 2.

Majority opinion at —— of 181 U.S.App.D.C., at 128 of 559 F.2d (emphasis added). What a statement! There is *absolutely* no allegation whatsoever in Count 2 about defrauding the United States or about conspiracy. Or for that matter about perjury. This argument in the majority opinion makes it plain that it is trying to convert Count 2 into another *conspiracy* count. One conviction on a single conspiracy is all that this court has previously allowed. It is plain error to permit "the allegations of *conspiracy* . . . to defraud the United

States in Count 1 [to constitute] . . . the basis of the allegations of the *substantive* offense of obstruction of justice in Count 2."

The sufficiency of the evidence on the conspiracy count is not an issue here. What is objected to is permitting a small portion of that evidence, offered in proof of the *consummated* conspiracy alleged in Count 1, to constitute the *sole* basis for the conviction on Count 2. Heretofore this court has always considered that it was immaterial what the evidence disclosed as to some *other* offense if a defendant was convicted on an offense that was not charged in the indictment. This was so because we considered that all defendants have a constitutional right to be tried only on felonious offenses that have been charged by the grand jury.

To support its decision here, to the contrary of this basic constitutional principle, the majority opinion attempts (at ——— ——— of 181 U.S.App.D.C., at 127–129 of 559 F.2d) to distinguish *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). It fails. It points only to evidentiary differences in the details of the two crimes. It is true that there are such differences—no two cases involve the same evidence—one is an interstate racketeering case and this case alleges obstruction of justice. But the controlling issues in the two cases are *identical* in that in *both* instances the trial court charged the jury that it could return a guilty verdict *solely* on evidence that supported an offense *not charged in the indictment*. All the attempts by the majority to pick out differences in the nature of the two offenses, in the evidence and in the jurisdictional base, cannot escape the complete identity of the two cases on that one *controlling* aspect. And that is all that matters. *Stirone* completely controls here.

### XVI. THE GENERALITY OF THE INDICTMENT

The majority also tries to make a point that *Stirone* "suggested that if the indictment had been *more general* Stirone's conviction would not have been reversed" (at ——— of 181 U.S.App.D.C., 128 of 559 F.2d). This is a good point, but it does not aid my colleagues—because the indictment there was *not* "more general" and neither is this indictment. The underlying point is that the obvious intent of the grand jury prevails and the fact that the indictment *might* have been more general is insufficient to permit the return of a guilty verdict on evidence that *might* have been admissible on a more general indictment. That rule applies here with equal force. To paraphrase *Stirone*:

> It follows that when only [making cash payments and offers of other benefits] is charged . . . a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that [through misuse of the CIA the investigation was delayed].

361 U.S. at 218, 80 S.Ct. at 274.

The majority attempts to make a similar argument for excessive liberality in construing indictments out of the provision in Rule 7(c), Fed.R.Crim.P., which states that an indictment may allege "that the means by which the defendant committed the offense are unknown . . ." This, however, does not eliminate the necessity for the indictment alleging sufficient *facts* to *identify* the specific offense that was committed by the accused in some unknown way, *i.e.,* that the defendants delayed the investigation by means unknown to the Grand Jury. In any event, the means here were not unknown—Count 1 specifically alleged "defrauding the . . . CIA" and the same allegation could easily have been included in Count 2 if the Grand Jury had intended to include it. That it did not do so indicates it did not intend to allege such offense.

### XVII. THE AMENDMENT OF THE INDICTMENT

As the majority opinion above indicates, it would actually amend Count 2 by reference to the allegations in Count 1:

Here, however, some indication of what was before the grand jury with respect to the CIA and what was intended by the phrase "by other means" in Count 2 is provided by the language of the conspiracy charge in Count 1 and the evidence admitted without objection in support thereof.

(Majority opinion at —— of 181 U.S.App. D.C., 128 of 559 F.2d).

As pointed out above, the breadth and *importance* of the allegations in Count 1 on the CIA and its failure to make even a *slight reference* to such charges in Count 2, when only a slight reference was needed, indicates that the Grand Jury did not intend to charge the defendants twice for a *consummated* conspiracy and the substantive offense of conspiracy to defraud a United States Agency.

Why the majority insist on failing to apply our established law which would reverse the conviction on this single count remains

**26.** Three minor points: (1) There is no claim here of a second prosecution so most of the discussion as to possible double jeopardy need not be answered.

(2) There is no basis in fact or logic for the following statements in the majority opinion: The limitation of the FBI investigation means, though not specifically alleged, certainly fits comfortably under "other means" of obstruction just as it does under the general language of Count 1. In fact, the allegations of conspiracy to obstruct justice and to defraud the United States in Count 1 are the basis of the allegations of the substantive offense of obstruction of justice in Count 2. Majority opinion at —— of 181 U.S.App.D.C., at 128 of 559 F.2d.

To assert that the "limitation of the FBI investigation . . . fits comfortably under 'other means' of obstruction just as it does under the general language of Count 1" is a complete misapplication of the normal meaning of words. There is absolutely nothing about the words "other means" in an indictment, preceded by two specific factual allegations identifying an offense, that would give any indication that they included anything so specific as limiting an FBI investigation. Of course, if one were to construe them, as the majority apparently does, to include all other means in the world then everything would be included. But that cannot be done in an indictment. So the limitation alleged does *not* fit comfortably under "other means" of obstruction.

a mystery. If this law is applied in the future it will be impossible to live with.

For the foregoing reasons [26] I respectfully dissent to the limited extent indicated above.

### APPENDIX A

### SINDLINGER AFFIDAVIT

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Criminal Case No. 74–110

United States of America

v.

John N. Mitchell, et al., Defendants

### AFFIDAVIT

ALBERT E. SINDLINGER, being duly sworn, deposes and says:

1. I am the chief executive officer of Sindlinger & Company, Inc. of Swarthmore,

And to liken the generality of the "other means" allegation in Count 2 to the "general language of Count 1" misdescribes the allegations of defrauding the government which were contained in Count 1. A single quotation from the indictment will prove the point. Count 1 of the indictment charged that the defendants did *conspire (inter alia )* . . . to defraud the United States and Agencies and Departments thereof, to wit, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), and the Department of Justice, of the Government's right to have the officials of these Departments and Agencies transact their official business honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction, all in violation of Title 18, United States Code, Section 371. That is a *specific* allegation of conspiring to defraud the government. The rest of the alleged conspiracy sought to obstruct justice and to make false statements and declarations. These were specific allegations. It would not have been legally permissible to introduce evidence of a conspiracy to commit *any* other offense—as the majority argues.

(3) My views on the disqualification of the judge are set forth in my separate opinion in *Mitchell v. Sirica,* 163 U.S.App.D.C. 373, 502 F.2d 375 (1974).

Pennsylvania. I have been engaged in various aspects of surveying and polling since 1929. From 1940 through September, 1946, I was Executive Vice President of Dr. George H. Gallup's Audience Research, Inc. In the fall of 1946 I left the Gallup organization to form my own company which has been engaged in political and economic research since that time. We publish weekly economic and political reports and forecasts and special surveys. Our clients include domestic and foreign automotive manufacturers, major banks, large financial institutions and national retailing organizations. We employ 45 people.

2. I am a member of the American Statistical Association, National Bureau of Economists and many other professional organizations. I have prepared survey material for and have testified in connection with the matters before the Congress of the United States, federal administrative agencies and courts.

3. The public opinion survey referred to herein was conducted from April 12–21, 1974, and was performed under my direct supervision and control. We employed a national sample of residential telephone numbers in 487 counties within the 48 contiguous states of the United States. These 487 counties were selected by computer on a random basis and individual telephone numbers were then selected within those counties, also by computer on a random probability basis. This process produces a selection of residential telephone numbers which is representative of the national population as a whole. Since we had also been requested to survey opinions within certain specific areas we derived additional samples for the counties within those areas which were not included within the counties which comprised our national sample. We used local telephone books in these additional counties to select residential telephone numbers on the same random probability by population basis as was employed for our national sample. The samples so derived were statistically representative of the population of the specific areas which we have been requested to survey.

4. The specific areas which were selected for survey in addition to the nation as a whole were:

(a) The District of Columbia;

(b) The state of Delaware which I am advised constitutes the territorial jurisdiction of the United States District Court for the District of Delaware;

(c) The following counties in the State of Indiana: Bartholomew, Boone, Brown, Clinton, Decatur, Delaware, Fayette, Fountain, Franklin, Hamilton, Hancock, Hendricks, Henry, Howard, Johnson, Madison, Marion, Monroe, Montgomery, Morgan, Randolph, Rush, Shelby, Tipton, Union and Wayne, which I am advised constitute the territorial jurisdiction of the Indianapolis Division of the United States District Court for the Southern District of Indiana;

(d) The following cities and counties in the State of Virginia: Cities of Richmond, Petersburg, Hopewell, Colonial Heights, and Fredericksburg, and the Counties of Amelia, Brunswick, Caroline, Charles City, Chesterfield, Dinwiddie, Essex, Goochland, Greensville, Hanover, Henrico, King and Queen, King George, King William, Lancaster, Louisa, Lunenburg, Mecklenburg, Middlesex, New Kent, Northumberland, Nottoway, Powhatan, Prince Edward, Prince George, Richmond, Spotsylvania, Surry, Sussex, Westmoreland and all other cites or towns geographically within the exterior boundaries of said counties, which I have been advised constitute the territorial jurisdiction of the Richmond Division of the United States District Court for the Eastern District of Virginia;

We also initiated a survey in the Eastern District of Pennsylvania, but that survey was not completed.

5. We utilized the following survey methodology. The telephone number shown by our sample was called. If the person answering the telephone was female, the surveyor would determine whether there was a male over the age of 18 in the

household who was available then or at some other convenient time. If the answer was no, the female was interviewed. If the answer was yes, the male was interviewed either then or by a later call back.[1] The person who was being interviewed was then asked a series of preliminary standard questions concerning economic issues and expectancies. They were then asked whether they were registered to vote, since we had been instructed that the survey should be limited to those persons who would be eligible to serve as jurors within the areas surveyed. Of a total national sample base of 1,096 adults (18 years or older), 935 or 85.2% stated that they are registered to vote. The District of Columbia total sample of 303 adults yielded 241 registered voters, or 79.3%. The Virginia area sample of 301 produced 237 registered voters, or 79%. The Delaware sample of 204 had 171 registered voters, or 84.3%. The Indiana area sample of 200 had 176 registered voters, or 87.8%.

6. Those persons who stated that they were registered voters were then asked a series of Watergate related questions. These included:

Have you ever read or heard anything about the fact that a number of President Nixon's former aides have been indicted for covering up the Watergate affair?

Thinking of Nixon's former aides who are now under indictment—do you have an opinion on their guilt or innocence?

How do you personally feel, do you feel they are guilty or innocent in the Watergate affair?

They were also asked a question which sought to identify the basis of their opinion, as follows:

In thinking of your own opinions with regard to the guilt or innocence of the defendants in the cases we have been talking about [which included the Fielding break-in case as well as this one]— what do you think has most influenced you—what you have read in the newspapers or what you have read in magazines, or your own political position?

7. The tabulated results[2] of this survey were as follows:

| | United States | District of Columbia | Delaware | Indianapolis Division Southern District of Indiana | Richmond Division Eastern District of Virginia |
|---|---|---|---|---|---|
| Have you ever read or heard anything about the fact that a number of President Nixon's former aides have been indicted for covering up the Watergate affair? | | | | | |
| Yes | 91% | 93% | 97% | 92% | 88% |
| No | 7% | 6% | 3% | 5% | 9% |
| Not Sure | 1% | 1% | — | 1% | 1% |
| No Opinion | 1% | 1% | — | 3% | 2% |
| Thinking of Nixon's former aides who are now under indictment—do you have an opinion on their guilt or innocence? [Response of those who knew of indictments.] | | | | | |
| Yes | 58% | 73% | 64% | 55% | 50% |
| No | 26% | 15% | 21% | 33% | 27% |
| Not Interested | 1% | 1% | 1% | 1% | 1% |
| Don't Know/No Opinion | 15% | 11% | 14% | 12% | 21% |

1. Since females will be available to answer telephones to a significantly greater extent than males, this procedure is necessary to assure that the composition of the total sample approximates the actual ratio of males to females in the population.

2. In making these tabulations, males and females were computed separately, projected to reflect the correct proportions of males to females in the general population, and the figures as so projected were then combined for an overall percentage. The percentages so derived were then rounded to the nearest whole number.

| | United States | District of Columbia | Delaware | Indianapolis Division Southern District of Indiana | Richmond Division Eastern District of Virginia |
|---|---|---|---|---|---|
| How do you personally feel, do you feel they are guilty or innocent in the Watergate affair? [Response of those who knew of indictments.] | | | | | |
| Guilty | 52% | 67% | 53% | 52% | 49% |
| Innocent | 5% | 2% | 1% | 2% | 3% |
| Not Guilty Until Proven | 24% | 16% | 21% | 23% | 19% |
| No Opinion/Don't Know | 19% | 14% | 25% | 23% | 29% |
| Of those who knew about the indictment and indicated that they had an opinion, those opinions were as follows: | | | | | |
| Guilty | 75% | 84% | 78% | 79% | 75% |
| Innocent | 7% | 2% | 1% | 3% | 4% |
| Not Guilty Until Proven | 15% | 13% | 20% | 16% | 18% |
| No Opinion/Don't Know | 2% | 1% | 1% | 2% | 4% |
| In thinking of your own opinions with regard to the guilt or innocence of the defendants in the cases we have been talking about—what do you think has most influenced you—what you have read in the newspapers or what you have read in magazines, or your own political position? [3] | | | | | |
| Newspapers | 37% | 58% | 39% | 28% | 25% |
| Television | 58% | 46% | 62% | 51% | 65% |
| Magazines | 7% | 16% | 17% | 9% | 11% |
| Radio | 5% | 11% | 9% | 4% | 3% |
| Political Position | 6% | 11% | 3% | 4% | 4% |
| Personal Decision | 13% | 14% | 15% | 15% | 8% |
| Don't Know | 6% | 4% | 4% | 6% | 8% |

[3] Multiple answers were recorded in more than one category. As a consequence, the totals of all answers to these questions will exceed 100%.

8. It is my opinion that the above indicated percentages for the nation are representative of the opinions of all registered voters in the nation within an overall maximum variation of ±2.5% and that the above indicated percentages for the specific areas surveyed are representative of the opinions of all registered voters within an overall maximum variation of ±5%.

/s/ Albert E. Sindlinger
ALBERT E. SINDLINGER

Sworn to before me this 30th day of April, 1974.

/s/ Dorothy E. Baker
Notary Public

My Commission Expires November 30, 1977

APPENDIX B

HOFFAR *voir dire*

[928] (John A. Hoffar entered the courtroom.)

THE COURT: Good morning, Mr. Hoffar.

Mr. Hoffar, I want you to know at the beginning that these questions are being propounded to you in private in the presence of the Defendants and their lawyers and the Government counsel not for the purpose of embarrassing you or prying into your personal affairs. This is the last part of our routine to determine whether or not you have the qualifications to be [929] selected to be on this jury if the lawyers

select you. It is a routine matter and I hope you will take it in that light.

Mr. Hoffar, are you employed now or retired?

JUROR HOFFAR: I am a retired U.S. Park policeman.

THE COURT: How long were you connected with the U.S. Park Police?

JUROR HOFFAR: Twenty-one years.

THE COURT: What generally were your duties at that time?

JUROR HOFFAR: Mostly supervisory and in a patrol car.

THE COURT: Are you married?

JUROR HOFFAR: Yes sir.

THE COURT: Does your wife work?

JUROR HOFFAR: No, sir.

THE COURT: Has she ever been employed?

JUROR HOFFAR: Only part time.

THE COURT: Where was that?

JUROR HOFFAR: She just assisted where she went to school or college—Trinity College.

THE COURT: Here out near Catholic University?

JUROR HOFFAR: Yes, sir.

THE COURT: Do you have any children?

JUROR HOFFAR: No, sir.

THE COURT: Now, I don't want to know how you voted in any election or what your political affiliations or anything [930] like that are, but this is a question I would like you to think about:

Are you or any relative or close friend a member of a political party? By, political party, I might say, like the local Republican State Committee or Democratic Central Committee?

JUROR HOFFAR: No, sir.

THE COURT: Did you contribute or have you ever contributed to any political party by way of cash or a check?

JUROR HOFFAR: Yes, sir.

THE COURT: Now, you recall I propounded a series of questions to about 18 or 12 of you as a group, you remember that? Were you in the group of 12 or 18?

JUROR HOFFAR: Eighteen.

THE COURT: Do you believe at this very moment, and without having heard any of the evidence that will be offered in this case, that any Defendant in this case is guilty of violation of any one or all of the charges set out in the various counts of the indictment?

JUROR HOFFAR: No, sir.

THE COURT: Your answer is, no.

JUROR HOFFAR: No.

THE COURT: As you probably know, this case has been the subject of many stories in newspapers, magazines, articles, and so forth, and you may have read or heard about this case or about the indictment.

[931] Now, I am not going to question you about what, if anything, you have heard or read about the case, but I am going to question you as to what you heard or read about the case to decide if you can be qualified to serve on this jury if you are selected by the attorneys at the proper time. But first I will make some comments so you can understand that simply because you may have heard or read or discussed this case does not mean that you will not be permitted to serve on this jury.

Neither I nor the Government, nor counsel for the Defendants, or the Defendants expect or are entitled to impanel a jury that has never heard anything about this case, read about it or discussed it or anything like that. We don't expect to get that kind of a jury, because I think, frankly, it would be impossible.

Instead, we would like to get a jury where each juror is able to put aside anything he or she may have read or heard and any opinion he or she may have formed based thereon and decide these Defendants' guilt or innocence based solely on the evidence you hear in open Court and in accordance with the instructions that I shall give you at the end of the trial, or the law of the case.

Now, I want to be sure, and counsel on both sides want to be sure, that you can decide this case for yourself based solely from what you hear in this courtroom at the proper time. Therefore, I ask you to consider very carefully the following [932] questions:

Had you heard about this case before coming into the courtroom, say, was it last Tuesday?

JUROR HOFFAR: Yes, sir, last Tuesday.

THE COURT: Had you heard about this case or read about it before that time?

JUROR HOFFAR: Yes, sir.

THE COURT: Does anything you may have heard or discussed about this matter particularly stand out in your mind? Any one thing or several things?

JUROR HOFFAR: No, sir.

THE COURT: Have you seen any of the Defendants or their lawyers on television or their pictures in the newspapers?

JUROR HOFFAR: Yes, sir.

THE COURT: Which ones? Can you indicate, if you remember?

JUROR HOFFAR: All of them.

THE COURT: You have seen all of them on television? Let's take television first.

JUROR HOFFAR: Television and the newspapers. I haven't paid particular attention.

THE COURT: You mean combined, that is, either on television or the newspapers, you have seen all their pictures from time to time, is that correct?

JUROR HOFFAR: Yes, sir.

[933] THE COURT: What, if anything, do you remember about these Defendants? Does anything stand out in your mind after seeing them or hearing them talking, anything like that?

JUROR HOFFAR: I really haven't paid that much attention to the whole thing to have anything stand out in my mind.

THE COURT: Do you read one or more of the daily newspapers here; and if so, which one?

JUROR HOFFAR: The Post mostly. Sometimes I see the Star.

THE COURT: You watch the news programs on television or listen to them on radio?

JUROR HOFFAR: Most days I do.

THE COURT: Have you followed the Watergate matters closely or casually?

JUROR HOFFAR: Casually.

THE COURT: Do you subscribe regularly to any magazines, we'll say?

JUROR HOFFAR: Just Reader's Digest.

THE COURT: How about Time Magazine or Newsweek, or Harper's, or any of those kind of magazines?

JUROR HOFFAR: I just haven't found time to subscribe to more than that. When I go to the library sometimes I read Newsweek or Business Week and that is about it.

THE COURT: Thank you.

Have you ever heard discussed or seen anything about [934] the so-called break-in of the Democratic National Committee in June of 1972?

JUROR HOFFAR: Yes, sir.

THE COURT: Read about it or discussed it or anything like that?

JUROR HOFFAR: Yes, sir.

THE COURT: What did you read about it if you remember?

JUROR HOFFAR: Just what is in the newspaper, just what everybody was talking about at the time.

THE COURT: Did you read about the results of the trial of the seven men who were indicted?

JUROR HOFFAR: Yes, I read the whole thing but I can't remember exactly.

THE COURT: Thank you.

Now, recently a man by the name of Jeb Stuart Magruder and two reporters from the Washington Post by the name of Carl Bernstein and Robert Woodward wrote two books. Mr. Magruder wrote a book called, "An American Life—One Man's Road to Watergate," and the two reporters wrote a book called, "All The President's Men." Have you heard of either one or both books?

JUROR HOFFAR: Yes, sir.

THE COURT: Have you read either of the books?

JUROR HOFFAR: No, sir.

THE COURT: Have you read any serialized account of those books that might have appeared in the newspapers or [935] magazines like that?

JUROR HOFFAR: Probably have, but I don't remember.

THE COURT: Do you recall them now?

JUROR HOFFAR: No, I just read them as I read the news.

THE COURT: Have you discussed this case or any of the Defendants with anyone or has anyone discussed the case or any of the Defendants in your presence?

JUROR HOFFAR: Yes, sir.

THE COURT: Can you remember who they might be that you have discussed the case with?

JUROR HOFFAR: It wasn't that important, it doesn't stand out in my mind. It was just idle conversation.

THE COURT: People that you might have worked with, friends of yours?

JUROR HOFFAR: Oh, yes.

THE COURT: Your wife, I suppose?

JUROR HOFFAR: Anybody that wanted to talk about it, I talked about it.

THE COURT: Do you recall when was the last time that you heard or read anything about this case? I am talking about the last time before last Tuesday when you came to Court, if you remember?

JUROR HOFFAR: I usually just read the headlines and if there is something outstanding, I read further.

[936] THE COURT: Have you ever read the so-called tape transcripts that were released by former President Nixon which were contained in what has familiarly become known as the Blue Book, about that thick (indicating), transcripts of the tapes released to the public?

JUROR HOFFAR: I read the first couple days and there was just too much. I have other things to read.

THE COURT: Was that in the library that you read those comments?

JUROR HOFFAR: The newspapers.

THE COURT: Do you have any personal knowledge of the facts of this case separate from any information you may have heard or read, television, radio, newspapers, books or magazines—personal knowledge?

JUROR HOFFAR: No, sir.

THE COURT: Are you aware of the fact that the Senate Select Committee on Presidential Campaign Activities also known as the Watergate Committee, or the Ervin Committee, held hearings on what is termed the Watergate matters last summer sometime?

JUROR HOFFAR: I really haven't kept track of it.

THE COURT: Are you aware that did happen?

JUROR HOFFAR: Oh, yes, sir.

THE COURT: Hearings were held and the hearings were televised nationally and locally, too, of course.

JUROR HOFFAR: Oh, yes.

[937] THE COURT: Are you aware of the fact that the Judiciary Committee of the House of Representatives, also known as the Impeachment Committee, conducted hearings on the impeachment of former President Nixon? Are you aware of that?

JUROR HOFFAR: You see all these hearings are sort of lumped together in my mind. I really haven't followed them closely to separate them.

THE COURT: Did you hear or see any part of the hearings on television or listen to any part on the radio?

JUROR HOFFAR: Yes, sir.

THE COURT: Often or infrequently?

JUROR HOFFAR: Infrequently.

THE COURT: They went on for some time as I remember.

JUROR HOFFAR: When I would listen to the news, if it was close to the news time, I would listen.

THE COURT: By the way, what programs do you usually listen to—news programs on radio or watch on television?

JUROR HOFFAR: Whatever anybody had on. I have no favorite news program.

THE COURT: Listen to this question carefully:

From what you have read or heard about this case from any source whatsoever, have you formed or expressed any opinion as to the guilt or innocence of any of these Defendants?

JUROR HOFFAR: Well, being a former policeman, I sort of tried to be neutral until a person has been convicted and I [938] really haven't said definitely one way or the other.

THE COURT: All right, sir, thank you.

Now the Government and the Defendants in this case are entitled to have this case decided on its merits, that is, on the evidence presented in open Court and pursuant to the law as the Court will try to explain it to the jury at the end of the case. You must not be influenced, of course, by any events that transpire outside of the courtroom. You may have read or heard that former President Richard M. Nixon has been pardoned for any offenses he may have committed against the laws of the United States while he was President. Are you aware of that?

JUROR HOFFAR: Yes, sir.

THE COURT: Is there anything about the pardon of Mr. Nixon that has caused you to form or express any opinion about the guilt or innocence of any of the Defendants in this case?

JUROR HOFFAR: No, sir.

THE COURT: Did you read, see, or hear about the Defendant, Mr. Ehrlichman's trial recently in the case of the *United States v. Ehrlichman,* commonly known as the Plumbers case? Do you recall that?

JUROR HOFFAR: Faintly, but I don't remember much about it.

THE COURT: Do you recall anything about that trial? Does anything stand out in your mind about the so-called Plumbers [939] case?

JUROR HOFFAR: I wasn't that interested to remember.

THE COURT: Did you happen to recall the result of that case, what the jury did, what the verdict was?

JUROR HOFFAR: Offhand, no.

THE COURT: Were you aware that former President Richard M. Nixon was named as an unindicted co-conspirator by the Grand Jury in this case?

JUROR HOFFAR: I think I remember that as a headline.

THE COURT: Did your knowledge that Mr. Nixon was named as an unindicted co-conspirator cause you to form any impression or opinion as to the guilt or innocence of any one of the Defendants in this case?

JUROR HOFFAR: No, sir.

THE COURT: Do you have any prejudice, bias, sympathy or fixed opinion which would prevent you from following the instructions which the Court will give to the jury at the end of the case?

JUROR HOFFAR: Not that I can think of.

THE COURT: Do you conscientiously believe you can render a fair and impartial verdict in this case if you are selected to serve on the case free from any prejudice, bias, if any you might have, for or against the Government or the Defendants?

JUROR HOFFAR: I think so.

[940] THE COURT: Did you make any effort to study the facts of this case to prepare for your jury duty?

JUROR HOFFAR: No, sir.

THE COURT: Does any reason whatsoever suggest itself to you at this time why if you are selected to serve on this jury you feel you could not listen to the evidence objectively and the testimony and at the proper time render or vote for a verdict or join in a verdict which will be based in your opinion solely upon the evidence that will be offered in open Court and the instructions on the legal principles involved of the law, in other words, applicable to the case?

184

JUROR HOFFAR: No, sir.

THE COURT: No reason whatsoever?

JUROR HOFFAR: None that I can think of offhand.

THE COURT: All right, let the juror step out for a few minutes.

(Juror Hoffar was temporarily excused from the courtroom.)

THE COURT: My Law Clerk reminds me there is one other question I forgot to ask him. Bring him back.

MR. NEAL: Your Honor, to save time, could we suggest—maybe we are talking about the same one—

THE COURT: —I have this question which my Law Clerk reminded me:

As you sit here today, without having heard any [941] of the evidence in this case, do you think it is unfair to prosecute certain of Mr. Nixon's associates, including some of the Defendants sitting in Court today simply because Mr. Nixon, himself, has been pardoned?

MR. NEAL: We are talking about the same one, Your Honor. But there is one other area I didn't understand, maybe I just missed it, does the juror have adult children?

COUNSEL: He has no children.

MR. NEAL: I missed that.

MR. BRESS: Your Honor, I don't think the juror was responsive to your first question as to whether he had any opinion on the guilt or innocence of the Defendants. I thought his attempted answer was not responsive. He said as a policeman he would try to be neutral. He said he would be neutral until convicted.

MR. HUNDLEY: Judge, could you also ask him—he says he is retired. Could you ask him what he does do? He obviously doesn't read or listen to anything about this case. Could you inquire a little bit about how he spends his time or at least how long he has been retired?

THE COURT: All right.

MR. WILSON: May it please the Court, with regard to Mr. Hundley's question, I think he may have asked most of which I want to ask, the man's personal situation, that is to say, when he retired, the reason for his retirement. After all, he [942] only had 21 years of service and he is 57, and why he does not find time to read much. What is he doing?

THE COURT: That is personal, I think. I don't want to get into that.

MR. WILSON: It helps us to form a judgment about the capacity of this man, Your Honor, which is one of the things we are entitled to do on a challenge.

THE COURT: You mean I should inquire as to how he spends his time?

MR. WILSON: Certainly. This is startling. A man who is only 57 and is retired and he is busy, busy what? Also, getting down to the question of opinion, you didn't ask him what opinions were expressed in his presence, if any. And on the question, have you expressed an opinion as to guilt or innocence, you didn't ask him whether he had an opinion.

THE COURT: I thought I did.

MR. WILSON: He could have an opinion but not having expressed it.

THE COURT: Didn't I ask him, isn't that contained or implied in the last question: Do you know any reason whatsoever and so forth and so forth? That is the cover-all question.

MR. WILSON: That question from a judicial point of view is absolution. I don't care what the answer to that question is, you do, but I don't.

THE COURT: I can't satisfy 15 lawyers, obviously.

[943] Everybody has a different idea about the questions.

MR. BRESS: Your Honor, that last question, we always ask it, but that leaves the judgment or decision to the juror where the decision on this question really resides with us.

THE COURT: All right, bring the juror back.

(Juror Hoffar returned to the courtroom.)

THE COURT: Do you recall whether or not I asked you in the early part of this interrogation whether or not you had any opinion—I am talking about now, as you sit in the jury box, do you have any opinion as to the guilt or innocence of any one or all of the Defendants?

JUROR HOFFAR: I have no opinion.

THE COURT: All right. Now, you said you were retired. You are 57 years old. You were a member of the Park Police, what was it, 21 years?

JUROR HOFFAR: Yes, sir.

THE COURT: Do you have any hobbies? Do you do a lot of reading? What do you do in your spare moments, some of the lawyers would like to know?

JUROR HOFFAR: It would be hard to believe, but I don't have any real hobbies that take up a lot of time. I have had two houses to take care of, my wife to take care of, and more or less wherever she wants to go, I take her, and we are just trying to enjoy ourselves and that takes—I don't know where the time goes. I have no idle moments.

[944] THE COURT: Do you and your wife travel much?

JUROR HOFFAR: No, sir, just around town.

THE COURT: I am talking about out of the City?

JUROR HOFFAR: No, sir.

THE COURT: Do you read quite a bit? I'm talking about outside of newspapers and magazines.

JUROR HOFFAR: I love to read but I just can't read very long.

THE COURT: All right. Have you ever expressed any opinion that you might have had to any person that you can recall or anyone, as a matter of fact, about this case one way or the other?

JUROR HOFFAR: I probably have.

THE COURT: Do you recall what that opinion might have been?

JUROR HOFFAR: Well, it really isn't that important to me to get into an argu-ment with somebody. If somebody discusses with me their points of view, I just agree with them, it doesn't make any difference to me to try to change their mind.

THE COURT: What I am trying to find out is have you ever taken a firm position on any part of this case, saying, well, I think so-and-so is guilty, I think so-and-so is innocent, or, I think this, or, I think that? That is what I am talking about, an opinion.

Have you ever done that with anybody?

[945] JUROR HOFFAR: No, sir.

THE COURT: You have a completely open mind on this matter as to the guilt or innocence of these Defendants?

JUROR HOFFAR: As far as forming a definite opinion, I have an open mind.

THE COURT: All right.

Listen to this question very carefully:

As you sit here today without having heard any of the evidence in this case,—is that clear?

JUROR HOFFAR: Yes.

THE COURT: —do you think it unfair to prosecute certain of Mr. Nixon's associates, some of whom are in the courtroom today, including some of the Defendants, as I said, sitting in the courtroom today, simply because Mr. Nixon, himself, has received a pardon?

Do you understand the question or do you want me to repeat it?

JUROR HOFFAR: Because Mr. Nixon received a pardon, no one else should be convicted, is that it?

THE COURT: That isn't precisely the way I put it. Let me read it again. Think about it:

As you sit here today without having heard a word of the evidence in this case, do you think it is unfair to prosecute, I mean for the Government to prosecute certain of Mr. Nixon's associates, including some of the Defendants sitting in Court [946] today, simply because Mr. Nixon, himself, has received a pardon from President Ford?

JUROR HOFFAR: No, sir.

THE COURT: You don't think so?

JUROR HOFFAR: No.

THE COURT: All right, sir, you may step out.

(Juror Hoffar left the courtroom.)

MR. WILSON: May it please the Court, it is very obvious to me this juror has not been forthright with you.

THE COURT: If it is obvious to you, it is not obvious to me, Mr. Wilson.

MR. WILSON: I am the one to be concerned about it.

THE COURT: I am just as concerned as you are that these men get a fair trial in my courtroom, I want you to understand that.

MR. WILSON: I understand that, but it helps us a lot if you will find out what he—he equivocated with you as to whether he heard it discussed and if it was discussed, he at one time said, sure, they are guilty and some other time somebody advocated to the contrary and said they weren't guilty. This man stopped short of the crucial answers. If he has not an opinion, he has got a view. It is just as clear to me as it is possible to be.

THE COURT: Obviously, he is not one of these so-called intellectuals but I think he is a man that has good common sense [947] and that to me is important.

Let's proceed.

MR. WILSON: I think he is equivocating with you.

THE COURT: If you think that, it is on the record.

MR. HUNDLEY: I challenge for cause.

MR. FRATES: I don't state it as strongly as Mr. Wilson, but I would request Your Honor to ask him what is his opinion, because I think it occurs to me he does have an opinion and in his answers to Your Honor he seems to have qualified them.

I don't think all of us are over-reacting and I request Your Honor to ask him what his opinion is.

THE COURT: I think I have covered that. I will deny your request.

MR. GREEN: Your Honor, following up something Mr. Frates said, my notes show in answer to one question he stated as far as forming a definite opinion, I have an open mind. That leads inescapably to the conclusion he has some opinion and has not been testified to hear.

THE COURT: I don't intend to conduct a cross-examination of these people. I will interrogate them fairly in my opinion. Obviously, again, I can't satisfy every one of you.

Let's proceed.

MR. BRESS: Are we entitled to know whether or not he is retired because of some disability?

[948] THE COURT: Bring him back.

MR. HUNDLEY: I thought you indicated to me that you would remind these people as they came in that they are still under oath.

THE COURT: I am going to tell them it has been suggested that I remind them.

MR. HUNDLEY: Yes, sir.

(Juror Hoffar returned to the courtroom.)

THE COURT: Mr. Hoffar, it has been suggested that I remind you that you are still under oath, you understand that?

JUROR HOFFAR: Yes, sir.

THE COURT: Now, were you retired for disability or what was the reason for your retirement, if any?

JUROR HOFFAR: Well, I was a year over the 20 years necessary for retirement and I figured I used up all my luck.

THE COURT: All right, sir, thank you.

Now, I want to explain to you something, sometime I forget to remind the jurors: When you go back upstairs—the young lady will escort you up—please do not discuss with any prospective juror—you are a prospective juror now—you will be called back to the jury box at the proper time when we actually start impaneling the jury. Please do not talk about what we discussed here, the questions I asked you or anything like that when you go home this evening, please don't talk to your wife about what transpired in Court and above all, don't [949] talk to any person about what took place in the confidence of the lawyers, and so forth. All right.

(Juror Hoffar was excused.)